# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>v.<br><br>STERLING BANCORP, INC.; GARY JUDD; THOMAS LOPP; MICHAEL MONTEMAYOR; SCOTT SELIGMAN; BARRY ALLEN; JON FOX; SETH MELTZER; SANDRA SELIGMAN; PETER SINATRA; BENJAMIN WINEMAN; LYLE WOLBERG; PIPER SANDLER COMPANIES; AND AMERICAN CAPITAL PARTNERS, LLC,<br><br>             Defendants. | Case 5:20-cv-10490-JEL-EAS<br><br>Hon. Judith E. Levy<br>Hon. Mag. Judge Elizabeth A. Stafford<br><br>**CLASS ACTION**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.     SUMMARY OF THE ACTION.................................................................... 2

II.    JURISDICTION AND VENUE .............................................................. 14

III.   PARTIES ................................................................................................. 15

    A.     Lead Plaintiff ............................................................................... 15

    B.     Defendants .................................................................................... 15

        1.     The Company .................................................................... 15

        2.     Officer Defendants ........................................................... 16

        3.     Defendant Scott Seligman ................................................ 19

        4.     Director Defendants .......................................................... 20

        5.     Underwriter Defendants .................................................... 21

IV.    CLASS ACTION ALLEGATIONS .......................................................... 23

V.     NO SAFE HARBOR ................................................................................ 25

VI.    BACKGROUND ...................................................................................... 27

    A.     Overview Of Sterling And The Advantage Loan Program.............. 27

        1.     The Company .................................................................... 27

        2.     The Founding Family ........................................................ 28

        3.     Regulatory Overview Of The Company And The Bank ....... 29

            a)     AML Overview ........................................................ 29

            b)     Money Laundering Risks Associated With Real
                Estate Lending ......................................................... 33

            c)     Indicators Of Potential Money-Laundering Activity .. 34

d)     Residential Real Estate Loan Underwriting ............... 35

4.     The Advantage Loan Program ............................... 37

B.     The Initial Public Offering .................................................. 38

1.     Overview ................................................................ 38

2.     Selling Shareholders/Founding Family ................. 38

3.     Oversight By Management .................................... 39

C.     Former Employee Accounts ............................................... 40

VII.     THE EXCHANGE ACT VIOLATIONS .................................... 54

A.     Defendants' False And Misleading Statements ................. 54

1.     The Company's IPO And The Registration Statement.......... 54

a)     The Registration Statement Touted The Advantage Loan Program And Its Underwriting, Risk Management, Growth, And The Strength Of Its Customers .................................................... 54

b)     The Registration Statement Touted The Company's Financial Results and Growth ..................................... 60

c)     The Registration Statement Touted Sterling's Internal Controls ........................................... 60

d)     The Registration Statement Described BSA/AML Compliance .................................................. 61

2.     The Company's Code of Conduct ......................... 62

3.     Defendants' Representations Regarding Sterling's Fourth Quarter 2017 and Full Year 2017 Results ............................. 63

4.     Statements Defendants Made In The Registration Statement, Code Of Conduct, And Regarding Sterling's Fourth Quarter And Full Year 2017 Results Were False And Misleading When Made ................................. 72

5.    Defendants' Representations Regarding Sterling's First Quarter 2018 Results ........................................................... 79

6.    Defendants' Representations Regarding Sterling's Second Quarter 2018 Results ........................................................... 83

7.    Defendants' Representations Regarding Sterling's Third Quarter 2018 Results ........................................................... 88

8.    Defendants' Representations Regarding Sterling's Fourth Quarter And Full Year 2018 Results ..................................... 93

9.    Defendants' Additional Early 2019 Representations .......... 100

10.   The Company's Representations In Connection With Its Annual Meeting ................................................................... 101

11.   Defendants' Representations Regarding Sterling's First Quarter 2019 Results ........................................................... 103

12.   Statements Defendants Made Beginning With The Company's First Quarter 2018 Results Through Its First Quarter 2019 Results Were False And Misleading When Made .................................................................................... 107

B.    While The Truth Begins To Be Revealed, Defendants Continue To Mislead The Market ....................................................... 115

1.    Defendants' June 2019 Disclosures And Misrepresentations ............................................................. 115

2.    Defendants' Representations Regarding Sterling's Second Quarter 2019 Results ........................................................... 119

3.    Sterling Announces The Abrupt Resignation of Judd ......... 123

4.    Defendants' Representations Regarding Sterling's Third Quarter 2019 Results ........................................................... 124

5.    Defendants' Disclosures Regarding The Suspension Of The Advantage Loan Program And The Departure Of Director Tom Minielly ......................................................... 131

6. Defendants' Representations Regarding Sterling's Fourth Quarter 2019 and Full Year 2019 Results ............................ 134

7. Statements Defendants Made From June 2019 Through Its Fourth Quarter 2019 Results Were False And Misleading When Made .......................................................................... 137

8. Defendants Disclose That Sterling Is Shutting Down The ALP And That, In Connection With Ongoing Internal Investigations, A Number Of ALP Employees Have Been Terminated, Sterling Is Under Federal And Regulatory Investigation, And Is Unable To Timely File Its Period Reports With The SEC ......................................................... 145

C. Post-Class Period Events ................................................................. 149

D. Additional Scienter Allegations ...................................................... 152

1. The Consistent Accounts By Former Employees Evidence A Strong Inference of Scienter .............................................. 152

a) Contrary To Defendants' False Statements, Sterling's Underwriting And Risk Management Were Neither Disciplined Nor Conservative ............. 153

b) Former Employee Accounts Detail Indicators Of Money Laundering, And Several Suspected That The ALP Was A Vehicle For Money Laundering .... 156

c) Several Former Employees Sought To Alert Senior Management About Their Concerns With The ALP But Were Rebuffed ................................................... 158

2. The Suspension And Then Termination Of The ALP And The Timing Thereof Shortly After The Defendants Issued False Statements Further Support Scienter .......................... 160

3. Scienter Is Established By The Fact That The Misconduct Related To Sterling's Core Business .................................... 163

4. The Officer Defendants' Oversight Of The Company's Day-To-Day Operations And Business, And Direct Knowledge Of Issues, Evidence Scienter ............................ 164

iv

5.	The Numerous And Suspiciously Timed Terminations And Resignations Of Key Senior Executives And Directors Evidence Scienter ................................................... 166

6.	The BSA And AML Violations Cited By The OCC, Its Subsequent Formal Investigation Of The Bank, And The Separate Investigation By The DOJ Evidence Scienter ...... 170

7.	Massive Insider Trading On Sterling's Artificially Inflated Stock Price Supports A Strong Inference Of Scienter ......... 171

8.	The Lack of Internal Controls Is Also Evidence of Scienter ................................................................................ 174

9.	The Fact That Defendants Violated The Company's Own Code Of Conduct And Risk Management Policy Further Supports Scienter ...................................................................... 175

10.	Defendants Judd and Lopp's Sarbanes-Oxley Certifications Further Establish Their Scienter ................... 178

E.	Violations Of SEC Rules Regarding Disclosures In Public Filings ................................................................................................ 179

F.	Loss Causation .............................................................................. 183

G.	Presumption Of Reliance .............................................................. 185

H.	Claims For Relief .......................................................................... 188

VIII.	SECURITIES ACT VIOLATIONS ........................................................ 194

A.	Summary Of The Offering .............................................................. 194

B.	The Registration Statement Contained Untrue Statements ............ 196

1.	Untrue Statements Regarding The Advantage Loan Program And Its Underwriting, Risk Management, Growth, And The Strength Of Its Customers ...................... 196

2.	Untrue Statements Regarding The Company's Financial Results And Growth ............................................................ 201

3.	Untrue Statements Regarding Sterling's Internal Controls . 201

4.    Untrue Statements Regarding The Company's BSA/AML
      Compliance ......................................................................... 202

5.    Statements Defendants' Made In The Registration
      Statement Were Untrue And Misleading When Made ........ 203

C.   Claims For Relief ........................................................................ 210

# <u>INTRODUCTION</u>

Court-appointed Lead Plaintiff Oklahoma Police Pension and Retirement System ("Lead Plaintiff") brings claims individually and on behalf of investors who purchased or otherwise acquired common stock of Sterling Bancorp, Inc. ("Sterling or the "Company") from November 17, 2017 through and including March 17, 2020 (the "Class Period"), including shares sold in the November 2017 initial public offering (the "IPO" or "Offering"), and were damaged as a result (the "Class").

Lead Plaintiff asserts claims under two federal statutes. First, Lead Plaintiff brings claims for violations of Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and 78t-1, respectively, and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule 10b5"). Second, Lead Plaintiff brings claims for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, respectively. The Securities Act claims allege strict liability and/or negligence and do not sound in fraud.

Lead Plaintiff alleges the following based upon personal knowledge as to the allegations specifically pertaining to Lead Plaintiff and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts are based upon an investigation

of Lead Counsel, which included a review and analysis of (a) U.S. Securities and Exchange Commission ("SEC") filings by Sterling; (b) press releases and other public statements; (c) securities analyst reports and media reports about the Company; and (d) interviews with former Sterling employees. Moreover, Lead Plaintiff believes that further substantial evidentiary support exists for these allegations, which will be revealed after a reasonable opportunity for discovery.

## I.  <u>SUMMARY OF THE ACTION</u>

1.     This case is about Sterling, the holding company of Sterling Bank and Trust (the "Bank"), which was experiencing exponential growth through its core product, the Advantage Loan Program (or "ALP"). During the Class Period, ALP loans represented 75% or more of the Company's entire loan portfolio. Defendants repeatedly touted ALP loans as being, *inter alia*, underwritten and Bank Secrecy Act ("BSA")/Anti-Money Laundering ("AML") compliant, when the truth was starkly different. Indeed, by the end of the Class Period, the Company: completely shut down the ALP as a result of  widespread, major issues with the ALP's loan origination process, including its income verification and requirements, reliance on third parties, and related documentation; terminated or triggered the abrupt resignation of almost 10% of Sterling's workforce, including all three Officer Defendants (defined *infra*), other top management and the two top ALP loan producers; and announced that the U.S. Department of Justice ("DOJ") had

2

commenced an investigation into the Bank's residential lending practices and the Office of the Comptroller of the Currency ("OCC") was formally investigating the Bank.

2.    Due primarily to loans issued through the ALP, ***from 2012 to the start of the Class Period, Sterling more than tripled its assets and grew its net income by an even greater magnitude***.[1]  The Company's loan portfolio increased from $755 million at the end of 2012 to $2.37 billion at September 31, 2017.

3.    Taking advantage of this exponential growth, the Company went public on November 17, 2017 through an IPO of common stock at a price of $12.00 per share sold by the Company and selling shareholders who are members of the family who founded the Bank (the "Founding Family"), who held the shares individually and/or through trusts.   The total offering size, including the underwriters' overallotment, was 17,250,000 shares for gross proceeds of $207 million.   The Founding Family, however, sold more than 55% of the shares in the IPO (9,557,692 shares) and reaped more than 55% of the proceeds of ($114,692,304).   Thus, ALP took Sterling from a regionally-focused privately-held bank, to a publicly traded company with a market capitalization in excess of $775 million at its Class-Period peak.   Additionally, the ALP-fueled IPO allowed the Founding Family to cash out over $100 million from unsuspecting investors.

---

[1] Unless otherwise noted, all emphasis has been added.

4.      Beginning with the IPO and throughout the Class Period, defendants repeatedly touted the ALP and its strict, disciplined, and conservative underwriting, risk management, compliance with BSA/AML regulations and other regulations, internal controls, growth, and financial results.  Defendants repeatedly described Sterling and the ALP's "***disciplined and conservative underwriting*** approach," which "includes ***a thorough review of [borrowers'] ability to repay, liquidity analysis and face-to-face customer interaction***" and its management of residential credit risks "through a ***financial documentation process***," its "***disciplined documentation***," and its "***effective***" ***risk management***.  Defendants also lauded the Company's "***risk-conscious culture*** that . . . includes infrastructure capable of addressing the evolving risks we face, as well as the changing regulatory and compliance landscape" and its "***robust governance*** [that] emphasizes . . . accountability for risk with our employees."

5.      Defendants additionally claimed that they had "***established processes and procedures intended to identify, measure, monitor, report and analyze the types of risk to which we are subject, including credit, liquidity, operational, [and] regulatory compliance***" and spoke of the duty to "***comply with significant anti-money laundering . . . laws and regulations***" including "institut[ing] and maintain[ing] an ***effective anti-money laundering program*** and ***[filing] timely reports such as suspicious activity reports and currency transaction reports***."

4

6.     Defendants also touted the Company's strong financial results and continued growth during the Class Period driven by ALP residential mortgage loan growth.   The Company stressed that its robust growth did not come at the expense of asset quality but instead was "***responsible growth,***" and that its "***strong sales team, disciplined underwriting*** and culture of cost management have driven consistent earnings and exemplary net interest margins, efficiency metrics and shareholder returns."

7.     In truth, however, the Company's risk management, internal controls, BSA/AML compliance, and underwriting for the ALP were practically non-existent and riddled with red flags indicating that the entire ALP was open for abuse by money launderers.   As detailed by the consistent accounts of seven (7) former employees who spanned various time periods, locations, and roles at the Company, contrary to defendants representations, Sterling and the ALP's documentation, underwriting, and risk management programs were neither disciplined nor conservative; the Company was not in compliance with BSA/AML laws and related reporting requirements; and effective internal controls were not in place to prevent improper lending, underwriting, and banking practices.   These former employees relay that there was almost no documentation required to verify ALP borrowers, which comprised most of the Bank's business.   The only records required for a customer to be approved under the ALP was a letter purportedly from the customer's

employer or from a CPA and a bank statement, which were essentially taken at face value.  There was no further inquiry or effort to verify the source of the cash or the validity of the purported employment—even though employer letters usually came from China and were often written in Mandarin or another Chinese language (the ALP targeted Chinese nationals and recent immigrants) and CPA letters for different borrowers often arrived from the same IP address (thus, the same source).  Sterling's main requirement was that ALP borrowers open accounts at Sterling and deposit the equivalent of two months' salary into their Sterling account.  But those funds and the required loan deposits did not receive any real scrutiny by Sterling.  For example, one former employee spoke of instances where the records of "salary" deposits had no indication that they came from the borrower's purported employer. Further, nearly 90% of ALP loans involved borrowers' relying on gifted funds, often from multiple "relatives" in "huge sums."  But those gifts were accepted at face value by Sterling with no scrutiny, even where the borrower's description of the donor was inconsistent.  As a result of these and other indicators of money laundering, several former employees believed that the ALP program was being used for money laundering.

8.     Indeed, these former employees describe multiple indicators of money laundering, including that (a) cash was deposited in structured amounts into home loan accounts, (b) deposits to buy a property were from often unverified sources or

gifted by third parties, (c) ownership of property was often the customer's only link to the United States, (d) the transactions involved foreign nationals or non-residents, (e) there were doubts about the validity of the documents submitted with loan applications, and (f) there was questionable involvement of third parties including brokers.

9.     Ultimately, defendants could not conceal the truth from investors indefinitely as the misconduct began to unravel through a series of partial corrective disclosures.  On June 21, 2019, after the market closed, Sterling revealed that it had entered into an agreement with the OCC, whereby the OCC required Sterling to enhance its deficient AML and BSA compliance ("OCC Agreement").

10.    However, the Company attempted to temper this news, stating that it did not believe that the agreement would have any material impact on its performance metrics.

11.    On that same date, the Company announced that Director Defendant (defined *infra*) Jon Fox, who had served as a director for 22 years—and most recently as a member of the Audit and Risk Management Committee—had resigned, effective June 18, 2019.  Again, the Company tried to temper the news, stating, "Mr. Fox's retirement and resignation was not due to any disagreement on any matter relating to the Company's operations, policies or practices."

12.     Upon this news, including the attempts to minimize it, Sterling's stock price dropped $0.16, or 1.59%, from a close of $10.06 on Friday, June 21, 2019 to a close of $9.90 on Monday, June 24, 2019.

13.     While not stated in the press release, the OCC Agreement, which the Company subsequently filed with the SEC as an attachment to its Quarterly Report on Form 10-Q for the period ending June 30, 2019 and filed on August 9, 2019 ("Second Quarter 2019 10-Q"), states that the OCC "***has found unsafe or unsound practices relating to the Bank's credit administration and violations of law relating to certain aspects of the Bank's BSA/AML compliance***."  The OCC Agreement further states that an undisclosed ***March 31, 2018 Report of Examination*** detailed BSA/AML violations by the Company.  The OCC Agreement requires, *inter alia*, that the Bank revise its policies and procedures to ensure effective controls over loan underwriting, including "effective controls and processes ***to collect and verify employment and income***"; "***verification of borrowers' income and cash flow*** information used in the Bank's underwriting process for non-owner occupied properties"; "effective controls and verification procedures for ***the acceptance of gift letters***, including proper execution and endorsement by both the donor and recipient"; and "effective oversight of exceptions identified by the Bank's quality control function, ***including proper escalation and disposition of concerns raised by quality control to management or the BSA Officer***."

8

14.     Then, on October 17, 2019, the Company abruptly announced that its Chairman and Chief Executive Officer ("CEO"), defendant Gary Judd—who had been with the Company since August 2008—was retiring, and that defendant Thomas Lopp would be taking over as CEO.

15.     Just three weeks later, on November 8, 2019, in its Quarterly Report on Form 10 Q for the period ending September 30, 2019 and filed on November 8, 2019 ("Third Quarter 2019 10-Q"), the Company disclosed that it had "***terminated two of our top loan producers within [the ALP] who were collectively responsible for 15% of our residential loan production through September 30, 2019***."    On November 25, 2019, before the market opened, Sandler O'Neill & Partners ("*Sandler O'Neill*") issued an analyst report highlighting the termination of the two top ALP producers, and the impact thereof, and ***downgrading its rating of the Company***.  However, the report also relayed that the analyst did not believe the terminations of these top producers was related to the OCC Agreement and BSA/AML issues, as Company management had relayed to *Sandler O'Neill* that the Company's "BSA/AML remediation efforts were making good progress," and the analyst did not believe any regulatory or credit issues would arise in connection with the terminations.

16.     In response to news of the downgrade, which was also tempered by *Sandler O'Neill*'s stated belief, based on discussion with management, that the

terminations were not related to the OCC and BSA/AML issues and would not result in regulatory issues, Sterling shares fell from a close of $9.90 on Friday November 22, 2019 to a close of $9.70 on Monday November 25, 2019, a decline of $0.20 or 2.02%.

17.    Thereafter, on December 9, 2019, before the market opened, Sterling filed with the SEC a Form 8-K revealing it was "voluntarily and temporarily" *suspending its Advantage Loan Program due to an internal review of its documentation procedures* as the Company "continues to audit documentation on past loans and puts in place additional systems and controls to ensure the Bank's policies and procedures are followed on loans originated under the program."

18.    Upon this news, Sterling shares fell from a close of $9.45 on Friday December 6, 2019 to a close of $7.29 on Monday December 9, 2019, a decline of $2.16 or 22.86%, on heavy volume.

19.    Ten days after the Company announced it was suspending the ALP, on December 19, 2019, the Company announced that Tom Minielly, who had replaced Director Defendant Jon Fox on the Board of Directors ("Board") and who also served on the Audit and Risk Management Committee, was resigning—just six months after being appointed to the Board to replace Mr. Fox.

20.    Then, on March 6, 2020, after the market closed, Sterling disclosed the preliminary results of its internal investigation into the Advantage Loan Program

which found ***misconduct in connection with the program's loan origination process, including its income verification and requirements, reliance on third parties, and related documentation***.   As a result, Sterling announced ***that a significant number of employees had been terminated, including the Senior Vice President with primary responsibility for, among other things, oversight of the Advantage Loan Program in California, with more terminations and resignations to come, and that it was shutting down the entire Advantage Loan Program***.   The Company also informed investors ***that it had received grand jury subpoenas from the DOJ, relating to an investigation into the Bank's residential lending practices. The Company further announced that the Bank was now under formal investigation by the OCC***.

21.    On this news, the price of Sterling's shares declined from $6.67 on Friday, March 6, 2020 to a close of $4.88 on Monday, March 9, 2020, a decline of $1.79, or 26.84%, on heavy trading volume.

22.    Then, on March 17, 2020, the last day of the Class Period, after the market closed, Sterling notified the SEC that it would delay the filing of its Annual Report on Form 10-K for the full year ending December 31, 2019 ("2019 10-K") to allow for time needed to complete (a) ***additional review and procedures, including on the part of the Company's independent auditors, relating to the circumstances that led to the previously reported suspension and termination of the Bank's***

11

***Advantage Loan Program and related matters***, and (b) the ***ongoing internal review relating to the discontinued Advantage Loan Program*** and that it intends to file the 2019 Form 10-K as soon as practicable upon completion of the additional review and procedures and internal review.

23.     On this news, the price of Sterling shares declined from a close of $4.54 on Tuesday, March 17, 2020 to a close of $2.94 on Wednesday, March 18, 2020, a decline of $1.60, or 35.24%, on heavy trading volume.

24.     Less than two months later, on May 8, 2020, the Company ***announced that defendant Thomas Lopp, having served as CEO for only five months, was also resigning, effective immediately***.   Mr. Lopp had been with the Company for 20 years, serving as Chief Operating Officer since 2009 and Chief Financial Officer ("CFO") since 2002, and also as President beginning in December 2016.  Mr. Lopp also led Sterling's expansion into Southern California in 2015.

25.     Three weeks later, on May 29, 2020, the Company announced that it had "***terminated Michael Montemayor from all of his positions with the Company and the Bank, including his positions as President of Commercial and Retail Banking and Chief Lending Officer, effective immediately***."

26.     Thereafter, on June 1, 2020, while still unable to file its delinquent annual and quarterly reports as the internal review and investigations were still ongoing, the Company reported unaudited financial highlights for its first quarter

ended March 31, 2020 reflecting the establishment of reserves relating to the ALP. The Company reported a net loss of $27.8 million and a "non-interest expense of $47.0 million, reflecting loan repurchase reserves of $7.8 million related primarily to the sale of loans originated under the Bank's Advantage Loan Program and contingency reserves of $25.0 million related to previously disclosed litigation and investigations stemming from the Advantage Loan Program," stating that "these reserves reflect additional information obtained during the course of the previously-disclosed internal review of this program."  The Company further announced that certain employees had engaged in misconduct in connection with the origination of loans*, including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation*. Further, on a June 1, 2020 earnings call, the Company's new Chairman, President, and CEO, Thomas O'Brien, stated that "*just short of 30" employees were let go in association with the ALP*—or almost 10% of the Company's entire work force.

27.    Despite the fact that the internal investigations have been ongoing for at least over seven months, to date, the investigation continues and the Company is still unable to file its annual and quarterly reports.  Further the DOJ and formal OCC investigations are ongoing.

## II.    __JURISDICTION AND VENUE__

28.    The claims alleged herein arise under Sections 10(b), 20(a), and 20A of

the Exchange Act, 15 U.S.C. §§ 78j(b) 78t(a), and 78t-1, respectively, and Rule

10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and arise under Sections 11,

12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o,

respectively, and the rules and regulations of the SEC promulgated thereunder.

29.    This Court has jurisdiction over the subject matter of this action

pursuant to Section 27 of the Exchange Act, 15 U.S.C. Section 78aa, Section 22(a)

of the Securities Act, 15 U.S.C. § 77v(a), and 28 U.S.C. § 1331.  This Court has

jurisdiction over the defendants because each defendant has sufficient minimum

contacts with this District, particularly since Sterling's corporate office is in this

District.

30.    Venue is proper in this District pursuant to Section 27 of the Exchange

Act, 15 U.S.C. § 78aa, Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and

28 U.S.C. § 1391(b), as a substantial part of the acts, events, and/or omissions giving

rise to the claims pleaded herein occurred in this District, and Sterling maintains its

corporate office in this District.  Many of the false and misleading statements were

made in or issued from this District.  Many of defendants' acts and practices that

give rise to this Complaint substantially occurred in this District.

31.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the NASDAQ.

## III.   PARTIES

### A.    Lead Plaintiff

32.    Court-appointed Lead Plaintiff Oklahoma Police Pension and Retirement System is a sophisticated institutional investor that manages the public pension system for municipal police officers in Oklahoma, with more than $2.6 billion in assets under its management as of June 30, 2019.   As set forth in its Certification attached hereto as **Exhibit 1**, Oklahoma Police Pension and Retirement System purchased shares of Sterling common stock during the Class Period, both in the IPO and thereafter, and suffered damages as a result of the violations of the federal securities laws alleged herein.   Oklahoma Police Pension and Retirement System's IPO shares were purchased from defendant Piper Sandler Companies, the successor to Sandler O'Neill & Partners, L.P.

### B.    Defendants

#### 1.    The Company

33.    Defendant Sterling Bancorp, Inc. is the unitary thrift holding company of Sterling Bank and Trust founded in 1984.  Sterling is headquartered in Southfield, Michigan with its primary branch operations in the San Francisco Bay Area and

Greater Los Angeles with a presence in New York and the Greater Seattle area as well. The Company specializes in residential mortgages but also offers a broad suite of products and services to individuals, professionals, businesses, and commercial customers. The majority of the Company's loans are to individuals and businesses in California. During the Class Period, the Company's largest product by far were mortgages offered through its ALP. Sterling stock trades under the symbol "SBT" on the NASDAQ. Sterling Bank and Trust is a Federal savings association and is chartered and examined by the OCC.

### 2. Officer Defendants

34. Defendant Gary Judd ("Judd") was the Chairman of the Company's Board and CEO from August 2008 until he abruptly resigned as announced on October 17, 2019. Judd signed the Company's Registration Statement (defined *infra*) and Annual Report on Form 10-K for the full year ending December 31, 2017 and filed on March 28, 2018 ("2017 10-K") and the Annual Report on Form 10-K for the full year ending December 31, 2018 and filed on March 18, 2019 ("2018 10-K"). Judd participated in the Company's Fourth Quarter and Year-End 2017 earnings conference call on January 30, 2018 ("Fourth Quarter and Year-End 2017 Earnings Call"), First Quarter 2018 earnings conference call on April 30, 2018 ("First Quarter 2018 Earnings Call"), Second Quarter 2018 earnings conference call on July 30, 2018 ("Second Quarter 2018 Earnings Call"), Fourth Quarter and

Year-End 2018 earnings conference call on January 28, 2019 ("Fourth Quarter and Year-End 2018 Earnings Call"), First Quarter 2019 earnings conference call on April 29, 2019 ("First Quarter 2019 Earnings Call"), Second Quarter 2019 earnings conference call on July 29, 2019 ("Second Quarter 2019 Earnings Call"), and Third Quarter 2019 earnings conference call on October 28, 2019 ("Third Quarter 2019 Earnings Call").

35.     Defendant Thomas Lopp ("Lopp") was the Chairman of the Company's Board, CEO, and President.  Lopp was appointed Chairman of the Board and CEO in November 2019, succeeding defendant Judd in those roles when Judd resigned, until, on May 8, 2020, the Company announced Lopp's resignation, effective immediately.  Lopp had served as President since December 2016, as Chief Operating Officer from September 2009 to November 2019, and as CFO and Treasurer from 2002 to November 2019.  Lopp had been at the Company since 1997. In 2015, Lopp assumed additional responsibility as the executive in charge of the Bank's Southern California expansion.  Lopp signed the Company's Registration Statement, 2017 10-K, Quarterly Report on Form 10-Q for the period ending March 31, 2018 and filed on May  4, 2018 ("First Quarter 2018 10-Q"), Quarterly Report on Form 10-Q for the period ending June 30, 2018 and filed on August 13, 2018 ("Second Quarter 2018 10-Q"), Quarterly Report on Form 10-Q for the period ending September 30, 2018 and filed on November 13, 2018 ("Third Quarter 2018

10-Q"), 2018 10-K, Quarterly Report on Form 10-Q for the period ending March 31, 2019 and filed on May 9, 2019 ("First Quarter 2019 10-Q"), Second Quarter 2019 10-Q, Third Quarter 2019 10-Q.  Lopp participated in the Company's Fourth Quarter and Year-End 2017 Earnings Call, First Quarter 2018 Earnings Call, Second Quarter 2018 Earnings Call, Third Quarter 2018 earnings conference call held on October 29, 2018 ("Third Quarter 2018 Earnings Call"), Fourth Quarter and Year-End 2018 Earnings Call, First Quarter 2019 Earnings Call, Second Quarter 2019 Earnings Call, Third Quarter 2019 Earnings Call, and Fourth Quarter and Year-End 2019 earnings conference call on January 29, 2020 ("Fourth Quarter and Year-End 2019 Earnings Call").

36.    Defendant Michael Montemayor ("Montemayor") was the President of Retail and Commercial Banking and the Chief Lending Officer at Sterling from 2006 until he was terminated on May 29, 2020.  Montemayor had been with the Company for 25 years, having first joined the Company as a Residential Lender in 1992. Montemayor worked his way through the Company as a Regional Branch Manager, Commercial Loan Officer, Construction Loan Officer, Construction Lending Manager, Managing Director of Commercial Lending, and then Chief Lending Officer starting in 2006, and served as the Retail Branch Executive from 2013 until his termination.  He also served as Executive Vice President from 2006 to 2016 and as President of Commercial and Retail Banking from December 2016 until his

termination.  Montemayor participated in the Company's Fourth Quarter and Year-End 2017 Earnings Call, First Quarter 2018 Earnings Call, Second Quarter 2018 Earnings Call, Third Quarter 2018 Earnings Call, Fourth Quarter and Year-End 2018 Earnings Call, First Quarter 2019 Earnings Call, Second Quarter 2019 Earnings Call, Third Quarter 2019 Earnings Call, and Fourth Quarter and Year-End 2019 Earnings Call.

37.    Defendants Judd, Lopp, and Montemayor are collectively referred to herein as the "Officer Defendants."

38.    The Officer Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and, through them, to the investing public.  By reason of their management positions and their ability to make public statements in the name of Sterling, the Officer Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Sterling to engage in the conduct complained of herein.

### 3.    Defendant Scott Seligman

39.    Defendant Scott Seligman ("Scott Seligman") is the founder of the Bank, Vice President of Sterling, a consultant to the Bank's Board, represents the interests of the Founding Family, and continues to serve in an advisory capacity to Sterling and the Bank, including through attendance at board meetings and frequent

consultation with senior management.  Scott Seligman, members of his family, and associated trusts have a controlling interest in the Company, as together they beneficially own approximately 70% of Sterling's common stock and voting power.

40.     Due to his positions with the Company and the Bank and controlling shareholder interest, Scott Seligman controlled and/or possessed the authority to control the contents of Sterling's reports, press releases, and presentations to securities analysts and, through them, to the investing public.  By reason of his management positions and his controlling interest, he was and is a controlling person, and had the power and influence to cause (and did cause) Sterling to engage in the conduct complained of herein.

### 4.     Director Defendants

41.     Defendant Barry Allen ("Allen") is a Director of the Company's Board. Allen was appointed Director in January 1998.  Allen signed the Company's Registration Statement.

42.     Defendant Jon Fox ("Fox") was a Director of the Company's Board. Fox was appointed Director in 1997 and resigned on June 21, 2019.  Fox signed the Company's Registration Statement.

43.     Defendant Seth Meltzer ("Meltzer") is a Director of the Company's Board.  Meltzer was appointed Director in January 2000.  Meltzer signed the Company's Registration Statement.

44.    Defendant Sandra Seligman ("Sandra Seligman") is a Director of the Company's Board.  Sandra Seligman was appointed Director in January 1984. Sandra Seligman signed the Company's Registration Statement.

45.    Defendant Peter Sinatra ("Sinatra") is a Director of the Company's Board.  Sinatra was appointed Director in January 2008.  Sinatra signed the Company's Registration Statement.

46.    Defendant Benjamin Wineman ("Wineman") is a Director of the Company's Board.  Wineman was appointed Director in January 2013.  Wineman signed the Company's Registration Statement.

47.    Defendant Lyle Wolberg ("Wolberg") is a Director of the Company's Board.  Wolberg was appointed Director in August 2017.  Wolberg signed the Company's Registration Statement.

48.    Defendants Allen, Fox, Meltzer, Sandra Seligman, Sinatra, Wineman, and Wolberg are collectively referred to herein as the "Director Defendants."

### 5.    Underwriter Defendants

49.     Defendant Piper Sandler Companies, the successor to Sandler O'Neill & Partners, L.P, ("Sandler"), was the lead book-running manager and underwriter of the Company's IPO.  Sandler assisted in the preparation and dissemination of the Registration Statement.  As an underwriter of the Offering, Sandler was responsible for ensuring the truthfulness and accuracy of the various statements contained in or

incorporated by reference into the Registration Statement. Sandler maintains its headquarters in Minneapolis, Minnesota.

50.    Defendant American Capital Partners, LLC ("American Capital") also served as an underwriter of the Company's IPO. American Capital assisted in the preparation and dissemination of the Registration Statement. As an underwriter of the Offering, American Capital was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the Registration Statement. American Capital maintains its headquarters in Hauppauge, New York.

51.    Defendants Sandler and American Capital are collectively referred to herein as the "Underwriter Defendants." The Underwriter Defendants, as a result of their control, position, or influence, had access to the underlying documentation about the Sterling, its IPO, and the Registration Statement. As such, the Underwriter Defendants had the opportunity to make a reasonable investigation to ensure that statements contained in the Offering documents were true and/or that there were no omissions of material fact necessary to make the statements contained therein not untrue or misleading.

52.    Sandler sold at least 14.5 million shares in the offering, while American Capital sold 500,000 shares. Those figures do not account for the overallotment of

2.25 million shares.   Based on the $0.72 underwriters discount, Sandler and American earned approximately $12.42 million in connection with the IPO.

## IV.   CLASS ACTION ALLEGATIONS

53.   Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of the following Class:

> All those who purchased or otherwise acquired Sterling Bancorp, Inc. (SBT) common stock, from November 17, 2017 through and including March 17, 2020 (the "Class Period"), including shares sold in the November 2017 initial public offering, and were damaged as a result.  Excluded from the Class are defendants herein, members of the immediate family of each of the defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, including trusts associated with members of the Founding Family, including the selling shareholders, and the legal representatives, agents, affiliates, heirs, successors-in-interest, or assigns of any such excluded party.

