## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Case 5:20-cv-10490-JEL-EAS |
| | Hon. Judith E. Levy |
| Plaintiff, | CLASS ACTION |
| v. | |
| | ORAL ARGUMENT |
| STERLING BANCORP, INC., et al., | REQUESTED |
| Defendants. | |

## DEFENDANT STERLING BANCORP, INC.'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

Under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6), and the Private Securities Litigation Reform Act of 1995, Defendant Sterling Bancorp, Inc. moves to dismiss with prejudice Plaintiff's Amended Class Action Complaint (ECF No. 36) as a matter of law. Defendant sought concurrence in this Motion from Plaintiff, and it was denied. *See* E.D. Mich. LR 7.1(a).

WHEREFORE, for the reasons set forth in the attached memorandum of law in support of this Motion, Defendant respectfully requests that the Court dismiss Plaintiff's Amended Class Action Complaint with prejudice and without leave to amend.

Dated:  September 22, 2020

Respectfully submitted,


**LEVINE LEE LLP**

Seth L. Levine
Kenneth E. Lee
Chad P. Albert
650 Fifth Avenue, 13th Floor
New York, NY  10019
(212) 223-4400
slevine@levinelee.com
klee@levinelee.com
calbert@levinelee.com

*Counsel for Defendant Sterling
Bancorp, Inc.*

**MILLER, CANFIELD,
PADDOCK & STONE, P.L.C.**

By:   s/ Matthew P. Allen
Matthew P. Allen (P57914)
Thomas W. Cranmer (P25252)
840 West Long Lake Road,
Suite 150
Troy, MI  48098
(248) 879-2000
allen@millercanfield.com
cranmer@millercanfield.com

*Counsel for Defendant Sterling
Bancorp, Inc.*

2

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2020, I electronically filed the foregoing document with the Clerk of the court using the ECF system which will send notification of such filing to all counsel of record.

Respectfully submitted,

By:    s/ Matthew P. Allen
Matthew P. Allen (P57914)
Thomas W. Cranmer (P25252)
840 West Long Lake Road,
Suite 150
Troy, MI 48098
(248) 879-2000
allen@millercanfield.com
cranmer@millercanfield.com

*Counsel for Defendant Sterling Bancorp, Inc.*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Case 5:20-cv-10490-JEL-EAS |
| | Hon. Judith E. Levy |
| Plaintiff, | CLASS ACTION |
| v. | |
| STERLING BANCORP, INC., et al., | |
| Defendants. | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT STERLING BANCORP, INC.'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

## <u>STATEMENT OF QUESTIONS PRESENTED</u>

1. Should the Court dismiss the 219-page Complaint where its conclusory and repetitive manner of pleading fails to satisfy the particularity requirements of the securities laws?

   Defendants say:  YES

2. Should the Court dismiss the claims under Section 11 and Section 12(a)(2) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, where the Complaint fails to sufficiently plead facts showing any material misstatement or omission, including because the Complaint fails to show a duty to disclose any alleged omission of information, and the alleged misrepresentations are non-actionable corporate puffery; suggest, at best, a non-actionable claim of corporate mismanagement; and are not shown to have been false or misleading when made based on any facts pled in the Complaint?

   Defendants say:  YES

3. Should the Court dismiss the claims under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder where the Complaint fails to sufficiently plead facts showing a strong inference of scienter that a reasonable person would consider as compelling as any non-fraudulent inference?

   Defendants say:  YES

4. Should the Court dismiss the "control person" claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act where Plaintiff has failed to sufficiently plead facts establishing any underlying violation of the securities laws and any Defendant's culpable participation in such violation and control over the primary violator?

   Defendants say:  YES

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

15 U.S.C. § 78j(b)

15 U.S.C. § 77k

15 U.S.C. § 77l(a)(2)

15 U.S.C. § 77o

15 U.S.C. § 78t(a)

15 U.S.C. § 78u-4

Fed. R. Civ. P. 8(a)

Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 12(b)(6)

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)

*ATSI Commc'ns v. Shaar Fund*,
   493 F.3d 87 (2d Cir. 2007)

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004)

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012)

*D.E. & J Ltd. P'ship v. Conaway*,
   284 F. Supp. 2d 719 (E.D. Mich. 2003)

*Doshi v. Gen. Cable Corp.*,
   386 F. Supp. 3d 815 (E.D. Ky. 2019)

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)

*Frank v. Dana Corp.*,
   547 F.3d 564 (6th Cir. 2008)

*Havenick v. Network Exp., Inc.*,
   981 F. Supp. 480 (E.D. Mich. 1997)

*Higginbotham v. Baxter Int'l, Inc.*,
   495 F.3d 753 (7th Cir. 2007)

*In re Citigroup Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004)

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
   2017 WL 4049253 (S.D.N.Y June 28, 2017)

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004)

*In re Huntington Bancshares Inc. Sec. Litig.*,
   674 F. Supp. 2d 951 (S.D. Ohio 2009)

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016)

*In re Nextcard Inc. Sec. Litig.*,
   2005 WL 6342406 (N.D. Cal. Feb. 7, 2005)

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014)

*In re Royal Bank of Scotland Grp. Sec. Litig.*,
   2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012)

*In re Sec. Cap. Assurance, Ltd. Sec. Litig.*,
   729 F. Supp. 2d 569 (S.D.N.Y. 2010)

*In re Sofamor Danek Grp., Inc.*,
   123 F.3d 394 (6th Cir. 1997)

*In re Synchrony Fin. Sec. Litig.*,
   2020 WL 1531297 (D. Conn. Mar. 31, 2020)

*In re TransDigm Grp., Inc. Sec. Litig.,*
   440 F. Supp. 3d 740 (N.D. Ohio 2020)

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)

*In re United Am. Healthcare Corp. Sec. Litig.*,
    2007 WL 313491 (E.D. Mich. Jan. 30, 2007)

*Indiana State Dist. Council of Laborers and Hod Carriers Pension & Welfare
    Fund v. Omnicare, Inc.*,
    583 F.3d 935 (6th Cir. 2009)

*J & R Mktg., SEP v. Gen. Motors Corp.*,
    549 F.3d 384 (6th Cir. 2008)

*Lubbers v. Flagstar Bancorp Inc.*,
    162 F. Supp. 3d 571 (E.D. Mich. 2016)

*Miller v. Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)

*PR Diamonds, Inc. v. Chandler*,
    91 F. App'x 418 (6th Cir. 2004)

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009)

*Scott v. Gen. Motors Co.*,
    46 F. Supp. 3d 387 (S.D.N.Y. 2014)

*Stadnick v. Vivint Solar, Inc.*,
    2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015)

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
    2010 WL 1332574 (S.D. Fla. Mar. 30, 2010)

# **TABLE OF CONTENTS**

**Page**

TABLE OF ABBREVIATIONS ............................................................... xvi

PRELIMINARY STATEMENT ................................................................ 1

STATEMENT OF ALLEGED FACTS ...................................................... 7

      A.    The Parties and Claims ........................................................ 7

      B.    Sterling's Disclosures ......................................................... 9

           1.  The Nature of the ALP ................................................... 9

           2.  The Risks of the ALP .................................................... 11

           3.  The Issues with the ALP ................................................ 12

      C.    Plaintiff's Allegations ....................................................... 14

           1.  Overview of Alleged Misstatements and Omissions .................... 14

           2.  The Alleged Misstatements and Omissions Relate to Soft Information ................................................................ 17

           3.  Plaintiff's Contradictory Allegations ............................... 17

           4.  Plaintiff's Selective Omission of Sterling's Disclosures .............. 18

LEGAL STANDARD .......................................................................... 20

ARGUMENT .................................................................................... 25

I.     Plaintiff's Formulaic Manner of Pleading Should Be Rejected ................... 25

II.    Plaintiff Fails to Allege an Actionable Misrepresentation or Omission ........ 29

      A.    Plaintiff Fails to Allege a Materially False or Misleading Statement ..................................................................... 29

           1.  Corporate Puffery Is Not Actionable .............................. 29

           2.  Allegations of Corporate Mismanagement Are Not Actionable ... 40

| | | 3. | Plaintiff Pleads No Facts Showing That Any Statement Was False or Misleading When Made | 43 |

    B.    Plaintiff Fails to Allege a Material Omission ..................................... 49

        1.   Sterling Disclosed Issues Raised by the OCC ............................. 50

        2.   Sterling Had No Duty To Opine on Issues Facing the ALP ......... 53

III.   Plaintiff Fails to Plead Scienter ...................................................... 55

    A.    Plaintiff Fails to Allege Facts Giving Rise to a Strong Inference of Corporate Scienter ........................................... 56

    B.    Plaintiff Fails to Allege Facts Giving Rise to a Strong Inference of Scienter for the Officer Defendants ............................... 58

        1.   Plaintiff Fails to Adequately Allege That Any of the Officer Defendants Knowingly Made Materially False Statements ......... 58

        2.   Plaintiff Fails to Allege That the Sarbanes-Oxley Certifications Were Made Recklessly ............................................. 60

    C.    Plaintiff Fails to Allege Facts Giving Rise to a Strong Inference of Scienter for Director Defendants Fox, Meltzer, Sandra Seligman, or for Scott Seligman ............................. 61

        1.   The Timing of Fox's Resignation Does Not Establish Scienter....61

        2.   Plaintiff Fails to Allege Insider Trading at Suspicious Times or in Suspicious Amounts ................................................... 62

    D.    Plaintiff's Confidential Witness Allegations Do Not Support a Strong Inference of Fraudulent Intent ................................ 63

    E.    Rather than Inferring Scienter, the Complaint Makes More Compelling the Inference that Sterling Disclosed the Relevant Risks Before and After They Materialized ......................................... 67

IV.   Plaintiff Fails to State a Claim of Control Person Liability ......................... 68

CONCLUSION ......................................................................................... 70

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## <u>CASES</u>

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
   512 F.3d 46 (1st Cir. 2008) ...............................................................23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .........................................................................20

*Ashland, Inc. v. Oppenheimer & Co., Inc.*,
   648 F.3d 461 (6th Cir. 2011) ..............................................................7

*ATSI Commc'ns v. Shaar Fund*,
   493 F.3d 87 (2d Cir. 2007) ...............................................................68

*Bailey v. Esperion Therapeutics, Inc.*,
   2019 WL 3296235 (E.D. Mich. Feb. 19, 2019) .................................63

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) .........................................................................20

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012)..........................................................27

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
   394 F.3d 126 (3d Cir. 2004) ..............................................................23

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) .............................................................21

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012).................................................69

*City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) ..............................................................55

*Coyne v. Gen. Elec. Co.*,
   2010 WL 2836730 (D. Conn. July 15, 2010)......................................46

*D.E. & J Ltd. P'ship v. Conaway*,
   284 F. Supp. 2d 719 (E.D. Mich. 2003) ................................. 21, 28, 68

*Doshi v. Gen. Cable Corp.*,
    386 F. Supp. 3d 815 (E.D. Ky. 2019) ............................................................ 41, 60

*Doshi v. Gen. Cable Corp.*,
    823 F.3d 1032 (6th Cir. 2016) ................................................................ 56

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) .................................................................. 32

*Fait v. Regions Fin. Corp.*,
    712 F. Supp. 2d 117 (S.D.N.Y. 2010) ................................................... 44

*Frank v. Dana Corp.*,
    547 F.3d 564 (6th Cir. 2008) .......................................................... 22, 27

*Halperin v. eBanker USA.com, Inc.*,
    295 F.3d 352 (2d Cir. 2002) .................................................................. 30

*Havenick v. Network Exp., Inc.*,
    981 F. Supp. 480 (E.D. Mich. 1997) .................................................... 27

*Hawaii Structural Ironworkers Pension Trust Fund v. AMC Ent. Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019) .................................................. 29

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ................................................... 56, 61, 62

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ............................................................ 6, 64

*I.B.E.W. v. Ltd. Brands, Inc.*,
    788 F. Supp. 2d 609 (S.D. Ohio 2011) ................................................ 34

*In re AFC Enters., Inc. Sec. Litig.*,
    348 F. Supp. 2d 1363 (N.D. Ga. 2004) ................................................ 62

*In re Agria Corp. Sec. Litig.*,
    672 F. Supp. 2d 520 (S.D.N.Y. 2009) .................................................. 55

*In re BioScrip, Inc. Sec. Litig.*,
    95 F. Supp. 3d 711 (S.D.N.Y. 2015) .................................................... 24

ix

*In re Citigroup Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004) .................................................. 5, 36, 42, 54

*In re Cognizant Tech. Solutions Corp. Sec. Litig.*,
   2018 WL 3772675 (D.N.J. Aug. 8, 2018) .............................................................42

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
   2017 WL 4049253 (S.D.N.Y. June 28, 2017) ..................................... 5, 28, 29, 41

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) ................................................................................30

*In re Gentiva Sec. Litig.*,
   932 F. Supp. 2d 352 (S.D.N.Y. 2013) ..................................................................33

*In re Huntington Bancshares Inc. Sec. Litig.*,
   674 F. Supp. 2d 951 (S.D. Ohio 2009) .................................................... 5, 6, 48, 64

*In re IAC/InterActiveCorp Sec. Litig.*,
   695 F. Supp. 2d 109 (S.D.N.Y. 2010) ..................................................................43

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
   251 F. Supp. 3d 596 (S.D.N.Y. 2017) ..................................................................69

*In re LendingClub Sec. Litig.*,
   254 F. Supp. 3d 1107 (N.D. Cal. 2017) ................................................................48

*In re Liberty Tax, Inc. Sec. Litig.*,
   435 F. Supp. 3d 457 (E.D.N.Y. 2020) ..................................................................42

*In re Lions Gate Ent. Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) .................................................... 49, 51, 52, 53

*In re Nextcard Inc. Sec. Litig.*,
   2005 WL 6342406 (N.D. Cal. Feb. 7, 2005) .....................................................6, 51

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ...................................................................... *passim*

*In re PetroChina Co. Ltd. Sec. Litig.*,
   120 F. Supp. 3d 340 (S.D.N.Y. 2015) ..................................................................42

x

*In re Prison Realty Sec. Litig.*,
   117 F. Supp. 2d 681 (M.D. Tenn. 2000) .............................................................68

*In re Refco, Inc. Sec. Litig.*,
   503 F. Supp. 2d 611 (S.D.N.Y. 2007) ................................................................21

*In re Restoration Robotics, Inc. Sec. Litig.*,
   417 F. Supp. 3d 1242 (N.D. Cal. 2019)..............................................................43

*In re Rigel Pharm., Inc. Sec. Litig.*,
   697 F.3d 869 (9th Cir. 2012) .............................................................................23

*In re Royal Bank of Scotland Grp. Sec. Litig.*,
   2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012) ..............................................5, 46

*In re Sanofi Sec. Litig.*,
   155 F. Supp. 3d 386 (S.D.N.Y. 2016) ................................................................55

*In re Sec. Cap. Assurance, Ltd. Sec. Litig.*,
   729 F. Supp. 2d 569 (S.D.N.Y. 2010) .................................................... 3, 31, 46

*In re Sofamor Danek Grp., Inc.*,
   123 F.3d 394 (6th Cir. 1997) .............................................................................54