54.   The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.  17,250,000 shares of Sterling common stock were sold in the IPO.   Throughout the Class Period, Sterling securities were actively traded on NASDAQ.   As of March 17, 2020, Sterling had 49.944 million outstanding shares of common stock and a public float of 14.807 million.  Thus, although the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes there are thousands of members of the Class who traded the Company's common stock during the Class Period.

55.    Members of the Class may be identified from records maintained by Sterling or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

56.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' respective acts as alleged herein;

(b)    whether the statements made were materially false or misleading, or omitted material facts;

(c)    whether the Offering statements made were materially untrue or misleading, or omitted material facts;

(d)    whether defendants acted with requisite scienter in issuing false and misleading financial statements in violation of the Exchange Act;

(e)    whether the Underwriter defendants exercised due diligence;

(f)    whether the prices of Sterling's securities during the Class Period were artificially inflated because of defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

57.    Lead Plaintiff's claims are typical of the claims of the members of the Class, as Lead Plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of federal laws as complained of herein.

58.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

59.     A class action is superior to alternative methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable.   Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

60.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine.   All purchasers of Sterling's securities during the Class Period suffered similar injuries, including injury through their purchase of the securities at artificially inflated prices.   A presumption of reliance, therefore, applies.

## V.     <u>NO SAFE HARBOR</u>

61.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly untrue or misleading statements in the Registration Statement nor to any of the false and

misleading statements pleaded in this Complaint.  The statements alleged to be false and misleading all relate to historical or then-existing facts and conditions.

62.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

63.    Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements, because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Sterling who knew that those statements were false, misleading, or omitted necessary information when they were made.  In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and defendants failed to update those statements which later became inaccurate.

## VI.    BACKGROUND

### A.    Overview Of Sterling And The Advantage Loan Program

#### 1.    The Company

64.    Sterling is a unitary thrift holding company that was incorporated in 1989.  It is the parent company to its wholly owned subsidiary, the Bank (Sterling Bank and Trust).  The Company's business is conducted through the Bank, which was founded as a federally chartered thrift institution in 1984 in Southfield, Michigan by members of the Seligman family, including defendant Scott Seligman.  In 1994, the Bank established its first branch in San Francisco.  In 2004, it made a strategic decision to sell all but one of its Detroit-area branches and focus almost exclusively on the California market.

65.    The Company is headquartered in Southfield, Michigan with its primary branch operations in the San Francisco Bay Area and Greater Los Angeles.  The Company also has a presence in New York and the Greater Seattle area.  During the Class Period, the Company specialized in residential mortgages and touted as a competitive advantage its niche loan products, including the ALP, which was by far its largest product.  Sterling led its expansion in new markets with its ALP.  As of September 30, 2019, the Company had $3.32 billion in assets, primarily consisting of loans, including $2.505 billion in residential real estate loans, 79% of which were ALP loans.

## 2. The Founding Family

66.     Sterling is a closely held company and is deemed a controlled company under the corporate governance rules for NASDAQ-listed companies. Approximately 70% of Sterling's common stock and voting power is owned by Seligman family trusts.  Moreover, defendant Sandra Seligman, the sister of Scott Seligman, and her son, Seth Meltzer, were directors of the Company throughout the Class Period.  In addition, as stated in the IPO Registration Statement and  2018 10-K, Scott Seligman, the founder of the Bank, Vice President of Sterling, and a consultant to the Bank's Board, represents the interests of the family and continues to serve in an advisory capacity to Sterling and the Bank, including through attendance at Board meetings and frequent consultation with senior management.

67.     Therefore, as also stated in the IPO Registration Statement and 2018 10-K, Scott Seligman has access to and influence with respect to Company operations and the Seligman family trustee has effective control over the outcome of votes on all matters requiring approval by shareholders, including the election of directors, the adoption of amendments to Sterling's articles of incorporation and bylaws, and approval of a sale of the Company and other significant corporate transactions, regardless of how other shareholders vote on these matters.

### 3.    Regulatory Overview Of The Company And The Bank

### a)    AML Overview

68.    Sterling must comply with the BSA, 31 U.S.C. § 5311 *et seq.*, which establishes program, recordkeeping, and reporting requirements for banks and includes AML regulations for banks, and is overseen by the OCC.  Sterling must also comply with stronger AML laws enacted by Congress as part of the USA PATRIOT Act[2] and its attendant regulations and examination requirements put in place to guard against money laundering.

69.    AML efforts are designed to combat money launderers and other wrongdoers who seek to use U.S. financial institutions to conceal, transfer, and spend suspect funds.[3]  Money laundering is the criminal practice of processing illegally obtained funds, or "dirty" money, through a series of transactions in order to "clean" the funds so that they appear to be proceeds from legal activities. Government authorities have documented the fact that criminals use loans or mortgages to layer and integrate illicit cash into high-value assets such as real estate.[4]

---

[2] The "USA PATRIOT Act" is the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

[3] Federal Financial Institutions Examination Council (FFIEC) *Bank Secrecy Act (BSA) /Anti-Money Laundering (AML) Examination Manual* (Feb. 27, 2015) ("FFIEC Examination Manual"), available at https://bsaaml.ffiec.gov/manual (last visited July 2, 2020).

[4] *Id.*; Financial Crimes Enforcement Network (FinCEN), *Suspected Money Laundering in the Residential Real Estate Industry: An Assessment Based Upon*

Mortgages serve as an ideal cover for laundering criminal proceeds, as money launderers or their straw buyers deposit lump sums or smaller structured cash amounts to qualify for mortgages, and repayment allows illicit funds to be commingled with legitimate funds.[5]

70.     Under the BSA and related AML laws, banks are required to maintain robust, sophisticated, and effective due diligence systems for purposes of BSA and AML compliance.

71.     Pursuant to 12 C.F.R. § 12.21, banks are required to have a written, board-approved program that is reasonably designed to assure and monitor compliance with the BSA.  The program must, at a minimum, provide for a system of internal controls to assure ongoing compliance, provide for independent testing

---

*Suspicious Activity Report Filing Analysis* (April 2008) ("Suspected Money Laundering in the Residential Real Estate Industry"), available at https://www.fincen.gov/sites/default/files/shared/MLR_Real_Estate_Industry_SAR_web.pdf; *see also Guide to U.S. Anti-Money Laundering Requirements: Frequently Asked Questions* (6th ed. Nov. 2014) ("Guide to U.S. AML"), available at https://www.protiviti.com/sites/default/files/united_states/insights/guide-to-us-aml-requirements-6thedition-protiviti_0.pdf; AUSTRAC for the Commonwealth of Australia, *Strategic Analysis Brief:  Money Laundering Through Real Estate* (2015) ("Money Laundering Though Real Estate"), available at https://www.austrac.gov.au/sites/default/files/2019-07/sa-brief-real-estate_0.pdf.

[5] Office of the Comptroller of the Currency, *BSA & Related Regulations*, available at https://www.occ.treas.gov/topics/supervision-and-examination/bsa/bsa-related-regulations/index-bsa-and-related-regulations.html (last visited July 2, 2020).

for compliance, designate an individual responsible for coordinating and monitoring day-to-day compliance, and provide training for appropriate personnel.

72.     Under the BSA, financial institutions are required to file Currency Transaction Reports ("CTRs") for each non-exempt transaction in currency (deposit, withdrawal, exchange, or other payment or transfer) of more than $10,000 by, through, or to the bank.   Types of currency transactions subject to reporting requirements include loan payments, purchases of certificates of deposit, deposits, and withdrawals.

73.     Banks must also file Suspicious Activity Reports ("SARs") when they detect certain known or suspected violations of federal law or suspicious transactions that might signal criminal activity, including money laundering.  A SARs filing is required for any potential crime involving insider abuse, regardless of the dollar amounts; where there is an identifiable suspect and the transaction involves $5,000 or more; or where there is no identifiable suspect and the transaction involves $25,000 or more.  A SARs filing also is required in the case of suspicious activity that is indicative of potential money laundering or BSA violations and the transaction involves $5,000 or more.

74.     In addition, the USA PATRIOT Act requires that every bank adopt a Customer Identification Program ("CIP") as part of its BSA compliance program. All banks must have a written CIP which "must include account opening procedures

that specify the identifying information that will be obtained from each customer" and "must also include reasonable and practical risk-based procedures for verifying the identity of each customer."[6]  A bank must verify enough information to form a reasonable belief that it knows the true identity of the customer.

75.     A BSA/AML-compliance program must also have risk-based Customer Due Diligence ("CDD") policies, procedures, and processes for all customers, "particularly those that present a higher risk for money laundering and terrorist financing."[7]  Customers who pose higher money-laundering or terrorist-financing risks present increased risk exposure to banks.  As a result, "due diligence policies, procedures, and processes should define both when and what additional customer information will be collected based on the customer risk profile and the specific risks posed."[8]

76.     A bank should do more in circumstances of heightened risk.  Collecting additional information about customers that pose heightened risk is referred to as Enhanced Due Diligence ("EDD").  Information provided by higher-risk profile customers and their transactions should be reviewed more closely at account opening and more frequently throughout the term of their relationship with the bank.

---

[6] FFIEC Examination Manual, *supra* note 3.

[7] *Id*.

[8] *Id*.

77.    Certain customer types may pose heightened risk, including nonresident aliens ("NRAs") and foreign individuals.[9]  The risk factors involved with NRAs include difficulty verifying and authenticating an NRA accountholder's identification, source of funds, and source of wealth.

### b)    Money Laundering Risks Associated With Real Estate Lending

78.    Lending activities, including real estate lending, present particularly high risks of money laundering.[10]  This is especially true when lending activities exhibit one or more of the following:  complexity (*e.g.*, the involvement of multiple parties who may manipulate the transaction), payments made in cash or by third parties, high frequency of international transactions, or historical susceptibility to abuse by criminals (*e.g.*, residential real estate).[11]  The mortgage industry suffers from several vulnerabilities that increase fraud risks, including non-face-to-face and automated loan processing channels such as the internet and telephone, innovative loan products such as no- or low-documentation products, involvement of entities other than regulated financial institutions such as mortgage brokers, and possible

---

[9] *Id.*

[10] *See* FFIEC Examination Manual, *supra* note 3; Suspected Money Laundering in the Residential Real Estate Industry, *supra* note 4; Guide to U.S. AML, *supra* note 4; Money Laundering Though Real Estate, *supra* note 4.

[11] Guide to U.S. AML, *supra* note 4.

collusion among multiple third parties including borrowers, mortgage brokers, real estate agents, appraisers, underwriters, lenders, and closing/settlement agents.

79.    Money launderers also may use individuals who, for a fee, agree to act as straw buyers and allow their identities to be used to apply for residential real estate loans, or money launderers establish front companies to falsify applicants' level of income and employment status.  The money launderer controls the straw buyers' bank accounts and makes loan payments using illicit funds.[12]

### c)    Indicators Of Potential Money-Laundering Activity

80.    The U.S. Treasury Department's Financial Crimes Enforcement Network's ("FinCEN") and other entities issue advisories and guidance containing examples of "red flags."  Some indicators or red flags that should trigger further monitoring and examination for potential illicit activity include:

- Cash deposited in structured amounts into home loan accounts;

- Customer uses unusual or suspicious identification documents that cannot be readily verified;

- Customer provides identification documents that are expired or appear false;

- Customer makes frequent or large transactions and has no record of past or present employment experience;

- Loans secured by pledged assets held by third parties unrelated to the borrower;

---

[12] Suspected Money Laundering in the Residential Real Estate Industry, *supra* note 4.

- Loans are made for, or are paid on behalf of, a third party with no reasonable explanation;

- To secure a loan, the customer purchases a certificate of deposit using an unknown source of funds, particularly when funds are provided via currency or multiple monetary instruments;

- Borrower uses cash to make a significant deposit for the purchase of a property and the balance is financed by an unusual source;

- Customer's ownership of property is his or her only link to the United States;

- Source of deposits to buy a property cannot be easily identified— for example, international funds transfer where the ordering and beneficiary customers are the same;

- Customer makes numerous deposits under $10,000 in an account, including home loan accounts, in short periods of time, thereby avoiding the bank's requirement to file a CTR;

- Transactions in which the parties are foreign or a non-resident; and

- Transactions where there are doubts about the validity of the documents submitted with loan applications.[13]

### d)    Residential Real Estate Loan Underwriting

81.    Separate and apart from the BSA/AML regulatory framework, Sterling is also subject to laws and regulations that govern the making of loans secured by residential real estate.  For example, Section 304 of the Federal Deposit Insurance Corporation Improvement Act (12 U.S.C § 1828(o)) directs banks to prescribe

---

[13] Money Laundering Through Real Estate, *supra* note 4.

formal written policies that establish acceptable terms and underwriting standards for real estate loans.

82.    Creditors must also make a reasonable and good faith determination at or before consummation that a borrower will have a reasonable ability to repay the loan according to its terms, which determination must be supported and verified with documentation.[14]    Creditors are required to verify borrowers' information using reasonably reliable third-party records, with specific rules for verification of income or assets and employment status.  In the case of the borrower's income or assets, the creditor must use third-party records that provide reasonably reliable evidence of such income or assets.  Loans "with reduced documentation of the borrower's assets, employment, or income" are an example of "higher risk" mortgage products, and the OCC instructs its examiners that such products require additional underwriting consideration.[15]

83.    Moreover, the Dodd-Frank Act severely restricts no-documentation loans, known as "stated-income" loans, by requiring creditors to verify income amounts relied on to determine a borrower's ability to repay the loan.  Further, where

---

[14] Regulation Z, 12 C.F.R. § 1026.43 (2016), which implements the Truth in Lending Act.

[15] "Residential Real Estate Lending," Office of the Comptroller of the Currency, *Comptroller's Handbook*, available at https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/index-comptrollers-handbook.html (last visited July 2, 2020).

a borrower does not have the traditional tax documents to demonstrate employment, so-called "bank statement loans" may be available and lenders typically analyze 12 to 24 months of bank statements to determine the ability to repay.

### 4.    The Advantage Loan Program

84.    During the Class Period, the Bank's largest lending product by far was its Advantage Loan Program.  The Company described the program as follows:

> Among our significant products is our Advantage Loan program, which consists of one, three, five, or seven year adjustable rate mortgages with a minimum 35% down payment requirement.  We offer this product to underserved home buyers who have good credit, but may have limited credit history.  We offer lower rates in cases where borrowers have the ability to make more than the minimum down payment.

85.    According to the Company, the Advantage Loan Program "works well for individuals with excellent credit and liquidity, seeking quick approval and closing, and who need to compete with all cash buyers."  The Advantage Loan Program reflected the Company's "focus on the minority and immigrant markets," and its customers were typically "foreign nationals and recent immigrants," including the "foreign national Chinese home buyer."

86.    As of September 30, 2019, the program constituted ***more than four-fifths of its residential loan portfolio and two-thirds of total loans***.  Sterling originated ***more than $5 billion*** in Advantage Loans during the last eight and a half years it was operating.

87.    Due in large part to loans issued through the ALP, *from 2012 to the start of the Class Period, Sterling more than tripled its assets and grew its net income by an even greater magnitude*.  The Company's loan portfolio increased from $755 million at the end of 2012 to $2.37 billion at September 31, 2017.

## B.    The Initial Public Offering

### 1.    Overview

88.    Taking advantage of the Company's exponential growth, which was driven in large part by the ALP, the Company went public on November 17, 2017 through an IPO of 15,000,000 shares of common stock at a price of $12.00 per share, including 7,692,308 shares of common stock sold by the Company and 7,307,692 shares sold by selling shareholders.  The underwriters exercised their overallotment option of an additional 2,250,000 from the selling shareholders, the sales of which were completed on December 4, 2017.  Thus, the total offering size, including the overallotment, was 17,250,000 shares for gross proceeds of $207 million.

89.    Sandler served as the lead underwriter for the IPO and American Capital also served as an underwriter.  Together, they reaped at least $12.42 million in connection with the IPO.

### 2.    Selling Shareholders/Founding Family

90.     The selling shareholders who sold in the IPO are members the Founding Family, who held the shares individually or through trusts.  The Selling Shareholders are Director Defendant Meltzer and trusts related to members of the

Founding Family, including defendant and Bank founder Scott Seligman, Director

Defendant Meltzer and Director Defendant Sandra Seligman.  In total, these selling

shareholders sold 9,557,692 shares for gross proceeds of $114,692,304 through the

IPO.

### 3.    Oversight By Management

91.    In reviewing the proposed IPO Registration Statement and Prospectus

(defined *infra*), on October 12, 2017, the SEC wrote to CEO Judd and requested that

he "tell us what consideration you gave to including a risk factor to address the risks,

if any, associated with your senior leadership team being located in Southfield,

Michigan while most of your lending activity occurs in California."  In an October

19, 2017 response, the Company stated:

> [T]he ***Company's senior leadership team typically spends at least one
> week per month at the Company's primary San Francisco branch and
> makes periodic in-person visits to its Los Angeles operations and
> more recently, to Seattle and New York City***.  In addition, the Company
> has ***long-tenured employees based in California***, including ***a senior
> vice president with over 28 years' experience at the Company
> [Stephen Adams]*** and ***a vice president of commercial lending with
> over 9 years' experience at the Company,*** each of whom are ***fully
> integrated into monthly senior management meetings***.  Finally, the
> Company utilizes videoconferencing technology to enable virtual face-
> to-face contact as its operations have grown geographically.

92.    Moreover, the Registration Statement stated that internal controls were

a Board-level responsibility and discussed the role of the Audit Committee:

> The Audit Committee assists the board of directors in fulfilling its
> responsibilities for general oversight of the integrity of our financial

statements, compliance with legal and regulatory requirements, the independent auditors' qualifications and independence, and the performance of our internal audit and risk management function and independent auditors. ***Among other things, the Audit Committee: . . . reviews disclosure controls and procedures, internal controls, internal audit function and corporate policies with respect to financial information;*** [and] oversees investigations into complaints concerning financial matters, if any . . . .

### C.    Former Employee Accounts

93.    The following accounts are based on interviews with former Sterling employees who were employed by Sterling before and/or during the Class Period.

94.    **Former Employee 1 ("FE 1")**:  FE 1 was a former Commercial Real Estate Relationship and Portfolio Manager at Sterling in San Francisco prior to and during the Class Period until Winter 2019 who is familiar with Sterling's Advantage Loan Program.  FE 1's role was to gather loan documentation and present it to the underwriting and credit teams and to respond to any requests for additional information.

95.    FE 1 said the ALP was targeted to foreign nationals, mainly Chinese immigrants, often with no traditional credit history, let alone any credit history.  FE 1 disagreed with Sterling's representation that its underwriting and risk management were disciplined and conservative as to loans in the ALP.  FE 1 stated that all that was required for a borrower to be approved under the ALP was initially a monthly bank statement and, later, a letter from a CPA (for purported self-employed borrowers), and a monthly bank statement.

96.    FE 1 said that FE 1 was told some of these CPA letters were from China and were written in Mandarin.  Sterling would sometimes have a bank employee translate the letter, but on occasion Sterling allowed the borrower to translate his or her own letter.

97.    FE 1 learned from a Sterling underwriter that many of the CPA letters used in the ALP were from the same IP address, thus likely from the same device or location.    (An IP address is a network address for a particular computer.) Additionally, FE 1 relayed that the Sterling underwriter told FE 1 that some of the CPA firms for the letters may not have actually existed.

98.    FE 1 further relayed that defendant Montemayor "absolutely" was fully aware of all of the problems with the ALP.  FE 1 said this is based on FE 1's interactions with Montemayor and conversations with the Sterling underwriter.  FE 1 commented that all loans went through Montemayor and that he was the person with the most knowledge about Sterling's operations, commenting that he "signed off on all loans" and there was "no way he wouldn't have known" of issues with the ALP.

99.    FE 1 further relayed that the OCC audit was conducted while FE 1 was at Sterling, but that management kept everyone in the dark about it.  FE 1 said that in either 2017 or 2018 an OCC auditor contacted FE 1 about an interview, and FE 1 advised both FE 1's immediate supervisor and Montemayor about it.  Montemayor

instructed FE 1 not to speak with the auditor and, if contacted again, to immediately let Montemayor know.

100.   FE 1 relayed that Yihou Han was one of the two loan producers later fired by Sterling in November 2019.  FE 1 spoke to Yihou Han after she was fired, who said that a reason for her firing was related to the use of a broker to send prospective clients to the Bank.  However, FE 1 was told by a Sterling underwriter that Yihou Han was fired because the CPA letters she was using had all come from the same IP address.

101.   FE 1 stated that Montemayor was aware of both the broker and CPA letter issues.  FE 1 said that there is no way Montemayor could not have known about the issues surrounding the CPA letters, as it was Montemayor's job to approve all residential loans, including the ALP loans.

102.   **Former Employee 2 ("FE 2")**: FE 2 was employed as a Loan Consultant at Sterling in the San Francisco Bay Area prior to the Class Period until the end of 2017.  FE 2 has worked in the mortgage industry for many years and at several large banks.  FE 2's job at Sterling included consulting with prospective borrowers and advising them on the loan-approval process as well as gathering documents for the application.

103.   Like FE 1, FE 2 does not agree with the Company's statements that it had a disciplined documentation and conservative underwriting program, as the

underwriting and documentation was neither conservative nor disciplined.  FE 2 said

there was almost no documentation required for ALP loans, which made up most of

the Bank's business.

104.   FE 2 is familiar with the ALP and closed loans in the program.  FE 2

said the ALP was targeted to Chinese nationals.  FE 2 said that the underwriting for

the program was much different than that of other mortgage programs at Sterling

and at other larger banks and did not require FICO credit or employment verification

documents.  FE 2 said that, instead, often only a letter from a business in China

indicating that the customer was an employee was required.  FE 2 said that

sometimes letters from a CPA alone were also accepted as proof of income or

employment for self-employed borrowers, who comprised most of the ALP

borrowers that FE 2 was aware of.  FE 2 further said that ALP customers were

required to open an account at a Sterling branch with cash and they were then

required to make deposits evidencing two months' salary.  These deposits could be

done over a series of weeks, and that the deposit itself was treated as income

verification by Sterling.  These deposits were in addition to the down payment

required for ALP loans.  FE 2 said there was never any attempt to verify the source

of the cash.  FE 2 relayed that the amount that was required to be deposited varied

depending on the purported salary of the borrower and the size of the loan.  FE 2

said that this practice is completely different than other banks' procedures as other

banks would require at least 12 months of bank statements to demonstrate a pattern of income.

105.   FE 2 suspected that ALP loans were used to launder money.

106.   FE 2 was aware that Sterling had fired two of the top loan producers for the ALP and said that one of them, Yihou Han, had no experience in traditional loan underwriting and was not aware of what was normally required to approve loans outside the ALP.

107.   FE 2 said that sometime in 2015, Yihou Han approached FE 2 to process a loan.   According to FE 2, Yihou Han presented, as part of the loan documentation, a tax return that FE 2 believed was clearly fraudulent and FE 2 would not accept it.  According to FE 2, Yihou Han walked away "furious" and they never spoke to each other again.

108.   FE 2 relayed that all underwriting was done from the Michigan headquarters.   FE 2 believes that underwriting management at Sterling was incompetent.   This included Jon Kolk, who was the manager of underwriting, worked in the Michigan headquarters, and who FE 2 said was poorly trained and not qualified to run the underwriting operation of a large bank.  FE 2 believes Kolk formerly worked at World Savings Bank ("WSB").  FE 2 said that WSB had a similar program like the ALP at Sterling.  FE 2 noted that ALP was akin to "quick qualifier," low-documentation loans that WSB and other less than reputable lenders

employed before 2009.  FE 2 noted that WSB ran into regulatory problems several years ago.  Defendant Montemayor, as President of Retail and Commercial Banking and Chief Lending Officer, would have supervised that department, including Kolk.

109.  According to FE 2, Montemayor "protected" Kolk.  FE 2 stated that Montemayor "knew exactly what was happening" at the Bank.

110.  **Former Employee 3 ("FE 3")**:  FE 3 was a BSA Compliance Analyst at Sterling from late Fall 2017 through October 2019 and has held similar BSA and AML positions at several institutions.  While at Sterling, FE 3 worked at the Michigan headquarters.

111.  FE 3 said that based on FE 3's experience and observations of Sterling's operations, Sterling did not have a disciplined or conservative underwriting process.  FE 3 relayed that there were problems with the ALP that FE 3 brought up to Sterling's General Counsel and FE 3's supervisors.  Similar to other former employees, FE 3 stated that the program was a residential mortgage program that targeted mainly Chinese immigrants with little or no traditional credit history.  FE 3 stated that to obtain an ALP mortgage the customer was required only to submit a letter from an employer or a CPA and to open an account with the Bank and make deposits, usually in cash, every two weeks for a few months.  FE 3 said there was little verification of income and no attempt to confirm the identity of account holders.  FE 3 described the whole process as "shady" and "suspicious."

112.  FE 3 said that to obtain an ALP mortgage the customer was required to provide some indication of their salary, often via a letter from an employer in China. Then, to "verify" that amount, Sterling required the borrower to deposit two months' salary into a Sterling account, typically in four installments over a two-month period. FE 3 said that these deposits were usually wired funds.  FE 3 said there was little or no attempt to confirm the identity of the account holder, and no attempt at all to identify the source of the funds.

113.  FE 3 further stated that some of the employment verification or CPA letters used for ALP loans would indicate that the customer owned a business, but there was no attempt to confirm this information.  These letters were written in Mandarin, or another Chinese language, and would need to be translated by a Chinese-language speaking employee or someone else.

114.  FE 3 stated that over 90% of the ALP loans FE 3 reviewed involved "huge lump sums" of gifted money, which went largely unverified.  FE 3 recalled ALP customers being asked to provide the source of the "gifts" and responding that the sources were relatives, such as an aunt or cousin who were purportedly sending amounts of often at or in excess of $50,000 to the borrower.  FE 3 stated that there was no follow up or attempt to confirm this information.  FE 3 recounted instances where borrowers said they were using gifted funds from the same person for both the initial down payment as well as for later payments.  But then later the borrower

provided contradictory information.  For example, if Jane Doe provided a $50,000 gift in connection with the down payment, she was described as the borrower's aunt; but when Jane Doe reappeared on a later payment, the borrower identified her as a cousin, or other relative.  FE 3 found such inconsistencies troubling and highlighted the risks and problems with ALP loans.

115.   FE 3 raised concerns about the ALP, including FE 3's belief that the program was a possible vehicle for money laundering to Sterling's Vice President and General Counsel, as well as to two of FE 3's supervisors in the AML/BSA department, but nothing changed.   FE 3 stated that management appeared "untouchable."  FE 3 said that approximately two months before FE 3 left Sterling, FE 3 was due for a promotion but was told by FE 3's supervisor that because FE 3 voiced concerns about the ALP, FE 3 would not be promoted.

116.   **Former Employee 4 ("FE 4")**:  FE 4 was a residential loan officer at Sterling in the Los Angeles area from prior to the Class Period through the end of 2017 and closed 10 to 12 loans through the ALP.  FE 4 was responsible for working with clients to obtain documentation and then closing the loan.  FE 4 said that most of the ALP customers were foreign nationals, mainly Chinese nationals.

117.   FE 4 said that two other banks in California, Cathay Bank and East West Bank, also offered residential loan programs focusing on Chinese nationals, but Sterling's program was different.  According to FE 4, the other banks had lower

47

interest rates, but Sterling could close the loan in 30 days, rather than 45 to 60 days, and Sterling's approval process was more lenient than the other two banks so that it was easier to get a loan approved at Sterling.

118.  FE 4 said that most of the borrowers worked in China and would provide letters purportedly from their Chinese employer stating their income and past employment.  According to FE 4, these letters were written in a Chinese language and were either translated by the borrowers themselves or by a Chinese-language-speaking bank employee.

119.  As relayed by other former employees, FE 4 said that borrowers were required to open an account with the Bank prior to closing.  FE 4 said that most borrowers used wire transfers to open the accounts, some of which originated in China.

120.  FE 4 also stated that the two ALP loan producers terminated as disclosed by the Company on November 8, 2019 are Yihou Han and Frank Yu.  FE 4 was told that Frank Yu had questionable connections to local builders and real estate agents.

121.  **Former Employee 5 ("FE 5")**:  FE 5 was a loan officer at Sterling from early to mid-2017, resigning a few months before the IPO.  FE 5 worked in Washington and reported to Steve Adams, a senior vice president in the Company's

San Francisco office.  FE 5 had approximately 10 years' experience in residential lending before joining Sterling.

122.  While FE 5 was at the Company, FE 5 learned about ALP and its guidelines.  FE 5 worked in close proximity to others who originated several ALP loans.  FE 5 stated that ALP was a program that catered to "wealthy Chinese borrowers."  FE 5 said that FE 5's colleague commented that Sterling could "fit anyone into a loan," but FE 5 found ALP to be "unnatural" and "abnormal" and that "something was funny" about the program.  FE 5 noted that ALP loans had higher interest rates and shorter payout terms, such that most borrowers could obtain more competitive terms elsewhere, but the ALP allowed money to move into the United States quickly and with little documentation.  FE 5 stated that ALP borrowers had to put down 35% for purchases (40% for refinances) and provide limited documents.  For example, ALP borrowers would provide letters confirming employment and salary, often sent from China or sent with translations provided by the borrowers.  Further, Sterling allowed gifted funds from family members, but limited its review of a gift to only requiring that the funds deposited into a borrower's account matched those of the purported gift.  FE 5 stated that Sterling did not otherwise verify the source of the funds.

123.  FE 5 also noted that Sterling provided "no training" on risk or compliance.  Sterling employees FE 5 dealt with had no training or familiarity with

SARs, CTRs, or other compliance procedures.  In one instance, FE 5 spoke with a retail banker at one of Sterling's retail locations in San Francisco and questioned whether a transaction was properly sourced.  When FE 5 commented that the retailer may need to complete a SAR, the retail banker was confused, thinking FE 5 was referencing Severe Acute Respiratory Syndrome.  FE 5 then spoke to that person's manager who also did not appear any more familiar with SARs.

124.  FE 5 had suspicions that the ALP could be abused by money laundering.  FE 5 singled out the widespread use of "gifts" that would arrive in borrowers' accounts from unconfirmed sources on the eve of closing as particularly suspicious.

125.  FE 5 commented that Sterling and its executives were "playing with fire" with the ALP and FE 5 believes that the senior executives "had to have known" what was going on.

126.  **Former Employee 6 ("FE 6")**:  FE 6 was a Quality Control Analyst at the Bank from Fall 2018 until Spring 2019 at the Company's Michigan headquarters. In this capacity, FE 6 looked at loans daily and conducted pre-closing reviews of the loans, including ALP loans. FE 6 has been in the mortgage banking business for 20 years

127.  FE 6's experience in mortgage banking was to "document everything." However, FE 6 said that Sterling offered non-conforming loans called ALP loans

and that the ALP left "a bad taste in my mouth."  FE 6 was "not at ease" performing quality control on these loans, because the process for ALP loans was "lackluster," and there was not much "regulation" of these loans.  FE 6 said Sterling approved a lot of loans "without getting proper ID and income verification."

128.  FE 6 confirmed other former employees' accounts that the ALP loans lacked specific employment information and that employment verification would consist of merely a letter from an employer stating the borrower is an employee at a company and what their salary is.  Sterling's Chinese employees would translate documents received in a Chinese language and convert yen into dollars.  FE 6 said that if a borrower had an employer letter and "assets in the bank," Sterling would issue the ALP loan.  FE 6 said that the Company's guidelines were weaker in the ALP compared to other loans.

129.  **Former Employee 7 ("FE 7"):**  FE 7 was an underwriter at Sterling until a few months before the IPO.  FE 7 worked in the loan origination office in Kirkland, Washington and reported to head underwriter, Jon Kolk, who was based in Sterling's corporate offices in Michigan.  FE 7 has been in the mortgage lending business for 40 years and has performed forensic underwriting for the DOJ, which work helped the DOJ levy fines against lenders. As a result, FE 7 stated, "I know when I see something funky."

130.   While FE 7 was at the Company, FE 7 closed over 10 ALP loans.  FE 7 said the ALP was a "foreign national lending program" and often targeted borrowers who lacked traditional credit.  FE 7 said that the majority of ALP borrowers were coming from China to the U.S. to buy investment or vacation property (non-primary residences).   FE 7 said the ALP loans "lacked substance and documentation."  FE 7 said the requirements of the ALP were that borrowers needed to deposit amounts into a Sterling bank account equal to two months' salary and maintain the funds in the account for at least 60 days.  In FE 7's experience, the deposits of funds purportedly representing the salaries were not clearly identified as coming from the borrower's employer but were largely unidentified deposits.  Borrowers were also required to submit a letter from an employer indicating employment and salary and the salary in the letter needed to equal the amount in the bank account.  The letters were often written in a Chinese language and translated into English by Sterling's Chinese employees.  FE 7 said that this was all that was required to satisfy the assets and income test of the ALP to get qualified.  FE 7 stated that as far as FE 7 knows, Sterling did not otherwise verify the source of the funds.  FE 7 further relayed that the translations of the employment letters appeared to follow a similar format.  Moreover, FE 7 noted that gifts were allowed to satisfy the down payment requirement.

131.   Based on this, FE 7 said, "I wondered if these were laundered funds" because there were questions about where the funds came from.  FE 7 commented the ALP "didn't make sense," as Sterling did not perform any or adequate due diligence on borrowers and/or their purported employers.  FE 7 questioned "where all the money came from" and "how is it so easily transferred."   FE 7 further relayed that FE 7 suspected that deficiencies in AML procedures.  FE 7 never saw or heard of a SAR ever being issued in connection with an ALP loan.  Referring to the ALP and the AML, FE 7 stated, "I never saw anything like that before," "it didn't make sense."  FE 7 also relayed that the Company had weak and deficient internal controls.

132.   When FE 7 questioned Jon Kolk, the manager of underwriting who worked at the Michigan headquarters, about the ALP and how the borrowers were able to remove such large sums from China, Kolk told FE 7 that Sterling had done such loans for many years and that FE 7 should "not question them, just underwrite."  FE 7 stated that the ALP was "out of control" and that FE 7 wondered "how can they [Sterling] get away with this stuff."

133.   FE 7 believed that there was an "ethical code of conduct" that was not met at Sterling.  FE 7 said that Steve Adams, Sterling's Senior Vice President of Residential Lending who was based in San Francisco, was someone whose conduct and statements during the underwriting process seemed to violate that code of

conduct.  According to FE 7, Steve Adams was aggressive about approving loans and did not want to have them held up due to underwriting.