*In re Stac Elecs. Sec. Litig.*,
   89 F.3d 1399 (9th Cir. 1996) .............................................................................23

*In re Synchrony Fin. Sec. Litig.*,
   2020 WL 1531297 (D. Conn. Mar. 31, 2020)........................................ 31, 34, 47

*In re TransDigm Grp., Inc. Sec. Litig.*,
   440 F. Supp. 3d 740 (N.D. Ohio 2020) ......................................................... 43, 54

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012) ....................................................55

*In re United Am. Healthcare Corp. Sec. Litig.*,
   2007 WL 313491 (E.D. Mich. Jan. 30, 2007)........................................ 41, 46, 49

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) .................................................... 31, 32, 33

*Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
　　537 F.3d 527 (5th Cir. 2008) .......................................................... 64, 66

*Indiana State Dist. Council of Laborers and Hod Carriers Pension & Welfare*
　　*Fund v. Omnicare, Inc.*,
　　583 F.3d 935 (6th Cir. 2009) ...................................................... *passim*

*J & R Mktg., SEP v. Gen. Motors Corp.*,
　　549 F.3d 384 (6th Cir. 2008) ...................................................... *passim*

*Konkol v. Diebold, Inc.*,
　　590 F.3d 390 (6th Cir. 2009) ............................................................... 60

*Ley v. Visteon Corp.*,
　　543 F.3d 801 (6th Cir. 2008) ............................................................... 64

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
　　902 F. Supp. 2d 329 (S.D.N.Y. 2012) .................................................. 24

*Lloyd v. CVB Fin. Corp.*,
　　811 F.3d 1200 (9th Cir. 2016) .............................................................. 33

*Lubbers v. Flagstar Bancorp Inc.*,
　　162 F. Supp. 3d 571 (E.D. Mich. 2016) .............................................. 55

*Matrixx Initiatives, Inc. v. Siracusano*,
　　563 U.S. 27 (2011) ...................................................................... 60, 64

*Melder v. Morris*,
　　27 F.3d 1097 (5th Cir. 1994) .............................................................. 23

*Miller v. Lazard, Ltd.*,
　　473 F. Supp. 2d 571 (S.D.N.Y. 2007) ................................................ 35

*North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
　　929 F. Supp. 2d 740 (M.D. Tenn. 2013) ............................................. 28

*Novak v. Kasaks*,
　　216 F.3d 300 (2d Cir. 2000) ............................................................... 46

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
　　575 U.S. 175 (2015) .................................................................. 5, 44, 45

xii

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
    777 F. App'x 726 (5th Cir. 2019)............................................................41

*PR Diamonds, Inc. v. Chandler*,
    91 F. App'x 418 (6th Cir. 2004)............................................... 21, 68, 69

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012) ........................................ 52, 53

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ................................................ 23, 43, 49

*Rubke v. Capitol Bancorp Ltd.*,
    551 F.3d 1156 (9th Cir. 2009) ..............................................................24

*Rudman v. CHC Grp. Ltd.*,
    217 F. Supp. 3d 718 (S.D.N.Y. 2016) ...................................................34

*Scott v. Gen. Motors Co.*,
    46 F. Supp. 3d 387 (S.D.N.Y. 2014) .......................................... 20, 46

*Sears v. Likens*,
    912 F.2d 889 (7th Cir. 1990) ...............................................................23

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992) ................................................................23

*Southeastern Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
    2015 WL 3833849 (M.D. Pa. June 22, 2015) ......................................33

*Stadnick v. Vivint Solar, Inc.*,
    2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015)..................................4, 40

*Stratte-McClure v. Morgan Stanley*,
    784 F. Supp. 2d 373 (S.D.N.Y. 2011) ..................................................32

*Strougo v. Barclays PLC*,
    105 F. Supp. 3d 330 (S.D.N.Y. 2015) ..................................................42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ....................................................... 55, 56, 66, 67

*U.S. ex rel. Garst v. Lockheed-Martin Corp.*,
    328 F.3d 374 (7th Cir. 2003) ................................................................25

*Wagner v. First Horizon Pharm. Corp.*,
    464 F.3d 1273 (11th Cir. 2006) .................................................... 23, 24

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.*,
    2013 WL 1345086 (E.D.N.Y. Mar. 29, 2013) ....................................27

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
    2010 WL 1332574 (S.D. Fla. Mar. 30, 2010) .................................... 3, 35, 47, 49

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
    2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016).....................................44

*Williams v. WMX Techs., Inc.*,
    112 F.3d 175 (5th Cir. 1997) .........................................................3, 25

*Woodward v. Raymond James Fin., Inc.*,
    732 F. Supp. 2d 425 (S.D.N.Y. 2010) ................................................31

## STATUTES

18 U.S.C. § 641 .........................................................................................51

15 U.S.C. § 78u-4.....................................................................................22

15 U.S.C. § 78j(b) ........................................................................... *passim*

15 U.S.C. § 77k ............................................................................... *passim*

15 U.S.C. § 77l(a)(2).......................................................................... 8, 20, 29

15 U.S.C. § 77o ................................................................................ 8, 21, 68

15 U.S.C. § 78t(a) ............................................................................ 9, 21, 68, 69

15 U.S.C. § 78t-1 .......................................................................................9

## RULES

Fed. R. Civ. P. 8(a).................................................................................26

Fed. R. Civ. P. 9(b) .......................................................................... 22, 24, 28, 43

Fed. R. Civ. P. 12(b)(6)........................................................................................20

**REGULATIONS**

12 C.F.R. § 4.37(b) .............................................................................................51

17 C.F.R. § 230.405 ............................................................................................21

17 C.F.R. § 240.10b-5......................................................................................8, 9

Item 103 of Regulation S-K .......................................................................... 52, 53

Item 303 of Regulation S-K .......................................................................... 52, 53

Item 503 of Regulation S-K .......................................................................... 52, 53

## <u>TABLE OF ABBREVIATIONS</u>

| | |
|---|---|
| **2017 10-K** | Sterling's annual 2017 Form 10-K, filed March 28, 2018 |
| **2018 10-K** | Sterling's annual 2018 Form 10-K, filed March 18, 2019 |
| **4/29/19 Conf. Call Tr.** | Transcript of Sterling's April 29, 2019 Earnings Call |
| **6/21/19 8-K** | Sterling's June 21, 2019 Form 8-K filing regarding the OCC Agreement |
| **8/9/19 10-Q** | Sterling's August 9, 2019 Form 10-Q filing |
| **11/8/19 10-Q** | Sterling's November 8, 2019 Form 10-Q filing |
| **12/4/19 Form 4** | A December 4, 2019 Form 4 filing by K.I.S.S. Dynasty Trust No. 9 |
| **12/9/19 8-K** | Sterling's December 9, 2019 Form 8-K filing |
| **3/6/20 8-K** | Sterling's March 6, 2020 Form 8-K filing |
| **ALP** | Sterling's Advantage Loan Program |
| **AML** | Anti-Money Laundering |
| **Bank** | Sterling Bank and Trust, F.S.B. |
| **BSA** | Bank Secrecy Act of 1970 |
| **Class Period** | Plaintiff's alleged class period of November 17, 2017 to March 17, 2020 |

| | |
|---|---|
| **Complaint or C** | Plaintiff's Amended Class Action Complaint for Violations of the Federal Securities Laws, dated July 2, 2020 (ECF No. 36) |
| **Director Defendants** | Defendants Barry Allen, Jon Fox, Seth Meltzer, Sandra Seligman, Peter Sinatra, Benjamin Wineman, and Lyle Wolberg |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **OCC** | U.S. Treasury's Office of the Comptroller of the Currency |
| **OCC Agreement** | An agreement dated June 18, 2019 by and between Sterling Bank and Trust, F.S.B. and the Office of the Comptroller of the Currency, filed on August 9, 2019 as Exhibit 10.1 to the 8/9/19 10-Q |
| **OCC Manual** | The OCC Policies & Procedures Manual, PPM 5310-3, dated November 13, 2018 |
| **OCC Report** | An OCC Report of Examination referenced in the OCC Agreement as being dated as of March 31, 2018 |
| **Officer Defendants** | Defendants Gary Judd, Thomas Lopp, and Michael Montemayor |
| **Plaintiff or OPP** | Oklahoma Police Pension and Retirement System |
| **Prospectus or Pros.** | Sterling's Form 424B4 Prospectus, filed November 17, 2017, which is part of Sterling's Registration Statement |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 |

| | |
|---|---|
| **Registration Statement** | Sterling's Registration Statement, consisting of the October 19, 2017 Initial Registration Statement on Form S-1; Amendment Nos. 1, 2, and 3 to Form S-1, filed with the SEC on October 31, 2017, November 7, 2017, and November 13, 2017, respectively; a Free Writing Prospectus slide presentation filed with the SEC on November 8, 2017; and the November 17, 2017 Prospectus Form 424B4. |
| **Rule 9(b)** | Rule 9(b) of the Federal Rules of Civil Procedure |
| **SEC** | United States Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933 |
| **Sterling** | Sterling Bancorp, Inc. |
| **Underwriter Defendants** | Defendants Piper Sandler Companies and American Capital Partners, LLC |

## **PRELIMINARY STATEMENT**

This putative securities fraud action brought against Sterling, certain of its current and former officers and directors, its founder, and its IPO underwriters, should be dismissed because Plaintiff fails to properly allege any material misstatement or omission in Sterling's Registration Statement or subsequent disclosures.  Plaintiff's claims under the Securities Act and the Exchange Act seek recovery for losses allegedly incurred as a result of declines in Sterling's stock price following Sterling's suspension, and later termination, of its ALP.  Because the Complaint fails to meet the requisite pleading requirements under either statute and Sterling's disclosures on their face demonstrate that the nature and risks of the ALP were disclosed to investors, Plaintiff has not pled a claim for securities fraud.

As disclosed by Sterling, the ALP was a residential lending program designed to offer "quick approval," high-down-payment mortgages to "underserved home buyers" who "may have limited credit history," including "foreign nationals and recent immigrants."  (C ¶¶ 84-85.)  In embracing the market for "nontraditional," "nonqualified" mortgages avoided by its "larger" rivals, Sterling "faced less competition for customers" in the ALP "as compared to the competition" it faced "in the market for qualified mortgages."  (Ex. A (Pros.) at 3, 15.)  Because a "significant portion" of the ALP's customers hailed from abroad, however, Sterling

also faced "disproportionate" compliance challenges relative to its peers, including with respect to BSA and AML laws and regulations.  (*Id.* at 30.)

Certain compliance issues unfortunately materialized.  Over a series of detailed disclosures, Sterling described (1) BSA/AML compliance issues identified by the OCC (C ¶¶ 246-48); (2) its termination of certain ALP employees following an internal compliance investigation (C ¶ 283); and (3) its suspension of the ALP in connection with an ongoing internal review of loan documentation procedures (C ¶ 287).  Sterling ultimately disclosed that it would discontinue the program. (C ¶ 310.)  In ending the ALP, Sterling explained that preliminary results from its internal review indicated that certain employees "engaged in misconduct" in connection with originating loans (C ¶ 310); that Sterling was "under formal investigation by the OCC" (C ¶ 312); and that Sterling had received grand jury subpoenas relating to the "Company's residential lending practices" (C ¶ 312).

Faced with Sterling's clear disclosures on the nature and risks of the ALP, Plaintiff attempts to convert into a securities violation a non-actionable claim that Sterling may have mismanaged this program.  Plaintiff takes no issue with any fact that Sterling disclosed to investors, and instead argues that Sterling committed securities fraud because (i) Sterling made various puffing or routine descriptions of its underwriting and risk management programs and (ii) these programs, in hindsight, failed to adequately prevent issues with the ALP.  Plaintiff's Complaint

2

relies on non-actionable puffery and claims of mismanagement and presents the typical "fraud by hindsight" allegations that courts routinely dismiss. It should be dismissed with prejudice for the following reasons.

*First*, Plaintiff fails to plead with particularity as required under the securities laws. Instead, its 219-page Complaint consists of lengthy block quotations from Sterling's disclosures followed by conclusory and repetitive assertions that unspecified aspects of those disclosures were false or misleading. Such "a garrulous style is not an uncommon mask for an absence of detail," *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997), and reflects Plaintiff's inability to plead with particularity any false or misleading statements or omissions.

*Second*, the Complaint is grounded in non-actionable corporate puffery. It identifies and repeats dozens of routine instances in which Sterling broadly described its underwriting and risk management programs as "disciplined," "conservative," "risk-conscious," or otherwise high quality. Plaintiff's mantra, which it repeats 38 times in various iterations, is that such programs in fact were not "disciplined" or "conservative" enough. But a bank's characterizations of its "underwriting approach as 'disciplined' and 'conservative' . . . are classic examples of puffery," *In re Sec. Cap. Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 597 (S.D.N.Y. 2010), which Plaintiff well knows, *see Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, 2010 WL 1332574, at *8 (S.D. Fla. Mar. 30, 2010)

3

(holding, in a case where OPP served as a Lead Plaintiff, that "Defendants' description of the Company's underwriting, appraisal, and credit standards as 'strict,' 'stringent,' 'conservative,' and 'strong'" were "commonplace statements of corporate puffery").

Plaintiff cherry-picks from these general disclosures while simultaneously ignoring Sterling's specific disclosures on the nature and risks of the ALP. For example, Plaintiff alleges that the ALP was not "disciplined" in part because it "catered to foreign nationals with little or no credit history" (C ¶¶ 166(e), 244(e), 308(e), 450(e)); but Plaintiff inexplicably ignores its own allegations that Sterling disclosed the ALP as "offer[ed] . . . to underserved home buyers" who "may have limited credit history," including "foreign nationals" (C ¶¶ 84-85). The Complaint even omits Sterling's warning to investors that these disclosed aspects of its programs yielded "disproportionate" compliance challenges. (Ex. A (Pros.) at 30.) Although Plaintiff now argues that it regrets its investment in Sterling, the practices it criticizes were at all times disclosed to the market. As such, "Plaintiff's distaste for the Company's disclosed business model is not actionable." *Stadnick v. Vivint Solar, Inc.*, 2015 WL 8492757, at *13 (S.D.N.Y. Dec. 10, 2015).

*Third*, once the allegations of corporate puffery are stripped from the Complaint, all that remain are allegations that, at most, suggest a claim of corporate mismanagement. Pointing to Sterling's statements on the existence of internal

control systems, the Complaint's central allegation is that these controls were inadequate to prevent employee misconduct or regulatory scrutiny. Even if that were true, "statements concerning the adequacy of [a] Bank's internal controls are not actionable." *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at \*7 (S.D.N.Y. June 28, 2017). The most generous reading of Plaintiff's claim is that Sterling's "business was mismanaged," but "allegations of mismanagement . . . are insufficient to support a securities fraud claim." *In re Citigroup Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004).