## VII.   THE EXCHANGE ACT VIOLATIONS

### A.   Defendants' False And Misleading Statements

#### 1.   The Company's IPO And The Registration Statement

134.  On Friday, November 17, 2017 the Company commenced its IPO through which, including the overallotment, 17,250,000 shares were sold at $12.00 each for total proceeds of $207 million, including 9,557,692 shares sold by the selling shareholders for proceeds of $114,692,304.

135.  The IPO was effectuated through the Registration Statement, which consists of the October 19, 2017 initial registration Statement on Form S-1; Amendment Nos. 1, 2, and 3 to Form S-1, filed with the SEC on October 31, 2017, November 7, 2017, and November 13, 2017, respectively; a Free Writing Prospectus slide presentation filed with the SEC on November 8, 2017; and the November 17, 2017 Prospectus Form 424b4 (the "Prospectus").  The Registration Statement was signed by Judd, Lopp, and the Director Defendants.

> **a)   The Registration Statement Touted The Advantage Loan Program And Its Underwriting, Risk Management, Growth, And The Strength Of Its Customers**

136.  In the Registration Statement, Sterling touted the ALP and its underwriting, including its disciplined documentation and face-to-face meetings

with its customers, its credit quality, the strength of its customers and its deep

knowledge of them, and the Company's risk management:

> We believe a ***disciplined and conservative underwriting approach*** has been the key to our ***strong asset quality***.

***

> We believe our significant growth has not come at the expense of asset quality.  We have historically been able to focus on long-term returns and ***remain committed to responsible growth***.  We also believe our ***strong sales team, disciplined underwriting and culture of cost management*** have driven consistent earnings and exemplary net interest margins, efficiency metrics and shareholder returns.

***

> Our risk management includes ***disciplined documentation of ability to repay, liquidity analysis and face-to-face customer interaction.***

***

> We have a loan approval process through which ***we require not only financial and other information from our borrowers, but our loan officers are required to meet face-to-face with each of our borrowers in our Advantage . . . program[] and produce a narrative documentation recommending the loan***.

***

> ***Our residential mortgage portfolio consists of homeowners with strong credit and ability to repay.  We work directly with our borrowers and third parties to confirm their credit status and ability to repay*** and offer our borrowers the opportunity to expand their credit history through what is often a first-time mortgage for the customer, while requiring a minimum down payment of 35% on our key residential loan programs.

***

55

We have established a culture that places credit responsibility with individual loan officers and management and does not rely solely on a loan committee and institutional experience to *remain disciplined in our underwriting.*

\*\*\*

Our lenders are our first line of defense for assuring credit quality and the integrity of our risk rating process. Our lenders must have an understanding of the nature of the borrower's ability to repay and the nature and value of the underlying collateral. . . . The Residential loan review examines compliance with Bank policy and loan documentation testing.

\*\*\*

*We manage residential credit risks through a financial documentation process* and programs with low loan to value ratios, which averaged 62% across our residential portfolio as of September 30, 2017.

\*\*\*

Our extensive knowledge of our customers enables us to tailor products and solutions that fit their needs.

\*\*\*

We believe our policy of meeting each portfolio loan customer in person has enabled us to leverage our significant loan growth to increase our deposits from $953.2 million as of December 31, 2014 to nearly $2.1 billion as of September 30, 2017 . . . . We believe that significant cross-selling of our deposit products to our residential mortgage customers and enrollment in our automated payment program contribute to our solid asset quality.

\*\*\*

Among our significant products is our Advantage Loan program, which consists of one, three, five, or seven year adjustable rate mortgages with a minimum 35% down payment requirement. *We offer this product to underserved home buyers who have good credit, but may have limited*

*credit history.* We offer lower rates in cases where borrowers have the ability to make more than the minimum down payment. Our Advantage Loan program constituted 75% of our residential loan portfolio as of September 30, 2017.

\*\*\*

We believe the success of our products is the result of our focus on the markets we serve, ***our understanding of customer needs, our management of product criteria, and our disciplined underwriting of the type of loans we make.*** We believe our willingness to focus on nontraditional loan products allows us to face less price competition for our non-TIC residential portfolio, in particular, than we do when competing for traditional conforming, fixed-rate mortgages. ***We have developed consistent underwriting and credit management processes tailored to each of the products we offer, allowing us to build high quality asset portfolios. We believe our relationships with, and knowledge of, our customers further enhances our credit quality, as we do not provide our key loan products to any customer unless the applicable relationship manager has met them and documented the interaction.*** We also subject our portfolios to annual stress testing and ongoing monitoring. Because we service our portfolio and retain servicing rights on loans that we sell, we maintain access to key information that enhances our ability to manage the entire customer relationship. We believe that our continuity and consistency in underwriting is reflected by our 0.06% rate of delinquency as of September 30, 2017.

\*\*\*

[W]e have not to date received any repurchase requests and we currently believe our repurchase risk remains low based upon our ***careful loan underwriting and documentation standards***.

\*\*\*

We believe that the market for our loans and servicer ratings is a testament to the ***quality of our underwriting standards***.

\*\*\*

We believe this stability and institutional knowledge allows us to promote our ***culture of solid underwriting and growth*** across all levels of our organization.

***

Since 2013, we have grown organically at a compound annual growth rate of 30% while maintaining stable margins and ***solid asset quality***.

***

Our enterprise risk management framework seeks to achieve an appropriate balance between risk and return, which is critical to optimizing shareholder value. ***We have established processes and procedures intended to identify, measure, monitor,*** report and analyze the types of risk to which we are subject, including credit, liquidity, operational, regulatory compliance and reputational.

***

We believe that effective risk management is of primary importance to our organization. Risk management refers generally to the activities by which we identify, measure, monitor, evaluate and manage the risks we face in the course of our banking activities. These include liquidity, interest rate, credit, operational, cyber/technological, legal, compliance, regulatory, strategic, financial and reputational risk exposures. ***Our board of directors and management team have created a risk-conscious culture that is focused on quality growth, which includes infrastructure capable of addressing the evolving risks we face, as well as the changing regulatory and compliance landscape.*** Our risk management approach employs comprehensive policies and processes to establish robust governance and emphasizes personal ownership and accountability for risk with our employees. We believe a ***disciplined and conservative underwriting approach has been the key to our strong asset quality.***

Our board of directors sets the tone at the top of our organization, adopting and overseeing the implementation of our company-wide risk management framework, which establishes our overall risk appetite and risk management strategy**.**

137.   The Registration Statement explained the Company's analysis of credit quality:

> The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors.   The Company analyzes loans individually by classifying the loans as to credit risk.   This analysis includes homogeneous loans such as residential real estate and consumer loans and non-homogeneous loans, such as construction and commercial real estate loans and commercial lines of credit.  This analysis is performed monthly.

138.  Based on this credit-quality analysis, the Company rated $1,895,272,000 of its $1,895,975,00 residential first mortgage loans and 100% of its $17,095,000 residential second mortgage loans as "Pass Loans:  Loans are of satisfactory quality."

139.  The November 8, 2017 Sterling Free Writing Prospectus slide presentation, which is part of the Registration Statement, touted the Company's: "Focus on efficiency and ***credit quality*** with industry leading metrics [and] ***Strong credit culture***"; "***Pristine Credit Quality***"; and "***Deep customer knowledge.***"[16]

---

[16]  The Company made nearly identical representations in additional slide presentations, specifically, a March 6, 2018 presentation for the Sandler O'Neill Partners West Coast Financial Services Conference in San Diego, California; a July 2018 presentation which was filed with the SEC on August 27, 2018 as an exhibit to Sterling's August 27, 2018 Form 8-K; a November 7–8, 2018 presentation at the Piper Jaffray Western Bank Symposium in Newport Beach, California; a March 5, 2019 presentation at the 2019 Sandler O'Neill Partners West Coast

### b) The Registration Statement Touted The Company's Financial Results and Growth

140.  The Registration Statement touted Sterling's growth and positive financial results, which were overwhelmingly dependent on the success of the Advantage Loan Program. The Registration Statement reported Sterling's financial numbers for the nine months ended September 30, 2017, including net income of $31.446 million, total loans of $2,386,838,000, 1–4 family residential real estate loans of $1,913,070,000, total deposits of $2.10 billion, total allowance for loan losses of $17.189 million, and allowance for loan losses for 1–4 family residential real estate loans of $13,578,000.  Moreover, the Company did not have any reserve for potential repurchases of sold loans.

141.  The Company further stated:

At September 30, 2017 and December 31, 2016, one-to-four family residential real estate loans amounted to $1.91 billion and $1.62 billion, or 80% and 81%, respectively, of our total loan portfolio, and we intend to continue this type of lending in the foreseeable future.

### c) The Registration Statement Touted Sterling's Internal Controls

142.  Sterling also represented in the Registration Statement that its internal controls were effective.  The Company stated:

---

Financial Services Conference in San Diego, California; a May 21 & 22, 2019 presentation at the 2019 SunTrust Robinson Humphrey 20th Annual Financial Services Conference in New York, New York; and a November 7, 2019 presentation at the Piper Jaffray Western Bank Symposium in Santa Monica, California.

We maintain a system of internal controls and insurance coverage to mitigate against operational risks, including data processing system failures and errors and customer or employee fraud.

\*\*\*

Our internal policies and procedures are a critical component of our corporate governance and, in some cases, compliance with applicable regulations.   We adopt internal policies and procedures to guide management and employees regarding the operation and conduct of our business.

\*\*\*

The Sarbanes-Oxley Act of 2002 is intended to improve corporate responsibility, to provide for enhanced penalties for accounting and auditing improprieties at publicly traded companies and to protect investors by improving the accuracy and reliability of corporate disclosures pursuant to the securities laws.   We have policies, procedures and systems designed to comply with these regulations, and we review and document such policies, procedures and systems to ensure continued compliance with these regulations.

### d) The Registration Statement Described BSA/AML Compliance

143.  In the Registration Statement, Sterling described the regulatory framework it was required to comply with regarding money laundering:

As a federal savings bank, Sterling Bank is subject to primary examination and regulation by the OCC . . . .  The federal system of regulation and supervision establishes a comprehensive framework of activities in which Sterling Bank may engage . . . we must comply with anti-money laundering and anti-terrorism laws and regulations.

\*\*\*

The Bank Secrecy Act, the USA Patriot Act and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and to file timely reports such as suspicious activity reports and currency

transaction reports.  We are required to comply with these and other anti-money laundering requirements.

***

Sterling Bank is subject to the USA PATRIOT Act, which gives federal agencies additional powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements.  The USA PATRIOT Act contains provisions intended to encourage information sharing among bank regulatory agencies and law enforcement bodies and imposes affirmative obligations on financial institutions, such as enhanced recordkeeping and customer identification requirements.

***

The Federal Reserve Board ("FRB") and the Office of the Comptroller of the Currency ("OCC") periodically examine our business, including our compliance with laws and regulations.  If, as a result of an examination, a federal banking agency were to determine that our financial condition, capital resources, asset quality, earnings prospects, management, interest rate risk and liquidity or other aspects of any of our operations had become unsatisfactory, or that we were in violation of any law or regulation, it may take a number of different remedial actions as it deems appropriate.

### 2.    The Company's Code of Conduct

144.  In connection with its IPO, on October 17, 2017, Sterling's Board approved the Sterling Bancorp, Inc. Code of Business Conduct and Ethics ("Code of Conduct").  The Code of Conduct states it is applicable to all employees (including part-time employees), officers, members of the Company's Board, members of their immediate family, including siblings, parents, children, and in-laws, and to any business entity, other than the Company, in which an employee,

62

officer or director, or any member of their immediate family, has a significant financial interest, including ownership of 5% or more of the equity of such business entity.   The Code of Conduct requires the filing of SARs under certain circumstances, including after discovery of known or suspected criminal acts involving the Company:

> Any employee, officer or director who commits a dishonest or fraudulent act will be terminated.  Furthermore, the law requires the Company to file suspicious activity reports with the appropriate law enforcement agencies after discovery of known or suspected criminal acts involving the Company or its subsidiaries, whether committed by employees or others, or of crimes or suspected crimes believed to be committed by Company employees or others against another financial institution.

### 3.    Defendants' Representations Regarding Sterling's Fourth Quarter 2017 and Full Year 2017 Results

145.   On January 30, 2018, Sterling issued a press release reporting "Fourth Quarter and Record Full Year 2017 Financial Results" that touted its financial results and growth, including:  "Total portfolio loans of $2.59 billion, a 31% year-over-year increase"; "Total deposits of $2.25 billion, a 39% year-over-year increase"; and "Net income of $6.5 million."  The Company also reported that as of December 31, 2017, its residential real estate mortgages totaled $2,132,641,000 and its total allowance for loan losses as $18.457 million.

146.   Further, the January 30, 2018 press release stated:

Total loans held for investment, net of allowance for loan losses, were $2.59 billion at December 31, 2017, compared with $2.37 billion at

September 30, 2017.  The increase was primarily attributable to a $220 million increase in the residential mortgage portfolio.  During the fourth quarter of 2017, the Company originated $520 million in loans, which included $463 million in residential mortgage loans . . . .

147.   In the January 30, 2018 press release, Judd touted the Company's "strong credit culture and discipline," stating:  "As a relationship bank, we remain committed to offering loan products that our customers value, ***while maintaining our strong credit culture and discipline***"; and "We continued our positive momentum in the fourth quarter, generating strong loan growth, ***pristine credit quality*** and an excellent efficiency ratio."

148.   Later that day on January 30, 2018, the Company held its Fourth Quarter and Year-End 2017 Earnings Call during which Judd repeated the financial numbers reported in the January 30, 2018 press release for the Company's quarterly net income of $6.5 million, and he added that full-year net income was $38 million.

149.   During the Fourth Quarter and Year-End 2017 Earnings Call, Judd also touted the Company's growth and demand including due to the ALP, stating:

> Residential loan growth was up 32% over 2016 . . . .  We originated $463 million in residential mortgage loans in the fourth quarter.  This led to both solid growth in our retained single family portfolio and an increase in our mortgages held-for-sale as compared to the end of last quarter.  We continue to experience healthy demand for our niche mortgage products including our advantage loans and our tenant-in-common loans.

150.   On the Company's Fourth Quarter and Year-End 2017 Earnings Call, Judd also touted the Company's underwriting, strong customer relationships, and pristine credit quality, stating:

> Our credit culture is key to our business model. It is built on loan programs that have delivered ***pristine credit quality***.  We're proud of our track record in credit and believe that it is one of our competitive advantages.
>
> Sterling is a relationship-based spread lender serving four very attractive geographic markets with unique business model consisting of ***high-touch customer relationships***, a suite of niche loan products, a high concentration of core deposits, ***a strong credit culture***, and very efficient back-office operations.
>
> ***
>
> Our growth while somewhat unique strategy for the industry straightforward is based on ***strong customer relationships***, loan product simplicity where we can earn a yield premium, and an efficient operating model with ***pristine credit quality***. Customer relationships are the key to our success.  Sterling was built on the belief that highly personalized service leads to customer loyalty, and thus, a high concentration of stable deposits. As a result, over 98% of our residential borrowers maintain a deposit relationship with us as well.
>
> ***
>
> We continue to see positive momentum in the fourth quarter, generating strong loan growth, continued ***pristine credit quality*** and well-managed expenses.

151.   On the Company's Fourth Quarter and Year-End 2017 Earnings Call, Lopp echoed Judd's remarks about the Company's strong credit culture, stating: "Turning to our asset quality, we had another quarter where we continue to ***exhibit excellent credit quality***" and "Our total allowance for loan losses was down slightly

to 71 basis points of total loans, ***so that you can see our credit quality remains
excellent, which is a testament to our time-tested loan products and our strong
credit culture.***"

152. During the Fourth Quarter and Year-End 2017 Earnings Call, Judd
further touted the pipeline and strong demand for Sterling's products, stating,
"turning to 2018, we expect another strong year . . . there continues to be good
demand for our loan products"; "Our pipelines remain strong and should deliver
another year of quality balance sheet growth"; and "There is strong demand for the
type of loans we originate and our capacity for loan sales is increasing, which will
be instrumental in supporting our balance sheet and liquidity management
strategies."   Similarly, Montemayor touted: "So, we're very excited about our
opportunities to continue on that path [of loan growth] and what we've been able to
do, and our pipelines are similarly strong as you compare to last year."

153. On March 28, 2018, the Company filed its 2017 10-K, in which the
Company repeated the numbers reported in the January 30, 2018 press release for
fourth-quarter net income of $6.531 million, total loans of $2.594 billion, residential
real estate loans of $2.133 billion, total deposits of $2.245 billion, and total
allowance for loan losses of $18.457 million.  The Company also reported its annual
net income as $37.977 million, its allowance for 1–4 family residential loan losses
as $12.279 million, and did not record any reserves for loan repurchases.

154.   In the 2017 10-K, the Company further touted its financial results stating:

> Total assets increased $798 million, or 36.9%, to $2.96 billion at December 31, 2017 from $2.16 billion at December 31, 2016, primarily as a result of loan growth.  We continue to focus on the residential mortgage market, construction, and commercial real estate lending. Net loans increased $612 million, or 30.9%, to $2.59 billion at December 31, 2017 from $1.98 billion at December 31, 2016.
>
> \*\*\*
>
> Our primary investing activities are the origination of loans and to a lesser extent, the purchase of securities.  During the year ended December 31, 2017, we originated $1.69 billion of loans and purchased $228.6 million of securities.  During the year ended December 31, 2016, we originated $1.21 billion of loans and purchased $93.9 million of securities.
>
> \*\*\*
>
> Our net income increased $4.7 million, or 14.3%, to $38.0 million for the year ended December 31, 2017, primarily as a result of income from loan growth outpacing corresponding increases in expenses.
>
> \*\*\*
>
> At December 31, 2017 and 2016, one-to-four family residential real estate loans amounted to $2.13 billion and $1.61 billion, or 82% and 81%, respectively, of our total loan portfolio, and we intend to continue this type of lending in the foreseeable future.
>
> \*\*\*
>
> During the year ended December 31, 2017 and 2016, the Bank sold pools of residential real estate mortgages for $308.4 million and $287.4 million, respectively, to third-party investors. The transactions resulted in full derecognition of the mortgages (i.e. transferred assets) from the consolidated balance sheets and recognition of gain on sale of portfolio loans of $10.1 million and $8.0 million for the year ended December 31, 2017 and 2016, respectively. ***After the sales, the Bank's***

*only continuing involvement in the transferred assets is to act as servicer of the mortgages. The Bank does not have any obligation to repurchase the residential real estate mortgage loans*.

155.   In the 2017 10-K, the Company touted the Advantage Loan Program, its strong underwriting, including through disciplined documentation and face-to-face meetings with borrowers, responsible growth, and effective risk management, stating:

> Among our significant products is our Advantage Loan program, which consists of one, three, five, or seven-year adjustable rate mortgages with a minimum 35% down payment requirement. ***We offer this product to underserved home buyers who have good credit, but may have limited credit history.*** Our Advantage Loan program constituted 77% of our residential loan portfolio as of December 31, 2017.

> \*\*\*

> ***We believe growth should not come at the expense of asset quality***. We have historically been able to focus on long-term returns and remain committed to responsible growth. We also believe our strong sales team***, disciplined underwriting*** and culture of cost management have driven consistent earnings and exemplary net interest margins, efficiency metrics and shareholder returns.

> \*\*\*

> We have a large and growing portfolio of adjustable rate residential mortgage loans. In our key residential loan program, we ***manage residential credit risks through a financial documentation process*** and programs with low loan to value ratios. ***Our risk management includes disciplined documentation of ability to repay, liquidity analysis and face-to-face customer interaction***.

> \*\*\*

> ***We have a loan approval process through which we require not only financial and other information from our borrowers, but our loan officers are required to meet face-to-face with each of our borrowers***

*in our Advantage program and produce a narrative documentation recommending the loan.*

\*\*\*

We believe that effective risk management is of primary importance to our organization.  Risk management refers generally to the activities by which we identify, measure, monitor, evaluate and manage the risks we face in the course of our banking activities. These include liquidity, interest rate, credit, operational, cyber/technological, legal, compliance, regulatory, strategic, financial and reputational risk exposures.  Our board of directors and management team have created a risk-conscious culture that is focused on quality growth, which includes infrastructure capable of addressing the evolving risks we face, as well as the changing regulatory and compliance landscape.  Our risk management approach employs comprehensive policies and processes to establish robust governance and emphasizes personal ownership and accountability for risk with our employees.  We believe a disciplined and conservative underwriting approach has been the key to our strong asset quality.

\*\*\*

Our enterprise risk management framework seeks to achieve an appropriate balance between risk and return, which is critical to optimizing shareholder value.  We have established processes and procedures intended to identify, measure, monitor, report and analyze the types of risk to which we are subject, including credit, liquidity, operational, regulatory compliance and reputational.

\*\*\*

[W]e have not to date received any repurchase requests and we *currently believe our repurchase risk remains low based upon our careful loan underwriting and documentation standards*.

156.   In the 2017 10-K, the Company touted the individualized and regular analysis it performed to ensure credit quality:

The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as:

current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors. The Company analyzes loans individually by classifying the loans as to credit risk. This analysis includes homogeneous loans such as residential real estate and consumer loans and non-homogeneous loans, such as commercial lines of credit, construction and commercial real estate loans. This analysis is performed monthly.

157. Based on this credit-quality analysis, the Company rated $2,114,511,000 of its $2,115,140,000 residential first mortgage loans and 100% of its $17,501,000 residential second mortgage loans as "Pass: Loans are of satisfactory quality."

158. The Company's 2017 10-K also highlighted its anti-money laundering duties:

The Bank Secrecy Act, the USA Patriot Act and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and to file timely reports such as suspicious activity reports and currency transaction reports. We are required to comply with these and other anti-money laundering requirements.

159. The Company also stressed its internal controls, stating: "Our internal policies and procedures are a critical component of our corporate governance and, in some cases, compliance with applicable regulations. We adopt internal policies and procedures to guide management and employees regarding the operation and conduct of our business." Further, the 2017 10-K included Sarbanes-Oxley Act ("SOX") section 302 certifications signed by defendants Judd and Lopp that stated:

1. I have reviewed this Annual Report on Form 10-K of Sterling Bancorp, Inc. for the year ended December 31, 2017;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Company as of, and for, the periods presented in this report;

4. The Company's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the Company and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Intentionally omitted.

(c) Evaluated the effectiveness of the Company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the Company's internal control over financial reporting that occurred during the Company's most recent fiscal quarter (the Company's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting; and

5. The Company's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Company's auditors and the audit committee of the Company's Board of Directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and

> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

160. The 2017 Form 10-K also included SOX section 906 certifications signed by defendants Judd and Lopp that stated:

> 1. The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

> 2. The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

### 4. Statements Defendants Made In The Registration Statement, Code Of Conduct, And Regarding Sterling's Fourth Quarter And Full Year 2017 Results Were False And Misleading When Made

161. The statements above in ¶¶ 136–139, 147, 150–51, and 155–157 regarding the Company's underwriting standards and practices for its loans, its knowledge of its customers, its credit and asset quality, and its risk management were affirmative statements of present fact that were materially false and misleading when made because the Company's underwriting and risk management programs

were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, focused on clients with little to no credit history, as opposed "strong" or "good" credit, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.

162. The statements in ¶¶ 1406–41, 145–46, 148–49, 153, and 154 regarding the Company's financial results and growth, including its reported net income, total loans, residential loans, total deposits, total allowance for loan losses, and allowance for loan losses for residential loans were affirmative statements of present fact that were materially false and misleading when made because the Company's allowance for loan losses were inadequate and its financial results were inflated by and dependent upon the Company's undisclosed and inadequate underwriting that lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and were riddled with red flags indicating that the loans were possibly being used to launder money.

163. The statements in ¶¶ 142, 159, and 160 regarding the quality of the Company's internal controls were affirmative statements of present fact that were materially false and misleading when made because effective internal controls were not in place to prevent improper lending, underwriting, and banking practices,

including money-laundering.  The Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and were riddled with red flags indicating that the loans were possibly being used to launder money.

164.   The statements in ¶¶ 143, 144, and 158 regarding banking regulations, anti-money laundering duties, and regulatory compliance were affirmative statements of present fact that were materially false and misleading when made because the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and were riddled with red flags indicating that the loans were possibly being used to launder money.  The Company's BSA/AML program was inadequate to identify, mitigate, and manage money-laundering risks and therefore the Company was not in compliance with BSA/AML laws.   In particular, the statements were false and misleading when made because (a) contrary to U.S. law, the Company failed to appropriately monitor and assess ongoing and high money-laundering risks associated with foreign nationals moving foreign money into the Company to facilitate real-estate lending involving properties in the United States; (b) despite the heightened risks, the Company did not carry out

appropriate due diligence on customers and transactions originating from China that had numerous indicators relating to money laundering risks; and (c) despite the heightened risks, the Company did not effectively monitor or report suspicious activities and transactions that had numerous indicators relating to money laundering risks.

165.   The statements in ¶¶ 149 and 152 regarding the pipeline and demand for Sterling's loans were affirmative statements of present fact that were materially false and misleading when made because they failed to disclose that the strong demand and pipeline were the result of the fact that the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, and were not BSA/AML compliant and lent themselves to be used for money-laundering, thus creating a demand and pipeline for the ALP loans.

166.   The truth that Sterling's underwriting and risk management were not conservative or disciplined, did not involve adequate documentation nor verification, were not BSA/AML compliant, and were riddled with red flags indicating that the loans were possibly being used to launder money, is evidenced by the detailed statements by former employees of Sterling, including:

a.     The statements by FEs 1, 2, 3, 4, 5, and 7 demonstrating that the Company's underwriting and risk management for ALP mortgages were neither disciplined nor conservative.

b.     The statements by FEs 1, 2, and 3 that underwriting and risk management for ALP mortgages were neither disciplined nor conservative.

c.     The statements by FEs 1, 2, 3, 4, and 7 that the only records required for a customer to be approved under the ALP was a letter purportedly from the customer's employer and/or from a CPA (for self-employed borrowers) and a monthly bank statement to verify income.

d.     The statements by all FEs that the target customers for the ALP were foreign nationals, particularly Chinese nationals.

e.     The statement by FEs 1, 3, and 7 that the ALP catered to foreign nationals with little or no credit history.

f.     The statements by FEs 1, 2, 3, 4, 6, and 7 that employer letters often came from China, were written in a Chinese language, and were then translated by the borrowers themselves or by a Chinese-language-speaking bank employee.

g.     The statement by FE 7 that translations of the employment letters were substantially similar in format.

h.     The statement by FE 1 that a Sterling underwriter relayed that many of the CPA letters used in the ALP were from the same source, as the letters came from the same IP address, and that some of the CPA firms for the letters may not have actually existed.

i.     The statements by FEs 2, 3, and 7 that to demonstrate the stated income in the letter, ALP customers were required to open an account at a Sterling branch with cash, and then had to make cash deposits into the account every two weeks for two or three months until a specified amount had been deposited.

j.      The statements by FEs 2, 3, 5, 6, and 7 that there was no attempt to confirm the employment or CPA information and little or no verification of income or the source of the funds.

k.      The statements by FE 3 that there was also little or no attempt to confirm the identity of the account holder and no attempt at all to identify the source of the funds, including gifted funds.

l.      The statements by FE 3 and 5 that while gifted funds were allowable if from a borrower's family members, Sterling's review of the gift was limited to requiring only that the funds deposited into a borrower's account matched those of the purported gift, and Sterling did not otherwise verify the source of the funds, even when presented with contradictory information provided by the borrower.

m.      The statements by FE 5 that Sterling provided "no training" on risk or compliance and that Sterling employees with whom FE 5 dealt had no training or familiarity with SARs, CTRs, or other compliance procedures.

n.      The statements by FE 7 that Sterling had weak and deficient internal controls.

o.      The statements by FEs 2, 3, 5, and 7 that they suspected that the ALP appeared to be used for money laundering.

167.   The truth that Sterling's underwriting and risk management were not conservative nor disciplined, did not involve adequate documentation nor verification, and were not BSA/AML compliant, is further demonstrated by the Company's own belated disclosures, including:

a.      The Company's disclosure on June 21, 2019 that it had entered into an agreement with the OCC to enhance its AML and BSA compliance, a critical component of which is customer due diligence and enhanced due diligence, which involves identifying and verifying borrowers' identity and sources of income and wealth.

b.  The OCC Agreement states that the OCC found unsafe or unsound practices relating to the Company's credit administration and required the Bank to revise its policies and procedures to ensure effective controls over loan underwriting, including "effective controls and processes to collect and verify employment and income" and "verification of borrowers' income and cash flow information used in the Bank's underwriting process for nonowner occupied properties."

c.  That as late as March 31, 2018, the OCC had detailed BSA/AML violations of law, as detailed in a Report of Examination and that the OCC found unsafe or unsound practices relating to the Company's credit administration—a report that was provided to Sterling, defendant Judd, and the Director Defendants, among others.

d.  The disclosure on November 8, 2019 in its Third Quarter 2019 10-Q that in November 2019, in connection with an internal compliance investigation, the Company had terminated two top loan producers within the Advantage Loan Program who together were collectively responsible for 15% of the Company's residential loan production through September 30, 2019.

e.  The disclosure on December 9, 2019 that the Company had temporarily suspended its Advantage Loan Program in connection with an ongoing internal review of the ALP's documentation procedures while it audited documentation on past loans and put in place additional systems and controls to ensure the Bank's policies and procedures are followed on loans originated under the ALP.

f.  The disclosure on March 6, 2020, that the Company was permanently shutting down the ALP based on preliminary results from its internal investigation, which found misconduct in connection with the origination of such loans, including with respect to income verification and requirements, reliance on third parties, and related documentation.

g.  The disclosures on March 6, 2020 that, in connection with this misconduct, the Company had terminated a number of employees, including the Senior Vice President with primary

responsibility for, among other things, oversight of the Advantage Loan Program in California.

h.  The disclosures on March 6, 2020 that the Bank was now under formal investigation by the OCC and that the Bank had received grand jury subpoenas from the DOJ in connection with its investigation into the Bank's residential lending practices.

i.  The May 29, 2020 disclosure that the Company had terminated defendant Montemayor, former President of Commercial and Retail Banking and Chief Lending Officer, from all of his positions with the Company, effective immediately.

j.  The June 1, 2020 disclosures that (i) the Bank's internal review of the Advantage Loan Program showed that "employees engaged in misconduct in connection with the origination of loans, including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation"; (ii) due to the internal review, "it has become apparent that the potential for liability related to the origination of residential mortgage loans under that program warrants the initial creation of reserves" including $7.8 million in reserves for loan repurchases and $25 million related to investigations and litigation regarding the ALP, which may need to be increased and may need to be applied to first quarter 2019 and/or earlier periods; and (iii) the Company was working to "right the ship and bring the bank into regulatory compliance and investor confidence" and "fix things that need to be fix[ed] and take them on aggressively," including examining the entire Company "culture."

## 5.  Defendants' Representations Regarding Sterling's First Quarter 2018 Results

168.  On April 30, 2018, the Company issued a press release reporting "First Quarter 2018 Financial Results" that reported: "Net income of $15.7 million, a 51% increase from Q1 2017"; "Total loan originations of $408 million, a 59% increase from Q1 2017"; "Total gross loans, including loans held for investment and loans

79

held for sale, of $2.80 billion, a 39% increase from Q1 2017"; and "Total deposits

of $2.29 billion, a 33% increase from Q1 2017."  The Company also reported that

as of March 31, 2018 its residential real estate loans totaled $2,134,447,000 and its

total allowance for loan losses was $19.132 million.

169.   The April 30, 2018 press release further touted:

> Total loans, which includes those held for investment and held for sale,
> were $2.80 billion at March 31, 2018, compared with $2.73 billion at
> December 31, 2017.  Contributing to the increase were an $88 million
> increase in residential real estate loans . . . .  During the first quarter of
> 2018, the Company originated $408 million in loans, which included
> $349 million in residential mortgage loans . . . .

170.   In the April 30, 2018 press release, Judd touted loan demand and

pipeline:

> We continue to see strong demand for residential mortgage loans in our
> target markets, and we increased the volume of loans sold into the
> secondary market as part of our balance sheet management strategy.
> Given our healthy loan pipeline, we expect to continue to strategically
> utilize loan sales to mitigate pressure on our net interest margin going
> forward, which we believe will enable us to continue to generate
> profitable growth for our shareholders.

171.   Later in the day on April 30, 2018, the Company held its First Quarter

2018 Earnings Call during which Judd repeated the financial numbers reported in

the April 30, 2018 press release for the Company's net income of $15.7 million, total

loan production of $408 million, and residential loan production of $349 million.

172.   On the First Quarter 2018 Earnings Call Judd further touted the

Company's residential financial results and loan origination and growth:

We're very pleased with our strong start to 2018. We delivered excellent revenue growth, to bind with well-controlled expenses. We generated income of $15.7 million or $0.30 per diluted share, a year-over-year increase of 51% and 30% respectively. Despite the first quarter being a seasonally slower period for home buying, we continued to see strong demand for our residential mortgage loans, both our Advantage Loans and our TIC or tenant-in-common loans. We generated $349 million in residential loan production in the first quarter, which is an increase of 67% over the first quarter of last year. Total loan production was 408 million in the quarter, which is an increase of 59%, compared to the first quarter of 2017.

*** 

Our total loan portfolio, including loans held for investment and loans held for sale increased by an annualized rate of 11% on a linked quarter basis and importantly was up 39% from the first quarter of 2017.

173. On the First Quarter 2018 Earnings Call Judd also touted the strong demand and pipeline for Sterling's loans: "Looking ahead, we remain optimistic about 2018. The housing markets remain healthy in the regions where we operate and there continues to be good demand for our loan products. We entered the second quarter with robust loan pipelines."

174. On the First Quarter 2018 Earnings Call, Judd also touted the Company's strong credit culture and deep customer relationships:

In summary, based on our first quarter performance and the positive trends we're seeing in many areas, we believe that 2018 will be another year of successfully executing on our strategy of expanding our franchise, creating **high touch customer relationships**, that result in strong loan production and a high concentration of core deposits. This combined with our **strong credit culture** and very efficient back office operations should continue to drive profitable growth and exceptional returns for our shareholders.