*Fourth*, even if the routine or puffing statements regarding Sterling's underwriting and risk management programs were somehow actionable, Plaintiff has "failed to plead with particularity that Defendants' statements . . . were *false when made*." *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 962 (S.D. Ohio 2009). Far from meeting the stringent pleading standards that apply to the statements of opinion lining the Complaint, *see Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 184-86, 194 (2015), Plaintiff points only to vague allegations made after-the-fact by anonymous sources, as well as Sterling's own subsequent disclosures. But a "backward-looking assessment . . . cannot help plaintiffs' case" where, as here, Plaintiff fails to "allege . . . contemporaneous facts to support [its] allegation[s]." *In re Royal Bank of Scotland Grp. Sec. Litig.*, 2012 WL 3826261, at \*7 (S.D.N.Y. Sept. 4, 2012).

5

*Fifth*, the Complaint alleges no material omission.  Unable to point to any misrepresentation, the Complaint declares that Sterling had a duty to disclose an OCC "Report of Examination" that allegedly raised compliance issues with respect to the ALP.  But Sterling properly disclosed its interactions with the OCC, and in "asserting a freestanding claim that [Sterling] violated § 10(b) by failing to disclose to the market the OCC . . . Exam Report," Plaintiff "fail[s] to allege facts demonstrating . . . a duty to disclose the contents of [this] document[]."  *In re Nextcard Inc. Sec. Litig.*, 2005 WL 6342406, at *11 (N.D. Cal. Feb. 7, 2005).  Nor did Sterling otherwise have an obligation to opine on potential issues facing the ALP.  *See, e.g.*, *Indiana State Dist. Council of Laborers and Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945 (6th Cir. 2009) ("*Omnicare I*").

*Finally*, the Complaint does not allege that any statements attributed to any defendants were made with scienter—in fact, the Complaint does not even include substantive factual allegations for the majority of the individual defendants.  Instead, the Complaint attempts, and fails, to create a general inference of fraudulent intent based on allegations from confidential witnesses that inherently should be discounted, *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) (Easterbrook, J.), and that, in any event, are "too vague and conclusory" to be accorded weight, *In re Huntington Bancshares*, 674 F. Supp. 2d at 960 (citation omitted).  Plaintiff likewise fails to plead control person liability against any

6

defendant based on its threadbare control allegations and its failure to plead a primary violation of the Exchange Act or Securities Act.

For these reasons and those that follow, Sterling respectfully requests that the Court dismiss the Complaint with prejudice.

## STATEMENT OF ALLEGED FACTS[1]

### A.    The Parties and Claims

Plaintiff purports to represent a putative class of purchasers of Sterling's stock during the Class Period.

Defendant Sterling is a unitary thrift holding company, headquartered in Southfield, Michigan, that provides financial services through its wholly owned subsidiary, the Bank.  (C ¶ 64.)  The Bank is not a defendant in this action.  Sterling became a public company through its IPO on November 17, 2017.  (C ¶ 88.) Defendants Piper Sandler Companies (through Sandler O'Neill & Partners, L.P., its affiliate's predecessor) and American Capital Partners, LLC served as Sterling's IPO underwriters.  (C ¶¶ 49-52.)

---

[1] On this motion to dismiss, the Court may properly consider "materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice," *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 467 (6th Cir. 2011), and may "consider the quotations in the Complaint in the context of the full documents from which they were taken," *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014).

The individual defendants include Sterling's and the Bank's officers, directors, and founder. Defendants Barry Allen, Seth Meltzer, Sandra Seligman, Peter Sinatra, Benjamin Wineman, and Lyle Wolberg serve as current Directors of Sterling, and Defendant Jon Fox is a former Sterling Director. (C ¶¶ 41-48.) Plaintiff alleges that Defendant Montemayor "was the President of Retail and Commercial Banking and the Chief Lending Officer" (C ¶ 36), which are positions he held at the Bank. Defendant Gary Judd served as the Company's Chairman and CEO, and Defendant Thomas Lopp served as the Company's Chairman, CEO, and President. (C ¶¶ 34-35.) According to the Complaint, Defendant Scott Seligman is the founder of the Bank and served as Vice President of Sterling and as a consultant to the Bank's Board during the Class Period. (C ¶¶ 39-40.)

The Complaint brings claims under (i) Section 11 of the Securities Act, 15 U.S.C. § 77k, against Sterling, the Director Defendants, the Underwriter Defendants, Judd, and Lopp, relating to disclosures in Sterling's IPO Registration Statement (C ¶¶ 452-61); (ii) Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), against Sterling and the Underwriter Defendants, relating to disclosures in Sterling's IPO Registration Statement (C ¶¶ 462-71); (iii) Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Officer Defendants, the Director Defendants, and Scott Seligman, concerning control person liability for the IPO disclosures (C ¶¶ 472-79); (iv) Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5

thereunder, 17 C.F.R. § 240.10b-5, against Sterling and the Officer Defendants, relating to Sterling's disclosures throughout the Class Period (C ¶¶ 409-16); (v) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against the Officer Defendants and Scott Seligman, concerning control person liability for the Class Period disclosures (C ¶¶ 417-23); and (vi) Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, against Scott Seligman (C ¶¶ 424-31).

### B.     Sterling's Disclosures

#### 1.     The Nature of the ALP

Sterling's lending activities focused on "residential real estate mortgages, which accounted for 80% of [its] loan portfolio" at the time of its IPO.  (Ex. A (Pros.) at 85.)  Sterling's ALP, a specific residential lending program, in turn "constituted 75% of [its] residential loan portfolio."  (C ¶ 136.)

As described by Sterling, the ALP was designed to provide residential loans to "underserved home buyers" seeking a "quick approval" mortgage "who have good credit, but may have limited credit history."  (C ¶¶ 84-85.)  Sterling disclosed that the ALP was "focus[ed] on the minority and immigrant markets," and that ALP customers were usually "foreign nationals and recent immigrants," including the "foreign national Chinese home buyer."  (C ¶ 85.)  Because ALP customers "may have limited credit history" (C ¶ 84), Sterling mitigated the risk of these loans through a high "minimum 35% down payment requirement" (C ¶ 84).

9

The ALP reflected Sterling's business strategy, as disclosed in its offering materials, to "focus on nontraditional loan products" as opposed to "traditional conforming, fixed-rate mortgages." (Ex. A (Pros.) at 3.) In embracing a market avoided by its "larger" rivals, Sterling "faced less competition for customers" in the ALP "as compared to the competition" it faced "in the market for qualified mortgages." (*Id.* at 15.) Sterling thus disclosed that a "majority of [its] residential mortgage loans [were] not 'qualified mortgages,'" meaning its "underwriting process does not strictly follow applicable regulatory guidance required for such qualification," including in the areas of "verify[ing] and document[ing] the income and financial resources relied upon to qualify a borrower for [a] loan." (*Id.* at 17.)

By the time of the IPO, Sterling enjoyed remarkable stability across its loan portfolio. For example, as a result of the high down payment requirement for ALP loans, Sterling's programs had "low loan to value ratios, which averaged 62% across [its] residential portfolio." (C ¶ 136.) A low loan-to-value ratio corresponds to higher home equity and a lower likelihood of defaults. And Sterling faced a mere "0.06% rate of delinquency" with respect to its loans (C ¶ 136), meaning that nearly every loan was being paid as agreed. As discussed below, there is no allegation that Sterling's disclosed loan-to-value ratios or rate of delinquency were inaccurate.

10

## 2.      The Risks of the ALP

In its offering materials, Sterling disclosed that, while its loan portfolio remained stable, its focus on underserved home buyers carried inherent risk.  In outlining its "risk of noncompliance and enforcement action" with respect to BSA/AML "statutes and regulations," for example, Sterling explained the uniquely challenging compliance issues raised by its programs:

> The Bank Secrecy Act, the USA Patriot Act and other laws and regulations require financial institutions, among other duties, to institute and maintain an effective anti-money laundering program . . . . We are also subject to increased scrutiny of compliance with the rules enforced by the Office of Foreign Assets Control. *Because a significant portion of our customer base consists of foreign nationals and recent immigrants, these laws and regulations pose disproportionate challenges to us relative to our peers.*  If our policies, procedures and systems are deemed deficient, we would be subject to liability, including fines and regulatory actions . . . .

(Ex. A (Pros.) at 29-30 (emphasis added); *see also* Ex. B (2017 10-K) at 32-33; Ex. C (2018 10-K) at 35.)   Sterling further warned that "employee and customer misconduct could subject us to financial losses or regulatory sanctions."  (Ex. A (Pros.) at 24; *see also* Ex. B (2017 10-K) at 27; Ex. C (2018 10-K) at 29.)  In particular, because, "[i]n deciding whether to extend credit," Sterling "may rely upon [its] customers' representations that their financial statements are accurate," it could ultimately "rely on materially misleading, false, inaccurate or fraudulent information."  (Ex. A (Pros.) at 24; *see also* Ex. B (2017 10-K) at 27; Ex. C (2018 10-K) at 29-30.)  Although Sterling explained that it "maintain[ed] a system of

11

internal controls" to mitigate such risks (*see, e.g.*, Ex. A (Pros.) at 24), it disclosed that "[i]f our internal controls fail to prevent or detect an occurrence," "it could have a material adverse effect on our business," and that, "[a]s with any risk management framework, there are inherent limitations to our risk management strategies." (Ex. A (Pros.) at 24-25; Ex. B (2017 10-K) at 27-28; Ex. C (2018 10-K) at 29-30.)

### 3.    The Issues with the ALP

The Complaint alleges that Sterling committed securities fraud because some of the risks that Sterling disclosed ultimately materialized.  On June 21, 2019, for example, Sterling disclosed that it had, three days earlier, "entered into a formal agreement [with the OCC] relating primarily to certain aspects of the Bank's [BSA/AML] compliance program." (C ¶ 246.)  Pursuant to this agreement, Sterling agreed to "enhance its policies and procedures to ensure compliance with BSA/AML laws and regulations." (C ¶ 246.)  Sterling further disclosed that "[a] finding by the OCC that the Bank failed to comply with the Agreement could result in additional regulatory scrutiny, constraints of the Bank's business, or other formal enforcement action." (Ex. D (6/21/19 8-K) at 2.)

Sterling filed the entire OCC Agreement on August 9, 2019, as an exhibit to its Second Quarter 2019 10-Q.  (C ¶ 248; *see* Ex. E (8/9/19 10-Q (Ex. 10.1)).)[2]  The

---

[2] Although the Complaint alleges this was filed on August 27, 2019, that date is incorrect.

OCC Agreement details the issues that Sterling previously disclosed, including that the "OCC found unsafe or unsound practices relating to the Company's credit administration and violations of law relating to certain aspects of its BSA/AML compliance program."  (C ¶ 248.)  It states that Sterling agreed to ensure effective controls "to collect and verify employment and income," and references an OCC "Report of Examination dated March 31, 2018."  (C ¶ 248.)

In November 2019, Sterling then disclosed that, "in connection with an internal compliance investigation," it "terminated two loan producers within the [ALP]."  (C ¶ 283; *see* Ex. F (11/8/19 10-Q) at 44.)  In making this disclosure, Sterling warned that, "if these producers or other loan producers within our Advantage Loan program are found to have engaged in misconduct, we could face regulatory or other pressure to disband the Advantage Loan Program."  (C ¶ 283.)

That disclosure ended up being prescient:  Sterling ultimately decided to discontinue the ALP.  On December 9, 2019, Sterling disclosed that it would "voluntarily and temporarily suspend[] its Advantage Loan program in connection with an ongoing internal review of the program's documentation procedures," in view of "put[ting] in place additional systems and controls to ensure the Bank's policies and procedures are followed."  (C ¶ 287; *see* Ex. G (12/9/19 8-K) at 2.)  The Company cautioned that, "if a decision is made to alter the program, the Company's results of operations could be materially and adversely affected."  (C ¶ 287.)  Then,

13

on March 6, 2020, Sterling disclosed it "no longer intends to resume the Advantage Loan Program."  (C ¶ 310; *see* Ex. H (3/6/20 8-K) at 2.)  Its internal review had preliminarily found that "certain employees engaged in misconduct . . . with respect to income verification and requirements, reliance on third parties, and related documentation," and Sterling noted that "a significant number of employees either have been terminated . . . or have resigned."  (C ¶ 310.)  Sterling further noted that it was "under formal investigation by the OCC" and had received federal grand jury subpoenas relating to the Bank's residential lending practices.  (C ¶ 312.)

Following the discontinuation of the ALP, Sterling made further disclosures concerning its internal review of the program.  Sterling disclosed on March 17, 2020 that it would delay filing its 2019 10-K to continue examining "the circumstances that led to the previously-reported suspension and termination of the [ALP]."  (C ¶ 316.)  And on June 1, 2020, Sterling disclosed it had established reserves relating to the ALP, including in light of governmental investigations and litigation surrounding the ALP.  (C ¶ 322.)

## C.   Plaintiff's Allegations

### 1.   Overview of Alleged Misstatements and Omissions

The central fraud alleged in the Complaint is that Sterling's underwriting and risk management were not "conservative" or "disciplined" as disclosed by Sterling (*see, e.g.*, C ¶¶ 166-67, 244-45, 308-09, 450-51), in that these programs failed to

14

prevent the issues ultimately facing the ALP.  The Complaint at bottom alleges just three types of supposed misstatements and two types of supposed omissions.

*First*, and foremost, the Complaint disputes Sterling's general descriptions of its underwriting standards and practices, which Sterling characterized as "conservative" and "disciplined" (*see*, *e.g.*, C ¶ 136), and which Plaintiff contends were "neither disciplined nor conservative" (*see, e.g.*, C ¶¶ 161, 238, 301, 446).

*Second*, the Complaint disputes Sterling's description of its risk management—*i.e.*, "the activities by which we [Sterling] identify, measure, monitor, evaluate and manage the risks we face in the course of our banking activities," including "liquidity, interest rate, credit, operational, cyber/technological, legal, compliance, regulatory, strategic, financial and reputational risk exposures" (*see, e.g.*, C ¶ 136)—which Sterling described as "robust" and of "primary importance" (*see, e.g.*, C ¶ 136), but which Plaintiff says were "inadequate" (*see, e.g.*, C ¶¶ 161, 163-165, 238, 240-242, 301, 303-304, 306-307, 446, 448-49).  The Complaint likewise takes issue with Sterling's disclosures of its risk management issues—*e.g.*, that Sterling viewed them as a "setback" (C ¶ 299)—asserting that they were "downplayed" (*see, e.g.*, C ¶ 299; *see also* C ¶ 306).

*Third*, the Complaint challenges Sterling's statements describing its credit and asset quality (*see* C ¶¶ 161, 238, 301, 446), including its "strong credit culture," "strong asset quality," "excellent credit quality," and "strong customer

15

relationships" (*see, e.g.*, C ¶¶ 136, 139, 151, 228), with the Complaint asserting that the ALP "focused on clients with little to no credit history, as opposed [to] 'strong' or 'good' credit" (C ¶¶ 161, 239, 302, 447).