81

\*\*\*

We will continue to use loan sales to balance our strong loan origination platform with the growth in deposits.  Meeting the borrowing needs of our customers and our markets will remain a priority.  We continued to build ***deeper customer relationships***, as most of our borrowers also use our depository products.

175.   On May 14, 2018, the Company filed its First Quarter 2018 10-Q, in which the Company repeated the numbers reported in the April 30, 2018 press release for net income of $15.749 million, total loans of $2.8 billion (total portfolio loans of $2.6 billion and mortgage loans held for sale of $200 million), residential real estate loans of $2.134 billion, total deposits of 2.29 billion, and total allowance for loan losses of $19.132 million.  The Company also reported at March 31, 2018 its allowance for 1–4 family residential real estate loan losses was $11,499,000 and did not record any reserves for loan repurchases.

176.   The First Quarter 2018 10-Q also reported:

In the first quarter of 2018, we originated loans of $408 million, a 59% increase over the first quarter of 2017, which included $349 million in residential mortgage loans . . . .  Also, we sold pools of residential real estate mortgages for $112.2 million to third party investors.

177.   In the First Quarter 2018 10-Q, the Company touted its credit quality:

The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors.  The Company analyzes loans individually by classifying the loans as to credit risk.   This analysis includes homogeneous loans such as residential real estate and consumer loans and non-homogeneous loans, such as commercial lines of credit,

construction and commercial real estate loans. This analysis is performed monthly.

178. Based on this credit-quality analysis, the Company rated $2,110,600,000 of its $2,115,568,000 residential first mortgage loans and 100% of its $18,879,000 residential second mortgage loans as "Pass: Loans are of satisfactory quality." Moreover, the First Quarter 2018 10-Q touted: "Since 2013, we have experienced significant growth while maintaining stable margins and solid asset quality."

179. The First Quarter 2018 10-Q included SOX certifications by Judd and Lopp that were identical in all material respects to those in the Company's 2017 10-K, ¶¶ 159 and 160, *supra*.

### 6. Defendants' Representations Regarding Sterling's Second Quarter 2018 Results

180. On July 30, 2018, Sterling issued a press release reporting its "Second Quarter 2018 Financial Results" that reported: "Net income of $16.0 million, a 79% increase from Q2 2017, and a 1.5% increase from Q1 2018"; "Total loan originations of $434 million, a 3% increase from Q2 2017, and a 6% increase from Q1 2018"; "Total gross loans, including loans held for investment and loans held for sale, of $2.86 billion, a 29% increase from Q2 2017, and an 8% annualized increase from Q1 2018"; and "Total deposits of $2.34 billion, a 30% increase from Q2 2017, and a 9% annualized increase from Q1 2018." In the July 30, 2018 press release, the

Company also reported that as of June 30, 2018, its residential real estate loans totaled $2,367,876,000 and its total allowance for loan losses was $20.3 million.

181.   The July 30, 2018, Sterling press release also touted:

> Total loans, which includes those held for investment and held for sale, were $2.86 billion at June 30, 2018, compared with $2.80 billion at March 31, 2018.   Contributing to the increase were a $55 million increase in residential real estate loans . . . .   During the second quarter of 2018, the Company originated $434 million in loans, which included $367 million in residential mortgage loans . . . .

182.   In the July 30, 2018 press release, Judd touted the Company's credit quality, stating: "Our strong performance was driven by continued balance sheet growth, disciplined expense control and ***excellent credit quality***."

183.   In the July 30, 2018 press release, Judd continued by touting the demand and pipeline for its loans:

> We continue to see strong demand for our suite of niche loan products, which resulted in $434 million of loan production in the second quarter, an increase of 6% compared to the prior quarter.   Our pipeline remains strong in our principal markets in Northern California, Southern California and New York City, and we believe the expansion of our presence in the greater Seattle market during the second half of the year will provide another catalyst for driving future growth in loans, deposits and earnings.

184.   That same day, July 30, 2018, the Company held its Second Quarter 2018 Earnings Call during which Judd repeated the financial numbers reported in the July 30, 2018 press release for the Company's net income of $16 million and total loan production of $434 million.

185.   Also on the Second Quarter 2018 Earnings Call Judd again touted the

Company's credit quality and high-touch customer relationships:

> We executed well in the second quarter and our formula of strong loan
> production, disciplined expense management and ***exceptional credit
> quality*** continued to generate a high level of performance and
> profitability.
>
> ***
>
> In summary, based on our second quarter performance and the solid
> trends we're seeing, we believe that 2018 will be another record year
> of profitable growth.  Sterling remains committed to executing on our
> strategy to expand our franchise ***through high touch customer
> relationships*** that result in strong loan production and a high percentage
> of core deposits, combined with our ***strong credit culture*** and highly
> efficient back-office operations.   This should continue to drive
> exceptional returns for our shareholders.

186.   During the Second Quarter 2018 Earnings Call, Judd also touted the

demand and pipeline for Sterling's loans:

> We continue to do a good job reaching our target customers. And
> demand for our suite of loan products continues to be strong across all
> of our markets, particularly for our niche residential mortgage loans and
> our commercial loans.
>
> ***
>
> Looking to the second half of the year, we are optimistic about our
> opportunities to continue delivering positive results.   Housing and
> commercial real estate continued to be healthy in our markets.  Our loan
> pipelines are strong, as demand for our net residential mortgage loans
> remained solid.

187.   On the Second Quarter 2018 Earnings Call, defendant Judd described

purported explanations for declining productivity of the ALP, yet continued to fail

to disclose the March 31, 2018 OCC Report of Examination, which had identified

violations of law committed by Sterling or that a cause of the Company's declining

growth was increased regulatory oversight as a result of such violations:

> During the second quarter, our loan beta and our deposit beta were
> relatively similar, which helped keep our net interest margin unchanged
> from the prior quarter.  However, we do see some signs of increasing
> price competition on the loan side which we believe could create some
> headwinds as we move forward.

188.  Similarly, on the Company's Second Quarter 2018 Earnings Call,

defendant Lopp stated:

> That being said, as Gary [Judd] mentioned, we are seeing increasingly
> aggressive pricing among some competitors.  So, we are finding that
> we need to lower some of our initial rates on residential mortgage loans
> in order to remain competitive.  This will likely reduce the level of
> increase in our average loan yields going forward.  Combined with the
> impact of higher deposit costs, this will likely lead to some NIM
> compression in the third quarter.

189.  Likewise, on the Company's Second Quarter 2018 Earnings Call,

defendant Montemayor participated in the following exchange regarding Sterling's

stated reasons for the growth decline:

> Q:  Now, the competition that you're seeing on the pricing for the resi,
> what—which competitors are aggressively pushing that price down?
>
> A:  Michael Montemayor:  There is a fair broad array of competitors
> between East West, HSBC, (inaudible) and a number of other
> institutions that we see competition.  I don't think there is one
> particular. But most of the mainstay within the markets that we're
> focused on have been relatively competitive and in that space.
>
> Q:  Were you guys surprised by the renewed competition on the pricing
> side, especially given the fact that the Fed seems to be signaling a
> couple of more hikes?

A:  Michael Montemayor:  Yes, actually given the rising rates, we were surprised as competitive as some of the competition got to garner volume.  So we're keeping a close eye on it, but we think we are priced right for the volumes that we are looking for to match our deposit growth.

190.   On August 13, 2018, Sterling filed its Second Quarter 2018 10-Q, in which the Company repeated the same numbers reported in the July 30, 2018 press release for net income of $15.982 million, total loans of $2.858 billion (total portfolio loans of $2.836 billion and mortgage loans held for sale of $21.641 million), residential real estate loans of $2,367,876,000, total deposits of $2.34 billion, and total allowance for loan losses of $20.3 million.  The Company also reported its allowance for 1–4 family residential real estate loan losses was $12,675,000 and did not record any reserves for loan repurchases.

191.   In the Second Quarter 2018 10-Q, the Company touted its loan origination and growth, stating:

> For the three months ended June 30, 2018, we originated loans of $434 million, a 3% increase over the same period in 2017, which included $367 million in residential mortgage loans . . . .  For the six months ended June 30, 2018, we originated loans of $842 million, a 24% increase over the same period in 2017, which included $716 million in residential mortgage loans . . . .  Also, for the three months and six months ended June 30, 2018, we sold pools of residential real estate mortgages for $157.5 million and $269.7 million, respectively, to third-party investors.

192.   In the Second Quarter 2018 10-Q, the Company touted its analysis of credit quality:

The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors.  The Company analyzes loans individually by classifying the loans as to credit risk.  This analysis includes homogeneous loans such as residential real estate . . . .  This analysis is performed monthly.

193.   In the Second Quarter 2018 10-Q, based on this credit-quality analysis, the Company rated $2,348,516,000 of its $ 2,349,082,000 residential first mortgage loans and 100% of its $18,794,000 residential second mortgage loans as "Pass: Loans are of satisfactory quality."   Further, the Company stressed that the Company's growth was not at the expense of asset quality, stating:  "Since 2013, we have experienced significant growth while maintaining stable margins and solid asset quality."

194.   The Second Quarter 2018 10-Q included SOX certifications by Lopp and Judd that were identical in all material respects to those in the Company's 2017 10-K, ¶¶ 159 and 160, *supra*.

### 7.    Defendants' Representations Regarding Sterling's Third Quarter 2018 Results

195.   On October 29, 2018, Sterling issued a press release reporting "Third Quarter 2018 Financial Results" that reported:  "Net income of $15.7 million, up 30% from Q3 2017, and down 1.5% from Q2 2018"; "Total loan originations of $419.2 million, down 15% from Q3 2017, and down 3% from Q2 2018"; "Total

gross loans, including loans held for investment and loans held for sale, of $2.93 billion, a 21% increase from Q3 2017, and a 10% annualized increase from Q2 2018"; and "Total deposits of $2.41 billion, a 15% increase from Q3 2017, and a 12% annualized increase from Q2 2018." The Company also reported its residential real estate loans totaled $2,341,989,000 and its total allowance for loan losses was $20.765 million.

196. In the October 29, 2018 press release, the Company also reported:

Total gross loans, which includes those held for investment and held for sale, were $2.93 billion at September 30, 2018, compared with $2.86 billion at June 30, 2018. Contributing to the increase was a $92.2 million increase in residential mortgage loans held for sale and a $7.8 million increase in commercial real estate and construction loans, partially offset by a $25.9 million decrease in residential mortgage loans held for investment.

During the third quarter of 2018, the Company originated $419.1 million in loans, which included $353.5 million in residential mortgage loans . . . .

197. Later that day on October 29, 2018, the Company held its Third Quarter 2018 Earnings Call, during which Lopp repeated the financial numbers reported in the October 29, 2018 press release for the Company's net income of $15.7 million, total loans of $2.93 billion, and total deposits of $2.41 billion.

198. On the Third Quarter 2018 Earnings Call, Montemayor repeated the numbers for total loan originations and touted the Company's financial results and loan origination and growth:

From an operational perspective, we continue to have strong loan production, although somewhat off the levels we've generated in recent quarters. During the third quarter, we originated $419 in loans which consisted of $354 million in residential mortgages, $38 million in construction loans, $22 million in commercial real estate loans, and $5 million in commercial and industrial loans. This resulted in an annualized growth in total gross loans of 10% during the quarter.

199. On the Third Quarter 2018 Earnings Call, Montemayor provided

purported reasons for the decline in growth:

Loan demand continues to be relatively healthy across our markets, although we have experienced a slowdown in demand for mortgages in the San Francisco market. Strong home price appreciation in that market and higher interest rates have led to rising affordability concerns, combined with the lack of inventory, this has resulted in some slowing of demand for new mortgages. On an absolute basis, the demand is still relatively good. It's just not at the level we've seen over the past few years.

Anecdotally, we have also noted some caution among real estate investors in our target markets amid the ongoing global trade disputes involving the U.S. and China. Having said that, we are optimistic about gaining share in our three newer markets. As we indicated on our last call, we have lowered rates a bit on our core mortgage product to be more in line with the market. We did this in July and have kept pricing firm since then. Our analysis indicates that we are priced competitively and aren't losing business due to price. The lower production is really being driven by a slowing demand.

200. However, during the Third Quarter 2018 Earnings Call, Montemayor

also touted the Company's demand and pipeline for its loans:

Our pipelines are healthy and our commercial loan production is picking up as we add to our commercial banking team. Therefore, we believe we can generate similar level of loan growth as we did in the third quarter. And longer term, we feel very good about our ability to continue to produce strong results and create value for our shareholders.

***

In each of those markets [L.A., N.Y, Seattle], there's plenty of room for opportunity for us to continue taking market share. We're utilizing the same formula that has driven our success in San Francisco and Los Angeles. We have a highly responsive and efficient underwriting process for residential mortgages which often enables us to close loans in half the time it takes our competition. This has helped us to build a very strong reputation amongst realtors and grow our referral sources. As we gain visibility and awareness in the newer markets, we expect to continue to increase our loan production as well as our ability to gain— bring in core deposits.

201. On the Third Quarter 2018 Earnings Call, Lopp touted the Company's credit quality, stating: "We delivered another strong quarter driven by continued loan growth, a stable net interest margin, ***excellent credit quality***, and disciplined expense management."

202. On November 13, 2018, the Company filed its Third Quarter 2018 10-Q and repeated the same financial numbers reported in the October 29, 2018 press release for net income of $15.741 million, total loans of $2.93 billion (total portfolio loans of $2.817 billion and mortgage loans held for sale of $113.805 million), residential real estate loans of $2,341,989,000, total deposits of $2.41 billion, and total allowance for loan losses of $20.765 million. The Company also reported its allowance for residential real estate losses was $12,709,000 and did not record any reserves for loan repurchases.

203. In the Third Quarter 2018 10-Q, the Company touted its financial results and loan origination and growth, stating:

For the three months ended September 30, 2018, we originated loans of $419 million, a 15% decrease over the same period in 2017, which included $354 million in residential mortgage loans . . . . For the nine months ended September 30, 2018, we originated loans of $1,261 million, an 8% increase over the same period in 2017, which included $1,069 million in residential mortgage loans . . . . Also, for the three months and nine months ended September 30, 2018, we sold pools of residential real estate mortgages for $82.4 million and $352.1 million, respectively, to third-party investors.

204.   In the Third Quarter 2018 10-Q, the Company again touted its analysis of credit quality:

The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors.  The Company analyzes loans individually by classifying the loans as to credit risk.   This analysis includes homogeneous loans such as residential real estate . . . . This analysis is performed monthly.

205. Based on this credit-quality analysis, the Company rated $2,321,998,000 of its $2,322,267,000 residential first mortgage loans and 100% of its $19,722,000 residential second mortgage loans as "Pass: Loans are of satisfactory quality."   Further, the Company stressed:  "Since 2013, we have experienced significant growth while maintaining stable margins and solid asset quality."

206.   The Third Quarter 2018 10-Q included SOX certifications by Judd and Lopp that were identical in all material respects to those in the Company's 2017 10-K, ¶¶ 159 and 160, *supra*.

### 8.   Defendants' Representations Regarding Sterling's Fourth Quarter And Full Year 2018 Results

207.   On January 28, 2019, Sterling issued a press release reporting "Fourth Quarter and Full Year 2018 Financial Results" that reported:  "Net income of $16.0 million, up 145% from Q4 2017, and 2% from Q3 2018"; "Total loan originations of $332.7 million, down from $520.6 million in Q4 2017 and $419.2 million in Q3 2018"; "Total gross loans, including loans held for investment and loans held for sale, of $2.92 billion, a 7% increase from Q4 2017, and unchanged from Q3 2018"; and "Total deposits of $2.45 billion, a 9% increase from Q4 2017, and a 7% annualized increase from Q3 2018."   The Company also reported that as of December 31, 2018, its residential real estate loans totaled $2,452,441,000 and its total allowance for loan losses was $21.850 million.

208.   The January 28, 2019 press release further reported:

Total gross loans, which includes those held for investment and held for sale, were $2.92 billion at December 31, 2018, relatively flat compared with $2.93 billion at September 30, 2018. The Company had a $112.6 million decrease in residential mortgage loans held for sale, a $3.0 million decrease in construction and commercial real estate loans and a $6.6 million decrease in commercial and industrial loans, partially offset by a $110.5 million increase in residential mortgage loans held for investment . . . .   During the fourth quarter of 2018, the Company originated $332.7 million in loans, which included $303.3 million in residential mortgage loans . . . .

209.   In the January 28, 2019 press release, Judd provided purported reasons for Sterling's lower loan production:

During the latter half of 2018, the market environment began to change with respect to the general housing market, as well as with the Chinese economy, particularly as it relates to trade tensions between China and the U.S.  These changes have created uncertainty with some of our customers, and as a result, we experienced lower loan production in the fourth quarter and continue to experience headwinds.  However, looking to 2019, we remain optimistic.  We are adapting to these changes and continue to make the necessary investments to ensure the long-term growth potential for our business.

210.  That same day, on January 28, 2019, the Company held its Fourth Quarter and Year-End 2018 Earnings Call, during which Judd repeated the financial numbers reported in the January 28, 2019 press release for the Company's net income of $16 million and total loan origination of $332 million, and Lopp repeated the numbers for total deposits of $2.45 billion.   Judd also touted the Company's loan portfolio:

For the fourth quarter, we generated solid loan growth but saw a lower loan production. Total loans held for investment increased by $101 million from the third quarter which translated into a 14% annualized growth rate.  The growth was primarily in our residential real estate portfolio which was up 19% on an annualized basis and our commercial real estate and construction loan portfolios were relatively flat from the third quarter.

On the production side, we originated $332 million in total loans during the fourth quarter consisting of $303 million in residential mortgages, $19 million in construction loans, and just over $10 million in commercial real estate and C&I loans.

211.  On the Fourth Quarter and Year-End 2018 Earnings Call, Judd also gave purported reasons for lower loan production:

During the latter half of 2018, the market environment began to change with respect to the housing market as well as the Chinese economy,

94

particularly as it related to the escalating trade tensions between the U.S. and China.  These factors have personally impacted our markets in the fourth quarter and has us being more cautious in the near term.

*** 

Total loan production was down from $419 million in the third quarter, reflecting the noticeable slowdown in residential home sales in the quarter, as well as purchases or project delays related to the lengthening of municipal approval time frames impacting a number of our commercial real estate and construction loans which are primarily used for the renovation of single or multifamily residential properties.

212.   Similarly, on the Fourth Quarter and Year-End 2018 Earnings Call, Montemayor participated in this exchange with an analyst, in which he expanded on these purported reasons for lower loan production and downplayed the impact on Sterling:

Q - Aaron James Deer:  I guess I would like to start on the subject of loan production.  Obviously, the demand has been a factor and you kind of walk through some of the environmental dynamics leading to that.  But I'm just—I'd like to get your sense of whether in your view as you kind of look at the market and your customers, whether this is a reset lower or maybe a temporary phenomenon and we get some lifts as we move forward through the year or if we could see a trend continue lower in terms of the production volumes?

A - Michael Montemayor:  We perceive it to be somewhat temporary in that there are some headwinds that we've been hearing and experiencing from our staff.  We have been able to expand our staff over the previous quarter on the residential side and the commercial side.  And we believe those expansions will eventually lead to larger market share in our California markets as well as the newer markets of New York and Seattle.  So we have a plan in place to expand our staff to pick up market share so that current volumes will increase in the coming quarter or two.

213.   On March 18, 2019, the Company filed its 2018 10-K, in which the Company repeated the same financial numbers reported in the January 28, 2019 press release for quarterly net income of $15.996 million, total loans of $2.919 billion (total portfolio loans of $2.918 billion and mortgage loans held for sale of $1.248 million), residential real estate loans of $2,452,441,000, total deposits of $2.45 billion, and total allowance for loan losses of $21.850 million.  The Company also reported its net income for the year was $63.468 million, its allowance for residential real estate losses was $13.826 million, and did not record any reserves for loan repurchases.

214.   In the 2018 10-K, the Company further touted its financial results, stating:

> Total assets increased $235 million, or 8%, to $3.20 billion at December 31, 2018 from $2.96 billion at December 31, 2017, primarily as a result of loan growth.  We continue to focus on the residential mortgage market, construction, and commercial real estate lending. Net loans increased $302 million, or 12%, to $2.90 billion at December 31, 2018 from $2.59 billion at December 31, 2017.
>
> ***
>
> During the year ended December 31, 2018, we originated $1.59 billion of loans and purchased $157 million of investment securities.  During the year ended December 31, 2017, we originated $1.69 billion of loans and purchased $229 million of investment securities.
>
> ***
>
> At December 31, 2018 and 2017, one-to-four family residential real estate loans amounted to $2.45 billion and $2.13 billion, or 84% and

82%, respectively, of our total loan portfolio, and we intend to continue this type of lending in the foreseeable future.

\*\*\*

During the year ended December 31, 2018, 2017 and 2016, the Bank sold pools of residential real estate mortgages for $475.6 million, $308.4 million and $287.4 million, respectively, to third-party investors. The transactions resulted in full derecognition of the mortgages (i.e. transferred assets) from the consolidated balance sheets and recognition of gain on sale of portfolio loans of $16.4 million, $10.1 million and $8.0 million for the year ended December 31, 2018, 2017 and 2016, respectively. *After the sales, the Bank's only continuing involvement in the transferred assets is to act as servicer or subservicer of the mortgages.*

215.  In the 2018 10-K, the Company touted the Advantage Loan Program, its strong underwriting, including through disciplined documentation and face-to-face meetings with borrowers, and responsible growth, stating:

Among our significant products is our Advantage Loan program, which consists of one, three, five, or seven-year adjustable rate mortgages with a minimum 35% down payment requirement. *We offer this product to underserved home buyers who have good credit, but may have limited credit history.* Our Advantage Loan program constituted 80% of our residential loan portfolio as of December 31, 2018.

\*\*\*

*We believe growth should not come at the expense of asset quality*. We have historically been able to focus on long-term returns and remain committed to responsible growth. We also believe *our strong sales team, disciplined underwriting* and culture of cost management have driven consistent earnings and exemplary net interest margins, efficiency metrics and shareholder returns.

\*\*\*

We have a large and growing portfolio of adjustable rate residential mortgage loans. *In our key residential loan program, we manage*

97

*residential credit risks through a financial documentation process and programs with low loan to value ratios. Our risk management includes a thorough review of ability to repay, liquidity analysis and face-to-face customer interaction.*

\*\*\*

*We have a loan approval process through which we require not only financial and other information from our borrowers, but our loan officers are required to meet face-to-face with each of our borrowers in our Advantage program and produce a narrative documentation recommending the loan.*

\*\*\*

[W]e currently believe our repurchase risk remains low based upon our *careful loan underwriting and documentation standards*.

\*\*\*

We believe that effective risk management is of primary importance to our organization. Risk management refers generally to the activities by which we identify, measure, monitor, evaluate and manage the risks we face in the course of our banking activities.  These include liquidity, interest rate, credit, operational, cyber/technological, legal, compliance, regulatory, strategic, financial and reputational risk exposures.  Our board of directors and management team have created a risk-conscious culture that is focused on quality growth, which includes infrastructure capable of addressing the evolving risks we face, as well as the changing regulatory and compliance landscape.  Our risk management approach employs comprehensive policies and processes to establish robust governance and emphasizes personal ownership and accountability for risk with our employees.  We believe a disciplined and conservative underwriting approach has been the key to our strong asset quality.

\*\*\*

Our enterprise risk management framework seeks to achieve an appropriate balance between risk and return, which is critical to optimizing shareholder value.  We have established processes and procedures intended to identify, measure, monitor, report and analyze

98

the types of risk to which we are subject, including credit, liquidity, operational, regulatory compliance and reputational.

*** 

The degree of risk in residential real estate lending depends primarily on the loan amount in relation to collateral value, the interest rate and the borrower's ability to repay in an orderly fashion.

216.   In the 2018 10-K, the Company touted the individualized and regular analysis it performed to ensure credit quality:

> The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors.   The Company analyzes loans individually by classifying the loans as to credit risk.   This analysis includes homogeneous loans such as residential real estate . . . .  This analysis is performed monthly.

217.  Based on this credit-quality analysis, the Company rated $2,425,584,000 of its $2,429,997,000 residential first mortgage loans and 100% of its $22,444,000 residential second mortgage loans as "Pass: Loans are of satisfactory quality."

218.   The Company's 2018 10-K also stated that "we must comply with significant anti-money laundering . . . laws and regulations," and highlighted its internal controls:

> The Bank Secrecy Act, the USA Patriot Act and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and to file timely reports such as suspicious activity reports and currency

99

transaction reports.  We are required to comply with these and other anti-money laundering requirements.

\*\*\*

Our internal policies and procedures are a critical component of our corporate governance and, in some cases, compliance with applicable regulations.  We adopt internal policies and procedures to guide management and employees regarding the operation and conduct of our business.

219.    The 2018 10-K, includes SOX certifications signed by Judd and Lopp that are identical to those in the 2017 10-K, ¶¶ 159 and 160, *supra*.

### 9.    Defendants' Additional Early 2019 Representations

220.    In a press release dated February 11, 2019 entitled "Sterling Bancorp Announces the Grand Opening of a New Branch in Arcadia, California," the Company touted, *inter alia*, its underwriting, disciplined growth, strong credit culture regarding the Advantage Loan Program, and top ALP producer Yihou Han— who would be terminated later that year:

The Bank is well regarded for its ***high-touch customer relationships***, a suite of niche loan products, a high concentration of core deposits and a ***strong credit culture***.

"We are a relationship-based lender and have grown our business through a long-term, disciplined approach that emphasizes focused geographic expansion with niche products and services that have proven successful for us and our customers since our founding," Montemayor added.

The Bank is also well known for its ***Advantage Loan program, which works well for individuals with excellent credit and liquidity***, seeking quick approval and closing, and who need to compete with all cash buyers.  This program has been very well received by the Company's

customers, having accounted for more than $4 billion in loan volume over the last seven years. The loan program's success has been validated in the 2018 Asian Real Estate Association of America (AREAA) loan officer rankings, which included six officers from Sterling Bank & Trust in its top twenty, including Yihou Han as the top broker, with $200 million in residential lending last year alone.

221. The Company sounded the same themes in a press release dated February 25, 2019 entitled, "Sterling Bancorp Announces the Grand Opening of its SBT Advantage Bank in Flushing, Queens, New York":

> The Bank is well regarded for its ***high-touch customer relationships***, a suite of niche loan products, a high concentration of core deposits and a ***strong credit culture***.

> The Bank is also well known for its ***Advantage Loan program, which works well for individuals with excellent credit*** and liquidity, seeking quick approval and closing, and who need to compete with all cash buyers. This program has been very well received by the Company's customers, having accounted for more than $4 billion in loan volume over the last seven years. The loan program's success has been validated in the 2018 Asian Real Estate Association of America (AREAA) loan officer rankings, which included six officers from Sterling Bank & Trust in its top twenty, including Yihou Han as the top producer, with $200 million in residential lending last year alone.

### 10. The Company's Representations In Connection With Its Annual Meeting

222. On April 9, 2019, Sterling filed with the SEC a Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934, in which the Company again touted its financial results and loan growth: "We reported record net income of $64.5 million, which translated into a 46% increase in earnings per

share reflecting the company's 25% year-over-year increase in total revenue, net of interest expense . . . .  For the full year, total loans increased 12%."

223.   The April 9, 2019 Proxy Statement credited the results to its strong customer relationships and credit quality, stating: "These outstanding results were driven by the successful execution of Sterling's strategic focus on strong customer relationships, targeted growth products and markets, and a culture where every dollar of cost counts.  Our success in 2018 was generated by solid balance sheet growth, continued strong credit quality and operating leverage."

224.   In Sterling's April 9, 2019 Proxy Statement, the Company touted its credit quality of its loans and risk management:

> On the lending side, we benefit from a strong understanding of our borrowers' needs within our target markets.  This has enabled us to develop a suite of niche lending products where we can earn a yield premium ***without compromising on credit quality.***
>
> ***
>
> Board's Role in Risk Oversight.  Our board of directors sets the tone at the top of our organization, adopting and overseeing the implementation of our company-wide risk management framework, which establishes our overall risk appetite and risk management strategy.  Risk management refers generally to the activities by which we identify, measure, monitor, evaluate and manage the risks we face in the course of our banking activities.  These include liquidity, interest rate, credit, operational, cyber/technological, legal, compliance, regulatory, strategic, financial and reputational risk exposures.  Our board of directors and management team have created a risk-conscious culture that is focused on quality growth, which includes infrastructure capable of addressing the evolving risks we face, as well as the changing regulatory and compliance landscape.  Our risk management

approach employs comprehensive policies and processes to establish robust governance and emphasizes personal ownership and accountability for risk with our employees.[17]

225.   The April 9, 2019 Proxy Statement also provided purported reasons for declining growth:

> During the latter half of 2018, the growth dynamics in our market environment began to change with respect to the housing market as well as the Chinese economy, particularly as it related to the escalated trade tensions/restrictions between the U.S. and China.   Despite rising deposit costs, driven by the increase in short-term rates, we achieved a strong net interest margin of 3.94% for the year.   These market uncertainties cause us to be somewhat more cautious for the near-term . . . .

### 11.   Defendants' Representations Regarding Sterling's First Quarter 2019 Results

226.   On April 29, 2019, the Company issued a press release reporting "First Quarter 2019 Financial Results," including:   "Net income of $15.7 million, consistent with Q1 2018, and down 2% from Q4 2018"; "Total loan originations of $304.9 million, down from $408.0 million in Q1 2018 and $332.7 million in Q4 2018"; "Total gross loans, including loans held for investment and loans held for sale, of $2.94 billion, a 5% increase from Q1 2018, and a 4% annualized increase from Q4 2018"; and "Total deposits of $2.44 billion, a 6% increase from Q1 2018, and a 1% decrease from Q4 2018."   The Company also reported that as of March 31,

---

[17] The Company's April 18, 2018 Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 filed with the SEC contained an identical representation.

2019, its residential real estate loans totaled $2,494,030,000 and its total allowance for loan losses was $20.698 million.

227. In the April 29, 2019 press release, the Company also reported:

Total gross loans, which includes those held for investment and held for sale, were $2.94 billion at March 31, 2019, an increase of 1% from $2.92 billion at December 31, 2018. The Company had a $41.6 million increase in residential mortgage loans held for investment, partially offset by a $14.3 million decrease in construction and commercial real estate loans, a $1.1 million decrease in residential mortgage loans held for sale and a $0.9 million decrease in commercial and industrial loans . . . . During the first quarter of 2019, the Company originated $304.9 million in loans, which included $257.6 million in residential mortgage loans . . . .

228. In the April 29, 2019 press release, Judd touted the Company's excellent credit quality and strong customer relationships as driving the results:

Our strong and consistent earnings are being driven by disciplined balance sheet management, well controlled expenses and **excellent credit quality**. Our strategic focus on **strong customer relationships** and our suite of niche loan products have contributed to our superior level of financial performance and earned us recognition as the top performing community bank in the United States in 2018 for the second year in a row, as recognized by S&P Global Market Intelligence.

229. In the April 29, 2019 press release, Judd provided purported reasons for the lagging residential loan originations:

Residential mortgage loan originations decreased both year-over-year and from the fourth quarter of 2018. Our customers remain cautious due to the uncertainty surrounding trade tensions with China and the outlook for moderating home price appreciation in our markets. However, as we continue to build our lending staff, we expect to see improved residential loan originations and also diversify our revenue by growing the commercial lending portfolio throughout 2019.

230.   Later that day, on April 29, 2019, the Company held its First Quarter 2019 Earnings Call during which Judd repeated the financial numbers reported in the April 29, 2019 press release for the Company's net income of $15.7 million, total loan originations of $305 million; Lopp repeated the numbers for total loans of $2.94 billion; and both Judd and Lopp repeated the numbers for total deposits of $2.44 billion.

231.   During the First Quarter 2019 Earnings Call, Judd also stressed the quality of and demand for its sales of its loans:  "We should point out that market demand remains strong for the loans we sell, reflecting the ***outstanding quality*** and performance of the loans we originate."  Moreover, Lopp stated: "We have an ***excellent credit history***."

232.   During the First Quarter 2019 Earnings Call, Judd provided purported explanations for the Company's drop in loan production but nevertheless touted continued loan growth, stating:

> As we indicated in our last call, during the latter half of 2018, we began to see a change in the market environment with respect to housing and also impacted by the trade frictions with China, which created uncertainty among a number of our customers.  This general sense of caution continued into the first quarter of 2019.

> As a result, this caution coupled with the expected seasonal drop in loan demand, our loan production was down again this quarter.  Annualized loan growth for the quarter was 4%.  Loan growth continues to be driven by our residential real estate portfolio, which was up nearly 7% on an annualized basis.

***

> Given the continued caution among our customers, we remain slightly
> more guarded for 2019.  However, we continue to believe our long term
> prospects remain favorable as we operate in four of the most attractive
> markets in the U.S.  We will continue to adapt to market changes and
> make the necessary investments to grow our business profitably.  We
> continue to expand our presence in our markets, adding client-facing
> professionals, including commercial loan officers.  Accordingly, we
> continue to believe these efforts will generate growth in both loans and
> deposits in the high single to low double-digits for the year.

233.   On May 9, 2019, the Company filed its First Quarter 2019 10-Q.  In the

First Quarter 2019 10-Q, the Company repeated the same financial numbers reported

in the April 29, 2019 press release for net income of $15,683 million, total loans of

$2.944 billion (total portfolio loans of $2.944 billion and mortgage loans held for

sale of $165,000), residential real estate loans of $2,494,030,000, total deposits of

$2.44 billion, and total allowance for loan losses of $20.698 million.  The Company

also reported that its total allowance for loan losses was $20.698 million, including

$13.488 million for residential real estate loans, and did not record any reserves for

loan repurchases.

234.   In the First Quarter 2019 10-Q, the Company touted its loan origination

and growth, stating:

> For the three months ended March 31, 2019, we originated loans of
> $304.9 million, down from $408.0 million for the same period of 2018,
> which included $257.6 million in residential mortgage loans . . . .  Also,
> for the three months ended March 31, 2019 and 2018, we sold pools of
> residential real estate mortgages for $49.9 million and $112.2 million,
> respectively, to third-party investors.

235.   In the First Quarter 2019 10-Q, the Company touted the individualized and regular analysis it performed to ensure credit quality:

> The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors.   The Company analyzes loans individually by classifying the loans as to credit risk.   This analysis includes homogeneous loans such as residential real estate . . . .   This analysis is performed monthly.