*Fourth*, turning to omissions, Plaintiff maintains that whenever Sterling spoke about its growth (C ¶¶ 243, 305, 307), the pipeline or demand for its loans (C ¶¶ 165, 242, 304), or its actual financial results (C ¶¶ 162, 239, 302, 447), Sterling was obliged to add a disclaimer that those views or results were tainted by the aforementioned alleged weaknesses in its underwriting and risk management. (*See, e.g.*, C ¶ 165 ("The statements . . . regarding the pipeline and demand for Sterling's loans were . . . materially false and misleading when made because they failed to disclose that the strong demand and pipeline were the result of the fact that the Company's underwriting and risk management programs were inadequate and neither disciplined nor conservative . . . .").) Notably, Plaintiff does not contend that any of the financial or performance figures Sterling disclosed were inaccurate, only that, in Plaintiff's estimation, Sterling was obligated to add footnotes adopting and disclosing Plaintiff's view that those figures were the product of "inadequate" underwriting and risk management. (*See, e.g.*, C ¶¶ 162, 239, 302, 447.)

*Finally*, the Complaint further alleges that Sterling should have disclosed the OCC Report to the market prior to entering into its disclosed agreement with the OCC. (C ¶¶ 392-98.)

16

The Complaint's "evidence" supporting the fraudulent nature of these alleged misstatements or omissions consists of a backward-looking assessment of Sterling's disclosures (C ¶¶ 167, 245, 309, 451) and unreliable, confidential, former-employee allegations (C ¶¶ 166, 244, 308, 450).

### 2.    The Alleged Misstatements and Omissions Relate to Soft Information

As discussed above, the Complaint takes issue with Sterling's qualitative statements, *e.g.*, whether underwriting was "conservative" and "disciplined," whether risk management was "effective" and "robust," and whether compliance obstacles were "setbacks."   The Complaint does not allege that Sterling misrepresented any hard fact with respect to the status or performance of its loan portfolios.   The Complaint does not contend, for example, that Sterling made misrepresentations in disclosing the low delinquency rate of its loans.   Nor does it contend that Sterling misrepresented the low loan-to-value ratio of its portfolios. Nor does it allege that any of Sterling's reported financial results were inaccurate because, for example, customers were not in fact paying their loans.   As discussed *infra*, fraud claims relating to "soft" information like this have a significantly higher pleading burden in the Sixth Circuit, a burden Plaintiff cannot meet.

### 3.    Plaintiff's Contradictory Allegations

Notably, Plaintiff contradicts its own allegations throughout the Complaint. For example, the Complaint states that Sterling disclosed the ALP as "focus[ed] on

the minority and immigrant markets," and that its customers were usually "foreign nationals and recent immigrants," including the "foreign national Chinese home buyer" (C ¶ 85), before later alleging that Plaintiff was misled by Sterling because "the target customers for the ALP were foreign nationals, particularly Chinese nationals" (C ¶¶ 166, 244, 308, 450).   Similarly, the Complaint states Sterling disclosed that the ALP was offered to "underserved home buyers" looking for a "quick approval" mortgage who "may have limited credit history" (C ¶¶ 84-85), before later alleging that Plaintiff was misled because the ALP "catered to foreign nationals with little or no credit history" (C ¶¶ 166(e), 244(e), 308(e), 450(e); *see also* C ¶¶ 161, 239, 302, 447).   And the Complaint's primary "evidence" of fraud amounts to 14 pages of confidential, former-employee allegations outlining that the ALP "targeted mainly Chinese immigrants with little or no traditional credit history" who were looking for "quick qualifier" loans (C ¶¶ 94-133), all of which, again, the Complaint confirms that Sterling had previously disclosed (C ¶¶ 84-85).

### 4.   Plaintiff's Selective Omission of Sterling's Disclosures

The Complaint further omits Sterling's early, detailed warnings of risk.   The Complaint, for example, fails to include Sterling's disclosures on the very nature of its ALP, including that "a majority of [Sterling's] residential mortgage loans are not 'qualified mortgages,' as [its] underwriting process does not strictly follow applicable regulatory guidance required for such qualification."   (Ex. A (Pros.) at

17; Ex. B (2017 10-K) at 20-21; Ex. C (2018 10-K) at 23.)  The Complaint then omits Sterling's disclosures regarding the risks of such programs, which were the same risks the Complaint alleges later materialized.  (*Compare, e.g.*, Ex. A (Pros.) at 30 ("Because a significant portion of our customer base consists of foreign nationals and recent immigrants, [BSA/AML] laws and regulations pose disproportionate challenges to us relative to our peers."), *with* C ¶ 248 ("[T]he OCC found . . . violations of law relating to certain aspects of its BSA/AML compliance program"); *compare* Ex. A (Pros.) at 24 ("[E]mployee and customer misconduct could subject us to financial losses or regulatory sanctions . . . .  [W]e may rely upon our customers' representations that their financial statements are accurate."), *with* C ¶ 310 ("[C]ertain employees engaged in misconduct . . . with respect to income verification and requirements, reliance on third parties, and related documentation.").)  Instead, the Complaint selectively quotes Sterling's risk controls as purporting to be infallible.  For example, Plaintiff continually points to Sterling's statement that "[w]e have established processes and procedures intended to identify [and] monitor . . . risk" (C ¶¶ 5, 136, 155, 215, 438), while omitting the very next sentences in which Sterling states that, "as with any risk management framework, there are inherent limitations to our risk management strategies," and that, "[i]f our risk management framework proves ineffective, we could suffer unexpected losses" (Ex. A (Pros.) at 25; Ex. B (2017 10-K) at 28; Ex. C (2018 10-K) at 30).

19

## **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, this requirement does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*The Securities Act Claims***.** "Sections 11 and 12(a)(2) create causes of action founded on misleading statements, misstatements, or omissions in a registration statement or a prospectus, respectively." *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 389 (6th Cir. 2008). To state a claim under either, Plaintiff must sufficiently plead that the offering materials contained "an untrue statement of a material fact" or omitted "to state a material fact" necessary to make the statements therein "not misleading." 15 U.S.C. § 77l(a)(2); 15 U.S.C. § 77k(a). "[T]he relevant inquiry is not whether . . . [a statement] later turned out to be correct, but rather whether the [defendant] knew or had reason to know, *at the time the offering documents were filed,* that the statement was untrue." *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 393-94 (S.D.N.Y. 2014) (first alteration added) (emphasis added) (citation omitted).

***The Exchange Act Claims***.  To state a claim for violation of Section 10(b), Plaintiffs must plead facts to establish:  "(1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by the plaintiff; and (5) proximately causing them injury." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005) (citation omitted).

***Control Person Liability***.  "Section 20(a) and Section 15 are parallel provisions, and their 'terms are interpreted in the same manner.'" *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007) (citation omitted).  To establish control person liability, a plaintiff must show that "the 'controlled person' must have committed an underlying violation of the securities laws" and that the "'controlling person' . . . directly or indirectly controlled the person liable for the securities law violation," with "control" defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 441 (6th Cir. 2004) (quoting 17 C.F.R. § 230.405).  In addition, a plaintiff must also allege "that the defendant 'culpably participated' in that underlying violation." *D.E. & J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 750 (E.D. Mich. 2003) (citation omitted).

21

*Heightened Pleading Requirements*.  A securities fraud plaintiff faces a double-heightened pleading standard.  First, "[s]ecurities fraud claims arising under Section 10(b) . . . must satisfy the particularity pleading requirements of Rule 9(b)," which require a plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Frank v. Dana Corp.*, 547 F.3d 564, 569-70 (6th Cir. 2008) (citation omitted).

Second, Plaintiff must meet the rigorous specificity requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA").  The Sixth Circuit calls the PSLRA an "elephant-sized boulder" blocking securities claims.  *In re Omnicare Sec. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014) ("*Omnicare II*").  With good reason.  The PSLRA "created heightened pleading standards for securities-fraud cases" that are far "heavier" than ordinary pleading standards and "not easily satisfied."  *Id*.  The complaint, for example, must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading[.]"  15 U.S.C. § 78u-4(b)(1)(B).  And "the complaint shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* § 78u-4(b)(2)(A).  Further, "when plaintiffs accuse defendants of misrepresenting or omitting soft information," as Plaintiff does here, they "must plead facts showing

that the defendants *knowingly* misrepresented or omitted facts to deceive, manipulate, or defraud the public." *Omnicare II*, 769 F.3d at 472 (emphasis added).

Importantly, the heightened pleading requirements for fraud apply to both the Securities Act and Exchange Act claims that Plaintiff has asserted because both sets of claims "sound in fraud." *Omnicare I*, 583 F.3d at 948; *see also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 68 (1st Cir. 2008) (same); *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (same); *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 288 (3d Cir. 1992) (same); *Melder v. Morris*, 27 F.3d 1097, 1100 n.6 (5th Cir. 1994) (same); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (same); *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1404-05 (9th Cir. 1996) (same); *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) (same).

Although the Complaint attempts to shield its Securities Act claims from these stringent standards by "disclaim[ing] any allegation that could be construed as alleging fraud" (C ¶ 432), a "one-sentence disavowment of fraud contained within Plaintiffs' section 11 Count . . . does not require [the Court] to infer that the claims are strict liability or negligence claims." *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 160 (3d Cir. 2004); *see also In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) ("We have held that a plaintiff's nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any

23

other basis for the claims.").  Rather, where "a complaint employs the exact same factual allegations to allege violations of section 11 as it uses to allege fraudulent conduct under section 10(b) of the Exchange Act, we can assume that it sounds in fraud."  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009); *see also Wagner*, 464 F.3d at 1278 ("It would strain credulity to claim that Rule 9(b) should not apply in this allegation:  The defendant is a no good defrauder, but, even if he is not, the plaintiff can still recover based on the simple untruth of the otherwise fraudulent statement.").

The Complaint's Securities Act claims "sound in fraud" because they employ the "same factual allegations" made with respect to its Exchange Act claim.  *Rubke*, 551 F.3d at 1161; *see also In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 742 (S.D.N.Y. 2015) ("Plaintiffs have staked their Securities Act claims upon the same factual allegations as their Rule 10b-5 claims and accordingly Rule 9(b) applies."). Plaintiff points to identical disclosures from Sterling's offering materials as forming the basis of both sets of claims (*compare* C ¶¶ 136-143, *with* C ¶¶ 438-445), and makes nearly identical allegations as to why such disclosures are allegedly false or misleading (*compare* C ¶¶ 166-67, *with* C ¶¶ 450-51).  *See, e.g.*, *Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 339 (S.D.N.Y. 2012) ("Several . . . instances of misstatements or omissions that Plaintiffs employ in alleging their '33 Act claims are the same as those they use to allege their '34 Act

24

claims, verbatim.  Although Plaintiffs claim that they should not be held to the higher standard for their '33 Act claims because they took the trouble to separate their claims into separate sections, the false and misleading statements and omissions alleged for both sets of claims pertain to the exact same underlying events.").

## ARGUMENT

While omitting Sterling's specific disclosures regarding the nature and risks of the ALP, the Complaint challenges Sterling's general disclosures surrounding its underwriting and control practices—statements that amount to non-actionable corporate puffery and opinion.  Plaintiff's reliance on corporate puffery reflects its failure to allege that Sterling made any actual misrepresentation with respect to the ALP and that, at best, Plaintiff's claims suggest a non-actionable claim of corporate mismanagement.  And even if such statements were actionable, the Complaint does not allege that any statement was false or misleading when made.  Nor does the Complaint make any particularized allegations against any defendant, much less allegations that any one of them acted with scienter or culpably participated in an underlying violation.  Accordingly, the Complaint should be dismissed.

## I.  Plaintiff's Formulaic Manner of Pleading Should Be Rejected

"A complaint can be long-winded, even prolix, without pleading with particularity; [i]ndeed, such a garrulous style is not an uncommon mask for an absence of detail."  *Williams*, 112 F.3d at 178; *see also U.S. ex rel. Garst v.*

25

*Lockheed-Martin Corp.*, 328 F.3d 374, 376, 378 (7th Cir. 2003) (Easterbrook, J.) (affirming dismissal of 155-page complaint that "broke the scale"; "Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud"). The Complaint falls squarely into this category.

Plaintiff's pleading follows a formula commonly employed by securities litigants unable to allege a particular misrepresentation based on particular facts. First, it lists four sets of lengthy quotations from Sterling's disclosures (C ¶¶ 136-60, 168-237, 246-299, 438-45)—including one spanning 28 pages (*see* C ¶¶ 168-237)—and emphasizes portions of statements within the disclosures. Next, it follows each of these four sets of disclosures with conclusory, repetitive allegations that general categories of the lengthy disclosures were false or misleading. (C ¶¶ 161-65, 238-43, 301-07, 446-49.) Finally, as "evidence[]" of the "truth," it concludes each of the four sections with the same list of statements from confidential witnesses and the same list of Sterling's own subsequent disclosures. (C ¶¶ 166-67, 244-45, 308-09, 450-51.) Nowhere does Plaintiff allege fraud with particularity.

This Court and others have rejected this precise manner of pleading:

> The Court finds that these allegations and the manner in which they are pled plainly fail to meet the particularity requirements that the Court has identified. . . . Nowhere in the Complaint do Plaintiffs specify each statement that is allegedly false nor do they give a particular reason why a particular statement is false. Rather, they have simply compiled a

> long list of block quotes . . . and they line these statements up against a
> conclusory list of omissions and pronounce that fraud exists.   Any
> notion of particularity . . .  certainly demands more than this.

*Havenick v. Network Exp., Inc.*, 981 F. Supp. 480, 526 (E.D. Mich. 1997); *see also*

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.*, 2013 WL

1345086, at *5 (E.D.N.Y. Mar. 29, 2013) ("The Court cannot overlook . . . the

problematic form of the pleading in this case.  The CAC contains many long block

quotes of public statements made by SBI, with smaller sections alleged to be

misleading highlighted in bold . . . .  These block quotes often follow one after the

other without Plaintiffs' explaining how and why each individual section is

misleading.").

That is, instead of "specify[ing] the statements that the plaintiff contends were

fraudulent" and "explain[ing] why the statements were fraudulent," *Dana Corp.*, 547

F.3d at 570 (citation omitted), the Complaint "leav[es] the District Court to search

the long quotations in the complaint for particular false statements, and then

determine on its own initiative how and why the statements were false," *Boca Raton*

*Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012).

Indeed, "many of Plaintiff['s] allegations span over multiple pages without

any indication of what, specifically, Plaintiff[] allege[es] to be false and misleading,"

and instead of "demonstrat[ing] with specificity how any of the statements are

allegedly false," "the complaint employs the same conclusory formula . . . four

27

separate times . . . to cover *all* of the allegedly material omissions." *In re Deutsche Bank*, 2017 WL 4049253, at *5.

The Complaint likewise makes no particularized allegations against Defendants. Because, as discussed *supra*, each of Plaintiff's claims sounds in fraud, Plaintiff must plead fraud with particularity with respect to each defendant. *See Omnicare I*, 583 F.3d at 948. And where, as here, fraud must be pled with particularity, "this Court is bound by existing Sixth Circuit precedents . . . that a fraud claim requires *specific allegations* as to *each defendant's* alleged involvement in the securities violations." *North Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (emphasis added). Group pleading fails to meet Rule 9(b)'s specificity requirements. *D.E. & J*, 284 F. Supp. 2d at 730. Here, the Complaint does not include a single allegation that Scott Seligman or any Director Defendant made a false or misleading statement. And while the Complaint points to certain statements from Sterling's or the Bank's former officers, it does not pair any facts with any specific statement to show that it was false or misleading.