236.   Based on this credit-quality analysis, the Company rated $2,465,820,000 of its $2,471,104,000 residential first mortgage loans and 100% of its $22,926,000 residential second mortgage loans as "Pass: Loans are of satisfactory quality."   The Company also stressed:  "Since 2013, we have experienced significant growth while maintaining stable margins and solid asset quality."

237.   The First Quarter 2019 10-Q included SOX certifications by Judd and Lopp that were identical in all material respects to those in the Company's 2017 10-K, ¶¶ 159 and 160, *supra*.

**12.    Statements Defendants Made Beginning With The Company's First Quarter 2018 Results Through Its First Quarter 2019 Results Were False And Misleading When Made**

238.   The statements above in ¶¶ 174, 177–78, 182, 185, 192–93, 201, 204–05, 215–17, 220–21, 223–24, 228, 231, 235, and 236 regarding the Company's underwriting standards and practices for its loans, its knowledge of its customers, its

credit and asset quality, and its risk management were affirmative statements of present fact that were materially false and misleading when made because the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money. These statements were also false and misleading when made because they failed to disclose that, as of March 31, 2018 at the latest, the OCC found BSA/AML violations at the Bank as detailed in an undisclosed March 31, 2018 OCC Report of Examination.

239. The statements in ¶¶ 168–69, 171–72, 175–76, 180–81, 184, 190–91, 195–98, 202–03, 207–08, 210, 213–14, 222, 226–27, 230, 233, and 234 regarding the Company's financial results and growth, including its reported net income, total loans, residential loans, total deposits, total allowance for loan losses, and allowance for loan losses for residential loans were affirmative statements of present fact that were materially false and misleading when made because the Company's allowance for loan losses were inadequate and its financial results were inflated by and dependent upon the Company's undisclosed and inadequate underwriting that lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, focused on clients with little to no credit history,

as opposed "strong" or "good" credit, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.

240.   The statements in ¶¶ 179, 194, 206, 219, and 237 regarding the quality of the Company's internal controls were affirmative statements of present fact that were materially false and misleading when made because effective internal controls were not in place to prevent improper lending, underwriting, and banking practices, including money-laundering.  The Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.

241.   The statements in ¶ 218 regarding banking regulations, anti-money laundering duties, and regulatory compliance were affirmative statements of present fact that were materially false and misleading when made because the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.  The Company's BSA/AML program was

inadequate to identify, mitigate, and manage money-laundering risks and therefore the Company was not in compliance with BSA/AML laws. In particular, the statements were false and misleading when made because (a) contrary to U.S. law, the Company failed to appropriately monitor and assess ongoing and high money-laundering risks associated with foreign nationals moving foreign money into the Company to facilitate real-estate lending involving properties in the United States; (b) despite the heightened risks, the Company did not carry out appropriate due diligence on customers and transactions originating from China that had numerous indicators relating to money laundering risks; and (c) despite the heightened risks, the Company did not effectively monitor or report suspicious activities and transactions that had numerous indicators relating to money laundering risks. These statements were also false and misleading when made because they failed to disclose that, as of March 31, 2018 at the latest, the OCC found BSA/AML violations at the Bank as detailed in an undisclosed March 31, 2018 OCC Report of Examination.

242. The statements in ¶¶ 170, 173, 183, 186, and 200 regarding the pipeline and demand for Sterling's loans were affirmative statements of present fact that were materially false and misleading when made because they failed to disclose that the strong demand and pipeline were the result of the fact that the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of

borrowers' identities, employment, income, and source of funds used, and were not BSA/AML compliant and lent themselves to be used for money-laundering, thus creating a demand and pipeline for the ALP loans.

243.  The statements in ¶¶ 187–89, 199, 209, 211–12, 225, 229, and 232 regarding the reasons for the decline in growth for Sterling's loans were affirmative statements of present fact that were materially false and misleading when made because they failed to disclose that a reason for the declining growth was that, as of March 31, 2018 at the latest, the OCC found BSA/AML violations at the Bank as detailed in an undisclosed March 31, 2018 OCC Report of Examination.

244.  The truth that Sterling's underwriting and risk management were not conservative or disciplined, did not involve adequate documentation nor verification, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money, is evidenced by the detailed statements by former employees of Sterling, including:

    a.    The statements by FEs 1, 2, 3, 4, 5, and 7 demonstrating that the Company's underwriting and risk management for ALP mortgages were neither disciplined nor conservative.

    b.    The statements by FEs 1, 2, and 3 that underwriting and risk management for ALP mortgages were neither disciplined nor conservative.

    c.    The statements by FEs 1, 2, 3, 4, and 7 that the only records required for a customer to be approved under the ALP was a letter purportedly from the customer's employer and/or from a

CPA (for self-employed borrowers) and a monthly bank statement to verify income.

d.   The statements by all FEs that the target customers for the ALP were foreign nationals, particularly Chinese nationals.

e.   The statement by FEs 1, 3, and 7 that the ALP catered to foreign nationals with little or no credit history.

f.   The statements by FEs 1, 2, 3, 4, 6, and 7 that employer letters often came from China, were written in a Chinese language, and were then translated by the borrowers themselves or by a Chinese-language-speaking bank employee.

g.   The statement by FE 7 that translations of the employment letters were substantially similar in format.

h.   The statement by FE 1 that a Sterling underwriter relayed that many of the CPA letters used in the ALP were from the same source, as the letters came from the same IP address, and that some of the CPA firms for the letters may not have actually existed.

i.   The statements by  FEs 2, 3, and 7 that to demonstrate the stated income in the letter, ALP customers were required to open an account at a Sterling branch with cash, and then had to make cash deposits into the account every two weeks for two or three months until a specified amount had been deposited.

j.   The statements by FEs 2, 3, 5, 6, and 7 that there was no attempt to confirm the employment or CPA information and little or no verification of income or the source of the funds.

k.   The statements by FE 3 that there was also little or no attempt to confirm the identity of the account holder and no attempt at all to identify the source of the funds, including gifted funds.

l.   The statements by FE 3 and 5 that while gifted funds were allowable if from a borrower's family members, Sterling's review of the gift was limited to requiring only that the funds deposited into a borrower's account matched those of the purported gift, and Sterling did not otherwise verify the source

112

of the funds, even when presented with contradictory information provided by the borrower.

m.   The statements by FE 5 that Sterling provided "no training" on risk or compliance and that Sterling employees with whom FE 5 dealt had no training or familiarity with SARs, CTRs, or other compliance procedures.

n.   The statements by FE 7 that Sterling had weak and deficient internal controls.

o.   The statements by FEs 2, 3, 5, and 7 that they suspected that the ALP appeared to be used for money laundering.

245.   The truth that Sterling's underwriting and risk management were not conservative nor disciplined, did not involve adequate documentation nor verification, and were not BSA/AML compliant, is further demonstrated by the Company's own belated disclosures, including:

a.   The Company's disclosure on June 21, 2019 that it had entered into an agreement with the OCC to enhance its AML and BSA compliance, a critical component of which is customer due diligence and enhanced due diligence, which involves identifying and verifying borrowers' identity and sources of income and wealth.

b.   The OCC Agreement states that the OCC found unsafe or unsound practices relating to the Company's credit administration and required the Bank to revise its policies and procedures to ensure effective controls over loan underwriting, including "effective controls and processes to collect and verify employment and income" and "verification of borrowers' income and cash flow information used in the Bank's underwriting process for nonowner occupied properties."

c.   That as late as March 31, 2018, the OCC had detailed BSA/AML violations of law, as detailed in a Report of Examination and that the OCC found unsafe or unsound practices relating to the

Company's credit administration—a report that was provided to Sterling, defendants Judd and the Director Defendants, among others.

d.  The disclosure on November 8, 2019 in its Third Quarter 2019 10-Q that in November 2019, in connection with an internal compliance investigation, the Company had terminated two top loan producers within the Advantage Loan Program who together were collectively responsible for 15% of the Company's residential loan production through September 30, 2019.

e.  The disclosure on December 9, 2019 that the Company had temporarily suspended its Advantage Loan Program in connection with an ongoing internal review of the ALP's documentation procedures while it audited documentation on past loans and put in place additional systems and controls to ensure the Bank's policies and procedures are followed on loans originated under the ALP.

f.  The disclosure on March 6, 2020, that the Company was permanently shutting down the ALP based on preliminary results from its internal investigation, which found misconduct in connection with the origination of such loans, including with respect to income verification and requirements, reliance on third parties, and related documentation.

g.  The disclosures on March 6, 2020 that, in connection with this misconduct, the Company had terminated a number of employees, including the Senior Vice President with primary responsibility for, among other things, oversight of the Advantage Loan Program in California.

h.  The disclosures on March 6, 2020 that the Bank was now under formal investigation by the OCC and that the Bank had received grand jury subpoenas from the DOJ in connection with its investigation into the Bank's residential lending practices.

i.  The May 29, 2020 disclosure that the Company had terminated defendant Montemayor, former President of Commercial and Retail Banking and Chief Lending Officer, from all of his positions with the Company, effective immediately.

j.     The June 1, 2020 disclosures that (i) the Bank's internal review of the Advantage Loan Program showed that "employees engaged in misconduct in connection with the origination of loans, including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation"; (ii) due to the internal review, "it has become apparent that the potential for liability related to the origination of residential mortgage loans under that program warrants the initial creation of reserves" including $7.8 million in reserves for loan repurchases and $25 million related to investigations and litigation regarding the ALP, which may need to be increased and may need to be applied to first quarter 2019 and/or earlier periods; and (iii) the Company was working to "right the ship and bring the bank into regulatory compliance and investor confidence" and "fix things that need to be fix[ed] and take them on aggressively," including examining the entire Company "culture."

## B.     While The Truth Begins To Be Revealed, Defendants Continue To Mislead The Market

### 1.     Defendants' June 2019 Disclosures And Misrepresentations

246.   On June 21, 2019, after the market closed, Sterling filed with the SEC a Form 8-K signed by Lopp disclosing that it had entered into an agreement with the OCC to enhance its AML and BSA compliance.   Specifically, the Form 8-K disclosed:

> On June 18, 2019, Sterling Bank and Trust, FSB, Southfield, Michigan (the "Bank"), a wholly-owned subsidiary of **Sterling Bancorp, Inc. (the "Company") and the Office of the Comptroller of the Currency (the "OCC") entered into a formal agreement (the "Agreement") relating primarily to certain aspects of the Bank's Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") compliance program**.

\*\*\*

115

> [The Agreement] generally ***requires that the Bank enhance its policies and procedures to ensure compliance with BSA/AML laws and regulations. The Bank will establish a Compliance Committee to monitor and assure compliance with the Agreement, oversee the completion of an independent review*** of account and transaction activity to be conducted by a third party vendor, and engage a third party to conduct a model validation for its BSA/AML monitoring software.

247.   In this June 21, 2019 8-K, the Company attempted to temper this news, stating that the "Bank's Board and management take the requirements of the Agreement seriously, and will strive to achieve full compliance in a timely manner. ***The Company does not believe that the Agreement will have any material impact on its performance metrics***, the payment of dividends, or the current share repurchase program."

248.   While not mentioned by Sterling in its press release, the OCC Agreement (subsequently filed on August 27, 2019 as an exhibit to Sterling's Second Quarter 2019 10-Q) specifically states that the ***OCC found unsafe or unsound practices relating to the Company's credit administration and violations of law relating to certain aspects of its BSA/AML compliance program***, *inter alia,* that the Bank revised its policies and procedures to ensure effective controls over loan underwriting, including "effective controls and processes ***to collect and verify employment and income***"; "***verification of borrowers' income and cash flow*** information used in the Bank's underwriting process for nonowner occupied properties"; "effective controls and verification procedures for ***the acceptance of***

*gift letters*, including proper execution and endorsement by both the donor and recipient"; and "effective oversight of exceptions identified by the Bank's quality control function, ***including proper escalation and disposition of concerns raised by quality control to management or the BSA Officer***." Moreover, the OCC Agreement states that the OCC found BSA/AML violations as detailed in a ***previously undisclosed March 31, 2018 Report of Examination*** and thereafter. The June 18, 2019 OCC Agreement was signed by defendants Allen, Judd, Meltzer, Sandra Seligman, Sinatra, Wineman, and Wolberg. Moreover, the Report of Examination dated March 31, 2018 would have required the signature of all Directors of Sterling, including defendant Judd.[18]

249.   Also on June 21, 2019, after the market closed, Sterling filed a second Form 8-K signed by Lopp that disclosed that ***Director Defendant Fox, who served on the Audit and Risk Management Committee, had resigned from Sterling's Board, effective immediately***. He was replaced by Tom Minielly, who would also serve on the Audit and Risk Management Committee (only to resign six months later on December 19, 2019).

---

[18] OCC, *Comptroller's Handbook, Examination Process, Bank Supervision Process*, (Version 1.1, Sept. 2019), available at https://www.occ.gov/publications-and-resources/publications/comptrollers-handbook/files/bank-supervision-process/pub-ch-bank-supervision-process.pdf

250.    Again, the Company tried to temper the news, further stating in the 8-K, "Mr. Fox's retirement and resignation *was not due to any disagreement on any matter relating to the Company's operations, policies or practices*."

251.    Upon the Company's June 21, 2019 disclosures, including the attempts to minimize them, the Company's stock price dropped $0.16, or 1.59%, from a close of $10.06 on Friday, June 21, 2019 to a close of $9.90 on Monday, June 24, 2019.

252.    Analysts, while noting disappointment with the news, also accepted the Company's efforts to temper it.  For example, a June 24, 2019 *Sandler O'Neill* report stated:

> This is a *disappointing development*, as for the past several years Sterling has had an excellent track record for maintaining a fastidious back office and a favorable relationship with its regulators.
>
> **Impact Should Be Modest . . .** *we do not believe the agreement will result in any loss of business relationships or restrictions of business activities*. Further, we do not expect the regulators to restrict Sterling's strategic actions (such as opening new branches) or capital management.  In fact, the company said explicitly that the agreement *should not have any material impact on its performance metrics*, the payment of dividends or its current share repurchase program.

253.    A June 24, 2019 *Piper Jaffray* Report, while noting the OCC Agreement may remain and overhang on the stock, remained optimistic that the issue would be resolved quickly, stating: "Hopefully SBT's smaller size and relatively straight forward business model can help in accelerating its time to comply."

254.   In a press release dated June 27, 2019 to announce that Sterling "Celebrates the Grand Opening of its Newest Branch Located in the Koreatown Area of Los Angeles," Montemayor touted the Company's disciplined approach, stating:

> Establishing this branch reflects ***our long-term, disciplined approach to banking*** that emphasizes focused geographic expansion coupled with niche products and services that have proven valuable to our customers since our founding. ***We are known for our relationship-based banking*** and intend to bring this same level of highly personalized service to our customers in Koreatown.

255.   In the June 27, 2019 release, the Company also touted that: "The Bank is well regarded for its ***high-touch customer relationships***, a suite of niche loan products, a high concentration of core deposits and a ***strong credit culture***."

### 2.   Defendants' Representations Regarding Sterling's Second Quarter 2019 Results

256.   On July 29, 2019, Sterling issued a press release reporting "Second Quarter 2019 Financial Results" that reported: "Net income of $13.4 million, down from $16.0 million in Q2 2018, and $15.7 million in Q1 2019"; "Total loan originations of $356.5 million, down from $433.9 million in Q2 2018 and up from $304.9 million in Q1 2019"; "Total gross loans, including loans held for investment and loans held for sale, of $2.95 billion, a 3% increase from Q2 2018, and flat from Q1 2019"; and "Total deposits of $2.55 billion, a 9% increase from Q2 2018, and a 5% increase from Q1 2019."  The Company also reported as of June 30, 2019, its

residential real estate loans totaled $2,523,883,000 and its total allowance for loan losses was $20.918 million.

257.    In the July 29, 2019 press release, the Company also reported:

Total gross loans, which includes those held for investment and held for sale, were $2.95 billion at June 30, 2019, an increase from $2.94 billion at March 31, 2019.  The Company had a $29.9 million increase in residential mortgage loans held for investment and a $0.3 million increase in residential mortgage loans held for sale, partially offset by a $20.3 million decrease in construction and commercial real estate loans, and an $8.1 million decrease in commercial and industrial loans . . . .  During the second quarter of 2019, the Company originated $356.5 million in loans, which included $316.1 million in residential mortgage loans . . . .

258.    In the July 29, 2019 press release, Judd touted Sterling's sound business and loan quality and pipeline, stating:  "***Our business remains sound***.  We will continue to opportunistically utilize loan sales to diversify our revenue.  We expect to resume our loan growth as our pipeline is healthy and ***credit quality remains excellent***, which should translate into continued strong returns for our shareholders."

259.    Later that day, on July 29, 2019, the Company held its Second Quarter 2019 Earnings Call, at which Judd repeated the financial numbers reported in the July 29, 2019 press release for the Company's net income of $13.4 million and total loan production of $356 million.

260.    On the Second Quarter 2019 Earnings Call, Judd also touted, "demand from institutional buyers continues to be healthy, reflecting ***the outstanding quality and performance of the loans we originate***."  He further stated: "Looking into the

second half of the year, we remain optimistic about our opportunities to continue delivering positive results despite some headwinds. Our **_business remains sound_** and we expect loan growth to continue as our pipelines are healthy and **_credit quality remains excellent_**, which should translate into increased revenue and continued strong returns for our shareholders." Judd stressed, "demand for our suite of loan products remains healthy across all of our markets, particularly, for our niche residential mortgage loans and our commercial loans."

261. On the Second Quarter 2019 Earnings Call, Judd also provided purported reasons for the growth slowdown stating, "However, with increased industry-wide refinancing activity, our existing portfolio isn't immune. And as a result, we experienced higher payoffs during the quarter, muting our overall loan growth."

262. On the Company's Second Quarter 2019 Earnings Call, with the agreement with the OCC now public, defendants characterized the BSA/AML implications of the OCC Agreement as little more than increased expenses for compliance. Judd stated, "expenses related to regulatory compliance are expected to remain somewhat elevated." Lopp likewise stated, "we expect to incur increased regulatory compliance costs, both ongoing and one time in nature, in order to comply with a recent agreement with the OCC."

263.   On August 9, 2019, Sterling filed its Second Quarter 2019 10-Q.  In the Second Quarter 2019 10-Q, the Company repeated the same financial numbers reported in the July 29, 2019 press release for net income of $13.434 million, total loans of $2.946 billion (total portfolio loans of $2.945 billion and mortgage loans held for sale of $500,000), residential real estate loans of $2,523,883,000, total deposits of $2.55 billion, and total allowance for loan losses of $20.918 million.  The Company also reported its allowance for residential real estate losses was $12.758 million and did not record any reserves for loan repurchases.

264.   In the Second Quarter 2019 10-Q, the Company described its loan portfolio:

> For the three months ended June 30, 2019, we originated loans of $356.5 million, down from $433.9 million for the same period of 2018, which included $316.1 million in residential mortgage loans . . . .  For the six months ended June 30, 2019, we originated loans of $661.4 million, down from $841.8 million for the same period of 2018, which included $573.7 million in residential mortgage . . . .  Also, for the three and six months ended June 30, 2019, we sold pools of residential mortgages loans for $71.9 million and $121.8 million, respectively, to third-party investors.

265.  In the Second Quarter 2019 10-Q, the Company touted the individualized and regular analysis it performed to ensure credit quality:

> The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors.  The Company analyzes loans individually by classifying the loans as to credit risk.  This analysis includes

122

homogeneous loans such as residential real estate and consumer loans and non-homogeneous loans, such as commercial lines of credit, construction and commercial real estate loans. This analysis is performed monthly.

266. Based on this credit-quality analysis, the Company rated $2,494,537,000 of its $2,501,179,000 residential first mortgage loans and 100% of its $22,704,000 residential second mortgage loans as "Pass: Loans are of satisfactory quality." The Second Quarter 2019 10-Q also stated: "We have grown significantly since 2013 while maintaining stable margins and solid asset quality."

267. The Second Quarter 2019 10-Q included SOX certifications by Judd and Lopp that were identical in all material respects to those in the Company's 2017 10-K, ¶¶ 159 and 160, *supra*.

### 3. Sterling Announces The Abrupt Resignation of Judd

268. On October 17, 2019, after the market closed, the Company issued a press release abruptly announcing that CEO Judd was retiring.

> Sterling Bancorp, Inc. (NASDAQ: SBT) ("Sterling" or the "Company"), the holding company of Sterling Bank and Trust, F.S.B., (the "Bank") ***today announced that Chairman and CEO Gary Judd will retire after over eleven years of service with the Company***. Sterling's Board of Directors has appointed Tom Lopp, the Company's current President, Chief Operating Officer and Chief Financial Officer, to succeed Judd as CEO and Chairman of the Board. The Company also announced that Steve Huber, in addition to his current role as Chief Financial Officer of the Bank, will be promoted to Chief Financial Officer and Treasurer of Sterling. The transitions will be effective on November 30, 2019.

269.   However, the press release also continued to tout Sterling's strong credit culture, quoting Judd as stating:   "Our success has been built on our **commitment to strong customer relationships, a suite of niche loan products, a strong credit culture**, and very efficient back-office operations."

### 4. Defendants' Representations Regarding Sterling's Third Quarter 2019 Results

270.   On October 28, 2019, Sterling issued a press release reporting its "Third Quarter 2019 Financial Results" that reported:   "Net income of $13.9 million, up from $13.4 million in Q2 2019, and down from $15.7 million in Q3 2018"; "Total loan originations of $282.1 million, down from $356.5 million in Q2 2019 and $419.2 million in Q3 2018"; "Total gross loans, including loans held for investment and loans held for sale of $2.93 billion, down 1% from Q2 2019, and flat from Q3 2018"; "Prior to loan sales, total gross loans increased by 2% from Q2 2019"; and "Total deposits of $2.57 billion, up 1% from Q2 2019 and 7% increase from Q3 2018."  The Company reported its residential real estate loans as $2,505,274,000 and its total allowance for loan losses as $21.204 million.

271.   The October 28, 2019 press release further touted:

Total gross loans, which includes those held for investment and held for sale, were $2.93 billion at September 30, 2019, a decrease from $2.95 billion at June 30, 2019. The Company had an $18.6 million decrease in residential mortgage loans held for investment . . . . During the third quarter of 2019, the Company originated $282.1 million in loans, which included $241.7 million in residential mortgage loans . . .

124

. The Company sold $76.1 million in residential mortgage loans during the third quarter, including Agency sales.

272.   In the October 28, 2019 press release, Judd continued to tout the "healthy loan pipeline" and "solid credit quality," stating:

> We remain optimistic in our outlook as we end the year. ***We are focused on converting our healthy loan pipeline into closed loans while maintaining solid credit quality and reducing deposit costs.*** While we will continue to opportunistically utilize loan sales to diversify our revenue going forward, we may significantly reduce these sales in the fourth quarter and retain the majority of our new loan production on our balance sheet. Therefore, we expect to resume our loan growth and achieve net interest margin stability, which should translate into continued strong returns for our shareholders.

273.   Later that day, October 28, 2019, the Company held its Third Quarter 2019 Earnings Call, during which Judd discussed Sterling's financial results and repeated the financial numbers reported in the October 28, 2019 press release for the Company's net income of $13.9 million.

274.   On the Third Quarter 2019 Earnings Call Judd touted the Company's loan credit quality and pipeline and demand, including in the secondary market:

> As you know, another component of managing our balance sheet liquidity is loan sales.  During the quarter, we sold $76 million of residential loans, including agency loans. Institutional demand in the secondary market for our loans remains healthy, reflecting the ***high quality of the loans we originate*** and allowing us to realize continued attractive premiums for the loans we sell.
>
> ***
>
> We remain optimistic in our outlook as we end the year.  We are focused on converting our healthy loan pipeline into closed loans, while maintaining ***solid credit quality*** and reducing deposit cost.  During the

fourth quarter, we expect to resume our loan growth and achieve NIM's stability, which should translate into continued strong returns for our shareholders.

275.   On the Third Quarter 2019 Earnings Call Judd also gave purported reasons for the decline while continuing to emphasize underwriting discipline and credit quality:

> Our total loans including both loans held for investment and held for sale declined by $20 million in the second quarter.  This was primarily driven by lower production during the third quarter.  Loan production was lower during the quarter, as we ***maintained our underwriting and pricing discipline*** in a very competitive lending market.  In addition, we are still experiencing some caution among some of our customers with respect to the ongoing trade friction in China and tighter enforcement on currency control, as well as inventory and general affordability concerns in the housing market, particularly in the Bay Area.

276.   On the Third Quarter 2019 Earnings Call, an analyst pushed back on the purported explanations given by Sterling asking the following question, which resulted in the following answer from defendant Montemayor:

> Q:  And then I'd like to start on the origination volumes, because it seems like they've continued to come down, and I know, you highlighted the inventory and affordability concerns, but it just—it's really surprising that I'm seeing a number of other banks that kind of traffic in your same space that seem to be—where their volume seem to be holding up, okay.  And so, I'm just wondering, you mentioned in the press release that it's partly related to competition.  If that's really the driver here, what types of things you see in the competition doing that you guys are unwilling to do or are there other factors that I'm just not getting?
>
> [Michael Montemayor answered:]   I would say that some of the competition has offered longer term fixed rates on some of the products that we hadn't.  We are looking at some of those currently and

evaluating whether that's right for us.  But they've gone out longer on the maturity and that maybe we weren't competing with.

277.   On the Third Quarter 2019 Earnings Call, taking cues from Sterling, an analyst offered this mild characterization of Sterling's regulatory issues as part of a question:  "You have a little bit of regulatory issues here that you're working through"—which went uncorrected by defendants; indeed, Lopp responded, "I think that's fair."  The exchange unfolded as follows:

Q:  Okay.  Now, when I look at overall expense growth this year, it's going to be something like 7%, 7.5% obviously much lower than previous years when balance sheet growth was much greater.  You have a little bit of regulatory issues here that you're working through.  What expansion plans do you have for 2020, and is that 7% growth rate at this stage a good ballpark for next year?

Lopp:  I believe it is.  I think that's fair and I—you've nailed the two issues.  As the growth has slowed somewhat, the expenses do reflect that, as well as some incremental cost for regulatory compliance.  But I think 7.5% is a fair estimate in every quarter, we will try to guide best we can at least a quarter out.

278.   On November 8, 2019, Sterling filed its Third Quarter 2019 10-Q.  In the Third Quarter 2019 10-Q, the Company repeated the same financial numbers reported in the October 28, 2019 press release for net income of $13.884 million, total loans of $2.926 billion (total portfolio loans of $2.925 billion and mortgage loans held for sale of $837,000), residential real estate loans of $2,505,274,000, total deposits of $2.57 billion, and total allowance for loan losses of $21.204 million.  The Company also reported its allowance for residential real estate losses was $12.440 million and did not record any reserves for loan repurchases.

279.   In the Third Quarter 2019 10-Q, the Company further touted:

> For the three months ended September 30, 2019, we originated loans of $282.1 million, down from $419.2 million for the same period of 2018, which included $241.7 million in residential mortgage loans . . . .  For the nine months ended September 30, 2019, we originated loans of $943.5 million, down from $1.26 billion for the same period of 2018, which included $815.4 million in residential mortgage loans . . . .  Also, for the three and nine months ended September 30, 2019, we sold pools of residential mortgages loans for $51.6 million and $173.4 million, respectively, to third-party investors.

\*\*\*

280.   In the Third Quarter 2019 10-Q, the Company continued to tout the individualized and regular analysis it performed to ensure credit quality:

> The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors.  The Company analyzes loans individually by classifying the loans as to credit risk.  This analysis includes homogeneous loans such as residential real estate . . . .  This analysis is performed monthly.

281. Based on this credit-quality analysis, the Company rated $2,475,200,000 of its $2,481,667,000 residential first mortgage loans and 100% of its $23,607,000 residential second mortgage loans as "Pass: Loans are of satisfactory quality."  The Company also stated:  "We have grown significantly since 2013 while maintaining stable margins and solid asset quality."

282.   The Third Quarter 2019 10-Q included SOX certifications by Lopp and Judd that were identical in all material respects to those in the Company's 2017 10-K, ¶¶ 159 and 160, *supra*.

283.   While continuing to make false and misleading statements in the Third Quarter 2019 10-Q, the Company also disclosed that in November 2019, it "terminated two of our top loan producers within [the Advantage Loan Program] who were collectively responsible for 15% of our residential loan production through September 30, 2019.  While we will undertake to retain their clients and replace their historical production with new production from existing or new loan producers, there can be no assurance these efforts will be successful."  In its Risk Factors, the Company further stated:

> Our business and ability to generate loans depends on the efforts of our top loan producers, particularly within our Advantage Loan program, which constituted 79% of our residential loan portfolio as of September 30, 2019 and has historically generated larger margins than traditional conforming mortgage products.  In November 2019, in connection with an internal compliance investigation, we terminated two loan producers within the Advantage Program.  If we are unable to maintain the clients of these producers or replace their production through other loan officers, our results of operations would be materially and adversely affected.  In addition, if these producers or other loan producers within our Advantage Loan program are found to have engaged in misconduct, we could face regulatory or other pressure to disband the Advantage Loan program, which would materially and adversely affect our profitability and margins.

284.   On November 25, 2019, before the market opened, *Sandler O'Neill* issued a report highlighting the termination of the two top ALP producers, and the

impact thereof, and *downgrading* its rating of the Company from Buy to Hold.

Specifically, the report stated:

> The Advantage Loan program is the company's largest lending product and constituted 79% of its residential loan portfolio, or 67% of total loans, as of September 30. Moreover, these loans have historically generated larger margins than traditional conforming mortgage products. In the nine months ended September 30, the Advantage Loan program generated 83% of Sterling's residential loan production and the two producers that were terminated collectively generated 15% of that production. *As such, we estimate the two producers accounted for about $100 million of the $944 million of loan production in the first nine months of the year. While the loss of two lenders is certainly not insurmountable, we estimate their production was 3–5 times the typical lender, and probably toward the high-end of that range.*
>
> ***
>
> [O]ur view of the company as a growth story, with growth having already slowed sharply over the past year or so, is further compromised...

285. However, the November 25, 2019 *Sandler O'Neill* report also relayed that the analyst did not believe it was related to the OCC Agreement and BSA/AML issues, as management relayed to them that its "BSA/AML remediation efforts were making good progress," and the analyst did not believe any regulatory or credit issues would arise in connection with the terminations, further stating:

> In a conversation we had with management on Friday afternoon, it said the company is working hard to retain clients brought in by these producers and to replace their historical volume with production from existing and new lenders.
>
> ***
>
> *Notably, management said that while the producers were not following company policies and procedures, there was no fraud*

130

*involved and that the underwriting was not compromised (all loans by these producers are paying as agreed). It also sounded to us like there is no direct link between the policy and procedure failures of these two lenders and the company's formal agreement with the OCC regarding deficiencies in its Bank Secrecy Act/Anti-Money Laundering program. On that point, management said its BSA/AML remediation efforts are making good progress.*

***

And *our sense is that no regulatory or credit issues will emerge from this event…*

286.   In response to news of the downgrade, which was also tempered by *Sandler O'Neill's* statements, **based on discussion with management**, that the terminations were not related to the OCC Agreement and BSA/AML compliance issues and would not result in regulatory issues, Sterling shares fell from a close of $9.90 on Friday November 22, 2019 to a close of $9.70 on Monday November 25, 2019, a decline of $0.20 or 2.02%.

### 5.    Defendants' Disclosures Regarding The Suspension Of The Advantage Loan Program And The Departure Of Director Tom Minielly

287.   Then, just two weeks later, on December 9, 2019, before the market opened, Sterling filed a Form 8-K which disclosed that the Bank had suspended its Advantage Loan Program in connection with an internal review of its documentation procedures.  Specifically, the Form 8-K disclosed:

On December 9, 2019, Sterling Bank and Trust, FSB, Southfield, Michigan (the "Bank"), a wholly-owned subsidiary of Sterling Bancorp, Inc. (the "Company") *voluntarily and temporarily suspended its Advantage Loan program in connection with an ongoing internal*

131

*review of the program's documentation procedures. Management believes it is prudent to temporarily halt the program as it continues to audit documentation on past loans and puts in place additional systems and controls to ensure the Bank's policies and procedures are followed on loans originated under the program. It is the Company's intention to resume the Advantage Loan program* as soon as management is confident its stated policies and procedures are being followed. However, it is presently difficult to estimate how long this suspension might last.

The Advantage Loan program is a material component of the Bank's total loan originations. While it is difficult to quantify the financial impact of the program's temporary suspension, management anticipates a reduced level of near-term loan originations, slower overall loan portfolio growth, and less loan sales.

\*\*\*

It is too early to assess the level of success that the Company will have in replacing the lost loan production volume from the Advantage Loan program's temporary suspension. If the Company is unable to replace the lost production in a timely matter, or if a decision is made to alter the program, the Company's results of operations could be materially and adversely affected.

288. Thus, while the Company partially revealed they truth, it also continued to mislead the market by repeatedly claiming that the ALP would only be "temporarily" halted or suspended to be "prudent" and that it intended to resume the program.

289. Upon this news, Sterling shares fell from a close of $9.45 on Friday December 6, 2019 to a close of $7.29 on Monday December 9, 2019, a decline of $2.16 or 22.86%, on heavy volume.

290.   Analyst and industry observers expressed surprise at the news.   On December 9, 2019, a *Seeking Alpha* contributor stated:   "After reviewing it more, I decided to quit the position.   This program was just responsible for too many of the loans they originated.   This news basically means the business will nearly stop for a while.   ***Seems like the CEO quitting was not a coincidence after all***."

291.   In a December 9, 2019 report, *Sandler O'Neill* had a very different take on the situation than it did in its November 25, 2019 report issued just two weeks earlier, including possible regulatory action:

> ***[T]he fact [Sterling] has now suspended the origination of Advantage Loans suggests potentially broader issues with internal controls, which could include faulty documentation, appraisal issues or other problems (management did not disclose any such details).   As such, we think it heightens the risk of potential regulatory restrictions (product offerings, branch expansion, etc.) as well as put-backs of previously sold mortgages or other adverse events . . . given the relative contribution of the Advantage Loan program to overall loan volumes, we believe the expansion of other categories is unlikely to be a meaningful offset in the near term***.