On its face, the Complaint does not even attempt to meet the particularity requirements of the securities laws, and, "[o]n this basis alone, the complaint fails to meet the pleading requirements necessary to state a claim." *In re Deutsche Bank*, 2017 WL 4049253, at *5; *see also id.* (explaining that "this type of complaint 'does

not comport'" with the principle that "plaintiffs 'must demonstrate with specificity why and how' each statement is materially false or misleading" (internal quotation omitted)).

## II.   Plaintiff Fails to Allege an Actionable Misrepresentation or Omission

Putting aside Plaintiff's impermissible manner of pleading, Plaintiff also fails to allege any actionable misrepresentation or omission.  Each of Plaintiff's claims require that Plaintiff "allege a material misrepresentation or omission," the analysis for which "is essentially the same under Section 10(b), Section 11, and Section 12." *Hawaii Structural Ironworkers Pension Trust Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 836 (S.D.N.Y. 2019) (citation omitted).

### A.   Plaintiff Fails to Allege a Materially False or Misleading Statement

The statements that Plaintiff alleges are false or misleading are insufficient to state a claim because they fall into at least one of three categories:  (1) statements that are corporate puffery, (2) statements that suggest corporate mismanagement, and (3) statements that are not alleged to have been false or misleading when made.

#### 1.   Corporate Puffery Is Not Actionable

In assessing the materiality of an alleged misrepresentation, the Court should "analyz[e] the statement at issue in the context of the entire document" in which it appears, and the "touchstone of the inquiry" is whether the "representations or omissions, considered . . . in context, would affect the total mix of information and

thereby mislead a reasonable investor regarding the nature of the securities offered."
*J & R Mktg.*, 549 F.3d at 395 (*quoting Halperin v. eBanker USA.com, Inc.*, 295 F.3d
352, 357 (2d Cir. 2002)).  Materiality hinges not on "[t]he importance of the topic
of the representation," but on "what particularly was represented."  *Id.* at 396.

Under this analysis, "Courts have consistently found immaterial 'a certain
kind of rosy affirmation commonly heard from corporate managers and numbingly
familiar to the marketplace—loosely optimistic statements that are so vague, so
lacking in specificity, or so clearly constituting the opinions of the speaker, that no
reasonable investor could find them important.'"  *Omnicare I*, 583 F.3d at 943-44
(quoting *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570-71 (6th Cir. 2004)).

### a)     Plaintiff's Alleged Misstatements Constitute Corporate Puffery

The Complaint does not allege that Sterling misstated facts concerning
Sterling's underwriting, controls, or the credit quality of its borrowers.  Nor does it
allege that Sterling made misrepresentations about its loan portfolio, its rates of
delinquency or default, or, even more broadly, any of its reported financial results.

Rather, the Complaint attacks, usually without the full language of the
disclosure, statements where Sterling characterized aspects of its lending programs
using terms such as "disciplined," "conservative," or "strong."  (*See, e.g.*, C ¶ 136.)
The Complaint then repeats—38 times in different iterations—that such programs

were in fact neither "disciplined" nor "conservative."[3]   Because such "generally optimistic statement[s]" "lack[] a standard against which a reasonable investor could expect the [representations] to be pegged," they are "too squishy, too untethered to anything measurable, to be considered material" as a matter of law.   *J & R Mktg.*, 549 F.3d at 396 (first alteration added) (citation omitted).

   ***Underwriting Statements.***   Sterling's underwriting-related statements forming the foundation of the Complaint—*e.g.*, that Sterling engages in "disciplined," "conservative," and "careful" underwriting[4]—are "classic examples of puffery."   *In re Sec. Cap. Assurance*, 729 F. Supp. 2d at 597; *see id.* ("Plaintiffs' allegations that SCA made material misrepresentations when it referred to its underwriting approach as 'disciplined' and 'conservative' . . . are classic examples of puffery."); *see also Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2010) (statement referring to "conservative lending practices" is "the quintessence of non-actionable puffery" and "defines the term 'puffery'"); *In re Synchrony Fin. Sec. Litig.*, 2020 WL 1531297, at *20 (D. Conn. Mar. 31, 2020) ("Defendants' statements about Synchrony's . . . 'consistent,' 'disciplined' underwriting are not material misstatements . . . ."); *In re Wachovia Equity Sec.*

---

[3] (C ¶¶ 7, 103, 111, 161, 163-165, 166, 166(a), 166(b), 167, 238, 240-42, 244, 244(a), 244(b), 245, 301, 303-04, 306-07, 308, 308(a), 308(b), 309, 326, 328, 336, 446, 448-49, 450, 450(a), 450(b), 451.)

[4] (*See* C ¶¶ 4, 6, 136, 155, 215, 254, 275, 299, 438.)

*Litig.*, 753 F. Supp. 2d 326, 353-54 (S.D.N.Y. 2011) ("Defendants' repeated public declarations of their 'conservative' underwriting standards and credit risk management . . . constitute corporate puffery rather than actionable misrepresentations."); *id.* at 376 (finding that "affirmative statements . . . [in] offering documents . . . regarding Wachovia's 'prudent' lending practices . . . and 'strong' credit risk management . . . constitute corporate puffery").

***Risk Management Statements.*** Courts have similarly rejected as puffery statements like Sterling's disclosures of a "risk-conscious culture," "robust governance," and "effective risk management,"[5] finding that "[n]o investor would take such statements seriously . . . for the simple fact that almost every investment bank makes these statements." *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009); *see id.* at 205-06 (statements concerning a bank's "highly disciplined" risk management process, reputation for "integrity," and "focus on financial discipline" were "no more than 'puffery' which does not give rise to securities violations"); *see also Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 385 (S.D.N.Y. 2011) ("Plaintiffs . . . allege that Defendants misrepresented . . . risk controls . . . citing generalized statements about the effectiveness of the Company's risk management.

---

[5] (*See* C ¶¶ 4, 136, 155, 215, 244, 388, 391, 438.)

However, the cited statements . . . are properly classified as 'puffery' and therefore are not actionable as a matter of law."); *In re Wachovia*, 753 F. Supp. 2d at 354 ("Defendants' statements about their 'conservative' . . . risk management constitute corporate puffery . . . ."); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370 (S.D.N.Y. 2013) ("[T]he descriptions . . . that the compliance program was 'robust' or 'best-of-class' . . . fall 'into the category of commonplace statement too general to cause reliance by a reasonable investor.'" (citation omitted)).

***Credit Quality and Asset Quality Statements.*** The Complaint's remaining scattering of statements concerning Sterling's "strong credit culture," "strong asset quality," "excellent credit quality," and "strong customer relationships"[6] are likewise "vague, optimistic statements" that "are not actionable." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1207 (9th Cir. 2016); *see id.* at 1206-07 (deeming as non-actionable puffery statements regarding "strong credit culture and underwriting integrity" and "sound" "credit quality of the loan portfolio"); *see also Southeastern Penn. Transp. Auth. v. Orrstown Fin. Servs., Inc.*, 2015 WL 3833849, at *20 (M.D. Pa. June 22, 2015) ("[C]haracterizations of . . . lending practices as 'conservative' and loan portfolio as 'high quality' represent vague statements that constitute immaterial puffery, and thus are not actionable."); *id.* at *29 (phrases "strong asset quality" and

---

[6] (S*ee* C ¶¶ 136, 139, 147, 150-51, 174, 182, 185, 201, 220-21, 224, 228, 231, 254, 260, 269, 274, 438, 441.)

"emphasis on credit quality" likewise constitute puffery); *Synchrony*, 2020 WL 1531297, at *20 ("In this case, Defendants' statements about Synchrony's 'stable asset quality' . . . are not material misstatements that would mislead a reasonable investor in the 'total mix' of available information."); *Rudman v. CHC Grp. Ltd.*, 217 F. Supp. 3d 718, 728 (S.D.N.Y. 2016) ("CHC's statements regarding its 'strong' relationships with its customers was no more than puffery which does not give rise to securities violations."); *I.B.E.W. v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 635 (S.D. Ohio 2011) (statement that the company was "very strong and that we are very well positioned" is "clearly puffery").

Context further belies the materiality of these statements. Sterling did not, for example, speak of "disciplined" underwriting in a vacuum—in that same paragraph, Sterling stated that the "continuity and consistency in [its] underwriting is reflected by [its] 0.06% rate of delinquency," a fact Plaintiff does not challenge. (C ¶ 136.) And when one of Sterling's executives spoke of its "excellent credit history" (C ¶ 231), in the next sentence he stated that "[i]n fact, the last residential mortgage charge-off on a non-legacy loan we originated was in January of 2012," a fact that Plaintiff does not include, much less dispute, in the Complaint. (Ex. I (4/29/19 Conf. Call Tr.) at 5.) The Complaint latches onto these classic phrases of corporate puffery precisely because it has no basis to question the "concrete" representations of "objective data" to which they relate. *J & R Mktg.*, 549 F.3d at 396.

34

Another Court previously admonished this same Plaintiff for doing precisely what it repeats here.  That Court, in dismissing Plaintiff's complaint, concluded that a company's descriptions of "underwriting, appraisal, and credit standards as . . . 'conservative,' and 'strong'" are "immaterial because these commonplace statements of corporate puffery could not influence a reasonable investor's investment decision." *BankUnited Fin. Corp.*, 2010 WL 1332574, at *8.  Plaintiff is required to, but did not, "look beyond these optimistic characterizations to . . . specific, verifiable statements . . . if they are to successfully allege a violation of the federal securities laws." *Id*.

### b) Sterling's Puffing Statements Must Be Read in the Context of its Extensive Disclosures

In cherry-picking various puffing statements from Sterling's disclosures, Plaintiff ignores or omits what Sterling actually disclosed with respect to the nature and risks of the ALP.  Contrary to the approach taken in Plaintiff's Complaint, "[i]n assessing whether statements provided in [a] prospectus are materially misleading, the prospectus must be read as a whole, not selectively or in a piecemeal fashion." *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007); *see also J & R Mktg.*, 549 F.3d at 395-96.

Beginning with its offering documents and continuing throughout the Class Period in its annual reports, Sterling made clear that "the risk management policy disclosures upon which Plaintiff relies did not purport to guarantee that [Sterling]

35

would not expose itself to risks." *In re Citigroup*, 330 F. Supp. 2d at 377.  The

Complaint, however, selectively omits these disclosures.   For example, the

Complaint points to Sterling's statement that "[w]e are required to comply

with . . . anti-money laundering requirements" (C ¶¶ 143, 158, 218, 445), while

omitting the disclosure in the same paragraph that:

> Because a significant portion of our customer base consists of foreign
> nationals and recent immigrants, [BSA/AML] laws and regulations
> pose disproportionate challenges to us relative to our peers. If our
> policies, procedures and systems are deemed deficient, we would be
> subject to liability . . . .
>
> Failure to maintain and implement adequate programs to combat
> money laundering and terrorist financing could also have serious
> reputational consequences for us.

 (Ex. A (Pros.) at 30; Ex. B (2017 10-K) at 32-33; Ex. C (2018 10-K) at 35.)  The

Complaint similarly points to Sterling's statement that "[w]e maintain a system of

internal controls . . . to mitigate against operational risks" (C ¶¶ 142, 444), while

omitting the accompanying disclosures that:

> [E]mployee and customer misconduct could subject us to financial
> losses or regulatory sanctions. . . . It is not always possible to prevent
> employee errors and misconduct, and the precautions we take to prevent
> and detect this activity may not be effective in all cases. . . .
>
> If our controls fail to prevent or detect an occurrence . . . it could have
> a material adverse effect on our business [and] financial condition . . . .
>
> * * *
>
> In deciding whether to extend credit, we may rely upon our customers'
> representations that their financial statements are accurate. . . . Our
> financial condition, results of operations, financial reporting and

36

reputation could be materially adversely affected if we rely on
materially misleading, false, inaccurate or fraudulent information.

(Ex. A (Pros.) at 24; *see also* Ex. B (2017 10-K) at 27; Ex. C (2018 10-K) at 29-30.)

And the Complaint continually points to Sterling's statement that it had "established

processes and procedures intended to identify [and] monitor . . . risk" (C ¶¶ 5, 136,

155, 215, 438), while continually omitting the very next sentence stating that:

> As with any risk management framework, there are inherent limitations
> to our risk management strategies . . . . If our risk management
> framework proves ineffective, we could suffer unexpected losses and
> our business and results of operations could be materially adversely
> affected.

(Ex. A (Pros.) at 25; Ex. B (2017 10-K) at 28; Ex. C (2018 10-K) at 30; *compare*

C ¶¶ 142, 159, 218, 444 (pointing to Sterling's statements that "[w]e adopt internal

policies and procedures" and "[o]ur internal policies and procedures are a critical

component of our corporate governance"), *with* Ex. A (Pros.) at 26, Ex. B (2017

10-K) at 29, Ex. C (2018 10-K) at 31 (Sterling stating, in the next sentence, that

"[a]ny deviation or non-adherence to these internal policies and procedures . . . could

have a detrimental effect on our management, operations or financial condition").

Moreover, in pointing to Sterling's descriptions of its ALP practices as

"disciplined" (*see, e.g.*, C ¶ 136) and arguing that they were not, the Complaint takes

issue with the very nature of the ALP as disclosed by Sterling.  Plaintiff peppers its

Complaint with former-employee allegations that the ALP was directed to foreign

nationals with limited credit history looking for "quick qualifier" loans[7] and uses these statements as "evidence[]" that "Sterling's . . . risk management [was] not conservative or disciplined."[8] But Sterling could not have made clearer in its Registration Statement and subsequent annual reports that extending nontraditional loans to underserved foreign nationals was the very business case for the ALP:

- We believe our willingness to focus on nontraditional loan products allows us to face less price competition . . . . (Ex. A (Pros.) at 3.)

- [W]e believe that we have historically faced less competition for customers of our Advantage Loan program as compared to the competition we face in the market for qualified mortgages. (Ex. A (Pros.) at 15; Ex. B (2017 10-K) at 19; Ex. C (2018 10-K) at 20.)

- A majority of our residential mortgage loans are not 'qualified mortgages,' as our underwriting process does not strictly follow applicable regulatory guidance required for such qualification . . . . (Ex. A (Pros.) at 17; Ex. B (2017 10-K) at 20-21; Ex. C (2018 10-K) at 23.)

---

[7] (*See, e.g.*, C ¶ 95 ("[T]he ALP was targeted to foreign nationals . . . often with no traditional credit history . . . ."); C ¶ 96 ("[S]ome of the[] CPA letters were from China . . . ."); C ¶ 108 ("ALP was akin to 'quick qualifier,' low-documentation loans . . . ."); C ¶ 111 ("[T]he program . . . targeted mainly Chinese immigrants with little or no traditional credit history."); C ¶ 113 ("Th[e] letters were written in Mandarin, or another Chinese language . . . ."); C ¶ 118 ("[M]ost of the borrowers worked in China . . . ."); C ¶ 130 ("[T]he majority of ALP borrowers were coming from China . . . .").)