> We believe the suspension of the Advantage Loan program will cause a material reduction to loan growth and gains on loan sales, partly offset by lower loan loss provisions and lower compensation costs.   Since Advantage Loans also have higher yields relative to many other loan types, the suspension may also result in a thinner net interest margin.

292.   However, in a follow up report issued December 17, 2019, *Sandler O'Neill* stated it expected that the ALP would resume soon stating:   "Having spent some additional time considering the impact of this suspension, we are increasing the near-term negative impact on loan production and balances, but shortening the

duration of the impact, on the expectation that Sterling resumes the program early next year."

293.  On December 27, 2019, in response to the suspension of the ALP, *American Banker* reported:

> The decision stunned industry observers, leaving them to wonder what led to the decision.  "I was *very surprised* by the initial headlines," said Robert Bolton, president of Iron Bay Capital and a Sterling shareholder who was concerned about a dearth of details in **Sterling's** announcement.  "*It looked like there was something really bad there*."

294.  The December 27, 2019 *American Banker* report also quoted Ryan O'Loughlin, director of RMBS at Fitch, who stated that the documentation Sterling used for the ALP "*are more vulnerable to manipulation and misrepresentation*."

### 6.    Defendants' Representations Regarding Sterling's Fourth Quarter 2019 and Full Year 2019 Results

295.  On January 29, 2020, Sterling issued a press release reporting "Fourth Quarter and Full Year 2019 Financial Results" that reported:  "Net income of $14.0 million, up 0.5% from Q3 2019, and down 13% from Q4 2018"; "Total loan originations of $281.7 million, consistent with Q3 2019 and down from $332.7 million in Q4 2018"; "Total gross loans, including loans held for investment and loans held for sale, of $2.91 billion, down slightly from Q3 2019 and Q4 2018"; and "Total deposits of $2.50 billion, a 3% decrease from Q3 2019, and a 2% increase from Q4 2018."  The Company also reported that, as of December 31, 2019, its

residential real estate loans as $2,476,866,000 and its total allowance for loan losses as $21.730 million.

296.   The January 29, 2020 press release stated:

Total gross loans, which includes those held for investment and held for sale, were $2.91 billion at December 31, 2019, down slightly from September 30, 2019.  The Company had a $28.4 million decrease in residential mortgage loans held for investment, a $22.8 million increase in construction and commercial real estate loans and a $6.6 million decrease in commercial lines of credit.  The decline in residential loans held for investment was primarily due to lower production combined with a modest increase in payoffs.  The lower production of residential loans was partially due to the Company's decision to suspend its Advantage Loan program, which occurred in early December.

During the fourth quarter of 2019, the Company originated $281.7 million in loans, which included $200.6 million in residential mortgage loans . . . .  The Company sold $51.4 million in residential mortgage loans during the fourth quarter, including $25.7 million of Agency loans and a $25.7 million CRA qualifying loan pool that was both purchased and sold in the quarter, down from $76.1 million of loans sold in the third quarter.

297.   In the January 29, 2020 press release, Lopp discussed the ALP but assured that a portion of the reduced volume due to the ALP suspension would be offset by new and expanded products:

We intend to offset a portion of our reduced loan volume by continuing to work on initiatives to diversify our overall loan production, including expanding our commercial lending and tenant-in-common lending efforts. In addition, we will continue to develop new residential loan products that we believe will meet the needs of our customers, as well as have a broader appeal in our served markets. We are committed to making the necessary investments in order to realize the bank's long-term growth potential.

298.   Later that day, on January 29, 2020, the Company held its Fourth Quarter and Year-End 2019 Earnings Call at which Montemayor noted the lower loan production due to the ALP shut down, but still stated that loan production for the first quarter of 2020 would be "in the $150 million to $180 million range." defendant Montemayor signaled that compliance problems with ALP would be temporary, stating, in regard to heightened expenses for professional fees, "I would say that Q4 was definitely very high. Q1, I think, would be comparable. But then I think you could see that start to drop meaningfully."

299.   On the Fourth Quarter and Year-End 2019 Earnings Call, defendant Lopp also downplayed the problems with the ALP as a "setback" and touted Sterling's prudent underwriting and credit quality and that the new products would fill the void:

> In addition, we continue to review new residential loan products that we believe can meet the needs of our customers in our served markets. We are presently in the planning stages for three new loan products that we think will appeal to traditional customers that found our programs attractive, as well as expand and diversify our potential base of clients. All three of these loan products are similar in approach to the advantage loan program in that we target underserved customers and yet will require a higher level of documentation.

> The first product would appeal to customers who live in higher cost areas, enabling them to access home ownership.  The second product focuses mainly on serving core national borrowers.  And the third product will focus on investors seeking loans for income producing residential properties.  All three of these products allow for expanded credit metrics **with prudent underwriting offsets, which is consistent with our lending history and one of the main reasons for our excellent**

*credit quality*.  While we are disappointed that we have encountered this **setback** with our advantage loan program, we are committed to making the necessary investments in 2020 to realize our long-term growth potential, while maintaining our higher profitability metrics.

> ### 7.   Statements Defendants Made From June 2019 Through Its Fourth Quarter 2019 Results Were False And Misleading When Made

300.   While the truth began to emerge beginning in June 2019, defendants also continued to issue false statements.

301.   The statements above in ¶¶ 254–55, 258, 260, 265–66, 269, 272, 274–75, 280–81, and 299 regarding the Company's underwriting standards and practices for its loans, its knowledge of its customers, its credit and asset quality, and its risk management were affirmative statements of present fact that were materially false and misleading when made because the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.  These statements were also false and misleading when made because they failed to disclose that, as of March 31, 2018 at the latest, the OCC found BSA/AML violations at the Bank as detailed in an undisclosed March 31, 2018 OCC Report of Examination.

302.   The statements in ¶¶ 256–57, 259, 263–64, 270–71, 273, 278–79, 295, and 296 regarding the Company's financial results and growth, including its reported

net income, total loans, residential loans, total deposits, total allowance for loan losses, and allowance for loan losses for residential loans were affirmative statements of present fact that were materially false and misleading when made because the Company's allowance for loan losses were inadequate and its financial results were inflated by and dependent upon the Company's undisclosed and inadequate underwriting that lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, focused on clients with little to no credit history, as opposed "strong" or "good" credit, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.

303. The statements in ¶¶ 267 and 282 regarding the quality of the Company's internal controls were affirmative statements of present fact that were materially false and misleading when made because effective internal controls were not in place to prevent improper lending, underwriting, and banking practices, including money-laundering. The Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.

304. The statements in ¶¶ 258, 260, and 272 regarding the pipeline and demand for Sterling's loans were affirmative statements of present fact that were materially false and misleading when made because they failed to disclose that the strong demand and pipeline were the result of the fact that the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and lent themselves to be used for money-laundering, thus creating a demand and pipeline for the ALP loans.

305. The statements in ¶¶ 261, 275, and 276 regarding the reasons for the decline in growth for Sterling's loans, were affirmative statements of present fact that were materially false and misleading when made because they failed to disclose that a reason for the declining growth was that, as of March 31, 2018 at the latest, the OCC found BSA/AML violations at the Bank as detailed in its March 31, 2018 OCC Report of Examination.

306. The statements in ¶¶ 247, 250, 262, 277, 285, 287–88, 298, and 299, including the analyst statements in ¶ 285, based on discussions with management and that went uncorrected by defendants, and ¶¶ 250, 287, and 288, its own partial corrective disclosure, downplaying the OCC Agreement and Sterling's compliance issues, were affirmative statements of present fact that were materially false and

misleading when made because, in truth, the compliance issues were severe as the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money. The Company's BSA/AML program was inadequate to identify, mitigate, and manage money-laundering risks and therefore the Company was not in compliance with BSA/AML laws. In particular, the statements were false and misleading when made because (a) contrary to U.S. law, the Company failed to appropriately monitor and assess ongoing and high money-laundering risks associated with foreign nationals moving foreign money into the Company to facilitate real-estate lending involving properties in the United States; (b) despite the heightened risks, the Company did not carry out appropriate due diligence on customers and transactions originating from China that had known financial indicators relating to money laundering risks; and (c) despite the heightened risks, the Company did not effectively monitor or report suspicious activities and transactions that had known financial indicators relating to money laundering risks.

307.  The statements in ¶¶ 297 and 299 regarding new products being developed to fill the void once the ALP was shut down, including that they would

have the same prudent underwriting consistent with its credit history, were affirmative statements of present fact that were materially false and misleading when made because the ALP was shut down because the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money—and rather than develop new products the Company would have to focus on fixing these severe issues.  Indeed, as the Company admitted on June 1, 2020, investors should "not to expect" net loan growth as "job one is to straighten out the regulatory challenges and restore the Bank's regulatory standing.  So, it's frankly not the time to develop new programs.  It's the time to fix what we have . . . ," and that the Company was working to "right the ship and bring the bank into regulatory compliance and investor confidence," and "fix things that need to be fix[ed] and take them on aggressively."

308.   The truth that Sterling's underwriting and risk management were not conservative or disciplined, did not involve adequate documentation nor verification, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money, is evidenced by the detailed statements by former employees of Sterling, including:

a.    The statements by FEs 1, 2, 3, 4, 5, and 7 demonstrating that the Company's underwriting and risk management for ALP mortgages were neither disciplined nor conservative.

b.    The statements by FEs 1, 2, and 3 that underwriting and risk management for ALP mortgages were neither disciplined nor conservative.

c.    The statements by FEs 1, 2, 3, 4, and 7 that the only records required for a customer to be approved under the ALP was a letter purportedly from the customer's employer and/or from a CPA (for self-employed borrowers) and a monthly bank statement to verify income.

d.    The statements by all FEs that the target customers for the ALP were foreign nationals, particularly Chinese nationals.

e.    The statement by FEs 1, 3, and 7 that the ALP catered to foreign nationals with little or no credit history.

f.    The statements by FEs 1, 2, 3, 4, 6, and 7 that employer letters often came from China, were written in a Chinese language, and were then translated by the borrowers themselves or by a Chinese-language-speaking bank employee.

g.    The statement by FE 7 that translations of the employment letters were substantially similar in format.

h.    The statement by FE 1 that a Sterling underwriter relayed that many of the CPA letters used in the ALP were from the same source, as the letters came from the same IP address, and that some of the CPA firms for the letters may not have actually existed.

i.    The statements by FEs 2, 3, and 7 that to demonstrate the stated income in the letter, ALP customers were required to open an account at a Sterling branch with cash, and then had to make cash deposits into the account every two weeks for two or three months until a specified amount had been deposited.

j.    The statements by FEs 2, 3, 5, 6, and 7 that there was no attempt to confirm the employment or CPA information and little or no verification of income or the source of the funds.

k.    The statements by FE 3 that there was also little or no attempt to confirm the identity of the account holder and no attempt at all to identify the source of the funds, including gifted funds.

l.    The statements by FE 3 and 5 that while gifted funds were allowable if from a borrower's family members, Sterling's review of the gift was limited to requiring only that the funds deposited into a borrower's account matched those of the purported gift, and Sterling did not otherwise verify the source of the funds, even when presented with contradictory information provided by the borrower.

m.    The statements by FE 5 that Sterling provided "no training" on risk or compliance and that Sterling employees with whom FE 5 dealt had no training or familiarity with SARs, CTRs, or other compliance procedures.

n.    The statements by FE 7 that Sterling had weak and deficient internal controls.

o.    The statements by FEs 2, 3, 5, and 7 that they suspected that the ALP appeared to be used for money laundering.

309.    The truth that Sterling's underwriting and risk management were not conservative nor disciplined, did not involve adequate documentation nor verification, and were not BSA/AML compliant, is further demonstrated by the Company's own belated disclosures, including:

a.    The Company's disclosure on June 21, 2019 that it had entered into an agreement with the OCC to enhance its AML and BSA compliance, a critical component of which is customer due diligence and enhanced due diligence, which involves identifying and verifying borrowers' identity and sources of income and wealth.

143

b.    The OCC Agreement states that the OCC found unsafe or unsound practices relating to the Company's credit administration and required the Bank to revise its policies and procedures to ensure effective controls over loan underwriting, including "effective controls and processes to collect and verify employment and income" and "verification of borrowers' income and cash flow information used in the Bank's underwriting process for nonowner occupied properties."

c.    That as late as March 31, 2018, the OCC had detailed BSA/AML violations of law, as detailed in a Report of Examination and that the OCC found unsafe or unsound practices relating to the Company's credit administration—a report that was provided to Sterling, defendants Judd and the Director Defendants, among others.

d.    The disclosure on November 8, 2019 in its Third Quarter 2019 10-Q that in November 2019, in connection with an internal compliance investigation, the Company had terminated two top loan producers within the Advantage Loan Program who together were collectively responsible for 15% of the Company's residential loan production through September 30, 2019.

e.    The disclosure on December 9, 2019 that the Company had temporarily suspended its Advantage Loan Program in connection with an ongoing internal review of the ALP's documentation procedures while it audited documentation on past loans and put in place additional systems and controls to ensure the Bank's policies and procedures are followed on loans originated under the ALP.

f.    The disclosure on March 6, 2020, that the Company was permanently shutting down the ALP based on preliminary results from its internal investigation, which found misconduct in connection with the origination of such loans, including with respect to income verification and requirements, reliance on third parties, and related documentation.

g.    The disclosures on March 6, 2020 that, in connection with this misconduct, the Company had terminated a number of employees, including the Senior Vice President with primary

responsibility for, among other things, oversight of the Advantage Loan Program in California.

h.     The disclosures on March 6, 2020 that the Bank was now under formal investigation by the OCC and that the Bank had received grand jury subpoenas from the DOJ in connection with its investigation into the Bank's residential lending practices.

i.      The May 29, 2020 disclosure that the Company had terminated defendant Montemayor, former President of Commercial and Retail Banking and Chief Lending Officer, from all of his positions with the Company, effective immediately.

j.      The June 1, 2020 disclosures that (i) the Bank's internal review of the Advantage Loan Program showed that "employees engaged in misconduct in connection with the origination of loans, including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation"; (ii) due to the internal review, "it has become apparent that the potential for liability related to the origination of residential mortgage loans under that program warrants the initial creation of reserves" including $7.8 million in reserves for loan repurchases and $25 million related to investigations and litigation regarding the ALP, which may need to be increased and may need to be applied to first quarter 2019 and/or earlier periods; and (iii) the Company was working to "right the ship and bring the bank into regulatory compliance and investor confidence" and "fix things that need to be fix[ed] and take them on aggressively," including examining the entire Company "culture."

**8.     Defendants Disclose That Sterling Is Shutting Down The ALP And That, In Connection With Ongoing Internal Investigations, A Number Of ALP Employees Have Been Terminated, Sterling Is Under Federal And Regulatory Investigation, And Is Unable To Timely File Its Period Reports With The SEC**

310.  Then, despite assuring that the ALP suspension was temporary, on March 6, 2020, Sterling filed with the SEC a Form 8-K disclosing that, contrary to

145

earlier assertions, it would be ***shutting down the ALP*** based on preliminary results from its internal investigation that found ***misconduct in connection with the origination of such loans, including with respect to income verification and requirements, reliance on third parties, and related documentation, and that a number of employees had been terminated, including the Senior Vice President with primary responsibility for, among other things, oversight of the Advantage Loan Program in California.*** Specifically, the Company disclosed:

> As previously reported, the Bank voluntarily suspended the Advantage Loan Program in connection with an ongoing internal review of the program's documentation procedures. To date, the primary focus of the internal review, which is being led by outside legal counsel under the direction of a special committee of independent directors (the "Special Committee"), ***has involved the origination of certain residential loans pursuant to the Advantage Loan Program. Preliminary results from the Special Committee's internal review indicate that certain employees engaged in misconduct in connection with the origination of such loans, including with respect to income verification and requirements, reliance on third parties, and related documentation***. The full extent of these issues and their potential consequences have yet to be established, and the internal review will take further time and effort on the part of the Special Committee and outside legal counsel to complete.

> In connection with the internal review, ***a significant number of employees either have been terminated, including the Senior Vice President with primary responsibility for, among other things, oversight of the Advantage Loan Program in California, or have resigned. The Company believes that additional terminations and resignations are possible, and the Company no longer intends to resume the Advantage Loan Program***. While the Company will continue to work on initiatives to diversify its overall loan production and to review new residential loan products, including a program designed to meet the needs of similar customers serviced by the

Advantage Loan Program, the implementation of any new loan products takes time and may be subject to the prior review and approval of applicable bank regulatory authorities. Accordingly, the Company expects adverse effects on its residential loan production as a result of the discontinuation of the Advantage Loan Program as well as likely adverse impacts on its results of operations as repayments from its loan portfolio will need to be invested in lower yielding assets until new loan programs can commence.

311. Notably, the terminated Senior Vice President was *the very employee the Company had touted in connection with the IPO and its risk management* and had assured the SEC was "*fully integrated into monthly senior management meetings*."

312. In the same March 6, 2020 Form 8-K, the Company also informed investors that the Bank had *received grand jury subpoenas from the U.S. Department of Justice relating to the Company's residential lending practices. The Company further announced that the Bank was now under formal investigation by the OCC and continued to be subject to the OCC Agreement*.

313. In the March 6, 2020 Form 8-K, the Company also disclosed that *it was unable to file its 2019 10-K* in order to allow for additional review and procedures, including on the part of the Company's independent auditors, relating to the circumstances that led to the December 2019 suspension of the ALP.

314. On this news, the price of Sterling's shares declined from $6.67 on Friday, March 6, 2020 to a close of $4.88 on Monday, March 9, 2020, a decline of $1.79, or 26.84%, on heavy trading volume.

315.   Analysts likewise responded strongly to the unexpected disclosures by the Company.  In a March 9, 2020 report, *Piper Sandler*, the successor to *Sandler O'Neill*, **downgraded its rating again in response to the "disappointing updates"** and "several discouraging items."  The report also noted that the failure of the Company to timely file its 2019 10-K "is frustrating for analysts and investors" and "also **raises questions about the adequacy of internal controls or the possibility of restated results**."

316.   Then, on March 17, 2020, the last day of the Class Period, Sterling notified the SEC that it **would again delay the filing of its 2019 10-K**, as it was unable to file it, in order to complete:

> (i) **additional review and procedures, including on the part of the Company's independent auditors, relating to the circumstances that led to the previously-reported suspension and termination of the Bank's Advantage Loan Program** . . . and related matters, and (ii) **an ongoing internal review relating to the discontinued Advantage Loan Program**, which review is being led by outside legal counsel under the direction of a special committee of independent directors . . . [and it] intends to file the Annual Report as soon as practicable upon completion of the additional review and procedures and internal review.

317.   On this news, the price of Sterling shares declined from a close of $4.54 on Tuesday, March 17, 2020 to a close of $2.94 on Wednesday, March 18, 2020, a decline of $1.60, or 35.24%, on heavy trading volume.

### C.    Post-Class Period Events

318.    On May 8, 2020, it was announced that Lopp, having served as CEO for less than six months, was resigning, effective immediately, with Steve Huber to serve as interim CEO.

319.    On May 12, 2020, the Company notified the SEC that it still is unable to file its Quarterly Report on Form 10-Q for the period ending March 31, 2020 ("First Quarter 2020 10-Q") or 2019 10-K by the due date of May 11, 2020, or by the extension date of May 18, 2020, because time is needed to complete the ongoing internal reviews and  investigation.

320.    On May 29, 2020, the Company announced that the Board of the Company and of the Bank *terminated defendant Montemayor, President of Commercial and Retail Banking and Chief Lending Officer, from all of his positions with the Company, effective immediately*.

321.    On June 1, 2020, Sterling announced that it was hiring Company outsider Thomas M. O'Brien ("O'Brien") the Chairman, President and CEO of the Company and the Bank.

322.    Also on June 1, 2020, while still unable to file its delinquent annual and quarterly reports as the internal review and investigations were still ongoing, the Company reported unaudited financial highlights for its first quarter ended March 31, 2020 reflecting the establishment of reserves relating to the Bank's

Advantage Loan Program. The Company reported a net loss of $27.8 million and a "*non-interest expense of $47.0 million, reflecting loan repurchase reserves of $7.8 million related primarily to the sale of loans originated under the Bank's Advantage Loan Program and contingency reserves of $25.0 million related to previously disclosed litigation and investigations stemming from the Advantage Loan Program*," stating that "these reserves reflect additional information obtained during the course of the previously-disclosed internal review of this program." The Company further disclosed:

> As the Bank's internal review of the circumstances that led to the previously-reported discontinuation of the Advantage Loan Program has progressed, it has become apparent that the potential for liability related to the origination of residential mortgage loans under that program warrants the initial creation of reserves. Results from the internal review indicate that certain employees engaged in misconduct in connection with the origination of loans, *including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation*.
>
> ***
>
> The outcome of the pending investigations and litigation is uncertain. There can be no assurance (i) that we will not incur material losses due to damages, penalties, costs and/or expenses as a result of such investigations and litigation, (ii) that the reserves we have established will be sufficient to cover such losses, or (iii) that such losses will not materially exceed such reserves and have a material impact on our financial condition or results of operations. *In addition, in connection with the audit of the Company's December 31, 2019 financial statements the Company is evaluating whether any portion of the reserves should be applied to the fourth quarter of 2019 and/or prior periods.* The Company has incurred significant legal expenses in

defending the litigation and in cooperating with the investigations and expects to continue to do so during the pendency of these matters.

323.    Later in the day on June 1, 2020, the Company held its First Quarter 2020 Earnings Call.  During the call, while stating that he could not say more than what was in the press release earlier that day, new CEO O'Brien relayed that "my assignment here as directed by the Company's Board of Directors is **to right the ship and bring the bank into regulatory compliance and investor confidence**."  He further stated that "**we're here to fix things that need to be fix[ed] and take them on aggressively and forthrightly**" and "**look at the culture of the institution**."  He further disclosed that **roughly 30 employees had been terminated so far** in connection with the internal investigation and review.  Further, while the Company had previously relayed that it was developing products to fill the void left by the shutdown of the ALP, including with three new loan products, O'Brien stated he "**would caution you not to expect" net loan growth as "job one is to straighten out the regulatory challenges and restore the bank's regulatory standing.  So, it's frankly not the time to develop new programs.  It's the time to fix what we have . . . ."**

324.    On the June 1, 2020 call, O'Brien also disclosed that approximately $2 billion of Sterling's Advantage Loan program loans were included in the Bank's balance sheet as of March 31, 2020 and estimated that an approximately $600 million of Advantage Loans had been previously sold.

325.  To date, this internal review and investigation are ongoing and the Company has not filed its delinquent annual and quarterly reports.

### D.    Additional Scienter Allegations

#### 1.    The Consistent Accounts By Former Employees Evidence A Strong Inference of Scienter

326.  The consistent accounts of former employees whose employment spanned various time periods, locations, and roles at the Company demonstrate that the defendants were either aware of or recklessly disregarded the fact that, contrary to Sterling's representations to the investing public, its documentation, underwriting, and risk management programs were neither disciplined nor conservative; the Company was not in compliance with BSA/AML laws and SARs reporting requirements; effective internal controls were not in place to prevent fraudulent lending, underwriting, and banking practices; and the ALP program—with its lax or nonexistent income and employment verification procedures—allowed applicants to use nonstandard forms of documentation that were susceptible to manipulation without further verification or inquiry and that lent themselves to money laundering abuses.

327.  Indeed, several former employees believed that the ALP program was being used for money laundering.  Moreover, several former employees raised concerns with senior management regarding the Company's lending practices but

were ignored or even instructed by senior management to keep quiet and not worry about what they were witnessing with their own eyes.

> **a)** **Contrary To Defendants' False Statements, Sterling's Underwriting And Risk Management Were Neither Disciplined Nor Conservative**

328.  As consistently relayed by FEs 1, 2, 3, 5, and 7, the Company's underwriting and risk management for ALP mortgages were neither disciplined nor conservative.  Rather, there was almost no documentation required for ALP loans, which generated most of the Bank's business.  The only records required to evaluate a potential ALP borrower was a letter purportedly from the borrower's employer or from a CPA (for self-employed borrowers), and bank statement to verify income.

329.  The ALP targeted borrowers whose verifying documents were unreliable.  As each FE relayed, the target borrowers for the ALP were Chinese nationals, and the employer letters often came from China, were often written in Mandarin or another Chinese language, and, according to FEs 1, 3, 4, 5, 6, and 7, were then translated by the borrowers themselves or by a Chinese-language-speaking bank employee.  FE 7 further relayed that translations of the employment letters were substantially similar in format.  One former employee, FE 1, was told by a Sterling underwriter that many of the CPA letters used in the ALP were from the same source, as the letters came from the same IP address.  Additionally, FE 1

153

relayed that the Sterling underwriter also told FE 1 that some of the CPA firms for the letters may not have actually existed.

330.   As explained by FEs 2, 3, and 7, to demonstrate the stated income in the letter, ALP customers were required to open an account at a Sterling branch with cash, and then had to make cash deposits into the account every two weeks for two months until a specified amount had been deposited representing two months' "salary."  Similarly, FE 7 relayed that, for the ALP, all the Bank wanted was two months' "salary" deposited into a bank account that matched what the employer letter stated, and that the funds remain in the account for 60 days.  Moreover, the bank statement that was used for income verification was often the very Sterling account that it required borrowers to open in connection with the ALP mortgage, which was usually opened with cash.  FE 7 noted that the source of deposits representing the borrower's purported salary usually did not identify the purported employer.

331.   Further, FE 5 stated that Sterling provided "no training" on risk or compliance and that Sterling employees with whom FE 5 dealt had no training or familiarity with SARs, CTRs, or other compliance procedures.  In one instance, FE 5 spoke with a retail banker at one of Sterling's San Francisco branches and commented that the retail banker may need to complete a SAR.  This confused the retail banker, who thought that SARs referred to Severe Acute Respiratory

Syndrome.  FE 5 then spoke to that person's manager, who also did not appear familiar with SARs.

332.  As relayed by these former employees, this was the extent of the underwriting and all that was needed to satisfy the assets and income test of the ALP. Indeed, FEs 2, 3, 5, 6, and 7 have said that there was no attempt to confirm the employment or CPA information and little verification of income.  According to FE 3, there was also little or no attempt to confirm the identity of the account holder and no attempt at all to identify the source of the funds.  For example, FE 3 recalled ALP customers being asked to provide the source of an initial deposit, and the answer given was a relative, such as an aunt or cousin, but there was no follow up or attempt to confirm this information.  Further, FE 3 accounted instances where the borrower provided inconsistent statements about the identify of purported relatives, but that Sterling did nothing.  FE 2 concurred that there was no attempt to verify the source of the cash.  FEs 2, 3, 5, 6, and 7 similarly relayed that the Bank did not otherwise attempt to verify the source of the income.  As stated by FE 6, Sterling approved many loans "without getting proper ID and income verification."  And FE 3 has described the whole ALP process as "shady" and "suspicious."

333.  FE 5 similarly found the ALP to be "unnatural" and "abnormal" and felt that "something was funny" about the program.  FE 5 said that the ALP allowed money to be moved into the United States quickly and with little documentation.

And FE 5 said that while gifted funds were allowable if from a borrower's family members, Sterling's review of these gifts was limited to requiring only that the funds deposited into a borrower's account matched those of the purported gifts. FE 5 stated that Sterling did not otherwise verify the source of the funds.

334. FE 6, who has been in the mortgage banking business for 20 years, stated that Sterling's ALP loans left "a bad taste in my mouth." FE 6 was "not at ease" performing quality control on these loans, because the process for ALP loans was "lackluster," and there was not much "regulation" of these loans.

335. Similarly, FE 7, who underwrote loans in the ALP, stated that gifts were allowed to satisfy the down payment requirement. FE 7 said the ALP loans "lacked substance and documentation." FE 7 felt that the situation "didn't make sense" and wondered "where all the money came from" and "how is it so easily transferred." FE 7 also confirmed that Sterling had weak and deficient internal controls.

> **b)    Former Employee Accounts Detail Indicators Of Money Laundering, And Several Suspected That The ALP Was A Vehicle For Money Laundering**

336. The consistent former employee accounts above not only demonstrate that Sterling's underwriting was neither conservative nor disciplined, but they also detail tell-tale red flags of money laundering. The indicators of possible money laundering at Sterling described by former employees include the fact that (a) cash was deposited in structured amounts into home loan accounts, (b) deposits to buy a

property were often from unverified sources or third parties, (c) ownership of property was often the customer's only link to the United States, (d) the transactions involved foreign nationals or non-residents, (e) there were doubts about the validity of the documents submitted with loan applications; and (f) there was questionable involvement of third-parties including brokers.

337.   As such, and not surprisingly, several former employees believed that the ALP was being used to launder money.  FEs 2, 3, 5, and 7 suspected that the large deposits of cash and the use of cash to purchase real estate, without any verification of the source of that cash, appeared to be illegal money laundering.

338.   FE 5 found the widespread use of "gifts" that would arrive in borrower's accounts from unconfirmed sources on the eve of closing to be particularly suspect.   Similarly, FE 3 recounted instances where the borrower provided inconsistent statements about the identity of purported relatives, but that Sterling did nothing.

339.   Similarly, FEs 3 and 7 wondered if these were laundered funds because there were questions about where the funds came from.  The Bank did not seek to confirm the source of the funds, which were sometimes large amounts.

340.   FE 7 has been in the mortgage lending business for 40 years and has performed forensic underwriting for the DOJ, which helped the DOJ levy fines against lenders.  So as FE 7 states, "I know when I see something funky."

### c) Several Former Employees Sought To Alert Senior Management About Their Concerns With The ALP But Were Rebuffed

341. Several of the former employees sought to alert senior management about their concerns. Not only did their complaints fall on deaf ears, but they were told to stay out of it and keep their mouths shut. FE 3 expressed concerns about the ALP and possible money laundering to Sterling's Vice President and General Counsel, and to two supervisors in the BSA/AML program. However, nothing changed. According to FE 3, approximately two months before leaving Sterling's employment, FE 3 was due for a promotion but was told by FE 3's supervisor that because FE 3 had voiced issues with the ALP program, FE 3 would not be promoted.

342. FE 1 said Yihou Han was one of the employees fired by Sterling in November 2019. FE 1 states that Yihou Han told FE 1 that Han was terminated for using a broker to send prospective clients to the bank and that defendant Montemayor was aware of the use of the broker. But FE 1 said that according to a Sterling underwriter, the reason Yihou Han was fired was the CPA letters she was using had come from the same IP address. FE 1 stated that Montemayor knew of the issues with both the broker and the CPA letters. As noted above, real estate transactions are high risk for money laundering in part because of multiple third parties that can complicate and manipulate the transactions. Of special concern is

the risk that a broker or other third party will put forward straw buyers to conceal the true ownership of the property and the funds used to acquire property.

343.   A different former employee, FE 2, relayed that sometime in 2015, Yihou Han approached FE 2 to process a loan and presented as part of the loan documentation a tax return that was clearly fraudulent.  FE 2 had been in the industry for a long time and believed that the return was fraudulent.  FE 2 told Yihou Han that the return was fraudulent, and that FE 2 would not move forward with the loan. Han was "furious" and walked away, and FE 2 and Yihou Han never spoke to each other again.

344.   FE 1 was at Sterling when the OCC audit was conducted, but said that management kept everyone in the dark about the audit.  FE 1 was contacted by an OCC auditor and then informed both a supervisor and Montemayor that FE 1 had been contacted by the OCC auditor, but was instructed by Montemayor not to speak with the auditor and, if contacted again, to immediately let Montemayor know.  FE 1 believes that ***Montemayor "absolutely" was fully aware of all the problems with the ALP and that there was no way he could not be aware***.

345.   Yet another former employee, FE 7, sought to bring concerns about the ALP to Jon Kolk, the manager of underwriting at Sterling, who worked in the main office in Southfield, Michigan, where (according to FE 2) all underwriting was done.

But Kolk told FE 7 that Sterling had done these loans for many years and that FE 7 should "not question them, just underwrite."

346.   In addition, FE 7 complained to Jon Kolk about Steve Adams—Sterling's Senior Vice President of Residential Lending who was terminated years later at the end of the Class Period in connection with the ALP investigations—as someone whose conduct and statements during the underwriting process appeared to violate the Company's ethical Code of Conduct.  According to FE 7, Adams was aggressive about approving loans and did not want to have them held up due to underwriting.

347.   According to a different former employee, FE 2, Jon Kolk had previously worked at WSB which had a similar "quick qualifier" program, a low-documentation loan employed by WSB, among other less reputable lenders.  FE 2 stated that WSB "ran into regulatory problems several years ago."  According to FE 2, Montemayor "protected" Kolk.

> **2.    The Suspension And Then Termination Of The ALP And The Timing Thereof Shortly After The Defendants Issued False Statements Further Support Scienter**

348.   The timing of the collapse of the ALP shortly after the defendants issued false statements regarding Sterling's underwriting, risk management, internal controls, asset quality, and ALP further supports a strong inference of scienter.

349.   On June 21, 2019, the Company issued a press release disclosing that it had entered into an agreement with the OCC regarding deficiencies in its AML and BSA compliance.  The agreement specifically states that the OCC "has found unsafe or unsound practices relating to the Bank's credit administration and violations of law relating to certain aspects of the Bank's Bank Secrecy Act/Anti-Money Laundering ('BSA/AML') compliance program."  Sterling nevertheless assured investors that there would be no material or negative impact on the Company. Although not mentioned by Sterling in its June 21, 2019 press release nor previously disclosed, the OCC Agreement also states that the OCC found BSA/AML violations as detailed in its March 31, 2018 Report of Examination and that the OCC found unsafe or unsound practices relating to the Company's credit administration.

350.   Yet, just three months prior to Sterling's June 21, 2019 revelation of the OCC Agreement, its 2018 10-K filed with the SEC on March 18, 2019 falsely touted, *inter alia*, its "disciplined and conservative underwriting approach," its "disciplined documentation of [customers'] ability to repay," its "effective" risk management that "includes a thorough review of [borrowers'] ability to repay, liquidity analysis and face-to-face customer interaction," its "risk-conscious culture," and its duty to "comply with significant anti-money laundering" laws and regulations.

351.    Defendants made similar false representations in a Proxy Statement filed on April 9, 2019 and in the Company's First Quarter 2019 10-Q filed on May 9, 2019.   And in an investor presentation on May 21, 2019, Sterling continued to emphasize its "deep customer knowledge," "focus on efficiency and credit quality," and "strong credit culture"—*just one month prior* to the June 2019 disclosure.