[8] (*See* C ¶¶ 166(d)-(f), 244(d)-(f), 308(d)-(f), 450(d)-(f).)

- We believe that a significant part of our historical strength has been our focus on the minority and immigrant markets.  (Ex. A (Pros.) at 22; Ex. B (2017 10-K) at 25; Ex. C (2018 10-K) at 28.)

- Many of our customers are recent immigrants or foreign nationals. . . .   Adverse economic conditions . . . in China or Taiwan . . . may . . . negatively impact asset values. . . .  (Ex. A (Pros.) at 26; Ex. B (2017 10-K) at 29; Ex. C (2018 10-K) at 32.)

- [A] significant portion of our customer base consists of foreign nationals and recent immigrants . . . .  (Ex. A (Pros.) at 30; Ex. B (2017 10-K) at 32-33; Ex. C (2018 10-K) at 35.)

- Among our significant products is our Advantage Loan program. . . .  We offer this product to underserved home buyers who have good credit, but may have limited credit history.  (Ex. A (Pros.) at 85; Ex. B (2017 10-K) at 3; Ex. C (2018 10-K) at 3.)

The Complaint acknowledges and then ignores many of these disclosures.  For example, although the Complaint admits that Sterling disclosed its ALP as "offer[ed] . . . to underserved home buyers" who "*may have limited credit history*" (C ¶ 84 (emphasis added)), it later repeats that it viewed Sterling's statements regarding its lending practices as "false or misleading" because the ALP "*focused on clients with little to no credit history*" (C ¶¶ 161, 239, 302, 447 (emphasis added)).  And although the Complaint states that Sterling disclosed that the ALP was "*focus[ed] on the minority and immigrant markets*," including the "*foreign national Chinese home buyer*" (C ¶ 85 (emphasis added)), it later alleges that Plaintiff was misled by the fact that "*the target customers for the ALP were foreign nationals, particularly Chinese nationals*."  (C ¶¶ 166(d), 244(d), 308(d), 450(d) (emphasis added).)

While Plaintiff now feigns disapproval of the ALP, the program's business model and inherent risks were disclosed when Plaintiff decided to invest in Sterling. *See Stadnick*, 2015 WL 8492757, at *13 ("Plaintiff's distaste for the Company's disclosed business model is not actionable."). Sterling's specific disclosures (which Plaintiff avoids) confirm that the alleged corporate puffery statements that command Plaintiff's focus would not have "affect[ed] the total mix of information and thereby misle[d] a reasonable investor regarding the nature of the securities offered" and that Plaintiff's alleged misstatements thus "are immaterial as a matter of law." *J & R Mktg.*, 549 F.3d at 395 (citation omitted).

## 2. Allegations of Corporate Mismanagement Are Not Actionable

At bottom, the Complaint pleads at most a claim of corporate mismanagement. The Complaint is premised on the allegation that Sterling's underwriting, internal controls, and compliance programs were "inadequate"—a phrase it repeats 28 times[9]—to prevent the alleged employee misconduct and regulatory scrutiny the ALP ultimately faced. (*See, e.g.*, C ¶¶ 166-67.) But "statements concerning the adequacy of the Bank's internal controls are not actionable," even if, as the Complaint alleges here, "there is evidence that the Bank's

---

[9] (C ¶¶ 161, 162 (twice), 163, 164 (twice), 165, 238, 239 (twice), 240, 241 (twice), 242, 301, 302 (twice), 303, 304, 306 (twice), 307, 446, 447 (twice), 448, 449 (twice).)

AML . . . procedures were deficient." *In re Deutsche Bank*, 2017 WL 4049253, at *7; *see also In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *14 (E.D. Mich. Jan. 30, 2007) ("The anti-fraud provisions were not intended to provide . . . an avenue for relief against executives for . . . corporate mismanagement.").

Plaintiff relies heavily on contesting Sterling's puffery because Sterling's specific disclosures concerning its controls simply describe its systems—*e.g.*, "[w]e maintain a system of internal controls . . . to mitigate against operational risks," and "[w]e have policies, procedures and systems designed to comply with [applicable] regulations" (*see* C ¶¶ 142-43, 444-45)—and provide no assurance as to their effectiveness. *See, e.g.*, *Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 831 (E.D. Ky. 2019) ("Because GC made no assurances beyond saying that it had programs designed to ensure compliance with laws, this statement is not objectively false or misleading and is not actionable . . . ."). And where, like here, a plaintiff does "not plead that the controls did not exist, but merely that they were ineffective," such claims amount to non-actionable "allegations of corporate mismanagement." *In re Deutsche Bank*, 2017 WL 4049253, at *7 (citation omitted); *see also Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 731 (5th Cir. 2019) ("[The] statements describe internal processes and procedures which, although they failed to function correctly in this instance, nevertheless existed. Therefore, describing them is not false or misleading.").

41

Indeed, were such generic descriptions of risk management systems sufficient to make failures of such systems actionable, "then every individual who purchases the stock of a [bank] that was later discovered to have broken any law could theoretically sue for fraud." *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 345 (S.D.N.Y. 2015) (citation omitted). This is precisely what Courts sought to avoid when "declin[ing] to 'bring within the sweep of the federal securities laws many routine representations made by investment institutions.'" *Id.* (citation omitted).

The Complaint, for all its length, at best pleads that the ALP was run in a manner "inconsistent with . . . stated risk management policies," which "amounts to nothing more than a charge that [Sterling's] business was mismanaged." *In re Citigroup*, 330 F. Supp. 2d at 375. And "[s]uch allegations of mismanagement, even where a plaintiff claims that it would not have invested in an entity had it known of the management issues, are insufficient to support a securities fraud claim." *Id.*[10]

---

[10] Plaintiff cannot overcome this conclusion by reaching to Sterling's generic SOX certifications regarding the effectiveness of its controls over financial reporting (*see* C ¶¶ 159, 160, 179, 194, 206, 219, 237, 267, 282) and suggesting that these were misstatements because "effective internal controls were not in place" (*see, e.g.*, C ¶ 163). Such certifications amount to puffery, *see, e.g.*, *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 467-68 (E.D.N.Y. 2020), Plaintiff has not alleged them to be false, *see In re Cognizant Tech. Solutions Corp. Sec. Litig.*, 2018 WL 3772675, at *25-26 (D.N.J. Aug. 8, 2018), and the Complaint, in any event, takes issue with Sterling's controls over underwriting and compliance—not Sterling's controls over financial reporting, *see In re PetroChina Co. Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 359-60 (S.D.N.Y. 2015).

42

### 3.   Plaintiff Pleads No Facts Showing That Any Statement Was False or Misleading When Made

Plaintiff has also failed to allege that any statement in the Complaint was false or misleading when made.  Because each of Plaintiff's claims sounds in fraud, the Complaint must "demonstrate with specificity" "why and how" each statement was "false and misleading."  *Rombach*, 355 F.3d at 174.  And even if Rule 9(b) were not applied to certain claims, Plaintiff must still "allege sufficient facts from which [the] Court can infer 'a statement was either false or misleading (in light of omitted information).'"  *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1257 (N.D. Cal. 2019) (quoting *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 117 (S.D.N.Y. 2010)).  Plaintiff has failed to meet either standard.

#### a)   Statements of Opinion Generally Are Not Actionable

Where "an alleged misrepresentation concerns 'soft information,' which 'includes predictions and matters of opinion,'" it is not actionable except under narrow circumstances.  *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 762 (N.D. Ohio 2020) (quoting *Omnicare II*, 769 F.3d at 470); *see id.* (distinguishing "soft information" from "hard information," which includes "historical information or other factual information that is objectively verifiable").  Specifically, a statement of opinion "is not an 'untrue statement of material fact,' regardless of whether an investor can ultimately prove the belief wrong," unless the plaintiff alleges that the speaker (i) "did not hold the belief [it] professed," (ii) supplied "supporting fact[s]

43

[that] were untrue," or (iii) omitted "particular (and material) facts going to the basis for [its] opinion . . . whose omission makes the opinion . . . misleading to a reasonable person." *Omnicare*, 575 U.S. at 184-86, 194.

The central disclosures at issue in this case are statements of opinion, *e.g.*, that Sterling's underwriting was "conservative," that Sterling's risk management was "robust," and that Sterling's credit and asset quality were "strong." *See, e.g.*, *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 2016 WL 1261135, at *10 (S.D.N.Y. Mar. 30, 2016) (finding that the defendant's "characterizations of its underwriting practices as 'sound'" were "statements in the nature of belief or opinion" under *Omnicare*). The Complaint is likewise brimming with statements of opinion underlying Plaintiff's ancillary allegations, including those regarding Sterling's compliance issues,[11] intentions for new products,[12] pipeline for loans,[13] decline in loan growth,[14] and disclosed allowance for loan losses.[15]

---

[11] (*See, e.g.*, C ¶ 247 ("The Company does not believe that the Agreement will have any material impact on its performance metrics . . . ."); *see also* C ¶ 306.)

[12] (*See, e.g.*, C ¶ 297 ("[W]e will continue to develop new residential loan products that we believe will meet the needs of our customers . . . ."); *see also* C ¶ 307.)

[13] (*See, e.g.*, C ¶¶ 173 ("[W]e remain optimistic about 2018."); *see also* C ¶¶ 165, 242, 304.)

[14] (*See, e.g.*, C ¶ 212 ("We perceive [lower production volumes] to be somewhat temporary . . . ."); *see also* C ¶¶ 243, 305.)

[15] (*See* C ¶¶ 162, 239, 302, 447; *see also Fait v. Regions Fin. Corp.*, 712 F. Supp. 2d 117, 124 (S.D.N.Y. 2010) ("Whether Regions had adequate reserves for its predicted loan losses is not a matter of objective fact. The reserves instead were statements of

Plaintiff, however, makes no showing that any statement of opinion was "false" under the stringent standards of *Omnicare*. Plaintiff does not plead facts showing that any such statement was made with knowledge of its falsity, and, to the extent any of these statements contain "supporting facts"—*e.g.*, "our continuity and consistency in underwriting *is reflected by* our 0.06% rate of delinquency" (C ¶ 136 (emphasis added))—these facts go unchallenged. Plaintiff likewise fails to plead that Defendants omitted particular (and material) facts going to the basis for their opinions—indeed, the Complaint says nothing at all about the basis for these statements. Accordingly, these statements of opinion are not actionable.

### b)      <u>Allegations of Fraud by Hindsight Are Not Actionable</u>

Far from meeting the rigid requirements of *Omnicare*, the Complaint fails even to make a baseline showing that any alleged misstatement was false or misleading when made. The Complaint provides no facts contemporaneous with any alleged misstatements sufficient to infer falsity and instead relies *exclusively* on Sterling's own subsequent disclosures regarding the ALP program and on conclusory allegations from former, confidential employees whose allegations are

---

opinion by defendants as to the portion of the stated value of Regions' loans that would prove to be uncollectable.").)

45

untethered to any particular time period.  (*See* C ¶¶ 166-67, 244-45, 308-09, 450-51.)  This manner of pleading consists of impermissible "fraud by hindsight":

> Plaintiffs allege no contemporaneous facts to support [their] allegation . . . .   Instead, with the benefit of hindsight, Plaintiffs now . . . attempt to frame past statements as false or misleading. However, in evaluating claims under the Securities Act, the 'truth of a statement . . . is adjudged by the facts as they existed' at the time of the statement. . . .   [A] backward-looking assessment . . . cannot help plaintiffs' case.

*In re Royal Bank of Scotland*, 2012 WL 3826261, at *7 (citation omitted); *see also In re United Am. Healthcare*, 2007 WL 313491, at *14 ("Plaintiffs' case appears to be a claim of fraud by hindsight and, therefore, must be dismissed."); *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[W]e have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.'"); *Scott*, 46 F. Supp. 3d at 394 ("A plaintiff may not . . . state viable Section 11 claims by relying solely on hindsight to prove a misstatement."); *Coyne v. Gen. Elec. Co.*, 2010 WL 2836730, at *10 (D. Conn. July 15, 2010) ("Pleading 'fraud by hindsight' (i.e., showing that defendants made a statement and then showing in hindsight that the statement is false) is impermissible."); *In re Sec. Cap. Assurance*, 729 F. Supp. 2d at 597 ("Allegations of 'fraud by hindsight' do not constitute fraud." (citation omitted)).

Plaintiff cannot, for example, point only to Sterling's later disclosures regarding issues surrounding its ALP and use such disclosures as evidence that earlier ALP-related statements must have been false or misleading (*see* C ¶¶ 167,

245, 309, 451).  *See Synchrony*, 2020 WL 1531297, at *20 (finding that "Lead Plaintiffs may not use Synchrony's disclosures or admissions on or after April 28, 2017, as evidence of earlier alleged misrepresentations, because they 'cannot proceed with allegations of fraud by hindsight'" (citation omitted)).  Indeed, in dismissing this very same Plaintiff's claims, the *BankUnited* Court stated: "Plaintiffs ask me to draw the unwarranted inference that because the [government] ultimately found that the lending practices followed by the Company were 'unsafe and unsound,' the specific factors touted by Defendants throughout the class period making up the Company's underwriting conservatism was somehow misleading." *BankUnited Fin. Corp.*, 2010 WL 1332574, at *12.

Nor can the Complaint avoid pleading contemporaneous facts supporting its allegations by pointing to after-the-fact, conclusory allegations from confidential witnesses.  (*See* C ¶¶ 166, 244, 308, 450.)  These allegations involve:  (1) former employees' general impressions that Sterling's underwriting and controls were insufficiently conservative (*see, e.g.*, C ¶¶ 166(a)-(b), (m)-(n)); (2) statements suggesting that the employees believed that particular loan approval and documentation practices were insufficiently rigorous (*see, e.g.*, C ¶¶ 166(c), (i)-(l)); (3) statements taking issue with the foreign focus of the ALP (*see, e.g.*, C ¶¶ 166(d)-(f)), notwithstanding Sterling's self-described focus on "underserved home buyers," including "foreign nationals and recent immigrants" (C ¶¶ 84-85);

47

and (4) general suspicions about the accuracy of customer-provided information (*see, e.g.*, C ¶¶ 166(h), (o)). Such allegations—which, in many cases, are consistent with Sterling's own disclosures—are subject to a steep discount (as further described *infra* Section III.D) and "are too vague and conclusory" to "be accorded much weight." *In re Huntington Bancshares*, 674 F. Supp. 2d at 960.

But even were the Court to consider these allegations, they simply suggest that the witnesses now view Sterling as having developed insufficiently conservative lending and compliance practices at some unspecified time—the allegations *still* fail to demonstrate that any statement in the Complaint was false or misleading *when made*. *See, e.g.*, *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1120 (N.D. Cal. 2017) ("The consolidated complaint . . . alleges that at an unspecified time . . . LendingClub began approving loan applications with 'large numbers of discrepancies and inconsistencies,' and it began employing tactics . . . that purportedly hid the true risk of certain loans . . . . [T]he allegations that purport to support this claim include no information about *when* the purported practices arose . . . and the emergence of these practices at some unspecified time does not warrant the inference that the practices existed at the time of the IPO."); *In re Huntington Bancshares*, 674 F. Supp. 2d at 962-63 ("[T]he Court finds Plaintiffs have failed to plead with particularity that Defendants' statements . . . were *false when made* . . . . Despite taking all the confidential witnesses['] statements as true,

the Court finds Plaintiffs do not present reasons why the subject statements are misleading, nor do Plaintiffs explain why the statements were fraudulent.").