352.    Then on November 8, 2019, in its Third Quarter 2019 10-Q, Sterling disclosed that it had terminated the employment of its top two ALP loan producers, but it failed to disclose that the entire ALP program might be in jeopardy.   Rather, it merely stated, under "risk factors," that "*if* these producers or other loan producers within our Advantage Loan program are found to have engaged in misconduct, we could face regulatory or other pressure to disband the Advantage Loan Program, which would materially and adversely affect our profitability and margins" (emphasis added).   Thus, even as it acknowledged that these top two ALP producers had been fired, the Company would not acknowledge that they had engaged in misconduct.

353.   And when the Company announced *just one month later*, on December 9, 2019, that it was suspending the ALP in connection with an internal compliance review, even at that point, defendants assured the market that it was just a "*temporary* halt" and that management intended to resume the program.   Likewise,

on January 29, 2020, in the Fourth Quarter and Year-End 2019 Earnings Call, defendant Lopp described the temporary halting of the ALP merely as a "*setback*."

354.   But then, *just over a month later*, on March 6, 2020, Sterling disclosed that *it was shuttering the ALP for good*, explaining that the "preliminary" results of its internal investigation into the ALP found that certain employees had engaged in misconduct in connection with the program's loan origination process, including its income-verification requirements, reliance on third parties, and related documentation issues.  It revealed that, as a result, a significant number of employees had resigned or were terminated, *including the Senior Vice President with primary responsibility for oversight of the ALP in California*, whom the Company expressly touted in connection with the IPO and risk management and specifically represented to the SEC was "*fully integrated into monthly senior management meetings*."  The Company also disclosed on March 6, 2020 that the Bank was now under formal investigation by the OCC and, further, that the Bank had received grand jury subpoenas from the DOJ in connection with an investigation into the Bank's residential lending practices and related issues.

### 3. Scienter Is Established By The Fact That The Misconduct Related To Sterling's Core Business

355.   A strong inference of scienter is also established by the fact that the misconduct related to Sterling's core business and product—the ALP—which represented four-fifths of the Company's residential loans and two-thirds of the

163

Company's total loan portfolio.   About 86% of Sterling's total loans as of September 30, 2019 were mortgages, and Advantage Loans made up 83% of all mortgage production during the first nine months of 2019.   Thus, the ALP was of crucial importance to the Company.   Facts that are critical to Sterling would have been known by its executive officers.

### 4.   The Officer Defendants' Oversight Of The Company's Day-To-Day Operations And Business, And Direct Knowledge Of Issues, Evidence Scienter

356.   The Officer Defendants directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to information regarding the ALP and Sterling's underwriting and loan business.   The Company acknowledged in its SEC filings that it had "established a culture that *places credit responsibility with* individual loan officers and *management*."   Indeed, in a letter to the SEC dated October 19, 2017—just prior to the IPO—the Company confirmed that its senior leadership regularly visits the bank branches and utilizes videoconferencing technology to enable face-to-face contact with management regarding the Company's operations.

357.   Specifically, on October 12, 2017, in reviewing the proposed IPO Registration Statement and Prospectus, the SEC wrote to Judd and requested that he "tell us what consideration you gave to including a risk factor to address the risks, if any, associated with your senior leadership team being located in Southfield,

Michigan while most of your lending activity occurs in California." On October 19, 2017, Sterling responded as follows:

> The Company respectfully advises the Staff that after due consideration, the Company does not believe the location of its senior leadership team in Southfield, Michigan despite the majority of lending activity occurring in California presents a material risk to the Company's financial condition or results of operations for the following reasons. ***The Company's senior leadership team typically spends at least one week per month at the Company's primary San Francisco branch and makes periodic in-person visits to its Los Angeles operations and more recently, to Seattle and New York City.*** In addition, ***the Company has long-tenured employees based in California, including a senior vice president with over 28 years' experience at the Company and a vice president of commercial lending with over 9 years' experience at the Company, each of whom are fully integrated into monthly senior management meetings.*** Finally, ***the Company utilizes videoconferencing technology to enable virtual face-to-face contact as its operations have grown geographically.***

358. Thus, the Company confirmed just prior to the IPO that it was—and would continue to be—in close and regular communication with senior management regarding its day-to-day operations and loan business. As stated in the 2017 Prospectus, senior management comprised Montemayor, Judd, and Lopp.

359. As alleged above, FE 1 has stated that Montemayor was fully aware of all the problems with the ALP and that there was no way he could not have been aware. And FE 1 confirmed that ***Montemayor was the person with the most knowledge about the bank's operations***.

360.    Moreover, FE 5 commented that Sterling and its executives were "playing with fire" with the ALP and that the senior executives "had to have known what was going on."

### 5.    The Numerous And Suspiciously Timed Terminations And Resignations Of Key Senior Executives And Directors Evidence Scienter

361.    The numerous and suspiciously timed departures of Sterling's top executives and directors support a strong inference of scienter.  On June 21, 2019, the Company announced that Director Defendant Fox, who had served as a director for 22 years (since 1997)—and most recently as a member of the Audit and Risk Management Committee—resigned, effective June 18, 2019.  The timing of Fox's departure was highly suspicious; on the same day that Sterling announced Fox's resignation, the Company also disclosed that it had entered into an agreement with the OCC regarding deficiencies in its BSA/AML compliance.

362.    Then, on October 17, 2019, the Company announced that Judd—who had been with the Company since August 2008—was retiring, and that Lopp would be taking over as CEO.  The timing of Judd's resignation supports a strong inference of scienter.

363.    Just three weeks later, on November 8, 2019, in its Third Quarter 2019 10-Q, the Company disclosed that it had "terminated two of our top loan producers

within [the ALP] who were collectively responsible for 15% of our residential loan production through September 30, 2019."

364. One month later, on December 9, 2019, Sterling disclosed that it was suspending its ALP in connection with an internal review of its documentation procedures and that the ALP was "a material component of the Bank's total loan originations." In response to this news, a contributor to *Seeking Alpha* stated: "This program was just responsible for too many of the loans they originated. This news basically means the business will nearly stop for a while. ***Seems like the CEO quitting was not a coincidence after all.***" *Sandler O'Neill* issued a report that same day, stating that Sterling's suspension of the ALP "suggests potentially broader issues with internal controls, which could include faulty documentation, appraisal issues or other problems (management did not disclose any such details)."

365. Ten days later, on December 19, 2019, the Company announced that Tom Minielly, who had replaced Fox on the Board and who also served on the Audit and Risk Management Committee, was resigning—just six months after being appointed to the Board to replace Fox.

366. On December 27, 2019, in response to the suspension of the ALP, *American Banker* reported that the "decision stunned industry observers, leaving them to wonder what led to the decision." Robert Bolton, president of Iron Bay Capital and a Sterling shareholder, was concerned about the dearth of details in

Sterling's announcement and stated that it "***looked like there was something really bad there.***"

367.  A little over two months later, on March 6, 2020, the Company announced that the bank was terminating the ALP and that "a significant number of employees either have been terminated, including the Senior Vice President with primary responsibility for, among other things, oversight of the Advantage Loan Program in California, or have resigned" and that Sterling was under investigation by the OCC and DOJ.  A March 9, 2020 report by *Piper Sandler* stated that the Company's March 6 disclosure "raises questions about the adequacy of internal controls or the possibility of restated results."

368.  Just two months after that, on May 8, 2020, the Company announced that defendant Lopp, having served as CEO for only five months, was also resigning, effective immediately.  Lopp had been with the Company for 20 years, serving as Chief Operating Officer since 2009 and CFO since 2002, and also as President beginning in December 2016.  Lopp also led Sterling's expansion into Southern California in 2015.

369.  Three weeks after Lopp's resignation, on May 29, 2020, the Company announced that it had "***terminated Michael Montemayor from all of his positions*** with the Company and the Bank, including his positions as President of Commercial and Retail Banking and Chief Lending Officer, effective immediately."

Montemayor had been with the Company for 25 years, having first joined the Company as a Residential Lender in 1992. Montemayor worked his way through the Company as a Regional Branch Manager, Commercial Loan Officer, Construction Loan Officer, Construction Lending Manager, Managing Director of Commercial Lending, and then Chief Lending Officer starting in 2006, and served as the Retail Branch Executive from 2013 on. He also served as Executive Vice President from 2006 to 2016 and as President of Commercial and Retail Banking from December 2016 until his termination. The 2017 Prospectus asserted that Montemayor's "broad experience in all aspects of our lending business and his long-term service as our Chief Lender has helped to provide continuity and consistency in our business model and lending practices."

370. Thus, all three members of senior management identified in the 2017 Prospectus—defendants Judd, Lopp, and Montemayor—resigned or were terminated from the Company in the wake of the investigations into the Company's lending, underwriting, internal control, and risk management practices.

371. Most recently, on a June 1, 2020 earnings call, the Company's new Chairman, President and CEO, Thomas O'Brien, stated that *"just short of 30" employees were let go in association with the ALP*—or almost 10% of the Company's entire work force.

      **6.      The BSA And AML Violations Cited By The OCC, Its Subsequent Formal Investigation Of The Bank, And The Separate Investigation By The DOJ Evidence Scienter**

372.   The fact that Sterling and its Board of Directors have been found by the OCC to have engaged in violations of the BSA and AML regulations and that the Bank is under formal investigation by the OCC supports a strong inference of scienter. Indeed, the Company's own SEC filings, which describe the regulatory framework within which the Bank must operate, establish defendants' awareness of their obligations to comply with BSA/AML laws and regulations.

373.   While the OCC's findings regarding Sterling's violations of law are not public, the detailed obligations imposed on Sterling in the OCC Agreement meant to remedy those violations strongly suggest that those violations reflected fundamental failings at multiple levels within the purview of senior management and the Board. These include deficiencies involving core BSA/AML responsibilities including customer due diligence, enhanced due diligence, validation of documentation provided for those purposes, suspicious activity monitoring, adequate BSA staffing, verification of income and legitimacy of funds, and internal controls and risk management related to the foregoing.

374.   Despite defendants' awareness, the Company nevertheless engaged in practices that resulted in a finding of noncompliance, a formal investigation by the OCC, and the termination or resignation of both CEOs (defendants Judd and Lopp),

defendant Montemayor, a senior vice president in charge of the ALP, and the two top loan producers in the ALP, as well as others.

375.    Moreover, it was only after the OCC started raising concerns that Sterling's rocket growth started to slow.  Yet, defendants continually blamed other factors for decline in loan originations, rather than coming clean about the ongoing OCC investigation, which further supports a strong inference of scienter.

376.    Further, the Company has received multiple grand jury subpoenas from the DOJ regarding the Company's residential lending practices.  This investigation into the Company's practices is further evidence of scienter.  Indeed, as the Company disclosed on June 1, 2020, it created contingency reserves of $25.0 million related to previously disclosed litigation and these investigations and other litigation stemming from the Advantage Loan Program.

### 7.    Massive Insider Trading On Sterling's Artificially Inflated Stock Price Supports A Strong Inference Of Scienter

377.    The Company's insiders engaged in massive insider trading during the Class Period.  Trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter.

378.    Here, the suspicious insider trading, which consists of massive sales by members of the Founding Family—either individually or through trusts associated with them—in the IPO and thereafter, is evidence of scienter.  The timing of the

insider stock sales is also suspicious, as the sales were made when the stock was trading at inflated prices due to defendants' false and misleading statements.

379.   Specifically, members of the Founding Family, including Director Defendants Meltzer and Sandra Seligman and Bank founder and President Scott Seligman, individually or through family trusts, sold 9,557,692 shares of Sterling common stock at $12.00 a share for gross proceeds of *$114,692,304* in the IPO, including the overallotment.  This is more money than the Company itself raised in the IPO.  On December 4, 2019, *just three trading days* before Sterling announced that it was suspending its ALP, the K.I.S.S. Dynasty Trust No. 9 sold 400,000 shares for proceeds of *$3,792,000*.  Thus, the gross proceeds from these insider sales totaled *$118.4 million.*

380.   The following chart shows the insider trading during the Class Period:[19]

---

[19] As the Class Period starts with the IPO, there is no prior period with which to compare these trades.

| Insider[20] | Total CP Shares Sold 1/17/2017– 3/17/2020 | Total CP Gross Proceeds 1/17/2017– 3/17/2020 |
|---|---|---|
| K.I.S.S. Dynasty Trust No. 5 (10% Owner) | (2,018,682) | $24,224,184.00 |
| K.I.S.S. Dynasty Trust No. 9 (10% Owner) | (3,763,268) | $44,151,216.00 |
| Meltzer, Seth S. (Director) | (398,820) | $4,785,840.00 |
| Scott J. Seligman 1993 Long Term Irrevocable Dynasty Trust (10% Owner) | (1,544,421) | $18,533,052.00 |
| Scott J. Seligman Revocable Living Trust (10% Owner) | (992,599) | $11,911,188.00 |
| Scott J. Seligman 1993 Irrevocable Dynasty Trust | (634,043) | $7,608,516.00 |
| Rachel S. Meltzer Revocable Living Trust | (209,582) | $2,514,984.00 |
| Sandra Seligman 1993 Long Term Irrevocable Trust | (396,277) | $4,755,324.00 |
| **Totals:** | **(9,957,692)** | **$118,484,304.00** |

381.   Defendant Meltzer has served as a director since October 2000, and the 2017 Prospectus discloses that he "helped guide the Bank through the 2008 financial crisis and was instrumental in curing Sterling's troubled asset and OREO portfolio" and chairs the Bank's Asset-Liability Committee.

---

[20] As stated in the November 17, 2017 Prospectus, Erwin A. Rubenstein, trustee to the Seligman family, holds sole voting and dispositive power over shares held by shares owned by the Scott J. Seligman 1993 Irrevocable Dynasty Trust, Scott J. Seligman 1993 Long Term Irrevocable Dynasty Trust, K.I.S.S. Dynasty Trust No. 9, K.I.S.S. Dynasty Trust No. 5, and Sandra Seligman 1993 Long Term Irrevocable Trust.  Scott Seligman holds sole voting and dispositive power over shares held by the Scott J. Seligman Revocable Living Trust.

382.   His mother, defendant Sandra Seligman, who has served as a director since the Company's inception, is the sister of Scott J. Seligman, vice president of the Company and founder of the Bank.  The 2017 Prospectus for the IPO discusses the influence that Scott Seligman and his family have on the Company's day-to-day operations:

> The Seligman family, through the family's trustee and the Bank's founder and the Company's Vice President, Scott Seligman, will have the ability to influence Company operations and control the outcome of matters submitted for shareholder approval and may have interests that differ from those of our other shareholders.
>
> . . . Seligman, the founder of the Bank, Vice President of the Company and consultant to the Bank's board of directors, represents the interests of the family and *continues to serve in an advisory capacity to the Company and the Bank, including through attendance at board meetings and frequent consultation with senior management.* Therefore, Mr. Seligman will continue to have access and influence with respect to Company operations and the Seligman family trustee will continue to have effective control over the outcome of votes on all matters requiring approval by shareholders after the offering . . . .

383.   In sum, the massive sales by members of the Founding Family—who exerted substantial control over the Company's management and operations—and the timing of those sales constitute strong evidence of scienter.

### 8.   The Lack of Internal Controls Is Also Evidence of Scienter

384.   The reports by the former employees discussed above, regarding the lack of internal controls over the Company's risk management, lending practices, underwriting procedures, and BSA/AML compliance, together with the OCC's

finding that the Company's internal controls were lacking, supports a strong inference of scienter.

385.   As alleged above, the BSA program must provide for a system of internal controls to assure ongoing compliance, independent testing for compliance, an individual responsible for coordinating and monitoring day-to-day compliance, and training for appropriate personnel.  Those controls either were not in place or were seriously lacking at Sterling during the Class Period.

386.   The OCC Agreement specifies that responsibilities imposed upon the Board include ensuring that Sterling has "sufficient processes, management, personnel, control systems, and corporate and risk governance to implement and adhere to all provisions of this Agreement."

### 9. The Fact That Defendants Violated The Company's Own Code Of Conduct And Risk Management Policy Further Supports Scienter

387.   The Company's Code of Conduct provides that, among other things:

[E]mployees, officers, and directors who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct [Company] business.

\*\*\*

To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal.  Employees, officers and directors must exercise the utmost care when handling material inside information.

\*\*\*

*[E]mployees, officers and directors must not allow information that has not been made public to influence their own investments.*

\*\*\*

[A]n employee, officer or director must not make or cause to be made a materially false or misleading statement about or concerning the affairs of the Company. ***Any employee, officer or director who commits a dishonest or fraudulent act will be terminated.*** Furthermore, the law requires the Company to file suspicious activity reports with the appropriate law enforcement agencies after discovery of known or suspected criminal acts involving the Company or its subsidiaries, whether committed by employees or others, or of crimes or suspected crimes believed to be committed by Company employees or others against another financial institution.

\*\*\*

The Company's periodic reports and other documents filed with the Securities and Exchange Commission (the "SEC"), including all financial statements and other financial information, must comply with federal securities laws and SEC rules. Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements or other financial information must ensure that the Company's books, records and accounts are accurately maintained.

\*\*\*

Each director, officer and employee who is involved in the Company's disclosure process must . . . be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

\*\*\*

176

If, in conducting business for the Company, an employee becomes aware of any illegal conduct or suspected illegal conduct (including any dishonest or fraudulent act) on the part of any person, the employee must inform the Internal Audit Department, which will investigate the matter . . . .   Furthermore, an employee must not refuse to answer questions of the Company's internal investigative personnel concerning any matter related to the performance of his or her official duties or to any other person dealing with or employed by the Company.  ***The Company does not tolerate acts of retaliation against any director, officer of employee who makes a good faith report of known or suspected acts of misconduct or other violations of this Code***. (Emphasis added).

388.   Additionally, the IPO Prospectus and subsequent Class Period SEC filings state in pertinent part that:

**[E]ffective risk management is of primary importance to our organization**. . . .   Risk management refers generally to the activities by which we identify, measure, monitor, evaluate and manage the risks we face in the course of our banking activities.  These include liquidity, interest rate, credit, operational, cyber/technological, legal, ***compliance, regulatory***, strategic, financial and ***reputational risk exposures***.   ***Our board of directors and management team have created a risk-conscious culture*** that is focused on quality growth, which includes infrastructure capable of addressing the evolving risks we face, as well as the changing regulatory and compliance landscape.  Our risk management approach ***employs comprehensive policies and processes to establish robust governance*** and ***emphasizes personal ownership and accountability for risk with our employees***.  ***We believe a disciplined and conservative underwriting approach has been the key to our strong asset quality***.

***Our board of directors sets the tone at the top of our organization, adopting and overseeing the implementation of our company-wide risk management framework, which establishes our overall risk appetite and risk management strategy***.   Our Enterprise Risk Committee meets every other month and provides a written report to our board on a quarterly basis regarding our enterprise risk management function, which includes risk policies, procedures, limits, targets and

177

reporting structured to guide decisions regarding the appropriate balance between risk and return considerations in our business. . . . (emphasis added).

389. Here, the fact that the Officer Defendants, the Company's insiders, and members of senior management acted contrary to the Company's own Code of Conduct and its stated risk management policies is additional evidence of defendants' scienter, as it establishes a consciousness of wrongdoing. In other words, defendants cannot plead ignorance of the duties set forth above. In fact, this inference is strengthened by now-CEO O'Brien's comment on the June 1, 2020 analyst call that new management had to "look *at the culture of the institution*."

### 10. Defendants Judd and Lopp's Sarbanes-Oxley Certifications Further Establish Their Scienter

390. Defendant Judd signed the Company's Registration Statement, 2017 10-K, and 2018 10-K. Defendant Lopp also signed the Company's Registration Statement, 2017 10-K, 2018 10-K, First Quarter 2018 10-Q, Second Quarter 2018 10-Q, Third Quarter 2018 10-Q, First Quarter 2019 10-Q, Second Quarter 2019 10-Q, and Third Quarter 2019 10-Q. In connection with those SEC filings, Judd and Lopp signed SOX certifications attesting to the accuracy and reliability of the Company's reported financial results for full year 2017 and 2018 and the first, second, and third quarters for 2018 and 2019 and the effectiveness of the Company's disclosure and internal controls procedures.

391.   Given that the Company's SEC filings falsely represented, *inter alia*, that the Company's risk management included "disciplined documentation of [customers'] ability to repay," that it engaged in "disciplined underwriting," that its loan approval process requires financial information from its borrowers, that its "board of directors and management team have created a risk-conscious culture," that the Company's "risk management approach employs ***comprehensive policies and processes to establish robust governance*** and emphasizes personal ownership and ***accountability*** for risk with our employees," and falsely touted Sterling's "***disciplined and conservative underwriting approach***," the SOX certifications signed by defendants Judd and Lopp further support scienter.

### E.   Violations Of SEC Rules Regarding Disclosures In Public Filings

392.   SEC rules and regulations govern the preparation and content of disclosures made by public companies in SEC filings.  In failing to disclose material information about the violations found by the OCC and related risks, defendants violated these rules and regulations.

393.   SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

394.   Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's periodic filings with the SEC, among other things:

> (i)  Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected.  In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

395. Instruction No. 3 to Section 303(a) provides: "The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations."

396.    Item 103 of Regulation S-K, 17 C.F.R. § 229.103, governing the disclosure of legal proceedings, requires an issuer to disclose in its periodic SEC filings "proceedings known to be contemplated by governmental authorities," as follows:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject.  Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought.  Include similar information as to any such proceedings known to be contemplated by governmental authorities.

397.    Item 503(c) of Regulation S-K, 17 C.F.R. § 229.503(c), which governs disclosure of risk factors, requires an issuer to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky."  Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."  Item 1A to Part I of the General Instruction instructs issuers about disclosing the risk factors in Forms 10-K, while Item 1A to Part II, which apply to Forms 10-Q, similarly requires the issuer to "[s]et forth any material changes from risk factors as previously disclosed in the registrant's Form 10-K (§ 249.310) in response to Items 1A. to Part [I] of Form 10-K."

181

398. Defendants violated the affirmative disclosure duties imposed by Items 303, 103, and 503(c) by failing to disclose, among other things, the following material information in the Company's Forms 10-Q and 10-K filed during the Class Period: (a) that as of March 31, 2018, the OCC had issued a Report of Examination that detailed BSA/AML violations of law by the Company and unsafe or unsound practices relating to the Company's credit administration; (b) that, as a result, Sterling was exposed to risks and/or uncertainty that the violations could result in the OCC or other regulatory bodies taking further inquiries and/or pursuing further actions that could result in significant costs and expenses, including potential sanctions, penalties or reputational damage; and (c) that the Company's financial results could be adversely affected. None of the post-First Quarter 2018 10-Qs or 10-Ks issued during the Class Period (up until August 27, 2019) disclosed the March 31, 2018 OCC Report of Examination or the associated risks and potential harm resulting therefrom, including penalties, costs, or reputational injury. The failure to disclosure this material information, therefore, violated the disclosure obligations imposed by Items 303, 503, and 103. Defendants falsely led investors to believe that the Company was not exposed to any risk other than those already disclosed.

## F.    Loss Causation

399.   During the Class Period, as detailed herein, Sterling and the Officer Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock price and operated as a fraud or deceit on acquirers of the Company's common stock.   At all relevant times, defendants issued materially false and misleading statements or omissions concerning the Company's growth, underwriting, risk management, compliance, and internal controls, including in relation to its Advantage Loan Program.   These materially false and misleading statements caused Sterling common stock price to be artificially inflated during the Class Period.   Lead Plaintiff and other Class members purchased Sterling's common stock at those artificially inflated prices.

400.   As detailed above, when the truth about, *inter alia*, the Company's growth, underwriting, risk management, compliance, internal controls, and the Advantage Loan Program was revealed, the Company's common stock declined as the prior artificial inflation came out of its common stock price.   That decline in Sterling's common stock price was a direct result of the nature and extent of the fraud finally being revealed to investors and the market.   The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Lead Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated

183

to the fraudulent conduct.    Accordingly, these false and misleading statements directly or proximately caused Lead Plaintiff and other Class members to suffer damages.

401.  The truth was revealed in a series of partial corrective disclosures until the end of the Class Period, including:

(a)  On June 21, 2019, after the market closed, Sterling disclosed that it had entered into an agreement with the OCC to enhance its AML and BSA compliance and that Director Defendant Fox, who had been a member of the Audit Committee was resigning from the Board.  Upon this news, including the attempts to minimize it, Sterling's stock price dropped $0.16, or 1.59%, from a close of $10.06 on Friday, June 21, 2019 to a close of $9.90 on Monday, June 24, 2019.

(b)  On November 25, 2019, before the market opened, analyst *Sandler O'Neill* issued a report downgrading its rating of the Company including due to the Company's termination of the two top ALP loan producers.  In response, Sterling shares fell from a close of $9.90 on Friday November 22, 2019 to a close of $9.70 on Monday November 25, 2019, a decline of $0.20 or 2.02%.

(c)  On December 9, 2019, Sterling revealed that it was suspending its Advantage Loan Program due to an internal review of its documentation procedures.  Upon this news, Sterling shares fell from a close of $9.45 on Friday December 6, 2019 to a close of $7.29 on Monday December 9, 2019, a decline of $2.16 or 22.86%, on heavy volume.

(d)  On March 6, 2020, after the market closed, Sterling disclosed the preliminary results of its internal investigation into the Advantage Loan Program, which found that certain employees engaged in misconduct in connection with the program's loan origination process, including its income verification and requirements, reliance on third parties and related documentation. As a result, Sterling announced that a significant number of employees had been terminated, with more

terminations and resignations to come, and that it was shutting down the Advantage Loan program. The Company also disclosed that the Bank had received grand jury subpoenas from the DOJ, relating to its investigation into the Bank's residential lending practices and that the Bank was under formal investigation by the OCC. On this news, the price of Sterling's shares declined from $6.67 on Friday, March 6, 2020 to a close of $4.88 on Monday, March 9, 2020, a decline of $1.79, or 26.84%, on heavy trading volume.

(e)     On March 17, 2020, after the market closed, Sterling notified the SEC that it would delay the filing of its 2020 10-K to allow for time needed to complete (i) additional review and procedures, including by the Company's independent auditors relating to the circumstances to the Advantage Loan Program and related matters, and (ii) the ongoing internal investigation lead by outside counsel relating to the Advantage Loan Program. On this news, the price of Sterling shares declined from a close of $4.54 on Tuesday, March 17, 2020 to a close of $2.94 on Wednesday, March 18, 2020, a decline of $1.60, or 35.24% on heavy trading volume.

402.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other Class members was a direct result of the fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the prior misrepresentations and other fraudulent conduct were revealed.

## G.     Presumption Of Reliance

403.    Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the-market doctrine. At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the

Company from all publicly available sources and reflected such information in the

price of the Company's securities.  Throughout the Class Period:

(a)     Sterling common stock was actively traded on the NASDAQ;

(b)     The market price of Sterling's common stock reacted promptly to the determination of public information regarding the Company;

(c)     The Company's stock was followed by financial analysts, including those cited in this Complaint;

(d)     The average weekly trading volume for Sterling stock during the Class Period was 462,466 shares;

(e)     As a regulated issuer, Sterling filed periodic public reports with the SEC during the Class Period;

(f)     Sterling regularly communicated with public investors via established market communication mechanisms; and

(g)     As of March 17, 2020, Sterling had 49.944 million outstanding shares of common stock and a public float of 14.807 million. Also, the Company's market capitalization reached as high as $775,912,000 during the Class Period.

404.   Throughout the Class Period, the Company was consistently followed

by the market, including securities analysts.  The market relies upon the Company's

financial results and management to accurately present the Company's financial

results.  During this period, Sterling and the Officer Defendants continued to pump

materially false and misleading information into the marketplace regarding the

Company.  This information was promptly reviewed and analyzed by analysts and

institutional investors and assimilated into the price of the Company's securities.

405.   As a result of the misconduct alleged herein (including defendants' false and misleading statements and omissions), the market for Sterling's common stock was artificially inflated.   Under such circumstances, the presumption of reliance, available under the "fraud-on-the market" theory, applies.   Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which defendants are each responsible.

406.   Lead Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of Sterling's common stock at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

407.   Lead Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted in this Complaint against defendants are predicated upon omissions of material fact for which there was a duty to disclose.   Because this action involves defendants' failure to disclose material adverse information, including regarding the Advantage Loan Program, which made up the vast majority of the Company's loans—information that defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a

reasonable investor might have considered them important in making investment decisions.

408.    Had Lead Plaintiff and other members of the Class known of the material adverse information not disclosed by defendants or been aware of the truth behind defendants' material misstatements, they would not have purchased Sterling's common stock at artificially inflated prices.

**H.    Claims For Relief**

**COUNT I**
**Violations of Section 10(b) of the Exchange Act**
**And Rule 10b-5 Promulgated Thereunder**
**(Against Sterling and the Officer Defendants)**

409.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

410.    Throughout the Class Period, the Company and the Officer Defendants, directly or indirectly, by the use of means or instrumentalities of interstate commerce, the United States mails, interstate telephone communications, and a national securities exchange, made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class in connection with their purchases of the common stock of Sterling during the Class Period, all in violation of Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

411.  The Company and Officer Defendants, as the most senior officers of Sterling during the Class Period, are liable as direct participants in all of the wrongs complained of through the date they left the Company.

412.  As detailed above, these defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them.

413.  Lead Plaintiff and other members of the Class relied upon these defendants' statements and/or on the integrity of the market in purchasing shares of Sterling's common stock during the Class Period.

414.  As a direct and proximate cause of the wrongful conduct described herein, Lead Plaintiff and the Class suffered damages in connection with their purchases of Sterling's common stock at artificially inflated prices during the Class Period.  Had Lead Plaintiff and the other members of the Class known of the material adverse information not disclosed by defendants, or been aware of the truth behind these defendants' materially false and misleading statements, they would not have purchased Sterling's common stock at artificially inflated prices during the Class Period.

415.   In addition to the duties of full disclosure imposed on the Officer Defendants, as a result of their responsibility for the Company's financial statements and making affirmative statements and reports to the investing public, the Officer Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including accurate and truthful information with respect to the Company's business operations, growth, and financial condition, so that the market price of the Company's securities would be based on truthful, complete, and accurate information.

416.   By virtue of the foregoing, Sterling and the Officer Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) promulgated thereunder and are liable to Lead Plaintiff and the Class members who have been damaged as a result of such violations.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### (Against the Officer Defendants and Scott Seligman)

417.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

418.   The Officer Defendants and Scott Seligman acted as control persons of Sterling within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  By virtue of their high-level positions, agency, and their ownership and

contractual rights, participation in and/or awareness of Sterling's operations, and/or intimate knowledge of the false financial statements filed by Sterling with the SEC and disseminated to the investing public, the Officer Defendants and Scott Seligman had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Sterling, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading.  The Officer Defendants and Scott Seligman were provided with or had unlimited access to copies of Sterling's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

419.  In particular, each Officer Defendant had direct and supervisory involvement in the day-to-day operations of Sterling and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged and to have exercised that power.

420.  Scott Seligman, because of his positions with the Company and the Bank and his controlling shareholder interest, controlled the contents and dissemination of the Company's statements.

421.  As a direct and proximate result of the Officer Defendants' and Scott Seligman's wrongful conduct, Lead Plaintiff and the other members of the

Class suffered damages in connection with their purchases of Sterling's common stock during the Class Period.

422.    As set forth above, Sterling, the Officer Defendants, and Scott Seligman each violated Section 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

423.    By reason of Sterling's conduct alleged in this Complaint, and by virtue of their positions as control persons, the Officer Defendants and Scott Seligman are liable pursuant to Section 20(a) of the Exchange Act.

**COUNT III**
**Violation of Section 20A of the Exchange Act**
**(Against Scott Seligman)**

424.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

425.    This claim is brought pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against defendant Scott Seligman on behalf of all members of the Class damaged by the insider trading of this defendant during the Class Period.

426.    Lead Plaintiff purchased at least one share of Sterling common stock contemporaneously with sales of Sterling common stock by defendant Scott Seligman.

427.   By virtue of his position at Sterling and the specific facts alleged herein, Scott Seligman was in possession of material, adverse, non-public information about Sterling contemporaneously with his sale of Sterling common stock.

428.   As alleged above, Scott Seligman violated Section 20(a) of the Exchange Act.

429.   Scott Seligman violated Section 20A of the Exchange Act and applicable rules and regulations thereto by selling Sterling common stock while in possession of material, non-public information about the adverse information detailed herein.

430.   Lead Plaintiff and other members of the Class who traded in Sterling securities contemporaneously with the sales of Sterling stock by Scott Seligman have suffered substantial damages in that they paid artificially inflated prices for Sterling stock as a result of the violations of Sections 20(a) described herein. Moreover, these Class members would not have traded Sterling stock at the prices they paid or received, or at all, if they had been aware that the market prices had been artificially inflated by Sterling's false and misleading statements.

431.   Scott Seligman is required to account for all such stock sales and to disgorge his profits or ill-gotten gains.

# VIII.  SECURITIES ACT VIOLATIONS

## A.    Summary Of The Offering

432.    Lead Plaintiff brings claims arising under the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), and 77o, against all defendants.   The Securities Act claims asserted herein are brought on behalf of only those Class members who purchased or otherwise acquired shares of Sterling common stock pursuant and/or traceable to the Company's November 2017 IPO.  The Securities Act claims solely allege strict liability and negligence causes of action, and do not sound in fraud.  Accordingly, for the purpose of these Securities Act claims, Lead Plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud, intentional misconduct, or reckless misconduct.  In addition, this disclaimer expressly excludes all allegations above contained in paragraphs 98, 99, 101, 109, and 125 and in Section VII in its entirety.

433.    On October 19, 2017, Sterling filed a Registration Statement on Form S-1.  Sandler was identified as the underwriter of the IPO.  On October 31, 2017, Sterling filed Amendment No. 1 to Form S-1 with the SEC.  Sandler was identified as the underwriter of the IPO.  On November 8, 2017, the Company filed a Free Writing Prospectus slide presentation with the SEC.  On November 7, 2017, Sterling filed Amendment No. 2 to Form S-1 with the SEC.  Sandler was identified as the underwriter of the IPO.  On November 13, 2017, Sterling filed Amendment No. 3 to

Form S-1 with the SEC.  On November 16, 2017, the Registration Statement was declared effective by the SEC.  On November 17, 2017, Sterling filed the Prospectus Form 424b4, which is part of the Registration Statement, with the SEC.  These documents are collectively referred to herein as the "Registration Statement." Sandler and American Capital were identified as underwriters for the IPO.  Sandler and American Capital are referred to herein as the "Underwriter Defendants."