Plaintiff has "entirely neglect[ed] to raise any specific facts from which [the Court] could find that the particular claims asserted by Defendants . . . were false." *BankUnited Fin. Corp.*, 2010 WL 1332574, at *12. In relying only on hindsight, Plaintiff has failed to "demonstrate with specificity why and how" any statement in the Complaint was "false and misleading." *Rombach*, 355 F.3d at 174.

## B.   Plaintiff Fails to Allege a Material Omission

The Complaint likewise fails to allege a material omission. Sterling was "not required to disclose a fact merely because a reasonable investor would very much like to know that fact," and "[i]t is axiomatic that before liability for non-disclosure can attach," Sterling "must have violated an affirmative duty of disclosure." *In re United Am. Healthcare*, 2007 WL 313491, at *6 (alterations omitted) (citation omitted). Sterling had a duty to disclose only "material information required to be disclosed by statute" and "information required to make another statement . . . not misleading." *J & R Mktg.*, 549 F.3d at 390. A "government investigation, without more, does not trigger a generalized duty to disclose," and "[t]here is no duty to disclose litigation that is not 'substantially certain to occur.'" *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (citation omitted).

Stretching to reach a securities violation, the Complaint alleges that Sterling was required, and failed, to disclose "an undisclosed March 31, 2018 Report of Examination" by the OCC that allegedly "detailed BSA/AML violations of law by the Company and unsafe or unsound practices relating to the Company's credit administration." (C ¶ 13; *see* C ¶¶ 392-98.) The Complaint further suggests that Sterling should have disclosed the OCC Report or alleged deficiencies with its programs in the context of making other unrelated statements regarding its underwriting, controls, financial results, and the pipeline for its loans. (*See* C ¶¶ 162, 165, 238-39, 241-43, 301-02, 304-05.) These arguments have no merit.

### 1. Sterling Disclosed Issues Raised by the OCC

Sterling provided significant disclosures to investors surrounding its dealings with the OCC. As the Complaint admits, Sterling disclosed on June 21, 2019 that it had entered into the OCC Agreement three days earlier and made clear that the agreement "requires that the Bank enhance its policies and procedures to ensure compliance with BSA/AML laws and regulations." (C ¶ 246; *see* Ex. D (6/21/19 8-K) at 2.) Sterling then provided the entire OCC Agreement to investors as an exhibit to its Second Quarter 2019 10-Q. (C ¶ 248; *see* Ex. E (8/9/19 10-Q (Ex. 10.1)).) Eager to invent a disclosure violation, the Complaint alleges that Sterling was required to disclose not only that OCC Agreement, but also an OCC Report of

Examination ("ROE") referenced in the OCC Agreement.  (C ¶¶ 392-98; *see* Ex. E (8/9/19 10-Q (Ex. 10.1)) at 2, 6, 9, 12.)

The Complaint misconstrues Sterling's disclosure obligations and the nature of a ROE.  To begin, in "asserting a freestanding claim that [Sterling] violated § 10(b) by failing to disclose to the market the OCC[] . . . Exam Report," Plaintiff "fail[s] to allege facts demonstrating . . . a duty to disclose the contents of [this] document[]."  *Nextcard*, 2005 WL 6342406, at \*11.  Moreover, Plaintiff outright ignores regulations providing that a bank may not disclose "non-public OCC information," including "OCC reports of examination," and that such disclosure subjects a bank to criminal penalties under 18 U.S.C. § 641.  12 C.F.R. § 4.37(b); *see also Nextcard*, 2005 WL 6342406, at \*11 ("[I]t appears from the record before the Court that Defendants were prohibited by law from disclosing the contents of the OCC's 2000 Exam Report.").  It thus would have been both unnecessary and inappropriate for Sterling to make such a disclosure.

Moreover, even if Sterling could have disclosed the OCC Report, the Complaint does not allege that the OCC Report indicated to Sterling that litigation with the OCC was "substantially certain to occur."  *Lions Gate*, 165 F. Supp. 3d at 12.  Nor could it:  a ROE simply "document[s] and communicate[s] the OCC's findings and conclusions from its supervisory review of a bank."  (*See* Ex. J (OCC Manual) at 3.)  And even where a ROE "contain[s] concerns . . . or citations of

51

violations requiring corrective action," the "actions that the board and management take or agree to take in response to" such concerns "are factors in the OCC's decision to pursue a bank enforcement action and the severity of that action." (*Id.*)  Here, as the Complaint alleges, Sterling ultimately entered into "an agreement with the OCC," whereby Sterling agreed "to enhance its . . . AML and BSA compliance" (*see* C ¶ 9), and no action was brought.

Such preliminary agency communications trigger no duty of disclosure. *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274-75 (S.D.N.Y. 2012) ("When the regulatory investigation matures to the point where litigation is apparent and substantially certain to occur, then 10(b) disclosure is mandated . . . .  Until then, disclosure is not required.").  Courts have made this clear in the context of Wells Notices, which involve a far-more-direct warning from the SEC that it is "considering recommending a civil action" against the Company. *Lions Gate*, 165 F. Supp. 3d at 16.  Because, like a ROE, a "Wells Notice 'does not necessarily indicate that charges will be filed,'" "defendants [do] not have a duty to disclose" such information, as "the securities laws do not impose an obligation on a company to predict the outcome of investigations." *Id.* at 12 (citation omitted).

Courts have similarly rejected attempts, like Plaintiff's, to manufacture a duty to disclose preliminary regulatory communications through Items 303, 103, and 503 of Regulation S-K.  (*See* C ¶¶ 392-98.)  The OCC Report was not a "pending" or

"contemplated" legal proceeding under Item 103 "because the [agency] had not yet decided" to bring an enforcement action. *Lions Gate*, 165 F. Supp. 3d at 18; *see also Richman*, 868 F. Supp. 2d at 274 ("Item 103 does not explicitly require disclosure of a Wells Notices [sic], and no court has ever held that this regulation creates an implicit duty to disclose receipt of a Wells Notice."). Nor can a preliminary communication from an agency, like an OCC ROE or SEC Wells Notice, be characterized as a "known trend" or "uncertainty" under Item 303 or as one of the "most significant risk factors" facing a company under Item 503. *See Lions Gate*, 165 F. Supp. 3d at 20 ("An SEC investigation could not be characterized as a 'known trend' or 'uncertainty' under Item 303."); *id.* at 21 ("[T]he plaintiffs fail to allege that the defendants had a duty to disclose the SEC investigation and Wells Notices under Item 503(c) . . . .").

## 2. Sterling Had No Duty To Opine on Issues Facing the ALP

This Court should likewise reject the Complaint's apparent argument that, in making general, puffing, or accurate statements concerning its underwriting, controls, financial results, and the pipeline for its loans, Sterling should have charged itself with wrongdoing with respect to its management of the ALP. (*See* C ¶¶ 162, 165, 238-39, 241-43, 301-02, 304-05.) The Sixth Circuit has made clear that this type of "soft information" does not warrant disclosure, notwithstanding a company's routine statements regarding its controls or legal compliance. *See, e.g.*, *Omnicare I*,

583 F.3d at 945, 947 (agreeing that "companies have no duty to opine about the legality of their own actions," even where they have made a "generic claim of lawfulness"); *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 402 (6th Cir. 1997) ("[O]ur cases firmly establish the rule that soft information must be disclosed only if virtually as certain as hard facts." (alterations and citation omitted)).

Nor can Plaintiff dodge this principle by alleging that Sterling's disclosure of accurate "hard information" concerning its financial results was misleading because Sterling failed to disclose that its results were "inflated by and dependent upon the Company's . . . inadequate underwriting" (*see, e.g.*, C ¶ 162). *See, e.g.*, *Sofamor Danek*, 123 F.3d at 401-02 (finding that, where "[t]he sales and earnings data publicly reported by Sofamor Danek during the Class Period [were] 'hard' numbers, the accuracy of which has never been challenged by the plaintiffs," defendant had no duty to disclose that these "hard numbers" resulted from the alleged "illegal promotion of its products," which was "soft information"); *In re TransDigm Grp.*, 440 F. Supp. 3d at 768 (agreeing, based on *Sofamor*, that "plaintiff is wrong in suggesting that TransDigm's broad, generic statements about revenue required the company to disclose any and all allegedly illegal conduct that may have contributed to that revenue" (citation omitted)); *In re Citigroup*, 330 F. Supp. 2d at 377 ("Plaintiff's allegation that Citigroup's failure to disclose that its revenues were derived from 'unsustainable and illegitimate sources' violated section 10(b) is

likewise unavailing, for the federal securities laws do not require a company to accuse itself of wrongdoing."); *Lubbers v. Flagstar Bancorp Inc.*, 162 F. Supp. 3d 571, 583 (E.D. Mich. 2016) (declining to "impose a general duty of unlimited disclosure whenever any kind of financial data is released").

In short, Sterling had "no affirmative duty to speculate or disclose 'uncharged, unadjudicated wrongdoings or mismanagement,' illegal internal policies, or violations of [its] internal codes of conduct and illegal policies." *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *31 (S.D.N.Y. Sept. 28, 2012) (collecting cases); *see, e.g.*, *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("Disclosure is not a rite of confession . . . ." (citation omitted)); *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016) ("[T]he securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct."); *In re Agria Corp. Sec. Litig.*, 672 F. Supp. 2d 520, 529 (S.D.N.Y. 2009) ("[T]here is no general duty to disclose internal problems merely because those problems might become significant." (collecting cases)).

## III.   **Plaintiff Fails to Plead Scienter**

Plaintiff additionally fails to plead with particularity "facts that give rise to a 'strong'—*i.e.*, a powerful or cogent—inference" of fraudulent intent for its Section 10(b) claim. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007); *see also Omnicare II*, 769 F.3d at 461 (explaining that the "elephant-sized boulder"

55

of the PLSRA requires that plaintiffs "state with particularity facts giving rise to a strong inference" of fraudulent intent (citation omitted)).

Courts in the Sixth Circuit consider the following factors in evaluating if scienter is adequately pleaded:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001), *abrogated on other grounds by Tellabs*, 551 U.S. at 314; *accord Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039-40 (6th Cir. 2016).

Plaintiff has failed to sufficiently meet any of these *Helwig* factors and, for the reasons that follow, has failed to plead corporate scienter or the scienter of any individual defendant.

## A. <u>Plaintiff Fails to Allege Facts Giving Rise to a Strong Inference of Corporate Scienter</u>

Corporate scienter involves a narrow inquiry—a corporation may have "scienter" based on the imputation of knowledge from only those employees who:

(1) uttered or issued an alleged misrepresentation; (2) prepared, reviewed, or authorized the statement in which an alleged misrepresentation was made; or (3) acted as high managerial agents or directors who ratified or recklessly disregarded the misrepresentation. *See Omnicare II*, 769 F.3d at 476.

Under this standard, the anonymous, former employees that Plaintiff relies upon for support are irrelevant. The Complaint does not allege that any employee falls into any relevant category of imputation (*see* C ¶¶ 326-47), and therefore none of the alleged knowledge of the former employees is imputed to the Company, *see Omnicare II*, 769 F.3d at 476.

Likewise, the Company's alleged misstatements where the Complaint fails to articulate a specific individual who made, reviewed, or ratified those statements are also irrelevant. (*See, e.g.*, C ¶¶ 348-52 (alleging that the suspension and termination of the ALP was shortly after Sterling issued alleged false statements).) These generalized allegations do not allege individual scienter and therefore do not allege corporate scienter. *See Omnicare II*, 769 F.3d at 476.

All that remains in the Complaint relevant to corporate scienter are conclusory allegations made against the Officer Defendants; Director Defendants Fox, Meltzer, and Sandra Seligman; and Scott Seligman. There are no specific allegations of scienter as to Defendants Allen, Sinatra, Wineman, or Wolberg. For the reasons that follow, Plaintiff has not adequately pleaded scienter with respect to any of these

defendants, and as a result, it cannot, as a matter of law, adequately plead corporate scienter for the Company.

**B.    Plaintiff Fails to Allege Facts Giving Rise to a Strong Inference of Scienter for the Officer Defendants**

In examining scienter under Section 10(b), the Sixth Circuit "rais[es] the bar" beyond recklessness for claims involving "soft information." *Omnicare II*, 769 F.3d at 471.  That is, "when plaintiffs accuse defendants of misrepresenting or omitting soft information . . . plaintiffs must plead facts showing that the defendants knowingly misrepresented or omitted facts to deceive, manipulate, or defraud the public." *Id.* at 472.  Here, Plaintiff alleges that the Officer Defendants made a series of statements involving soft information in connection with press releases and earnings calls.  (*See, e.g.*, C ¶¶ 147, 150, 151.)  Because Plaintiff has failed to allege any facts to give rise to a strong inference that the Officer Defendants made any statements with intent to defraud, Plaintiff has failed to adequately plead scienter with respect to these officers.

**1.    Plaintiff Fails to Adequately Allege That Any of the Officer Defendants Knowingly Made Materially False Statements**

As exemplary of Plaintiff's claims, Plaintiff alleges that in a January 30, 2018 press release and on a year-end 2017 earnings call, Defendant Judd touted the Company's "strong credit culture and discipline," "pristine credit quality," "high-touch customer relationships," "strong credit culture," and "strong customer

58

relationships." (C ¶¶ 147, 150.) The Complaint likewise tags Defendant Lopp for remarking on Sterling's "excellent credit quality" and "strong credit culture" on that earnings call. (C ¶ 151.) Defendant Montemayor's alleged misstatements—that the Company had a "disciplined approach to banking" and "relationship-based banking" (C ¶ 254)—are similar. These types of statements, as discussed, amount to non-actionable puffery, *see supra* Section II.A.1, and the Complaint in any event does not sufficiently allege that they were false when made, *see supra* Section II.A.3. But even if such statements could amount to actionable misstatements, they express only "soft information," and the Complaint has pleaded no facts to support a finding "that the defendants knowingly misrepresented or omitted facts to deceive, manipulate, or defraud the public."[16]  *Omnicare II*, 769 F.3d at 472. Accordingly, Plaintiff has

---

[16]  Plaintiff also relies on these very same statements and like-statements that were repeated by either Defendant Judd or Lopp on the First Quarter 2018 Earnings Call (C ¶ 174 ("high touch customer relationships," "strong credit culture," and "deeper customer relationships")), Second Quarter 2018 Earnings Call (C ¶ 185 ("exceptional credit quality")), Third Quarter 2018 Earnings Call (C ¶ 201 ("excellent credit quality")), First Quarter 2019 Earnings Call (C ¶ 231 ("outstanding quality" and "excellent credit history")), Second Quarter 2019 Earnings Call (C ¶ 260 ("the outstanding quality and performance of the loans we originate," "business remains sound," and "credit quality remains excellent")), and in the July 30, 2018 press release (C ¶ 182 ("excellent credit quality")), the April 29, 2019 press release (C ¶ 228 ("excellent credit quality" and "strong customer relationships")), and the July 29, 2019 press release (C ¶ 258 ("Our business remains sound" and "credit quality remains excellent")). Plaintiff's repetition of these statements does not further its allegation that these soft statements were material, false, or made with an intent to defraud. *See Omnicare II*, 769 F.3d at 472.

failed to adequately plead facts giving rise to a strong inference of scienter for any of the Officer Defendants based on their alleged statements.