434.   The Company went public on November 17, 2017 through an IPO of 15,000,000 shares of common stock at a price of $12.00 per share, including 7,692,308 shares of common stock sold by the Company and 7,307,692 shares sold by selling shareholders.  The underwriters exercised their overallotment option of an additional 2,250,000 shares from the selling shareholders, the sales of which were completed on December 4, 2017.   The total offering size, including the overallotment, was 17,250,000 shares for proceeds of $207 million.

435.   The Company received net proceeds of $85.5 million from the IPO.

436.   The selling shareholders who sold in the IPO are members of the Founding Family and who held the shares individually or through trusts. The selling shareholders include Director Defendant Meltzer who is a member of the Founding Family.  The remaining selling shareholders are trusts related to Director Defendants Meltzer and Sandra Seligman (also a member of the Founding Family), defendant Scott Seligman and other members of the Founding Family.  In total, these selling

shareholders sold 9,557,692 shares for gross proceeds of $114,692,304 through the IPO.

437.   The Underwriter Defendants received $12,420,000 for its discount in selling the shares in the IPO, including the over-allotment.

## B.   The Registration Statement Contained Untrue Statements

### 1.   Untrue Statements Regarding The Advantage Loan Program And Its Underwriting, Risk Management, Growth, And The Strength Of Its Customers

438.   In the Registration Statement, Sterling touted the ALP and its underwriting, including its disciplined documentation and face-to-face meeting with its customers, its credit quality, the strength of its customers and its deep knowledge of them, and the Company's risk management:

> We believe a ***disciplined and conservative underwriting approach*** has been the key to our ***strong asset quality***.
>
> ***

> We believe our significant growth has not come at the expense of asset quality.  We have historically been able to focus on long-term returns and ***remain committed to responsible growth***.  We also believe our ***strong sales team, disciplined underwriting and culture of cost management*** have driven consistent earnings and exemplary net interest margins, efficiency metrics and shareholder returns.
>
> ***

> Our risk management includes ***disciplined documentation of ability to repay, liquidity analysis and face-to-face customer interaction.***
>
> ***

We have a loan approval process through which *we require not only financial and other information from our borrowers, but our loan officers are required to meet face-to-face with each of our borrowers in our Advantage . . . program[] and produce a narrative documentation recommending the loan*.

\*\*\*

*Our residential mortgage portfolio consists of homeowners with strong credit and ability to repay. We work directly with our borrowers and third parties to confirm their credit status and ability to repay* and offer our borrowers the opportunity to expand their credit history through what is often a first-time mortgage for the customer, while requiring a minimum down payment of 35% on our key residential loan programs.

\*\*\*

We have established a culture that places credit responsibility with individual loan officers and management and does not rely solely on a loan committee and institutional experience to *remain disciplined in our underwriting.*

\*\*\*

Our lenders are our first line of defense for assuring credit quality and the integrity of our risk rating process. Our lenders must have an understanding of the nature of the borrower's ability to repay and the nature and value of the underlying collateral. . . . The Residential loan review examines compliance with Bank policy and loan documentation testing.

\*\*\*

*We manage residential credit risks through a financial documentation process* and programs with low loan to value ratios, which averaged 62% across our residential portfolio as of September 30, 2017.

\*\*\*

197

Our extensive knowledge of our customers enables us to tailor products and solutions that fit their needs.

\*\*\*

We believe our policy of meeting each portfolio loan customer in person has enabled us to leverage our significant loan growth to increase our deposits from $953.2 million as of December 31, 2014 to nearly $2.1 billion as of September 30, 2017 . . . . We believe that significant cross-selling of our deposit products to our residential mortgage customers and enrollment in our automated payment program contribute to our solid asset quality.

\*\*\*

Among our significant products is our Advantage Loan program, which consists of one, three, five, or seven year adjustable rate mortgages with a minimum 35% down payment requirement. ***We offer this product to underserved home buyers who have good credit, but may have limited credit history.*** We offer lower rates in cases where borrowers have the ability to make more than the minimum down payment. Our Advantage Loan program constituted 75% of our residential loan portfolio as of September 30, 2017.

\*\*\*

We believe the success of our products is the result of our focus on the markets we serve, ***our understanding of customer needs, our management of product criteria, and our disciplined underwriting of the type of loans we make.*** We believe our willingness to focus on nontraditional loan products allows us to face less price competition for our non-TIC residential portfolio, in particular, than we do when competing for traditional conforming, fixed-rate mortgages. ***We have developed consistent underwriting and credit management processes tailored to each of the products we offer, allowing us to build high quality asset portfolios. We believe our relationships with, and knowledge of, our customers further enhances our credit quality, as we do not provide our key loan products to any customer unless the applicable relationship manager has met them and documented the interaction.*** We also subject our portfolios to annual stress testing and ongoing monitoring. Because we service our portfolio and retain

servicing rights on loans that we sell, we maintain access to key information that enhances our ability to manage the entire customer relationship. We believe that our continuity and consistency in underwriting is reflected by our 0.06% rate of delinquency as of September 30, 2017.

\*\*\*

[W]e have not to date received any repurchase requests and we currently believe our repurchase risk remains low based upon our *careful loan underwriting and documentation standards*.

\*\*\*

We believe that the market for our loans and servicer ratings is a testament to the *quality of our underwriting standards*.

\*\*\*

We believe this stability and institutional knowledge allows us to promote our *culture of solid underwriting and growth* across all levels of our organization.

\*\*\*

Since 2013, we have grown organically at a compound annual growth rate of 30% while maintaining stable margins and *solid asset quality*.

\*\*\*

Our enterprise risk management framework seeks to achieve an appropriate balance between risk and return, which is critical to optimizing shareholder value. *We have established processes and procedures intended to identify, measure, monitor,* report and analyze the types of risk to which we are subject, including credit, liquidity, operational, regulatory compliance and reputational.

\*\*\*

We believe that effective risk management is of primary importance to our organization. Risk management refers generally to the activities by which we identify, measure, monitor, evaluate and manage the risks we

face in the course of our banking activities.  These include liquidity, interest rate, credit, operational, cyber/technological, legal, compliance, regulatory, strategic, financial and reputational risk exposures.  ***Our board of directors and management team have created a risk-conscious culture that is focused on quality growth, which includes infrastructure capable of addressing the evolving risks we face, as well as the changing regulatory and compliance landscape.***  Our risk management approach employs comprehensive policies and processes to establish robust governance and emphasizes personal ownership and accountability for risk with our employees.  We believe a ***disciplined and conservative underwriting approach has been the key to our strong asset quality.***

Our board of directors sets the tone at the top of our organization, adopting and overseeing the implementation of our company-wide risk management framework, which establishes our overall risk appetite and risk management strategy.

439.   The Registration Statement explained the Company's analysis of credit quality:

The Company categorizes loans into risk categories based on relevant information about the ability of borrowers to service their debt such as: current financial information, historical payment experience, credit documentation, public information, and current economic trends, among other factors.  The Company analyzes loans individually by classifying the loans as to credit risk.  This analysis includes homogeneous loans such as residential real estate and consumer loans and non-homogeneous loans, such as construction and commercial real estate loans and commercial lines of credit.  This analysis is performed monthly.

440.  Based on this credit-quality analysis, the Company rated $1,895,272,000 of its $1,895,975,00 residential first mortgage loans and 100% of its $17,095,000 residential second mortgage loans as "Pass Loans:  Loans are of satisfactory quality."

441.   The November 8, 2017 Sterling Free Writing Prospectus slide presentation, which is part of the Registration Statement, touted the Company's: "Focus on efficiency and ***credit quality*** with industry leading metrics. . .[and] ***Strong credit culture***"; "***Pristine Credit Quality***"; and "***Deep customer knowledge***"

### 2.   Untrue Statements Regarding The Company's Financial Results And Growth

442.   The Registration Statement touted Sterling's growth and positive financial results which were overwhelmingly dependent on the success of the Advantage Loan Program.  The Registration Statement reported Sterling's financial numbers for the nine months ended September 30, 2017, including net income of $31.446 million, total loans of $2,386,838,000, 1–4 family residential real estate loans of $1,913,070,000, total deposits of $2.10 billion, total allowance for loan losses of $17.189 million, and allowance for loan losses for 1–4 family residential real estate loans of $13,578,000.   Moreover, the Company did not have any reserve for potential repurchases of sold loans.

443.   The Company further stated:

At September 30, 2017 and December 31, 2016, one-to-four family residential real estate loans amounted to $1.91 billion and $1.62 billion, or 80% and 81%, respectively, of our total loan portfolio, and we intend to continue this type of lending in the foreseeable future.

### 3.   Untrue Statements Regarding Sterling's Internal Controls

444.   Sterling also represented in the Registration Statement that its internal controls were effective.  The Company stated:

We maintain a system of internal controls and insurance coverage to mitigate against operational risks, including data processing system failures and errors and customer or employee fraud.

\*\*\*

Our internal policies and procedures are a critical component of our corporate governance and, in some cases, compliance with applicable regulations.  We adopt internal policies and procedures to guide management and employees regarding the operation and conduct of our business.

\*\*\*

The Sarbanes-Oxley Act of 2002 is intended to improve corporate responsibility, to provide for enhanced penalties for accounting and auditing improprieties at publicly traded companies and to protect investors by improving the accuracy and reliability of corporate disclosures pursuant to the securities laws.  We have policies, procedures and systems designed to comply with these regulations, and we review and document such policies, procedures and systems to ensure continued compliance with these regulations.

### 4.      Untrue Statements Regarding The Company's BSA/AML Compliance

445.  In the Registration Statement, Sterling described the regulatory framework it was required to comply with regarding money laundering:

As a federal savings bank, Sterling Bank is subject to primary examination and regulation by the OCC . . . . The federal system of regulation and supervision establishes a comprehensive framework of activities in which Sterling Bank may engage . . . we must comply with anti-money laundering and anti-terrorism laws and regulations.

\*\*\*

The Bank Secrecy Act, the USA Patriot Act and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program and to file timely reports such as suspicious activity reports and currency

transaction reports.   We are required to comply with these and other anti-money laundering requirements.

\*\*\*

Sterling Bank is subject to the USA PATRIOT Act, which gives federal agencies additional powers to address terrorist threats through enhanced domestic security measures, expanded surveillance powers, increased information sharing, and broadened anti-money laundering requirements.   The USA PATRIOT Act contains provisions intended to encourage information sharing among bank regulatory agencies and law enforcement bodies and imposes affirmative obligations on financial institutions, such as enhanced recordkeeping and customer identification requirements.

\*\*\*

The Federal Reserve Board ("FRB") and the Office of the Comptroller of the Currency ("OCC") periodically examine our business, including our compliance with laws and regulations.   If, as a result of an examination, a federal banking agency were to determine that our financial condition, capital resources, asset quality, earnings prospects, management, interest rate risk and liquidity or other aspects of any of our operations had become unsatisfactory, or that we were in violation of any law or regulation, it may take a number of different remedial actions as it deems appropriate.

### 5.   Statements Defendants' Made In The Registration Statement Were Untrue And Misleading When Made

446.   The statements above in ¶¶ 438–441 regarding the Company's underwriting standards and practices for its loans, its knowledge of its customers, its credit and asset quality, and its risk management were affirmative statements of present fact that were materially untrue and misleading when made because the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification

of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.

447.   The statements in ¶¶ 442 and 443 regarding the Company's financial results and growth, including its reported net income, total loans, residential loans, total deposits, total allowance for loan losses, and allowance for loan losses for residential loans were affirmative statements of present fact that were materially untrue and misleading when made because the Company's allowance for loan losses were inadequate and its financial results were inflated by and dependent upon the Company's undisclosed and inadequate underwriting that lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, focused on clients with little to no credit history, as opposed "strong" or "good" credit, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.

448.   The statements in ¶ 444 regarding the quality of the Company's internal controls were affirmative statements of present fact that were materially untrue and misleading when made because effective internal controls were not in place to prevent improper lending, underwriting, and banking practices, including money-laundering.   The Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation

and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.

449.   The statements in ¶ 445 regarding banking regulations, anti-money laundering duties, and regulatory compliance were affirmative statements of present fact that were materially untrue and misleading when made because the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative, lacked proper documentation and verification of borrowers' identities, employment, income, and source of funds used, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money.   The Company's BSA/AML program was inadequate to identify, mitigate, and manage money-laundering risks and therefore the Company was not in compliance with BSA/AML laws.   In particular, the statements were untrue and misleading when made because (a) contrary to U.S. law, the Company failed to appropriately monitor and assess ongoing and high money-laundering risks associated with foreign nationals moving foreign money into the Company to facilitate real-estate lending involving properties in the United States; (b) despite the heightened risks, the Company did not carry out appropriate due diligence on customers and transactions originating from China that had numerous indicators relating to money laundering risks; and (c) despite the heightened risks,

the Company did not effectively monitor or report suspicious activities and transactions that had numerous indicators relating to money laundering risks.

450.   The truth that Sterling's underwriting and risk management were not conservative or disciplined, did not involve adequate documentation nor verification, were not BSA/AML compliant, and had multiple red flags indicating that the loans were possibly being used to launder money, is evidenced by the detailed statements by former employees of Sterling, including:

a.   The statements by FEs 1, 2, 3, 4, 5, and 7 demonstrating that the Company's underwriting and risk management for ALP mortgages were neither disciplined nor conservative.

b.   The statements by FEs 1, 2, and 3 that underwriting and risk management for ALP mortgages were neither disciplined nor conservative.

c.   The statements by FEs 1, 2, 3, 4, and 7 that the only records required for a customer to be approved under the ALP was a letter purportedly from the customer's employer and/or from a CPA (for self-employed borrowers) and a monthly bank statement to verify income.

d.   The statements by all FEs that the target customers for the ALP were foreign nationals, particularly Chinese nationals.

e.   The statement by FEs 1, 3, and 7 that the ALP catered to foreign nationals with little or no credit history.

f.   The statements by FEs 1, 2, 3, 4, 6, and 7 that employer letters often came from China, were written in a Chinese language, and were then translated by the borrowers themselves or by a Chinese-language-speaking bank employee.

g.   The statement by FE 7 that translations of the employment letters were substantially similar in format

h.   The statement by FE 1 that a Sterling underwriter relayed that many of the CPA letters used in the ALP were from the same source, as the letters came from the same IP address, and that some of the CPA firms for the letters may not have actually existed.

i.   The statements by FEs 2, 3, and 7 that to demonstrate the stated income in the letter, ALP customers were required to open an account at a Sterling branch with cash, and then had to make cash deposits into the account every two weeks for two or three months until a specified amount had been deposited.

j.   The statements by FEs 2, 3, 5, 6, and 7 that there was no attempt to confirm the employment or CPA information and little or no verification of income or the source of the funds.

k.   The statements by FE 3 that there was also little or no attempt to confirm the identity of the account holder and no attempt at all to identify the source of the funds, including gifted funds.

l.   The statements by FEs 3 and 5 that while gifted funds were allowable if from a borrower's family members, Sterling's review of the gift was limited to requiring only that the funds deposited into a borrower's account matched those of the purported gift, and Sterling did not otherwise verify the source of the funds, even when presented with contradictory information provided by the borrower.

m.   The statements by FE 5 that Sterling provided "no training" on risk or compliance and that Sterling employees with whom FE 5 dealt had no training or familiarity with SARs, CTRs, or other compliance procedures.

n.   The statements by FE 7 that Sterling had weak and deficient internal controls.

o.   The statements by FEs 2, 3, 5, and 7 that they suspected that the ALP appeared to be used for money laundering.

451.   The truth that Sterling's underwriting and risk management were not conservative nor disciplined, did not involve adequate documentation nor

verification, and were not BSA/AML compliant, is further demonstrated by the

Company's own belated disclosures, including:

a.   The Company's disclosure on June 21, 2019 that it had entered into an agreement with the OCC to enhance its AML and BSA compliance, a critical component of which is customer due diligence and enhanced due diligence, which involves identifying and verifying borrowers' identity and sources of income and wealth.

b.   The OCC Agreement states that the OCC found unsafe or unsound practices relating to the Company's credit administration and required the Bank to revise its policies and procedures to ensure effective controls over loan underwriting, including "effective controls and processes to collect and verify employment and income" and "verification of borrowers' income and cash flow information used in the Bank's underwriting process for nonowner occupied properties."

c.   That as late as March 31, 2018, the OCC had detailed BSA/AML violations of law, as detailed in a Report of Examination and that the OCC found unsafe or unsound practices relating to the Company's credit administration.

d.   The disclosure on November 8, 2019 in its Third Quarter 2019 10-Q that in November 2019, in connection with an internal compliance investigation, the Company had terminated two top loan producers within the Advantage Loan Program who together were collectively responsible for 15% of the Company's residential loan production through September 30, 2019.

e.   The disclosure on December 9, 2019 that the Company had temporarily suspended its Advantage Loan Program in connection with an ongoing internal review of the ALP's documentation procedures while it audited documentation on past loans and put in place additional systems and controls to ensure the Bank's policies and procedures are followed on loans originated under the ALP.

f.      The disclosure on March 6, 2020, that the Company was permanently shutting down the ALP based on preliminary results from its internal investigation which found misconduct in connection with the origination of such loans, including with respect to income verification and requirements, reliance on third parties, and related documentation.

g.      The disclosures on March 6, 2020 that, in connection with this misconduct, the Company had terminated a number of employees, including the Senior Vice President with primary responsibility for, among other things, oversight of the Advantage Loan Program in California.

h.      The disclosures on March 6, 2020 that the Bank was now under formal investigation by the OCC and that the Bank had received grand jury subpoenas from the DOJ in connection with its investigation into the Bank's residential lending practices.

i.      The May 29, 2020 disclosure that the Company had terminated defendant Montemayor, former President of Commercial and Retail Banking and Chief Lending Officer, from all of his positions with the Company, effective immediately.

j.      The June 1, 2020 disclosures that (i) the Bank's internal review of the Advantage Loan Program showed that "employees engaged in misconduct in connection with the origination of loans, including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation"; (ii) due to the internal review, "it has become apparent that the potential for liability related to the origination of residential mortgage loans under that program warrants the initial creation of reserves" including $7.8 million in reserves for loan repurchases and $25 million related to investigations and litigation regarding the ALP, which may need to be increased and may need to be applied to first quarter 2019 and/or earlier periods; and (iii) the Company was working to "right the ship and bring the bank into regulatory compliance and investor confidence" and "fix things that need to be fix[ed] and take them on aggressively," including examining the entire Company "culture."

209

**C.    Claims For Relief**

## COUNT IV
### Violations of Section 11 of the Securities Act
### (Against Sterling, Judd, Lopp, the Director Defendants
### and the Underwriter Defendants)

452.    Lead Plaintiff repeats and re-alleges each and every allegation contained in each of the foregoing paragraphs as if set forth fully herein, with the exception of any allegation that could be construed as alleging fraud, recklessness, or intentional misconduct.  In addition, this disclaimer expressly excludes all allegations above contained in paragraphs 98, 99, 101, 109, and 125 and in Section VII in its entirety.

453.    This Count is asserted against Sterling, Judd, Lopp, the Director Defendants and the Underwriter Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Sterling shares issued in or traceable to the IPO pursuant to the Registration Statement.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

454.    As set forth above, the Registration Statement contained untrue and/or misleading statements of material fact, omitted material facts which were necessary to make those statements not misleading, and omitted to state material facts required to be stated in it.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

455.   Class members who purchased or otherwise acquired shares pursuant and/or traceable to the Registration Statement did not know, or in the exercise of reasonable diligence could not have known, of the untrue statements of material fact or omissions of material facts in the Registration Statement.

456.   Less than one year elapsed from the time Class members discovered or reasonably could have discovered the facts upon which this cause of action is based. Less than three years elapsed from the time that the securities upon which this cause of action is brought were bona fide offered to the public.

457.   Class members who purchased or otherwise acquired shares pursuant and/or traceable to the Registration Statement have sustained damages and are entitled to damages pursuant to 15 U.S.C. § 77k(e).

458.   Sterling is the registrant for the Offering and, as issuer of the shares, it is strictly liable to Lead Plaintiff and to the members of the Class for materially untrue and/or misleading statements and omissions alleged herein.

459.   None of the other defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged in this Count.

460.  Defendants Sterling, Judd, Lopp, and the Director Defendants signed or authorized the signing of the Registration Statement.  By virtue of signing the Registration Statement, they issued, caused to be issued, and participated in the issuance of the Registration Statement, which contained untrue statements of material fact, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.  The Underwriter Defendants acted as the underwriters of the Offering within the meaning of Section 11 of the Securities Act by selling and distributing the Sterling common stock offered to the investing public and purchased or otherwise acquired by Lead Plaintiff and members of the Class.

461.  For the foregoing reasons, defendants Sterling, Judd, Lopp, the Director Defendants, and the Underwriter Defendants violated Section 11 of the Securities Act and are strictly liable to Class members who purchased or otherwise acquired shares pursuant and/or traceable to the Registration Statement.

## COUNT V

### Violations of Section 12(a)(2) of the Securities Act
### (Against Sterling and the Underwriter Defendants)

462.  Lead Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein with the exception of any allegation that could be construed as alleging fraud, recklessness, or intentional misconduct.  In addition, this

disclaimer expressly excludes all allegations above contained in paragraphs 98, 99, 101, 109, and 125 and in Section VII in its entirety.

463.   This Count is asserted against the Sterling and the Underwriter Defendants for violations of § 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Sterling shares issued in the IPO pursuant to the Registration Statement.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

464.   Sterling and the Underwriter Defendants were sellers, offerors, or solicitors of purchasers of the shares offered pursuant to the Registration Statement.

465.   By means of the Registration Statement (as well as instruments of transportation and communication in interstate commerce and the mails), the defendants named in this Count, through the Offering, which was a public offering, solicited and sold Sterling common stock to members of the Class.

466.   As set forth above, the Registration Statement contained untrue and/or misleading statements of material fact, omitted material facts which were necessary to make those statements not misleading, and omitted to state material facts required to be stated in it.  The facts misstated and omitted would have been material to a reasonable person reviewing the Registration Statement.

467.   Class members who purchased or otherwise acquired shares pursuant to the Registration Statement did not know, or in the exercise of reasonable diligence

could not have known, of the untrue statements of material fact or omissions of material facts in the Registration Statement.

468.   Less than one year elapsed from the time Class members discovered or reasonably could have discovered the facts upon which this cause of action is based. Less than three years elapsed from the time that the securities upon which this cause of action is brought were sold to the public.

469.   As the issuer of the registered securities, Sterling is strictly liable for the untrue statements and omissions of material facts contained in the Registration Statement.

470.   None of the Underwriter Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were accurate and complete in all material respects.  Had they exercised reasonable care, they would have known of the material misstatements and omissions alleged in this Count.

471.   By reason of the foregoing, Sterling and the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Class members who purchased or otherwise acquired securities sold pursuant to the Registration Statement.  These Class members also have the right to rescind and recover the consideration paid for these securities upon tender of their stock to the Underwriter

Defendants, and to recover rescissory damages to the extent they have already sold the securities.

## COUNT VI
### Violations of Section 15 of the Securities Act
### (Against the Officer Defendants, Defendant Scott Seligman and the Director Defendants)

472.   Lead Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein with the exception of any allegation that could be construed as alleging fraud, recklessness, or intentional misconduct.  In addition, this disclaimer expressly excludes all allegations above contained in paragraphs 98, 99, 101, 109, and 125 and in Section VII in its entirety.

473.   This Count is asserted against the Officer Defendants, Scott Seligman, and the Director Defendants for violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Company shares in or traceable to the IPO pursuant to the Registration Statement.  This Count is based solely on claims of strict liability and/or negligence under the Securities Act.

474.   At all relevant times, the Officer Defendants, Scott Seligman, and the Director Defendants were controlling persons of Sterling within the meaning of Section 15 of the Securities Act.  As set forth herein, by reason of their positions of control and authority as officers and/or directors of Sterling, the Officer and Director Defendants had the power to directly or indirectly control or influence Sterling to

engage in the acts described herein, including by causing Sterling to conduct the Offering pursuant to the Registration Statement, and exercised the same.

475.   The Officer Defendants each served as an executive officer of Sterling prior to and at the time of the Offering.  As such, at all relevant times the Officer Defendants each participated in the operation and management of Sterling, including participating in the preparation and dissemination of the Registration Statement, and/or otherwise participated in the process necessary to conduct the Offering.  By virtue of their positions as officers of Sterling, and their status as signatories of the Registration Statement, each of the Officer Defendants had the power to control, and did control, Sterling in its conduct of the Offering, including controlling the contents of the Registration Statement, which contained materially untrue statements.  As officers of a publicly owned company, the Officer Defendants had a duty to disseminate accurate and truthful information with respect to Sterling's business operations, growth, and financial condition.

476.   Similarly, each of the Director Defendants served as directors on Sterling's Board at the time the Offering was conducted.  As directors of a publicly owned company, the Director Defendants had a duty to disseminate accurate and truthful information with respect to the Sterling's operations at the time of the Offering.  Each Director Defendant signed the Registration Statement disseminated to the investing public and were Directors of the Company at the time the Offering

was conducted.  Thus, the Director Defendants controlled the contents and dissemination of the Registration Statement.

477.  Scott Seligman, because of his positions with the Company and the Bank and his controlling shareholder interest, controlled the contents and dissemination of the Registration Statement.

478.  None of the Officer Defendants, Scott Seligman, or Director Defendants conducted a reasonable investigation or possessed a reasonable basis for the belief that the statements contained in the Registration Statement were true, were without omissions of material fact, and were not misleading.  By reason thereof, each of the Officer Defendants, Scott Seligman, and Director Defendants is liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as the Company is liable under Sections 11 and 12(a)(2) of the Securities Act, to the Class members who purchased or otherwise acquired Sterling common stock pursuant and/or traceable to the Registration Statement.

479.  As a direct result of the aforementioned conduct, these Class members suffered damages in connection with their purchase of Sterling common stock.  Less than one year elapsed from the time Class members discovered or reasonably could have discovered the facts upon which this cause of action is based.  Less than three years elapsed from the time that the securities upon which this cause of action is brought were bona fide offered or sold to the public.

217

## **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff, on its own behalf and on behalf of the Class, prays for judgment as follows:

(a)     Determining this action to be a proper class action and certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Lead Plaintiff and the other members of the Class against all defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of defendants, together with interest thereon;

(c)     Awarding Lead Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Lead Plaintiff's attorneys and experts;

(d)     Granting extraordinary equitable and/or injunctive relief, as permitted by law, equity, and federal and state statutory provisions sued on hereunder;

(e)     Awarding rescission damages as to claims under the Securities Act; and

(f)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Lead Plaintiff

hereby demands a trial by jury.

DATED: July 2, 2020          **BERMAN TABACCO**

By:  */s/ Kristin J. Moody*
     Kristin J. Moody

Carl N. Hammarskjold
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: kmoody@bermantabacco.com
       chammarskjold@bermantabacco.com

   -and-

**BERMAN TABACCO**
Patrick T. Egan
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: pegan@bermantabacco.com

*Counsel for Lead Plaintiff Oklahoma Police
Pension and Retirement System and Interim Lead
Counsel for the Putative Class*

219

Paul F. Novak
Fisher Building
**WEITZ & LUXENBERG**
3011 West Grand Blvd., 24th Floor
Detroit, MI 48202
Telephone: (313) 800-4170
Facsimile: (646) 293-7992
Email: pnovak@weitzlux.com

*Local Counsel for Lead Plaintiff Oklahoma
Police Pension and Retirement System and
Interim Local Counsel for the Putative Class*

# Exhibit 1

## CERTIFICATION OF MOVANT OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM PURSUANT TO FEDERAL SECURITIES LAW

I, Ginger Sigler, Executive Director of Oklahoma Police Pension and Retirement System ("Oklahoma Police"), hereby certify that the following is true and correct to the best of my knowledge, information, and belief:

1.      I have reviewed the Amended Class Action Complaint being filed in this matter captioned *Oklahoma Police v. Sterling Bancorp Inc., et al.*, 2:20-cv-10490-AJT-EAS (E.D. Mich.) and authorized its filing.

2.      Oklahoma Police did not engage in transactions in the securities that are the subject of this action at the direction of counsel or in order to participate in this or any other litigation under the federal securities laws.

3.      Oklahoma Police is willing to serve as a representative party on behalf of the class, understands the duties of a lead plaintiff and is willing to provide testimony at deposition and trial, if necessary.

4.      Oklahoma Police's transactions in the securities that are the subject of this action are set forth in Exhibit A appended to this certification. Other than those transactions set forth in Exhibit A, Oklahoma Police has engaged in no transactions during the class period in the securities that are the subject of this action.

5.      During the three-year period preceding the date of this certification, Oklahoma Police has sought to serve and was appointed lead plaintiff or a representative party on behalf of a class under the federal securities laws in the following matters:

- *In re Tempur Sealy Int'l, Inc, Sec, Litig,*, No. 17-cv-02169 (S.D.N.Y.)
- *Milbeck v. TrueCar, Inc.,* No. 2:18-cv-02612 (C.D. Cal.)
- *Oklahoma Police Pension & Retirement System,* v. *Nevro Corp.,* No. 18-cv-05181 (N.D. Cal.)
- *Ronge* v. *Camping World Holdings Inc,*, No. 18-cv-07030 (N.D. Ill.)
- *Mo-Kan Iron Workers Pension Fund* v. *Teligent Inc.,* No. 19-cv-03354 (S.D.N.Y.)
- *Plymouth County Retirement System* v. *Evolent Health Inc.,* No. 19-CV-01031 (E.D. Va.)
- *Logan v. ProPetro Holding Corp.,* No. 19-cv-00217 (W.D. Tex.)

6.     Oklahoma Police has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three year period preceding the date of this Certification, but either did not file a lead plaintiff motion, withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

- *McKenna* v. *Dick's Sporting Goods Inc.,* No. 17-cv-03680 (S.D.N.Y)
- *Hessefort v. Super Micro Computer Inc.*, No. 18-cv-00838 (N.D. Cal.)
- *City of Birmingham Firemen's and Policemen's Supplemental Pension System v. Pluralsight Inc.*, No. 19-cv-07563 (S.D.N.Y.)

7.     Oklahoma Police will not accept any payment for serving as representative party on behalf of the class beyond Oklahoma Police's *pro rata* share of any recovery, except for any award, as ordered or approved by the Court in compliance with federal law, directly relating to the representation of the class.

8.     As Executive Director of Oklahoma Police, I am duly authorized to sign this Certification on behalf of Oklahoma Police.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 26, 2020.

Ginger Sigler
*Executive Director*
*Oklahoma Police Pension and*
*Retirement System*

**Sterling Bancorp, Inc.**
**Common Stock (CUSIP 85917W102)**
**Exhibit A**

**Class Period:  11/17/17 – 03/17/20**
**Oklahoma Police Pension and Retirement System**

| Trade Date | Trans. | No. Bought | No. Sold | Price |
|---|---|---|---|---|
| Beginning Holdings | | 0 | | |
| | | | | |
| 11/17/17 | PURCHASES | 30,626 | | $12.0000 |
| 11/21/17 | PURCHASES | 7,351 | | $12.6232 |
| 12/17/18 | SALES | | (4,105) | $8.4113 |
| 08/19/19 | SALES | | (4,766) | $9.6103 |
| 10/22/19 | PURCHASES | 6,571 | | $10.0000 |
| 12/09/19 | SALES | | (348) | $8.2358 |
| 12/09/19 | SALES | | (6,125) | $7.5235 |
| 12/10/19 | SALES | | (18,135) | $7.0943 |
| 12/10/19 | SALES | | (2,389) | $7.1605 |
| 12/11/19 | SALES | | (4,862) | $6.8819 |
| 12/11/19 | SALES | | (3,818) | $6.8675 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on July 2, 2020, I authorized

the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF

system which will send notification of such filing to the e-mail addresses on the

attached Electronic Mail Notice List.

**BERMAN TABACCO**

By:   /s/ Kristin J. Moody
          Kristin J. Moody

Carl N. Hammarskjold
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: kmoody@bermantabacco.com
          chammarskjold@bermantabacco.com

          -and-

**BERMAN TABACCO**
Patrick T. Egan
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: pegan@bermantabacco.com

*Counsel for Lead Plaintiff Oklahoma Police
Pension and Retirement System and Interim Lead
Counsel for the Putative Class*

Paul F. Novak
Fisher Building
**WEITZ & LUXENBERG**
3011 West Grand Blvd., 24th Floor
Detroit, MI 48202
Telephone: (313) 800-4170
Facsimile: (646) 293-7992
Email: pnovak@weitzlux.com

*Local Counsel for Lead Plaintiff Oklahoma*
*Police Pension and Retirement System and*
*Interim Local Counsel for the Putative Class*

# Mailing Information for a Case 5:20-cv-10490-JEL-EAS OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM v. Sterling Bancorp, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Chad Albert**
  calbert@levinelee.com

- **Matthew P. Allen**
  allen@millercanfield.com,Rouman@millercanfield.com,christenson@millercanfield.com

- **Thomas M. Amon**
  tamon@wnj.com,ljager@wnj.com

- **Michael G. Brady**
  mbrady@wnj.com,tparrish@wnj.com,tlias@wnj.com

- **Thomas W. Cranmer**
  cranmer@millercanfield.com,Rouman@millercanfield.com,christenson@millercanfield.com

- **Patrick Thomas Egan**
  pegan@bermantabacco.com

- **Alex C. Lakatos**
  alakatos@mayerbrown.com,3962032420@filings.docketbird.com,wdc.docket@mayerbrown.com

- **Madelaine C. Lane**
  mlane@wnj.com

- **Kenneth E. Lee**
  klee@levinelee.com,managingclerk@levinelee.com,calbert@levinelee.com

- **Seth L. Levine**
  slevine@levinelee.com

- **Thomas G. McNeill**
  TMcNeill@dickinsonwright.com,ahelms@dickinsonwright.com

- **Kristin J Moody**
  kmoody@bermantabacco.com,sfservice@bermantabacco.com

- **Paul F. Novak**
  pnovak@weitzlux.com,gstamatopoulos@weitzlux.com

- **Matthew J. Turchyn**
  mturchyn@hertzschram.com,lbaumhardt@hertzschram.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`