### 2.     Plaintiff Fails to Allege That the Sarbanes-Oxley Certifications Were Made Recklessly

Plaintiff fares no better in relying on Defendants Judd's and Lopp's signatures on Sarbanes-Oxley ("SOX") Certifications to allege scienter.  (C ¶¶ 159-60, 179, 194, 206, 219, 237, 267, 282, 390.)  A SOX Certification involving the effectiveness of "internal control over financial reporting . . . is soft information since it is [defendant's] perception of its internal controls," and the Complaint must still allege facts showing that the officers "actually knew the falsity of [the] statements when [they] issued them and that [they] acted to defraud the public."  *See Doshi*, 386 F. Supp. 3d at 835; *see also Konkol v. Diebold, Inc.*, 590 F.3d 390, 402-03 (6th Cir. 2009) ("[C]ertifications are probative of scienter only if they are accompanied by allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it."), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48-50 (2011).  The Complaint has made no such showing.

60

### C.   Plaintiff Fails to Allege Facts Giving Rise to a Strong Inference of Scienter for Director Defendants Fox, Meltzer, Sandra Seligman, or for Scott Seligman

Plaintiff likewise fails to adequately allege facts to show a strong inference of scienter for any of the Director Defendants or Scott Seligman.  The Complaint is silent as to the majority of the Director Defendants and includes only conclusory allegations against Fox, Sandra Seligman, Meltzer, and Scott Seligman.

### 1.   The Timing of Fox's Resignation Does Not Establish Scienter

The Complaint suggests that the timing of Fox's resignation on June 18, 2019 is suspicious because Sterling disclosed the resignation on June 21, 2019, which is the same date it announced that it had entered into the OCC Agreement.  (C ¶ 361.)  But Plaintiff offers no factual support for its speculation, and no *Helwig* factor supports an inference that the timing of a resignation confers scienter on the resignee.  *See Helwig*, 251 F.3d at 552.[17]  There are, for example, no facts to support an allegation that Mr. Fox resigned as a result of his knowledge of making, reviewing, or ratifying a materially false statement.  Nor does Plaintiff allege that the OCC Agreement was entered into because of Mr. Fox's conduct.  Plaintiff does not allege

---

[17] Plaintiff's non-specific allegations concerning additional "suspiciously timed terminations and resignations" fail for the same reason. (*See* C ¶¶ 361-71.)  Plaintiff does not articulate any facts establishing that any of the terminations or resignations demonstrate knowledge on behalf of any individual whose scienter is imputed to Sterling.

that Mr. Fox signed the OCC Agreement, and it is not even alleged that Mr. Fox knew of the contents of the OCC Agreement. (*See* C ¶ 248.) Consequently, Plaintiff has failed to raise a strong inference that Mr. Fox had scienter that can be imputed to the Company.

### 2.   Plaintiff Fails to Allege Insider Trading at Suspicious Times or in Suspicious Amounts

Plaintiff also fails to allege facts to support a strong inference that Scott Seligman and Director Defendants Sandra Seligman and Meltzer acted with scienter because of alleged trading activity. Although the Complaint alleges that these Defendants engaged in insider trading at suspicious times or in suspicious amounts (*see* C ¶¶ 377-83),[18] it addresses only their trading in connection with the IPO. And "[i]t is not uncommon or otherwise suspicious to sell stock in association with a public offering; indeed, the sale of stock is often the point of the offering." *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004) (citation omitted).

The allegation concerning a transaction by the "K.I.S.S. Dynasty Trust No. 9" prior to the announcement of the suspension of the ALP (*see* C ¶ 379), also fails to

---

[18] Although Plaintiff asserts that there was insider trading in "suspicious amounts" (*see* C ¶ 377), Plaintiff never articulates how or why the size of any trade made by any Defendant was suspicious. Plaintiff is likely trying to invoke the *Helwig* factor, but mere recitation of the factor does not amount to alleging facts sufficient to show the factor. *See Helwig*, 251 F.3d at 552.

demonstrate scienter.  Notably, the Complaint does not even allege who benefits from this trust (*see* C ¶¶ 379-80), and omits that the trust's sale of 400,000 shares amounted to only 3% of the trust's holdings.[19]  *See Bailey v. Esperion Therapeutics, Inc.*, 2019 WL 3296235, at *4 (E.D. Mich. Feb. 19, 2019) ("[M]any courts have held that the inference of scienter is weak where an officer sells only a small fraction of the shares owned." (citation omitted)).  Moreover, the fact that no other defendants likewise sold their stock in December 2019 negates any suspicion.  *Id.* ("[T]he CEO and CFO would have been essential participants in any scheme, thus, their having sold no stock[] undermines any suggestion of knowledge on the part of defendants due to the other sales." (citation omitted)).

### D.   Plaintiff's Confidential Witness Allegations Do Not Support a Strong Inference of Fraudulent Intent

As discussed *supra* Section II.A.3, the Complaint leans almost entirely on general, conclusory allegations from confidential informants to suggest that the statements in the Complaint were false and made with knowledge of their falsity—these allegations likewise form the foundation of the Complaint's case for scienter. (*See* C ¶¶ 326-47.)  But the Court "must discount allegations that the complaint attributes to . . . 'confidential witnesses,'" for obvious reasons:

---

[19] *See* Ex. K (12/4/19 Form 4) (reflecting holdings of 12,107,732 shares following the transaction).

63

> It is hard to see how information from anonymous sources could be deemed "compelling" or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist.

*Higginbotham*, 495 F.3d at 756-57; *see also Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) ("While we agree that anonymous sources are not altogether irrelevant to the scienter analysis, Plaintiffs' allegations here are too vague and conclusory to be accorded much weight. Indeed, Plaintiffs fail to allege who at Visteon knew about these alleged accounting improprieties and what, when, where, and how they knew. Without such context, we cannot say the statements raise an inference of scienter." (citing *Higginbotham*, 495 F.3d at 757)), *abrogated on other grounds by Matrixx*, 563 U.S. at 48-50; *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 535 (5th Cir. 2008) ("That these allegations derive from confidential sources further detracts from their weight in the scienter analysis."). To warrant consideration, "the who, what, when, where, and how a confidential witness knew of information should be definite," and "allegations that are too vague and conclusory will not be accorded much weight." *In re Huntington Bancshares*, 674 F. Supp. 2d at 960 (citation omitted). Here, the conclusory allegations from former employee witnesses do not support a compelling inference of scienter.

Of the seven former employee witnesses, only two (FE 1 and FE 2) even discuss the alleged knowledge of any individual whose knowledge could be imputed

to the Company, and these two witnesses address only the alleged knowledge of Defendant Montemayor.[20]  FE 1 makes two allegations on this front.  First, the witness states that "Montemayor 'absolutely' was fully aware of all the problems with the ALP and that there was no way he could not be aware."  (C ¶ 344.)  The sole fact to support this conclusory allegation is that Montemayor allegedly told FE 1 not to speak with the OCC auditor and, if contacted by the OCC, to let Montemayor know.  (C ¶ 344.)  But there is no clear connection between not wanting FE 1 to have unauthorized conversations with the OCC and actual knowledge of any material misstatement.  FE 1 does not even articulate what the "problems with the ALP" were of which Montemayor was aware.  (C ¶ 344.)  FE 1 only states that "there was no way he could not be aware," with zero detail about the circumstances or context of that statement.  (C ¶ 344.)  FE 1 provides only vague, non-specific information that does not support an inference of scienter.

The second allegation by FE 1 includes secondhand information rather than her own direct interactions with Montemayor, further limiting its probative value.

_____

[20] The remaining former employees (FE 3-7) fail to make any particularized allegations of knowingly made misrepresentations.  Instead, they highlight aspects of the ALP disclosed to investors (*see, e.g.*, C ¶ 111 (alleging the ALP "targeted mainly Chinese immigrants with little or no traditional credit history"); C ¶ 118 ("most of the borrowers worked in China")) or vaguely state that they "had suspicions" (C ¶ 124).  Although the knowledge of these former employees is not imputed to the Company, even if it were, Plaintiff has failed to allege scienter.

(*See* C ¶ 342.)  This information is even less reliable than general information from a confidential informant, which a Court should already discount, *see Indiana Elec. Workers' Pension Trust Fund IBEW*, 537 F.3d at 535, and it far from supports a "cogent and compelling" inference of scienter, *Tellabs*, 551 U.S. at 324.

Additionally, there is a mismatch between what FE 1 says that Montemayor knew—that there was a broker who sent the Bank clients and that Yihou Han was fired for using CPA letters from the same IP address—and what the alleged misrepresentations were:  that there was not a policy of conservative and disciplined underwriting.  *See Omnicare I*, 583 F.3d at 945-46.  In fact, Yihou Han's termination for these reasons would cut against scienter because it shows that when employees did not follow protocol, they were terminated.

With respect to FE 2, that anonymous source states only that Montemayor "'knew exactly what was happening' at the Bank."  (C ¶ 109.)  FE 2 does not state a single fact to support this conclusory allegation.  Nor does FE 2 articulate exactly "what was happening at the Bank" that Montemayor allegedly knew that was relevant to scienter.  This blanket allegation cannot support the particularized showing necessary to allege scienter.  In sum, none of the former employees add any information or facts that help Plaintiff meet its burden to plead scienter with particularity.

**E.     Rather than Inferring Scienter, the Complaint Makes More Compelling the Inference that Sterling Disclosed the Relevant Risks Before and After They Materialized**

Plaintiff's Section 10(b) claims "will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  As described *supra*, Sterling set forth early and detailed disclosures regarding its vision for the ALP as an untapped market for "quick approval," nontraditional mortgages to "underserved home buyers," including "foreign nationals and recent immigrants" who "may have limited credit history" (C ¶¶ 84-85; Ex. A (Pros.) at 3, 15, 30, 85), while acknowledging that such a program would bring "disproportionate challenges" in the regulatory sphere (Ex. A (Pros.) at 30).  The more compelling and plausible inference to be drawn from the Complaint is that Defendants believed that the Company had apprised the market and the investing public of both the merits and the regulatory risk relating to the ALP and, when those risks materialized, issued a series of disclosures documenting Sterling's issues with the OCC and its investigation of potential issues with the ALP.

Plaintiff has failed to meet its burden of pleading facts suggesting a "strong" or "cogent and compelling" inference of scienter, let alone an inference that is at least as strong as the reasonable inference to be drawn in Defendants' favor, and the 10(b) count should be dismissed.

IV.     **Plaintiff Fails to State a Claim of Control Person Liability**

Because Plaintiff has failed to plead a primary violation of any of its Exchange Act or Securities Acts claims, its claims under Sections 20(a) and 15 fail as well. *See PR Diamonds*, 91 F. App'x at 441-42.

But even if Plaintiff had sufficiently alleged underlying violations, its control person claims still fail.  With respect to the Officer Defendants, Director Defendants, and Scott Seligman, Plaintiff has pleaded only conclusory control person allegations or alleged the individual's position within the company, without more.   Such pleadings are insufficient.  *See In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000) (dismissing Section 20(a) and Section 15 claims for failure to allege specifics on "control," despite finding that plaintiffs had sufficiently alleged primary claims).

Nor has Plaintiff adequately pleaded that the Officer Defendants, Director Defendants, or Scott Seligman were "culpable participants" in any of the alleged securities violations.  *See D.E. & J*, 284 F. Supp. 2d at 750 ("To plead a Section 20(a) violation, a complaint must allege facts establishing that the defendant 'controlled' another person who committed an underlying violation of the Act, and that the defendant 'culpably participated' in that underlying violation."); *ATSI Commc'ns v. Shaar Fund*, 493 F.3d 87, 108 (2d Cir. 2007) (requiring that plaintiffs allege that the "control person" participated "in some meaningful sense" in the

alleged securities fraud).  While the Complaint is replete with generic allegations regarding influence exercised by scattered defendants (*see* C ¶¶ 38, 40, 67, 382), it falls short of alleging that they actually participated in the alleged fraud and furthered it through their own actions.  *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 625 (S.D.N.Y. 2017) ("[A] plaintiff 'must plead at a minimum particularized facts establishing a controlling person's conscious misbehavior or recklessness in the sense required by Section 10(b).'").

Plaintiff also improperly pleads both primary and secondary claims against the same individuals.  Many courts have outright prohibited these so-called "double back" control claims.  *See, e.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 375 (S.D.N.Y. 2012) ("The Complaint does not allege any plausible alternative theory where defendants are not primary violators and yet can still be held liable on a secondary violation theory through controlling Lockheed Martin.").  And the Sixth Circuit, while not deciding the issue, has pointed to the authority that "suggests that a plaintiff may not be able simultaneously to assert both Section 10(b) . . . and Section 20(a) claims against the same defendant." *PR Diamonds*, 91 F. App'x at 442 & n.4.  Here, Plaintiff has not articulated a separate theory for "control person" liability that is different from allegations supporting the primary claims.  Accordingly, where Plaintiff has decided to sue the Officer Defendants and Director Defendants Allen, Meltzer, Sinatra, Sandra

Seligman, Wineman, or Wolberg as both primary violators and secondary violators,

the Court should dismiss the secondary violation claims to the extent it permits any

primary claim violations to continue.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:      Troy, Michigan
            September 22, 2020


**LEVINE LEE LLP**                              **MILLER, CANFIELD,**
                                                **PADDOCK & STONE, P.L.C.**

Seth L. Levine
Kenneth E. Lee                        By:      s/ Matthew P. Allen
Chad P. Albert                                 Matthew P. Allen (P57914)
650 Fifth Avenue, 13th Floor                   Thomas W. Cranmer (P25252)
New York, NY  10019                            840 West Long Lake Road,
(212) 223-4400                                 Suite 150
slevine@levinelee.com                          Troy, MI  48098
klee@levinelee.com                             (248) 879-2000
calbert@levinelee.com                          allen@millercanfield.com
                                               cranmer@millercanfield.com

*Counsel for Defendant Sterling*               *Counsel for Defendant Sterling*
*Bancorp, Inc.*                                 *Bancorp, Inc.*

70

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 22, 2020, I electronically filed the foregoing document with the Clerk of the court using the ECF system which will send notification of such filing to all counsel of record.

Respectfully submitted,

By:    s/ Matthew P. Allen
               Matthew P. Allen (P57914)
               Thomas W. Cranmer (P25252)
               840 West Long Lake Road,
               Suite 150
               Troy, MI  48098
               (248) 879-2000
               allen@millercanfield.com
               cranmer@millercanfield.com

               *Counsel for Defendant Sterling Bancorp, Inc.*