# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| OKLAHOMA POLICE PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>STERLING BANCORP, INC.; GARY JUDD; THOMAS LOPP; MICHAEL MONTEMAYOR; SCOTT SELIGMAN; BARRY ALLEN; JON FOX; SETH MELTZER; SANDRA SELIGMAN; PETER SINATRA; BENJAMIN WINEMAN; LYLE WOLBERG; PIPER SANDLER COMPANIES; AND AMERICAN CAPITAL PARTNERS, LLC,<br><br>　　　　　Defendants. | Case 5:20-cv-10490-JEL-EAS<br><br>Hon. Judith E. Levy<br>Hon. Mag. Judge Elizabeth A. Stafford<br><br>**<u>CLASS ACTION</u>** |

## <u>LEAD PLAINTIFF'S CORRECTED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

## STATEMENT OF THE QUESTIONS PRESENTED[1]

1.      Whether the detailed allegations of the Complaint adequately allege that Sterling and the Officer Defendants made materially false and misleading statements sufficient to pursue a claim under Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder?

Lead Plaintiff's Answer: YES

2.      Whether the detailed allegations in the Complaint collectively give rise to a strong inference that Sterling and the Officer Defendants acted with requisite scienter under Rule 9(b) and the PSLRA?

Lead Plaintiff's Answer: YES

3.      Whether the detailed allegations of the Complaint adequately state a claim under Section 20A of the Exchange Act against Defendant Scott Seligman at the pleading stage?

Lead Plaintiff's Answer: YES

4.      Whether the detailed allegations of the Complaint state a claim at the pleading stage under Section 11 of the Securities Act against Sterling, the Director Defendants, the Underwriter Defendants, and Defendants Gary Judd and Thomas Lopp, where each defendants signed a Registration Statement that contained untrue statements of material fact?

---

[1] All defined terms in the Statement of Questions Presented are included on the Table of Abbreviations, *infra*.

Lead Plaintiff's Answer: YES

5.      Whether the detailed allegations of the Complaint state a claim under Section 12(a)(2) of the Securities Act against Sterling and the Underwriter Defendants at the pleading stage?

Lead Plaintiff's Answer: YES

6.      Whether the detailed allegations of the Complaint state a claim for control person claims under Section 20(a) of the Exchange Act against Defendant Scott Seligman and the Officer Defendants at the pleading stage?

Lead Plaintiff's Answer: YES

7.      Whether the detailed allegations of the Complaint state a claim for control person claims pursuant to Section 15 of the Securities Act against the Officer Defendants, Defendant Scott Seligman, and the Director Defendants at the pleading stage?

Lead Plaintiff's Answer: YES

# CONTROLLING OR MOST APPROPRIATE AUTHORITIES

15 U.S.C. § 78j(b)

15 U.S.C. § 77k

15 U.S.C. § 77k(a)(1)

15 U.S.C. § 77l(a)(2)

15 U.S.C. § 77o

15 U.S.C. § 78t(a)

15 U.S.C. § 78u-4

17 C.F.R. § 230.405

17 C.F.R. § 229.303(a)(3)(ii)

17 C.F.R. § 229.503(c)

Fed. R. Civ. P. 8(a)

Fed. R. Civ. P. 8(d)(2)

Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 12(b)(6)

Restatement (Third) of Trusts § 74 (2007)

*Ashcroft v. Iqbal*,
        556 U.S. 662 (2009)

*Atlas v. Accredited Home Lenders Holding Company*,
        556 F. Supp. 2d 1142 (S.D. Cal. 2008)

*Bell Atl. Corp v. Twombly*,
        550 U.S. 544 (2007)

*Burges v. BancorpSouth, Inc.*,
        No. 3-14-1564, 2015 WL 4198795 (M.D. Tenn. July 10, 2015)

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005)

*Doshi v. Gen. Cable Corp.*,
    823 F.3d 1032 (6th Cir. 2016)

*Frank v. Dana Corp.*,
    547 F.3d 564 (6th Cir. 2008)

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011)

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001)

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)

*In re Accredo Health, Inc. Sec. Litig.*,
    No. 03-2216-BBD, 2005 WL 8152649 (W.D. Tenn. Apr. 11, 2005)

*In re BofI  Holding, Inc. Sec. Litig.*,
    No. 3:15-CV-02324-GPC-KSC, 2016 WL 5390533 (S.D. Cal. Sept. 27,
    2016)

*In re BofI  Holding, Inc. Sec. Litig.*,
    No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980 (S.D. Cal. May 23,
    2017)

*In re BofI  Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020)

*In re Cardinal Health Sec. Litig.*,
    426 F. Supp. 2d 6889 (S.D. Ohio 2006)

*In re CMS Energy Sec. Litig.*,
    No. 02-CV-72004, 2005 WL 8154422 (E.D. Mich. Jan. 7, 2005)

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008)

*In re Envision Healthcare Corp. Sec. Litig*.,
　　No. 3:17-CV-01112, 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019)

*In re Equifax Inc. Sec. Litig*.,
　　357 F. Supp. 3d 1189 (N.D. Ga. 2019)

*In re EveryWare Global, Inc. Sec. Litig*.,
　　175 F. Supp. 3d 837 (S.D. Ohio 2016)

*In re Nat'l Century Fin. Enters., Inv. Litig*.,
　　No. 2:03-MD-1565, 2006 WL 469468 (S.D. Ohio Feb. 27, 2006)

*In re Nat'l Century Fin. Enters., Inv. Litig*.,
　　504 F. Supp. 2d 287 (S.D. Ohio 2007)

*In re New Century*,
　　588 F. Supp. 2d 1206 (C.D. Cal. 2008)

*In re Omnicare, Inc. Sec. Litig*,
　　769 F.3d 455 (6th Cir. 2014)

*In re Prison Realty Sec. Litig*.,
　　117 F. Supp. 2d 681 (M.D. Tenn. 2000)

*In re ProQuest Sec. Litig.*,
　　527 F. Supp. 2d 728 (E.D. Mich. 2007)

*In re Regions Morgan Keegan Sec., Deriv., & ERISA Litig.*,
　　743 F. Supp. 2d 744 (W.D. Tenn. 2010)

*In re Regions Morgan Keegan Sec., Deriv., & ERISA Litig.*,
　　No. 2:09-2009 SMHV, 2012 WL 12875982 (W.D. Tenn. Mar. 30, 2012)

*In re Rospatch Sec. Litig.*,
　　760 F. Supp. 1239 (W.D. Mich. 1991)

*In re Signet Jewelers Ltd. Sec. Litig*.,
　　No. 16 Civ. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)

*In re Sirrom Capital Corp. Sec. Litig*.,
　　84 F. Supp. 2d 933 (M.D. Tenn. 1999)

*JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*,
    997 F. Supp. 2d 710 (E.D. Mich. 2014)

*Johnson v. Aljian*,
    490 F.3d 778 (9th Cir. 2007)

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671, 681 (6th Cir. 2004)

*Sohol v. Yan*,
    No. 1:15-cv-00393, 2016 WL 1704290 (N.D. Ohio Apr. 27, 2016)

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)

*Wilkof v. Caraco Pharm. Labs, Ltd.*,
    No. 09-12830, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010)

*Williams v. Globus Med., Inc.*,
    869 F.3d 235 (3d Cir. 2017)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..........................................................................1

FACTUAL BACKGROUND ...........................................................................4

    A.    Overview of Sterling and the ALP ...................................................4

    B.    Sterling Was Required to Comply With Strict BSA/AML and
         Mortgage Lending Laws ...................................................................5

         1.    Overview of BSA/AML Requirements ...................................5

         2.    The ALP Posed Heightened Risks Requiring Additional
              Diligence Under BSA/AML Laws and Regulations ...............6

         3.    Residential Real Estate Loan Underwriting............................7

    C.    Defendants' Misrepresentations.......................................................8

    D.    Former Employee Accounts Portray a Starkly Different Picture ......9

    E.    The Truth Began To Be Revealed As the 10(b) Defendants
         Continued To Mislead the Market ...................................................13

ARGUMENT .............................................................................................19

I.    STANDARD OF REVIEW ......................................................................19

II.    PLAINTIFF PROPERLY ALLEGES CLAIMS UNDER SECTION
      10(b) OF THE EXCHANGE ACT..........................................................20

    A.    Plaintiff Sufficiently Pleads Material Misrepresentations and
         Omissions .......................................................................................20

         1.    Misrepresentations Concerning Underwriting.......................24

         2.    Misrepresentations Concerning Risk Management and
              Internal Controls .................................................................30

         3.    Misrepresentations Concerning Regulatory Compliance ......34

         4.    Misrepresentations Concerning Financial Results................36

5.     Misrepresentations Concerning Pipeline and Demand..........39

6.     Misrepresentations and Omissions Concerning the 2018 OCC Report, OCC Agreement and OCC Investigation ........42

     a)     Misrepresentations Regarding the OCC Agreement and Its Impact .............................................................42

     b)     Misrepresentations and Omissions Concerning the 2018 OCC Report .......................................................44

7.     The 10(b) Defendants' Additional Arguments Fail...............49

     a)     None of the Challenged Statements Is Puffery ...........49

     b)     Sterling's Risk Disclosures Argument Fails................56

     c)     The Complaint Does Not Allege Mere Corporate Mismanagement...........................................................58

     d)     The Statements Were Not Non-Actionable "Opinions" ..................................................................61

     e)     The Complaint Does Not Allege Fraud By Hindsight......................................................................64

     f)     Montemayor Is Liable For Each Misrepresentation....66

B.     Plaintiff Adequately Pleads a Strong Inference of Scienter.............67

1.     Plaintiff Alleges Facts Establishing the 10(b) Defendants' Knowledge and/or Recklessness.............................................69

2.     The Complaint Also Alleges Facts Giving Rise To a Strong Inference of the Company's Scienter........................99

III.     PLAINTIFF ADEQUATELY PLEADS A SECTION 20A CLAIM AGAINST SCOTT SELIGMAN .........................................................100

IV.     PLAINTIFF PROPERLY ALLEGES CLAIMS UNDER SECTIONS 11 AND 12 OF THE SECURITIES ACT...........................105

A.     The Securities Act Claims Do Not Sound In Fraud.......................105

B.      Plaintiff Adequately Pleads Untrue Statements and Omissions ....108

C.      The Underwriters Are Statutory Sellers .........................................113

V.     PLAINTIFF PROPERLY ALLEGES CONTROL
PERSON LIABILITY ...............................................................................115

A.      Plaintiff Adequately Pleads Control..............................................117

B.      Pleading a Primary Violation and Secondary Control Person
Liability Is Expressly Allowed by the Federal Rules ....................123

CONCLUSION ...............................................................................................124

# TABLE OF AUTHORITIES

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ................................................................................108

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................20

*Ashland, Inc. v. Oppenheimer & Co.*,
648 F.3d 461 (6th Cir. 2011) ..............................................................................69

*Atlas v. Accredited Home Lenders Holding Company*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008) .................................................. 29, 51, 112

*Banks v. N. Trust Corp.*,
929 F. 3d 1046 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 1243 (2020) ..............104

*Beach v. Healthways, Inc.*,
No. 3:08-0569, 2009 WL 650408 (M.D. Tenn. Mar. 9, 2009)...........................101

*Bell Atl. Corp v. Twombly*,
550 U.S. 544 (2007) ............................................................................................20

*Berger v. Ludwick*,
No. C-97-0728-CAL, 2000 WL 1262646 (N.D. Cal. Aug. 17,
2000), *aff'd*, 15 F. App'x 528 (9th Cir. 2001) ....................................................105

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ....................................................................... 92, 94

*Brown v. Enstar Grp., Inc.*,
84 F.3d 393 (11th Cir. 1996) ............................................................................120

*Burges v. BancorpSouth, Inc.*,
No. 3-14-1564, 2015 WL 4198795 (M.D. Tenn. July 10, 2015) ................... 36, 99

*Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*,
394 F.3d 126 (3d Cir. 2004) .............................................................................108

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016), *amended on denial of reconsideration*, No. CV H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016) ...................................................................................41

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010) ............................................ 76, 82, 96, 97

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
632 F.3d 751 (1st Cir. 2011)........................................................... 83, 84

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .............................................................. passim

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) ...................................................85

*City of Painesville v. First Montauk Fin. Corp.*,
178 F.R.D. 180 (N.D. Ohio 1998) ...................................................121

*City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*,
No. 1:10-CV-520, 2011 WL 2650717 (W.D. Mich. July 6, 2011) ......................24

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
814 F. Supp. 2d 395 (S.D.N.Y. 2011) ......................................................... 45, 85

*Coyne v. Gen. Elec. Co.*,
No. 08cv1135 (SRU), 2010 WL 2836730 (D. Conn. July 15, 2010), *aff'd sub nom. Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
445 F. App'x 368 (2d Cir. 2011) ...................................................66

*Curran v. Freshpet, Inc.*,
No. 16-2263, 2018 WL 394878 (D.N.J. Jan. 12, 2018) .....................................42

*Cutler v. Kirchner*,
696 F. App'x 809 (9th Cir. 2017) ...................................................57

*D.E.&J Ltd. P'ship v. Conaway*,
284 F. Supp. 2d 719 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005) ......................................................... 66, 67, 69, 81

*Doshi v. Gen. Cable Corp. (Doshi I)*,
823 F.3d 1032 (6th Cir. 2016) ...................................................... 69, 74

xi

*Doshi v. Gen. Cable Corp. (Doshi II)*,
386 F. Supp. 3d 815 (E.D. Ky. 2019) ....................................................................60

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)...............................................................................................20

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) .................................................................................55

*First E. Corp. v. Mainwaring*,
21 F.3d 465 (D.C. Cir. 1994)................................................................................46

*Fox v. First BanCorp*,
No. 05-2148 (GAG), 2006 WL 4128534 (D.P.R. Nov. 6, 2006) .......................107

*Frank v. Dana Corp. (Dana I)*,
547 F.3d 564 (6th Cir. 2008) .................................................................. 21, 47, 68

*Frank v. Dana Corp. (Dana II)*,
646 F.3d 954 (6th Cir. 2011) ........................................................................ passim

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................... 33, 37, 53

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
No. 3:09-00882, 2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011)............... passim

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...................................................................90

*Global Tech., Inc. v. Moto Diesel Mexicana*,
No. 05-cv-70069, 2007 WL 1500178 (E.D. Mich. May 22, 2007)....................104

*Grae v. Corr. Corp. of Am.*,
No. 3:16-cv-2267, 2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)............. 49, 91

*Halford v. AtriCure, Inc.*,
No. 1:08cv867, 2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)........ 73, 74, 79, 94

*Hall v. Rent-A-Ctr., Inc.*,
No. 4:16CV978, 2017 WL 6398742 (E.D. Tex. Oct. 19, 2017), *report and
recommendation adopted*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) .........42

*Handy-Clay v. City of Memphis*,
  695 F.3d 531 (6th Cir. 2012) ...............................................................20

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ...............................................................87

*Havenick v. Network Exp., Inc.*,
  981 F. Supp. 480 (E.D. Mich. 1997)....................................................24

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001), *overruled on other grounds by Tellabs, Inc.
  v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)................................... passim

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)............................................................... 109, 123

*Higginbotham v. Baxter Int'l, Inc.*,
  495 F.3d 753 (7th Cir. 2007) ......................................................... 73, 76

*In re 3Com Sec. Litig*,
  No. C-97-21083 JW, 1999 WL 1039715 (N.D. Cal. July 8, 1999)....................105

*In re Accredo Health, Inc. Sec. Litig.*,
  No. 03-2216-BBD, 2005 WL 8152649 (W.D. Tenn. Apr. 11, 2005) ..................58

*In re Adams Golf, Inc. Sec. Litig.*,
  381 F.3d 267 (3d Cir. 2004)...............................................................109

*In re AFC Enters., Inc. Sec. Litig.*,
  348 F. Supp. 2d 1363 (N.D. Ga. 2004)..................................................84

*In re Am. Serv. Grp., Inc.*,
  No. 3:06-0323, 2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009)................. passim

*In re Ancor Commc'ns*,
  22 F. Supp. 2d 999 (D. Minn. 1998)....................................................93

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................108

*In re BofI Holding, Inc. Sec. Litig. (BofI I)*,
  No. 3:15-CV-02324-GPC-KSC, 2016 WL 5390533 (S.D. Cal. Sept. 27,
  2016) ................................................................................ 36, 52, 75

*In re BofI Holding, Inc. Sec. Litig. (BofI II)*,
   No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980 (S.D. Cal. May 23,
   2017) ........................................................................................................77

*In re BofI Holding, Inc. Sec. Litig. (BofI III)*,
   977 F.3d 781 (9th Cir. 2020) ...................................................................98

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) ....................................................41

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002)....................................................................100

*In re Cardinal Health Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) ........................................... passim

*In re Century Bus. Servs. Sec. Litig.*,
   No. 1:99CV02200, 2002 WL 32254513 (N.D. Ohio June 27, 2002)...................67

*In re Citigroup Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v.
   Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006)) ........................ 47, 57

*In re CMS Energy Sec. Litig.*,
   No. 02-CV-72004, 2005 WL 8154422 (E.D. Mich. Jan. 7, 2005) ....................124

*In re Complete Mgt., Inc. Sec. Litig.*,
   153 F. Supp. 2d 314 (S.D.N.Y. 2001) .....................................................91

*In re Computer Assocs. Class Action Sec. Litig.*,
   75 F. Supp. 2d 68 (E.D.N.Y. 1999) ........................................................40

*In re Compuware Sec. Litig.*,
   301 F. Supp. 2d 672 (E.D. Mich. 2004) ..................................................77

*In re Consumers Power Co. Sec. Litig.*,
   105 F.R.D. 583 (E.D. Mich. 1985) ................................................ 106, 107

*In re Converium Holding AG Sec. Litig.*,
   No. 04 Civ. 7897 (DLC), 2006 WL 3804619 (S.D.N.Y. Dec. 28, 2006),
   *reconsideration in part*, 2007 WL 1041480 (S.D.N.Y. Apr. 9, 2007)................39

xiv

*In re Countrywide Fin. Corp. Deriv. Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ................................................. 29, 51, 69

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
    No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253 (S.D.N.Y. June 28,
    2017), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729
    F. App'x 55 (2d Cir. 2018) ........................................................................ 24, 60

*In re Direct Gen. Corp. Sec. Litig.*,
    398 F. Supp. 2d 888 (M.D. Tenn. 2005)...............................................................119

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
    No. 1446, 2016 WL 4095973 (S.D. Tex. Aug. 2, 2016), *aff'd sub
    nom. Giancarlo v. UBS Fin. Servs., Inc.*, 725 F. App'x 278 (5th Cir. 2018).....105

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
    258 F. Supp. 2d 576 (S.D. Tex. 2003)...................................................................123

*In re Envision Healthcare Corp. Sec. Litig.*,
    No. 3:17-CV-01112, 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019).. 105, 116

*In re Envoy Corp. Sec. Litig.*,
    133 F. Supp. 2d 647 (M.D. Tenn. 2001)..................................................................93

*In re Equifax Inc. Sec. Litig.*,
    357 F. Supp. 3d 1189 (N.D. Ga. 2019)................................................. 51, 58, 61

*In re EveryWare Global, Inc. Sec. Litig.*,
    175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd sub nom. IBEW Local No. 58
    Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017) ...... 79, 114

*In re FirstEnergy Corp. Sec. Litig.*,
    316 F. Supp. 2d 581 (N.D. Ohio 2004) ............................................. 84, 106, 107

*In re ForceField Energy Inc. Sec. Litig.*,
    No. 15 Civ. 3020 (NRB), 2017 WL 1319802 (S.D.N.Y. Mar. 29, 2017)............34

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y.), *reconsideration in part on other grounds*,
    856 F. Supp. 2d 645 (S.D.N.Y. 2012) ...................................................................51

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
    No. 10 Civ. 3461(PAC), 2014 WL 2815571 (S.D.N.Y. June 23, 2014).............32

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019) ...................................................................33

*In re Hayes Lemmerz Int'l, Inc.*,
271 F. Supp. 2d 1007 (E.D. Mich. 2003) ............................................................74

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ................................................. 91, 117, 124

*In re Huntington Bancshares Inc. Sec. Litig.*,
674 F. Supp. 2d 951 (S.D. Ohio 2009) ................................................... 65, 76, 82

*In re Keithley Instruments, Inc. Sec. Litig.*,
268 F. Supp. 2d 887 (N.D. Ohio 2002) ...............................................................84

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011) .................................................................32

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017) ..............................................................66

*In re Lions Gate Entertainment Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) .....................................................................48

*In re Merck & Co., Inc. Sec. Litig.*,
MDL No. 1658 (SRC), 2015 WL 2250472 (D.N.J. May 13, 2015)....................61

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
982 F. Supp. 2d 277 (S.D.N.Y. 2013) ....................................................... 32, 54

*In re Miller Energy Res. Sec. Litig.*,
No. 3:11-CV-386-TAV-CCS, 2014 WL 415730 (E.D. Tenn. Feb. 4, 2014).........97

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig. (Nat'l Century I)*,
No. 2:03-MD-1565, 2006 WL 469468 (S.D. Ohio Feb. 27, 2006) ....................124

*In re Nat'l Century Fin. Enters., Inc. Inv. Litig. (Nat'l Century II)*,
504 F. Supp. 2d 287 (S.D. Ohio 2007) ............................................... 115, 116, 123

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................ 29, 39, 51, 112

*In re Nextcard, Inc. Sec. Litig.*,
No. C-01-21029-JF (RS), 2005 WL 6342406 (N.D. Cal. Feb. 7, 2005), .............46

*In re Oak Tech. Sec. Litig.*,
No. 96-20552 SW, 1997 WL 448168 (N.D. Cal. Aug. 1, 1997) .......................105

*In re Omnicare, Inc. Sec. Litig*,
769 F.3d 455 (6th Cir. 2014) ................................................................ 3, 49, 99

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y. 1999) .....................................................................84

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015) ..............................................................34

*In re Pixar Sec. Litig.*,
450 F. Supp. 2d 1096 (N.D. Cal. 2006) ............................................................84

*In re PMA Capital Corp. Sec. Litig.*,
No. 03-6121, 2005 WL 1806503 (E.D. Pa. July 27, 2005). .................................39

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000)...........................................................106

*In re ProQuest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007) ..................................................... passim

*In re PXRE Grp., Ltd. Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009), *aff'd sub nom. Condra v. PXRE
Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) .....................................................74

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ........................................................................39

*In re RAIT Fin. Trust Secs. Litig.*,
No. 2:07-cv-03148-LDD, 2008 WL 5378164 (E.D. Pa. Dec. 22, 2008) .............53

*In re Refco Sec. Litig.*,
503 F. Supp. 2d 611 (S.D.N.Y. 2007) .............................................................101

*In re Regions Morgan Keegan Sec., Deriv., & ERISA Litig.*,
743 F. Supp. 2d 744 (W.D. Tenn. 2010) .........................................................123

*In re Regions Morgan Keegan Sec., Deriv., & ERISA Litig.*,
No. 2:09-2009 SMH V, 2012 WL 12875982 (W.D. Tenn. Mar. 30, 2012).......113

*In re Rigel Pharms., Inc. Sec. Litig.*,
697 F.3d 869 (9th Cir. 2012) ...........................................................................108

*In re Rospatch Sec. Litig.*,
760 F. Supp. 1239 (W.D. Mich. 1991) ..............................................................59

*In re Royal Bank of Scotland Grp. PLC*,
No. 09 Civ. 300 (DAB), 2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012), *aff'd
sub nom. Freeman Grp. v. Royal Bank of Scotland Grp. PLC*, 540 F.
App'x 33 (2d Cir. 2013) ....................................................................................66

*In re Sanofi Sec. Litig.*,
155 F. Supp. 3d 386 (S.D.N.Y. 2016), *report and recommendation
adopted*, No. 6:19-cv-619-Orl-40LRH, 2020 WL 1072582 (M.D. Fla. Feb.
14, 2020) ...........................................................................................................47

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001) ...............................................................................84

*In re Sec. Cap. Assurance, Ltd. Sec. Litig.*,
729 F. Supp. 2d 569 (S.D.N.Y. 2010) ....................................................... 55, 66

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16 Civ. 6728 (CM), 2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018). 39, 61, 62

*In re Sipex Corp. Sec. Litig.*,
No. C 05-00392 WHA, 2005 WL 3096178 (N.D. Cal. Nov. 17, 2005)...............91

*In re Sirrom Capital Corp. Sec. Litig.*,
84 F. Supp. 2d 933 (M.D. Tenn. 1999)............................................. 107, 118, 123

*In re SmarTalk Teleservs., Inc. Sec. Litig.*,
124 F. Supp. 2d 527 (S.D. Ohio 2000) .............................................................86

*In re Sofamor Danek Grp., Inc.*,
123 F.3d 394 (6th Cir. 1997) ............................................................................46

*In re Suprema Specialties, Inc. Sec. Litig.*,
438 F.3d 256 (3d Cir. 2006) ..................................................................... 106, 114

*In re Synchrony Fin. Sec. Litig.*,
  450 F. Supp. 3d 127 (D. Conn. Mar. 31, 2020), *appeal docketed*, No. 20-
  1352 (2d Cir. Apr. 24, 2020) ...................................................................... 55, 66

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ...............................................................105

*In re Telxon Corp. Sec. Litig.*,
  133 F. Supp. 2d 1010 (N.D. Ohio 2000) .............................................................79

*In re Twinlab Corp. Sec. Litig.*,
  103 F. Supp. 2d 193 (E.D.N.Y. 2000) ...............................................................115

*In re United Am. Healthcare Corp. Sec. Litig.*,
  No. 2:05-CV-72112 (LPZ/RSW), 2007 WL 313491 (E.D. Mich. Jan. 30,
  2007) .......................................................................................................... 48, 60, 66

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................88

*In re VEON Ltd. Sec. Litig.*,
  No. 15-CV-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ... 54, 59

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) ................................................................55

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) .................................................. 29, 51

*In re Wells Fargo Sec. Litig.*,
  12 F.3d 922 (9th Cir. 1993) ................................................................................39

*In re Wilmington Tr. Sec. Litig.*,
  29 F. Supp. 3d 432 (D. Del. 2014)......................................................................54

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ...............................................................................73

*Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare
  Fund v. Omnicare, Inc.*,
  583 F.3d 935  (6th Cir. 2009) ...........................................................................108

*Institutional Investors Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009) ......................................................................74

*JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*,
   997 F. Supp. 2d 710 (E.D. Mich. 2014) ............................................ 20, 121, 122

*Jackson v. Abernathy*,
   960 F.3d 94 (2d Cir. 2020) ......................................................................92

*Johnson v. Aljian*,
   490 F.3d 778 (9th Cir. 2007) .................................................................103

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ....................................................................85

*Konkol v. Diebold, Inc.*,
   590 F.3d 390 (6th Cir. 2009), *abrogated by Matrixx Initiatives, Inc. v.
   Siracusano*, 563 U.S. 27 (2011), *as recognized in Frank v. Dana Corp.*,
   646 F.3d 954 (2011)............................................................................ 93, 97

*Laborers' Local #231 Pension Fund v. PharMerica Corp.*,
   No. 3:18-CV-109-RGJ, 2019 WL 4645583 (W.D. Ky. Sept. 24, 2019)..............23

*Ley v. Visteon Corp.*,
   543 F.3d 801 (6th Cir. 2008) ...................................................................76

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011) ....................................................................44

*Local 295/Local 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth
   Third Bancorp*,
   731 F. Supp. 2d 689 (S.D. Ohio 2010) ...................................... 118, 123

*Lubbers v. Flagstar Bancorp Inc.*,
   162 F. Supp. 3d 571 (E.D. Mich. 2016) ................................................. 46, 108

*Makor Issues & Rights, Ltd. v. Tellabs, Inc. (Tellabs II)*,
   513 F.3d 702 (7th Cir. 2008) ................................................. 69, 73, 93

*Marksman Partners LP v. Chantal Pharm. Corp.*,
   927 F. Supp. 1297 (C.D. Cal. 1996) ....................................................86

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
    No. 6:19-cv-619-Orl-40LRH, 2019 WL 5394011 (M.D. Fla. Oct. 16,
    2019) ...............................................................................................47

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016) .................................................43

*Mike Vaughn Custom Sports, Inc. v. Piku*,
    15 F. Supp. 3d 735 (E.D. Mich. 2014) .............................................104

*Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*,
    523 F.3d 75 (1st Cir. 2008)..................................................................94

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014)...................................................65

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
    929 F. Supp. 2d 740 (M.D. Tenn. 2013)............................... 98, 118, 119

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.
    Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ..............................................................44

*Norris v. Wirtz*,
    719 F.2d 256 (7th Cir. 1983) ............................................................103

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ................................................... 64, 66, 95

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)....................................................... 61, 63, 99, 100

*Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*,
    940 F. Supp. 1101 (W.D. Mich. 1996) ..............................................124

*Pinter v. Dahl*,
    486 U.S. 622 (1988)..........................................................................113

*Platt v. Bd. of Comm'rs on Grievances & Discipline of the Ohio Supreme
    Ct.*,
    894 F.3d 235 (6th Cir. 2018) ................................................................3

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) ...............................................................80

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
  777 F. App'x 726 (5th Cir. 2019) ........................................................60

*PR Diamonds, Inc. v. Chandler*,
  364 F.3d 671 (6th Cir. 2004), *abrogated on other grounds by Matrixx*
  *Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), *as recognized in Frank*
  *v. Dana Corp.*, 646 F.3d 954 (2011).............................................. passim

*Pullins v. Klimley*,
  No. 3:05-CV-082, 2008 WL 85871 (S.D. Ohio Jan. 7, 2008)............................123

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by City of*
  *Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
  856 F.3d 605 (9th Cir. 2017) ...............................................................78

*Ricker v. Zoo Entm't, Inc.*,
  534 F. App'x 495 (6th Cir. 2013) .........................................................74

*Rihn v. Acadia Pharms. Inc.*,
  No. 15CV00575 BTM(DHB), 2016 WL 5076147 (S.D. Cal. Sept. 19,
  2016) ........................................................................................ 92, 94

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004) ...............................................................66

*Rubke v. Capitol Bancorp Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) ............................................................108

*S. Ferry L.P., No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ..............................................................92

*Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*,
  973 F.2d 474 (6th Cir. 1992) ................................................. 116, 118, 119, 123

*Scott v. Gen. Motors Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015) ......66

*SEC v. Ballesteros Franco*,
  253 F. Supp. 2d 720 (S.D.N.Y. 2003) ...................................................102

*SEC v. Wyly*,
  56 F. Supp. 3d 394 (S.D.N.Y. 2014) ...................................................................104

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) .................................................................................39

*Shaw v. Digital Equip. Corp.*,
  82 F.3d 1194 (1st Cir. 1996)..................................................................................84

*Sohol v. Yan*,
  No. 1:15-cv-00393, 2016 WL 1704290 (N.D. Ohio Apr. 27, 2016)..................109

*Stadnick v. Vivint Solar, Inc.*,
  No. 14-cv-9283 (KBF), 2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015),
  *aff'd*, 861 F.3d 31 (2d Cir. 2017)........................................................................58

*Stein v. U.S. Xpress Enters., Inc.*,
  No. 1:19-cv-98, 2020 WL 3584800 (E.D. Tenn. June 30, 2020) ............ 22, 24, 92

*Stratte-McClure v. Morgan Stanley*,
  784 F. Supp. 2d 373 (S.D.N.Y. 2011), *aff'd*, 776 F.3d 94 (2d Cir. 2015),
  and *aff'd*, 598 F. App'x 25 (2d Cir. 2015).............................................................55

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) ..................................................................60

*Sumpter v. United States*,
  302 F. Supp. 2d 707 (E.D. Mich.), *subsequent determination*, 314 F. Supp.
  2d 684 (E.D. Mich. 2004) ...................................................................................103

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
  690 F. Supp. 2d 959 (D. Ariz. 2010) ..................................................................120

*Tellabs, Inc. v. Makor Issues & Rights, Ltd. (Tellabs I)*,
  551 U.S. 308 (2007)....................................................................... 47, 68, 83, 87

*TransDigm Grp., Inc. Sec. Litig.*,
  440 F. Supp. 3d 740 (N.D. Ohio 2020) ......................................................... 47, 62

*U.S. ex rel. Garst v. Lockheed-Martin Corp.*,
  328 F.3d 374 (7th Cir. 2003) ...............................................................................24

*U.S. S.E.C. v. Smith*,
  No. C2-CV-04-739, 2005 WL 2373849 (S.D. Ohio Sept. 27, 2005)................124

*USM Holdings, Inc. v. Simon*,
  No. 15-14251, 2016 WL 4396061 (E.D. Mich. Aug. 18, 2016) ............... 116, 121

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  No. 13-6731, 2015 WL 3755218 (E.D. Pa. June 16, 2015) ......................... 50, 51

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
  28 F. Supp. 3d 93 (D. Mass. 2014)....................................................................82

*Washtenaw Cty. Emps.' Ret. Sys. v. Walgreen Co.,*
  No. 15-cv-3187, 2016 WL 5720375 (N.D. Ill. Sept. 30, 2016)...........................47

*Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*,
  No. 08-CIV-22572, 2010 WL 1332574 (S.D. Fla. Mar. 30, 2010).....................55

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
  No. 14 CV 3876-LTS, 2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016)................63

*Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.*,
  No. 10-CV-864 (SLT) (RER), 2013 WL 1345086 (E.D.N.Y. Mar. 29,
  2013) ..................................................................................................................24

*Wilkof v. Caraco Pharm. Labs, Ltd.*,
  No. 09-12830, 2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) ................... passim

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) ...............................................................................56

*Williams v. WMX Techs., Inc.*,
  112 F.3d 175 (5th Cir. 1997) ..............................................................................24

*Willis v. Big Lots, Inc. (Willis I)*,
  No. 2:12-cv-604, 2016 WL 8199124 (S.D. Ohio Jan. 21, 2016) ................. 88, 96

*Willis v. Big Lots, Inc. (Willis II)*,
  No. 2:12-cv-604, 2017 WL 2608690 (S.D. Ohio June 16, 2017) .......................90

*Winslow v. BancorpSouth, Inc.*,
  No. 3:10-00463, 2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011), *report*

*and recommendation approved*,  2012 WL 214635 (M.D. Tenn. Jan. 24, 2012) ........................................................................................................81

*Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425 (S.D.N.Y. 2010) ....................................................................55

*Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009) ................................................................................90

**Statutes**

12 C.F.R. § 4.37(b) .....................................................................................45

15 U.S.C. § 77k(a)(1)................................................................................109

15 U.S.C. § 78t-1(a) .................................................................................101

15 U.S.C. § 78u-4(b)(1)(B).........................................................................21

15 U.S.C. § 78u-4(b)(2)(A).........................................................................67

15 U.S.C. § 78u-5......................................................................................56

17 C.F.R. § 229.103 ...................................................................................45

17 C.F.R. § 229.105(a)...............................................................................45

17 C.F.R. § 229.303(a)(3)(ii) .....................................................................44

17 C.F.R. § 230.405 .................................................................................115

18 U.S.C. § 641 .........................................................................................45

Exchange Act § 10(b) ......................................................................... passim

Exchange Act § 15 ...................................................................................115

Exchange Act § 20(a)........................................................... 101, 103, 115, 119

Restatement (Third) of Trusts § 74 (2007) .............................................102

Securities Act § 11 .............................................................................. passim

Securities Act § 12 ..................................................................................108

Securities Act § 12(a)(2) ................................................................................. passim

**Rules**

Fed. R. Civ. P. 8 .............................................................................. 106, 108, 115

Fed. R. Civ. P. 8(a)..........................................................................................22

Fed. R. Civ. P. 8(d)(2)....................................................................................124

Fed. R. Civ. P. 9(b) ................................................................................ passim

Fed. R. Civ. P. 10(b) ............................................................................... passim

Fed. R. Civ. P. 12(b)(6)...................................................................................19

N.D. Cal. L.R. 3-4(e) .......................................................................................46

## TABLE OF ABBREVIATIONS

### PARTIES:

| | |
|---|---|
| **Plaintiff** | Oklahoma Police Pension and Retirement System |
| **Sterling (or the "Company")** | Defendant Sterling Bancorp, Inc. |
| **Fox** | Defendant Jon Fox |
| **Judd** | Defendant Gary Judd |
| **Lopp** | Defendant Thomas Lopp |
| **Meltzer** | Defendant Seth Meltzer |
| **Montemayor** | Defendant Michael Montemayor |
| **Sandra Seligman** | Defendant Sandra Seligman |
| **Scott Seligman (or "Seligman")** | Defendant Scott Seligman |
| **Sinatra** | Defendant Peter Sinatra |
| **Officer Defendants** | Defendants Gary Judd, Thomas Lopp, and Michael Montemayor |
| **10(b) Defendants** | Sterling Bancorp, Inc. and the Officer Defendants |
| **Director Defendants** | Defendants Barry Allen, Jon Fox, Seth Meltzer, Sandra Seligman, Peter Sinatra, Benjamin Wineman, and Lyle Wolberg |
| **Control Person Defendants** | Officer Defendants, Scott Seligman, and the Director Defendants |
| **Outside Directors** | Defendants Barry Allen, Jon Fox, Benjamin Wineman, and Lyle Wolberg |
| **Underwriter Defendants** | Defendants Piper Sandler Companies and American Capital Partners, LLC |

**MOTIONS:**

| | |
|---|---|
| **Dkt. #55** | Mem. of Law in Supp. of Def. Michael Montemayor's Mot. to Dismiss Plts.' Am. Class Action Compl. |
| **Dkt. #56** | Mem. of Law in Supp. of Def. Scott Seligman's Mot. to Dismiss Plts.' Am. Class Action Compl. |
| **Dkt. #57** | Mem. of Law in Supp. of Def. Sterling Bancorp, Inc.'s Mot. to Dismiss The Am. Class Action Compl. |
| **Dkt. #58** | Def. Peter Sinatra's Joinder in Def. Sterling Bancorp, Inc.'s Mot. to Dismiss The First Am. Compl. |
| **Dkt. #59** | Brief in Supp. of Def. Thomas Lopp's Mot. to Dismiss Am. Compl. |
| **Dkt. #60** | Mem. of Law in Supp. of [the Outside Directors] Joinder of Def. Sterling Bancorp's Mot. to Dismiss The Am. Compl. |
| **Dkt. #61** | Mem. of Law in Supp. of The Underwriter Defs.' Mot. to Dismiss |
| **Dkt. #63** | Mem. of Law in Supp. of Def. Gary Judd's Mot. to Dismiss The Am. Class Action Compl. |
| **Pltf. RJN** | Lead Plaintiff's Motion To Take Judicial Notice, filed concurrently herewith |
| **Moody Decl.** | Declaration of Kristin J. Moody in Support of Lead Plaintiff's Motion To Take Judicial Notice, filed concurrently herewith |

**OTHER TERMS:**

| | |
|---|---|
| **2019 10-K** | Sterling's annual 2019 Form 10-K, filed October 6, 2020 |
| **ALP** | Sterling's Advantage Loan Program |
| **AML** | Anti-Money Laundering |
| **Bank** | Sterling Bank and Trust, F.S.B. |

| | |
|---|---|
| **BSA** | Bank Secrecy Act of 1970 |
| **Class Period** | Plaintiff's alleged class period of November 17, 2017 to March 17, 2020 |
| **Complaint (or "Compl." or "Dkt. #36")** | Plaintiff's Amended Class Action Complaint for Violations of the Federal Securities Laws, filed July 2, 2020 |
| **DOJ** | U.S. Department of Justice |
| **Exchange Act** | Securities Exchange Act of 1934 |
| **FE** | Former Employees |
| **Founding Family** | Members of the family who founded the Bank, including Defendants Scott Seligman, Sandra Seligman and Seth Meltzer |
| **IPO** | Sterling's Initial Public Offering on November 17, 2017 |
| **OCC** | U.S. Treasury's Office of the Comptroller of the Currency |
| **OCC Agreement** | An agreement dated June 18, 2019 by and between Sterling Bank and Trust, F.S.B. and the Office of the Comptroller of the Currency, filed on August 9, 2019 as Exhibit 10.1 to Sterling's Form 10-Q, filed with the SEC on August 9, 2019 |
| **2018 OCC Report** | An OCC Report of Examination referenced in the OCC Agreement as being dated as of March 31, 2018 |
| **Prospectus** | Sterling's Form 424B4 Prospectus, filed November 17, 2017, which is part of Sterling's Registration Statement |
| **PSLRA** | Private Securities Litigation Reform Act of 1995 |
| **Registration Statement** | Sterling's Registration Statement, consisting of the October 19, 2017 Initial Registration Statement on Form S-1; Amendment Nos. 1, 2, and 3 to Form S-1, filed with the SEC on October 31, 2017, November 7, 2017, and November 13, 2017, respectively; a Free Writing |

|  | Prospectus slide presentation filed with the SEC on November 8, 2017; and the November 17, 2017 Prospectus Form 424B4. |
|---|---|
| **Rule 9(b)** | Rule 9(b) of the Federal Rules of Civil Procedure |
| **SEC** | United States Securities and Exchange Commission |
| **Securities Act** | Securities Act of 1933 |

xxx

## PRELIMINARY STATEMENT

This case is about defendant Sterling, a bank holding company, that was experiencing exponential growth through its core loan program, the ALP, which represented more than 70% of its revenue and assets.  The ALP peddled high down payment, lower documentation mortgages to foreign nationals and recent immigrants.  Sterling and the ALP operated in a highly regulated environment and were subject to residential lending regulations as well as strict BSA/AML laws to guard against money laundering.  These laws required that Sterling maintain robust, sophisticated, and effective due diligence systems; documentation and procedures to verify borrowers' identify, income, ability to repay, and sources of funds; and internal controls to ensure compliance.  Given the nature of the ALP, it posed heightened BSA/AML risks that required additional due diligence.

In this heightened regulatory environment with a high-risk product experiencing exponential growth, Defendants repeatedly touted, *inter alia*, the ALP and its "disciplined" and "conservative" underwriting, risk management, and internal controls – including specific practices, such as "a thorough review of [borrowers'] ability to repay, liquidity analysis and face-to-face customer interaction," a "financial documentation process," and "established processes and procedures intended to identify, measure, monitor, report and analyze the types of risk to which we are subject, including credit, liquidity, operational, [and] regulatory

1

compliance." Defendants also touted the Company's compliance with BSA/AML regulations and its responsible growth. All of this was of utmost importance to investors given the critical importance of the ALP to the Company's success.

In truth, however, as relayed by a chorus of former employees, underwriting, internal controls, and risk management for the ALP was practically non-existent; the Company was not in compliance with BSA/AML and residential lending laws, there was almost no documentation required to verify ALP borrowers' identity, employment, or sources of cash they used to obtain the mortgages, and the ALP loans were riddled with red flags of money laundering without any further diligence.

Ultimately, by the end of the Class Period, the Company was forced to completely shut down the ALP as a result of widespread, major issues with the ALP's loan origination process, including its income verification and requirements, reliance on third parties, and related documentation; numerous employees were terminated or abruptly resigned, including all three Officer Defendants and other top management; and Sterling and the ALP's residential lending practices were subject to an internal review as well as a criminal DOJ investigation and formal OCC investigation, both of which continue to date.

In the face of this, Defendants advance a host of disingenuous arguments and largely ignore Plaintiff's well-pled allegations. For example, despite nine separate briefs and hundreds of pages in submission, Defendants rarely even mention money

2

laundering or Sterling's own damning admissions.  Moreover, Defendants barely acknowledge and summarily dismiss the consistent and detailed FE accounts that are corroborated by contemporaneous OCC findings and Sterling's belated admissions.  Defendants also assert that their repeated statements about the heart of the Company that were of critical importance to investors were mere puffery.  Defendants likewise suggest the allegations are merely indicative of mismanagement.  However, the facts alleged by Plaintiff, including the pervasive, flagrant and egregious compliance failures that ultimately led to the entire ALP being permanently shut down and the Company being subject to criminal and regulatory investigations, tell a dramatically different story.

For all Defendants' bluster, their motions to dismiss are fundamentally flawed, and Plaintiff has more than sufficiently alleged its claims, as detailed herein.[2]

---

[2] In connection with their motions to dismiss Sterling, Judd, Lopp, Montemayor, and Seligman offer twenty-five exhibits, consisting of Forms 3 and 4, excerpts of other SEC filings, and earnings call transcripts.  Sterling and Montemayor note that the Court may take judicial notice of appropriate materials (Dkt. #57, PageID.647 n.1; Dkt. #55, PageID.566), and/or "consider the quotations in the Complaint in the context of the full documents from which they were taken" (Dkt. #57, PageID.647 n.1), while Judd, Lopp, and Seligman simply attach the exhibits to their memoranda.  To the extent any Defendant seeks to introduce these exhibits for the truth of the matters asserted therein, to dispute factual issues, or for any other improper purpose, Plaintiff opposes such consideration of the documents.  *See, e.g., Platt v. Bd. of Comm'rs on Grievances & Discipline of the Ohio Supreme Ct.*, 894 F.3d 235, 245 (6th Cir. 2018) (documents subject to judicial notice are not entitled to be accepted for their truth); *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) (incorporation by reference does not entitle documents to be accepted for their truth).

3

## FACTUAL BACKGROUND[3]

### A.    Overview of Sterling and the ALP

Sterling is the parent company to the Bank, its wholly owned subsidiary through which Sterling conducts its business.  ¶¶33, 64.  Sterling is headquartered in Southfield, Michigan with its primary branch operations in the San Francisco Bay Area and Greater Los Angeles.  ¶65.  At all relevant times, Sterling's core product was the ALP, representing 75% or more of the Company's entire loan portfolio.  ¶¶1, 84, 86-88, 136, 355, 438.   Sterling described the program as focusing on adjustable rate mortgages with a minimum of a 35% down payment that it marketed to "underserved home buyers who have good credit, but may have limited credit history," specifically, "foreign nationals and recent immigrants" including the "foreign national Chinese home buyer."  ¶¶7, 84, 85, 136, 155, 215, 438.

From 2012 to the start of the Class Period, Sterling more than tripled its assets.  ¶¶87, 88.  Due primarily to loans issued through the ALP, the Company's loan portfolio increased from $755 million at the end of 2012 to $2.37 billion as of September 31, 2017.  ¶87.

Taking advantage of the exponential growth driven by the ALP, the Company

---

[3] Unless otherwise indicated, all emphasis is added and all alterations, footnotes, internal quotation marks, and citations are omitted.  All references to "¶_" are to paragraphs in the Complaint (Dkt. #36).

went public on November 17, 2017, the first day of the Class Period, through a $207 million IPO.  ¶¶3, 88, 134.  More than 55% of the shares in the IPO were sold by selling shareholders who are members of the Founding Family of the Bank or trusts related to them, including Defendants Scott Seligman, Sandra Seligman and Meltzer, who reaped over $114 million. ¶¶3, 90.  Thereafter, the Company continued to grow, fueled by the success of the ALP.  As of September 30, 2019, the Company had $3.3 billion in assets, primarily consisting of loans, including $2.5 billion in residential real estate loans, 79% of which were ALP loans.  ¶65.

## B.  Sterling Was Required to Comply With Strict BSA/AML and Mortgage Lending Laws

### 1.  Overview of BSA/AML Requirements

Money laundering is the criminal practice of processing illegally obtained funds, or "dirty" money, through a series of transactions in order to "clean" the funds.  ¶69.  Mortgages are used as a cover for money laundering, as money launderers or their straw buyers deposit lump sums or structured cash amounts to qualify for mortgages, and repayment allows illicit funds to be commingled with legitimate funds.  ¶69.  Throughout the Class Period, Sterling was subject to strict BSA/AML laws and regulations designed to combat money laundering.  ¶¶68, 69.

Sterling was required to maintain robust, sophisticated, and effective due diligence systems of BSA/AML compliance including a written, board-approved policy and internal controls to assure and monitor compliance with the BSA and

5

provide training for appropriate personnel.  ¶¶70-71. Sterling was also required to file Currency Transaction Reports ("CTRs") for transactions of more than $10,000 and Suspicious Activity Reports ("SARs") for known or suspected violations of federal law or suspicious transactions that might signal criminal activity, including money laundering.  ¶¶72-73.

Sterling was required to have a Customer Identification Program that "must include account opening procedures that specify the identifying information that will be obtained from each customer," "risk-based procedures for verifying the identity of each customer," and verification of enough information to form a reasonable belief that it knew the customer's true identity.  ¶74.  Sterling was also required to have risk-based Customer Due Diligence policies, procedures, and processes for all customers, particularly those that presented a higher risk for money laundering.  ¶75. Where there was a heightened risk, Sterling was required to do more diligence and review information provided by higher-risk profile customers more closely.  ¶76.

## 2. The ALP Posed Heightened Risks Requiring Additional Diligence Under BSA/AML Laws and Regulations

The ALP required increased diligence, as nonresident aliens and foreigners – the customers targeted by the ALP – posed heightened risks, including difficulty verifying and authenticating a non-resident alien accountholder's identification, source of funds, and source of wealth.  ¶77.  Moreover, real estate lending presents particularly high risks of money laundering.  ¶78.  This is especially true when

lending activities exhibit one or more of the following, as does the ALP: complexity, payments made in cash or by third parties, high frequency of international transactions, or historical susceptibility to abuse by criminals. ¶78.

Moreover, the following are known money laundering "red flags":

- Cash deposited in structured amounts into home loan accounts;
- Customer uses unusual or suspicious identification documents that cannot be readily verified;
- Loans secured by pledged assets held by third parties unrelated to the borrower;
- Borrower uses cash to make a significant deposit for the purchase of a property, and the balance is financed by an unusual source;
- Source of deposits to buy a property cannot be easily identified;
- Transactions in which the party is foreign or a non-resident;
- Transactions where there are doubts about the validity of the documents submitted with loan applications; and
- Questionable involvement of third parties including brokers.

¶¶8, 80. ALP loans were riddled with such red flags, yet no diligence was performed.

### 3. Residential Real Estate Loan Underwriting

Sterling was also required to comply with residential lending laws, including that it was required to make a determination that a borrower would have a reasonable ability to repay a loan, supported and verified with documentation, regarding borrowers' information, income, and assets using reasonably reliable third-party records. ¶¶81-83.[4] Loans such as those pursuant to the ALP "with reduced documentation of the borrower's assets, employment, or income" are "higher risk"

---

[4] Even though ALP loans were non-qualified loans, they still had to comply with these rules, despite Sterling's suggestion otherwise. Dkt. #57, PageID.658-659.

mortgage products, and thus, require even additional underwriting consideration.

¶82.   As discussed below, no such verification was performed for ALP loans.

###### C.      Defendants' Misrepresentations

In this heightened regulatory environment with a high-risk product that was of crucial importance to the Company, throughout the Class Period, Defendants again and again falsely portrayed, *inter alia*, the ALP and its underwriting, risk management, and internal controls, its compliance with BSA/AML, and what drove its growth – information that was of primary concern to investors. Defendants stressed Sterling's "disciplined," "careful,"  and "conservative" underwriting and documentation which "includes a thorough review of [borrowers'] ability to repay, liquidity analysis and face-to-face customer interaction"  and Sterling's management of residential credit risks "through a financial documentation process," its "disciplined documentation" and its "effective risk management."  ¶¶136, 155, 215, 438.  Defendants also repeatedly touted Sterling's "[d]eep customer knowledge" and that "[w]e work directly with our borrowers and third parties to confirm their credit status and ability to repay."  ¶¶136, 139, 438.

Defendants also lauded the Company's "risk-conscious culture that ... includes infrastructure capable of addressing the evolving risks we face, as well as the changing regulatory and compliance landscape" and its "robust governance [that] emphasizes ... accountability for risk with our employees," including Sterling's

8

"established processes and procedures intended to identify, measure, monitor, report and analyze the types of risk to which we are subject, including credit, liquidity, operational, [and] regulatory compliance." ¶¶136, 155, 215, 244, 438. Defendants also spoke of the duty to "comply with significant anti-money laundering ... laws and regulations," including "institut[ing] and maintain[ing] an effective anti-money laundering program and [filing] timely reports such as suspicious activity reports and currency transaction reports." ¶¶143, 158, 218, 445.

Furthermore, Defendants repeatedly touted the Company's strong financial results including that it was driven by "disciplined underwriting" and continued "responsible growth" during the Class Period, propelled by ALP residential mortgage loan growth. ¶¶136, 140-41, 145-46, 148-49, 153-55, 168-69, 171-72, 175-76, 180-81, 184, 190-91, 195-98, 202-03, 207-08, 210, 213-15, 222, 226-27, 230, 233-34, 256-57, 259, 263-64, 270-71, 273, 278-79, 295-96, 438, 442-43. The 10(b) Defendants also repeatedly downplayed the effect of Sterling's agreement with the OCC, the 2018 OCC Report, and Sterling's compliance issues (as discussed below). ¶¶17, 212, 287-88, 298-99, 310, 353.

### D.      Former Employee Accounts Portray a Starkly Different Picture

The consistent accounts of FEs spanning various time periods, locations, and roles at the Company detail that, throughout the Class Period, Sterling and its ALP documentation, underwriting, internal controls, and risk management programs were

practically non-existent; the Company was not in compliance with BSA/AML and residential lending laws, including ability-to-repay verification and document requirements; and there was no training on BSA/AML requirements.  ¶¶93-133.

These consistent FE accounts also detail multiple tell-tale red flags of money laundering that were ignored, including that cash was deposited in structured amounts; funds were often from unverified sources or third parties; suspect documentation was used; and there was questionable involvement of third parties, including brokers.  Indeed, several FE believed that the ALP program was being used for money laundering and several sought to alert senior management about their concerns with the ALP but were rebuffed.  ¶¶105, 115, 131-32.

Specifically, FEs 1, 2, 3, 5, 6, and 7 consistently relay that there was almost no documentation or due diligence for ALP loans, even though they were subject to ability-to-repay and BSA/AML regulations, had heightened risks, and were riddled with money laundering red flags that went unheeded.  ¶¶95, 103, 111, 122, 127-31.

The only records required to evaluate an ALP borrower was a letter purportedly from the borrower's employer or from a CPA, and a bank statement to verify income, which were essentially taken at face value.  ¶¶95, 104, 128, 130. The employer letters usually came from China and were often translated by a Bank employee or the borrower him/herself, and CPA letters for different borrowers often arrived from the same source. ¶¶96-97, 100, 104, 111, 118, 122, 130.   As explained

10

by FEs 2, 3, and 7, to demonstrate the stated income in the letter, Sterling's main requirement was that ALP borrowers open an account at Sterling with cash and then make cash deposits into the account every two weeks for two months until a specified amount had been deposited representing two months' "salary."  ¶¶104, 111-12, 130.  Those funds did not receive any scrutiny by Sterling.  For example, FE 7 described instances where the records of "salary" deposits had no indication that the funds came from the borrower's purported employer.  ¶130.  As FEs 2, 3, 5, 6, and 7 relay, there was no further attempt to confirm the income or employment or CPA information.  ¶¶104, 111, 113, 122, 128, 130.

According to FE 3, there was also little or no attempt to confirm the account holder's identity and no attempt at all to identify the source of the funds.  ¶112.  FEs 3, 5, and 7 detailed the rampant use (nearly 90%) of unconfirmed "gifts" without any follow up or verification of the source of such gifts, even when the borrower provided inconsistent information about such gifts.  ¶¶114, 122, 124, 130

FE 5 felt that there was "something was funny" about the program, which allowed money to be moved into the United States quickly and with little documentation.  *Id*.  Similarly, FE 7, who underwrote ALP loans, stated that the ALP loans "lacked substance and documentation" that the situation "didn't make sense" and wondered "where all the money came from" and "how is it so easily transferred."  ¶¶130-31.  FE 3 has described the whole ALP process as "suspicious."  ¶111.  FE 6

11

stated that Sterling's ALP loans left "a bad taste in my mouth." ¶127. FE 6 was "not at ease" performing quality control on these loans, because the process for ALP loans was "lackluster," and there was not much "regulation" of these loans. ¶127. FE 7 also stated that the Company had weak and deficient internal controls, and FEs 2 and 3 confirmed that the underwriting and documentation for the ALP was neither conservative nor disciplined. ¶¶103 111, 131.

Several FEs alerted senior management about their concerns, which fell on deaf ears. ¶¶115, 132. For example, FE 3 expressed concerns about the ALP and possible money laundering to Sterling's Vice President and General Counsel, and to two supervisors in the BSA/AML program. ¶115. However, nothing changed.

FE 1 said Yihou Han, one of the employees fired in November 2019, told FE 1 that Han was terminated for using a broker to send prospective clients to the bank. ¶100. FE 1 also said that, according to a Sterling underwriter, Yihou Han was fired because the CPA letters she was using had come from the same source. ¶100. FE 2 relayed that Yihou Han had approached FE 2 to process a loan and presented an applicant's tax return that was clearly fraudulent, so FE 2 would not move forward with the loan. ¶107. Han was "furious" and walked away. ¶107.

FE 7 brought concerns about the ALP to Jon Kolk, the manager of underwriting, who worked in the Michigan headquarters where all underwriting was done. ¶¶108, 132. But Kolk told FE 7 that Sterling had done these loans for many

years and that FE 7 should "not question them, just underwrite."  ¶132.  FE 7 also complained to Jon Kolk about Steve Adams – Sterling's Senior Vice President of Residential Lending who was terminated at the end of the Class Period in connection with the ALP investigations – as someone whose conduct and statements during the underwriting process appeared to violate the Company's ethical Code of Conduct.  ¶¶133, 346.  According to FE 7, Adams was aggressive about approving loans and did not want to have them held up due to underwriting.  *Id.*

Moreover, FE 5 relayed that Sterling provided "no training" on risk or compliance and that Sterling employees with whom FE 5 dealt had no training or familiarity with SARs, CTRs, or other compliance procedures.  ¶123.

### E.     The Truth Began To Be Revealed As the 10(b) Defendants Continued To Mislead the Market

The truth began to trickle out through a series of partial corrective disclosures. On June 21, 2019, Sterling revealed that it had entered into the OCC Agreement, which required Sterling to enhance its deficient AML and BSA compliance.  ¶246. On that same date, the Company announced that Defendant Fox, who had served as a director for 22 years – and most recently as a member of the Audit and Risk Management Committee – had resigned, effective June 18, 2019.  ¶¶42, 249.  The Company attempted to temper this news, stating that it did not believe the OCC Agreement would have any material impact and that "Mr. Fox's retirement and resignation was not due to any disagreement on any matter relating to the Company's

13

operations, policies or practices." ¶¶247, 250.  Moreover, the 10(b) Defendants thereafter continued to tout, *inter alia*, Sterling's underwriting and compliance.

The OCC Agreement, which the Company eventually filed with the SEC on August 9, 2019, states that the OCC "has found unsafe or unsound practices relating to the Bank's credit administration and violations of law" regarding certain aspects of the Bank's BSA/AML compliance.  ¶¶13, 248.  The OCC Agreement also references an undisclosed March 31, 2018 Report of Examination that details BSA/AML violations by the Bank.  ¶248.

The OCC Agreement requires, among other things, that the Bank revise its policies and procedures to ensure effective controls over loan underwriting, including "effective controls and processes to collect and verify employment and income"; "verification of borrowers' income and cash flow information used in the Bank's underwriting process for non-owner occupied properties"; "effective controls and verification procedures for the acceptance of gift letters, including proper execution and endorsement by both the donor and recipient"; and "effective oversight of exceptions identified by the Bank's quality control function, including proper escalation and disposition of concerns raised by quality control to management or the BSA Officer."  ¶248.

Thereafter, on October 17, 2019, Sterling abruptly announced that its CEO, Defendant Judd – who had been with the Company since August 2008 – was retiring,

14

and that Defendant Lopp would be taking over as CEO. ¶268. Just three weeks later, on November 8, 2019, the Company disclosed that it had "terminated two of our top loan producers within [the ALP] who were collectively responsible for 15% of our residential loan production through September 30, 2019." ¶¶278, 283-86.

Then, on December 9, 2019, Sterling revealed it was "voluntarily and temporarily" suspending its ALP due to an internal review of its documentation procedures and that it "continues to audit documentation on past loans and puts in place additional systems and controls to ensure the Bank's policies and procedures are followed on loans originated under the program." ¶287. Yet, the 10(b) Defendants stated that this was just a "temporary" "setback" and that the Company's underwriting, risk management, and internal controls remained prudent and effective. ¶¶298-99.

In response to the ALP suspension, a *Seeking Alpha* contributor stated, "***Seems like the CEO quitting was not a coincidence after all***." ¶290. An analyst stated that the ALP's suspension "suggests potentially broader issues with internal controls, which could include faulty documentation, appraisal issues or other problems (management did not disclose any such details)." ¶291. *American Banker* reported that the "decision stunned industry observers, leaving them to wonder what led to the decision," and quoted one as saying he was "very surprised by the initial headlines" and concerned about the dearth of details in Sterling's announcement,

15

stating that it "looked like there was something really bad there." ¶293.  Ten days after announcing the ALP suspension, Sterling announced that Tom Minielly, who had replaced Fox on the Board of Directors ("Board"), was resigning.  ¶249.

On March 6, 2020, Sterling disclosed that it was permanently shuttering the ALP, explaining that the preliminary results of its internal investigation found misconduct in connection with the ALP's loan origination process, including income verification and requirements, reliance on third parties, and related documentation. ¶310.  As a result, Sterling announced that a significant number of employees had been terminated, including Steve Adams, the Senior Vice President with primary responsibility for oversight of the ALP in California – with more terminations and resignations to come.  ¶¶310, 311.  The Company also informed investors that it had received grand jury subpoenas from the DOJ relating to an investigation into the Bank's residential lending practices and announced that the Bank was now under formal investigation by the OCC.  ¶312.  A March 9, 2020 report by *Piper Sandler* stated that the Company's March 6 disclosure "raises questions about the adequacy of internal controls or the possibility of restated results."  ¶315.

On March 17, 2020, the last day of the Class Period, Sterling notified the SEC that it would delay the filing of its 2019 10-K to allow time to complete its internal review and additional procedures, including by the Company's independent auditors, relating to the ALP.  ¶316.

Upon these partial disclosures, Sterling's stock price fell sharply, including one day drops of 22.86%, 26.84%, and 35.24%, causing significant losses to Plaintiff and the Class, and it has not recovered.  ¶¶18, 21, 23, 289, 314, 317.

Sterling also made several post-Class Period disclosures.  On May 8, 2020, the Company announced that Lopp, who had been with the Company for 20 years and, having served as CEO for only five months, was also resigning, effective immediately.  ¶318.  Three weeks later, Sterling announced that it had terminated Defendant Montemayor from all of his positions, effective immediately. ¶320.

Thereafter, on June 1, 2020, while still unable to file its 2019 10-K, Sterling reported unaudited financial highlights for the first quarter of 2020 reflecting the establishment of repurchase reserves relating to the ALP.  ¶322.  It also announced that certain employees had engaged in misconduct in connection with the origination of loans, including with respect to the verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation.  ¶322. On an earnings call that day, the Company announced that "just short of 30" employees were let go in connection with the ALP.  ¶¶323, 371.

Just recently, on October 6, 2020, Sterling finally filed its 2019 10-K and stated that it had actually terminated over 100 officers and employees, including more than 35 loan officers, in connection with the violations regarding the ALP – roughly one-third of its workforce.  Moody Decl. Ex. C (2019 10-K) at 6, 38, 39, 64.

17

While the allegations in the Complaint are more than sufficient to plead the claims, this recently filed 2019 10-K contains additional statements by the Company that further support the claims, including the following (all emphasis in original):

- "***The Internal Review results indicate numerous instances of misconduct by employees in connection with the origination of residential mortgage loans in our Advantage Loan Program***…. Results from the Internal Review have indicated that certain employees engaged in misconduct in connection with the origination of a significant number of such loans, including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation." Moody Decl. Ex. C at 26.

- "***The Internal Review has revealed instances of the Bank's failure to comply with federal regulations governing the origination of residential mortgage loans, including rules governing the verification of a borrower's ability to repay a loan***." Moody Decl. Ex. C at 29.

- "In the fourth quarter of 2019, our board of directors became aware of significant compliance issues in connection with the origination of residential mortgage loans under the Advantage Loan Program, which ultimately led to the voluntary suspension, and then permanent discontinuation, of the Advantage Loan Program." Moody Decl. Ex. C at 64.

- The Company's disclosure controls and procedures were not effective as of December 31, 2019; there were material weaknesses in its internal control over financial reporting and failure to promptly remediate them; there is a reasonable possibility that a material misstatement of its annual or interim financial statements would not be prevented or detected; there were material weaknesses in the internal controls and risk assessment and identification related to the ALP, including a lack of independence between different functions and regarding identifying and assessing risks in the program that could create fraud risks. Moody Decl. Ex. C at 29, 34-35, 154-56.

- Sterling's commission programs and plans in 2019 and prior years did not properly account for potential risk and contributed to the misconduct. Moody Decl. Ex. C at 172.

- As a result of the misconduct, remedial actions taken by the Company

18

include Clawback Policies, "which provide[] for the recoupment of certain cash and equity incentive compensation from executive officers in the event of an accounting restatement and/or detrimental conduct" "due to material noncompliance with the securities laws;" and revising its compliance programs, internal controls, risk assessment, and code of conduct regarding the report of suspicious activity and developing manuals and training regarding loan origination. Moody Decl. Ex. C at 155-56, 171, 179-80.

- Sterling made offers to repurchase 100% of sold ALP loans, and as of December 31, 2019, the unpaid principal balance of residential mortgage loans sold that were subject to potential repurchase obligations for breach of representations and warranties totaled $759,568,000, meaning that at least over three quarters of one billion dollars in loans outstanding as of that date were potentially originated improperly and in violation of federal regulations. Moody Decl. Ex. C at 5, 29, 64, 86, 88, 145.

- Sterling's 2019 profits were a 54 percent decline from the year before and roughly half of the $57 million of what was initially reported in unaudited financial statements in January 2020. Moody Decl. Ex. C at 66, 80.

- Defendant Scott Seligman had "resigned from his positions as consulting director to the board of the Bank and as vice president of the Company effective December 31, 2019." Moody Decl. Ex. C at 54.

- DOJ and OCC investigations are ongoing, the Company remains subject to the 2019 OCC Agreement, and the Bank is also subject to certain restrictions on expansion activities. Moody Decl. Ex. C at 6.

## ARGUMENT

### I.  STANDARD OF REVIEW

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must consider the complaint in its entirety, "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531,

19

538 (6th Cir. 2012). To survive a motion to dismiss, the complaint must allege only "enough facts to state a claim to relief that is plausible on its face." *Frank v. Dana Corp. (Dana II)*, 646 F.3d 954, 958-59 (6th Cir. 2011). "[P]lausibility" is something "more than the 'sheer possibility' of relief but less than a 'probable' entitlement to relief." *JAC Holding Enters., Inc. v. Atrium Capital Partners, LLC*, 997 F. Supp. 2d 710, 725 (E.D. Mich. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The allegations must merely produce an inference of liability strong enough to "nudge" the plaintiff's claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680; *Bell Atl. Corp v. Twombly*, 550 U.S. 544, 570 (2007).

## II. PLAINTIFF PROPERLY ALLEGES CLAIMS UNDER SECTION 10(b) OF THE EXCHANGE ACT

To state a claim for securities fraud under § 10(b) of the Exchange Act, a plaintiff must allege: (1) "a material misrepresentation (or omission)"; (2) "scienter, i.e., a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance"; (5) "economic loss"; and (6) "loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005) (emphasis omitted). The 10(b) Defendants only challenge the first two elements: material falsity and scienter.

### A. Plaintiff Sufficiently Pleads Material Misrepresentations and Omissions

Under the PSLRA, investors must "specify each statement alleged to have

20

been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B).  Likewise, Rule 9(b) requires a plaintiff to: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Frank v. Dana Corp. (Dana I)*, 547 F.3d 564, 569-70 (6th Cir. 2008).  Here, the 10(b) Defendants largely ignore the Complaint's well-detailed, particularized allegations and instead raise boilerplate, broadside defenses in hopes of portraying the widespread fraudulent conduct that led to the collapse of the ALP as mere corporate mismanagement, and seek to recast years of false and misleading statements about Sterling's core loan program as harmless puffery. While the 10(b) Defendants may attempt to re-write history, they cannot re-write the well-pled allegations in the Complaint.

The Complaint details, in 175 paragraphs, the 10(b) Defendants' statements over a two-year period that were materially false and misleading.  ¶¶134-309.  These misrepresentations fall within the following categories:

- Underwriting standards and practices, Sterling's knowledge of customers, its credit and asset quality, and its risk management (¶¶136-39, 147, 150-51, 155-57, 174, 177-78, 182, 185, 192-93, 201, 204-05, 215-17, 220-21, 223-24, 228, 231, 235-36, 254-55, 258, 260, 265-66, 269, 272, 274, 280-81, 299);
- Internal controls (¶¶142, 159, 160, 179, 194, 206, 219, 237, 267, 282);
- BSA/AML duties and compliance (¶¶143, 144, 158, 218);
- Financial results and growth (¶¶140-41, 145-46, 148-49, 153, 154, 168-69, 171-72, 175-76, 180-81, 184, 190-91, 195-98, 202-03, 207-08, 210, 213-14, 222, 226-27, 230, 233-34, 256-57, 259, 263-64, 270-71, 273,

278-79, 295, 296);

- Pipeline and demand for loans (¶¶149, 152, 170, 173, 183, 186, 200, 231, 258, 260, 272, 274); the stated reasons for the decline in growth in Sterling's loans (¶¶187-89, 199, 209, 211-12, 225, 229, 232, 261, 275-76); and new products to replace the ALP (¶¶297, 299);
- The OCC Agreement, the 2018 OCC Report, and compliance issues (¶¶246-47, 250, 262, 277, 285, 287-88, 298-99).

Further, Plaintiff specifies why each statement is materially false and misleading and/or omits material information, where the misrepresentations were made, and the speakers for those statements as well as for group-published documents. ¶¶161-67, 238-45, 301-09 (referring to specific statements).

Despite these particularized allegations – identifying the who, what, when, where, and why each statement is false and misleading – Sterling maintains that the Complaint suffers from a "formulaic manner of pleading," baselessly asserting that it "does not pair any facts with any specific statement to show that it was false or misleading," and "simply compiled a long list of block quotes . . . up against a conclusory list of omissions." Dkt. #57, PageID.665-669. This is specious.

The Complaint sorts the alleged false statements chronologically and by document, identifies the speaker and explains why each statement is false or misleading, which more than adequately satisfies Rule 8(a), Rule 9(b) and the PSLRA. *See Stein v. U.S. Xpress Enters., Inc.*, No. 1:19-cv-98, 2020 WL 3584800, at \*6-7 (E.D. Tenn. June 30, 2020) ("To be unduly puzzled by these pleadings, ... would require an intentional disregard of context and structure").

22

Similarly, Sterling's grumblings about the length of quotations ignore that the Complaint uses excerpts of statements. The 10(b) falsely argue that a quotation "span[s] 28 pages," Dkt. #57, PageID.666 (citing ¶¶168-237), the cited paragraphs actually demonstrate Plaintiff's compliance with the PSLRA and Rule 9(b). In those paragraphs, Plaintiff isolates various and diverse false statements, attributed to different speakers, from a range of sources, and then explains why each isolated statement was false and misleading when made.[5]

Courts in this Circuit and elsewhere have found complaints with far less exacting pleading to be sufficient under Rule 9(b) and the PSLRA. *See, e.g. Laborers' Local #231 Pension Fund v. PharMerica Corp.*, No. 3:18-CV-109-RGJ, 2019 WL 4645583, at *10 n.3 (W.D. Ky. Sept. 24, 2019) (rejecting a similar argument to a complaint that "list[ed] the alleged omissions separately from the

---

[5] *See, e.g.,* ¶238 (detailing reasons for falsity of statements specifically identified in ¶¶174, 177-78, 182, 185, 192-93, 201, 204-05, 215-17, 220-21, 223-24, 228, 231, 235, and 236 regarding Company's underwriting standards and practices for its loans, its knowledge of its customers, its credit and asset quality, and its risk management); ¶239 (detailing reasons for falsity of statements specifically identified in ¶¶168-69, 171-72, 175-76, 180-81, 184, 190-91, 195-98, 202-03, 207-08, 210, 213-14, 222, 226-27, 230, 233, and 234 regarding Company's financial results and growth); ¶240 (detailing reasons for falsity of statements specifically identified in ¶¶179, 194, 206, 219, and 237 regarding the quality of Company's internal controls); ¶241 (detailing reasons for falsity of statements specifically identified in ¶218 regarding compliance with banking regulations and anti-money laundering duties); ¶242 (detailing reasons for falsity of statements specifically identified in ¶¶170, 173, 183, 186, and 200 regarding pipeline and demand for Sterling's loans); ¶243 (detailing reasons for falsity of statements specifically identified in ¶¶187-89, 199, 209, 211-12, 225, 229, and 232 regarding the reasons for the decline in growth for Sterling's loans).

23

[p]roxy statements those omissions allegedly make misleading" because the court could "adequately decipher ... which alleged omissions generally correspond to which proxy statements"); *City of Pontiac Gen. Emps.' Ret. Sys. v. Stryker Corp.*, No. 1:10-CV-520, 2011 WL 2650717, at *7 (W.D. Mich. July 6, 2011) (rejecting similar argument where the plaintiffs "use[d] a single set of reasons to explain why various statements were false"); *see also Stein*, 2020 WL 3584800, at *6 (rejecting "puzzle pleading" challenge and cautioning that "[d]ismissing the complaint over its formatting would be drastic and unwarranted").[6]

### 1.    Misrepresentations Concerning Underwriting

The ALP was the core of Sterling's business, representing the vast majority of its loans and revenue, and was subject to heightened risks and diligence requirements.  ¶¶84-87, 355.  Throughout the Class Period, the 10(b) Defendants

---

[6] Sterling's authority is inapposite.  Dkt. #57, PageID.665-668 (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 180 (5th Cir. 1997) ("no attempt [was] made to isolate statements and particularize their falsity"); *Havenick v. Network Exp., Inc.*, 981 F. Supp. 480, 526 (E.D. Mich. 1997) (plaintiffs failed to provide a reason why each statement was misleading); *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 379 (7th Cir. 2003) (court dismissed complaint which was merely "400 variations" on one kind of paragraph); *Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp, Inc.*, No. 10-CV-864 (SLT) (RER), 2013 WL 1345086, at *5 (E.D.N.Y. Mar. 29, 2013) (complaint included "block quotes often follow[ing] one after the other without [p]laintiffs' explaining how and why each individual section is misleading"); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16 Civ. 3495 (AT) (BCM), 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017) (allegations spanned multiple pages without indicating what was false or misleading), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018)).

made numerous false and misleading statements concerning the Company's lending practices and underwriting – information of crucial importance to investors.[7] For example, the Complaint identifies numerous other statements touting Sterling's "disciplined," "careful," and "conservative" underwriting and documentation that included "a thorough review of [borrowers'] ability to repay, liquidity analysis and face-to-face customer interaction," that Sterling relied on "disciplined documentation of ability to repay," "a financial documentation process," a focus on "homeowners with strong credit and ability to repay," and a commitment "to confirm [borrowers'] credit status and ability to repay" (¶¶136, 139, 155, 215). The 10(b) Defendants further stressed Sterling's "[d]eep customer knowledge" and that "[w]e work directly with our borrowers and third parties to confirm their credit status and ability to repay." ¶¶136, 139. The 10(b) Defendants also stated that, "[t]he Residential loan review examines compliance with Bank policy and loan documentation testing." ¶136.

Even after the OCC found significant failures, the 10(b) Defendants continued to misrepresent Sterling's underwriting. For example, in a late 2019 conference call,

---

[7] ¶¶136-39, 147, 150-51, 155-57, 174, 177-78, 182, 185, 192-93, 201, 204-05, 215-17, 220-21, 223-24, 228, 231, 235-36, 254-55, 258, 260, 265-66, 269, 272, 274, 280-81, 299 (false and misleading statements); *see also* ¶¶161, 166-67, 238, 244-45, 301, 308-09 (why each of the statements was false and misleading). Sterling's assertion that the Complaint does not allege that it misstated facts (Dkt. #57, PageID.670), is absurd.

25

Judd emphasized: "we maintained our underwriting and pricing discipline" (¶275), and even after the ALP was suspended, Lopp continued to tout "prudent underwriting offsets, which is consistent with our lending history…" (¶299).

These statements were false and misleading because there was almost no underwriting, documentation, or due diligence for ALP loans, despite being subject to ability-to-repay and BSA/AML regulations, and which risks which were heightened due to the nature of the product. Moreover, the ALP loans were riddled with red flags of money laundering, yet no further diligence was performed.

Specifically, as detailed by the consistent accounts of numerous Fes,[8] Sterling originated loans to borrowers without verifying their ability to repay, and it obtained minimal – and questionable – documentation before approving those loans. With the ALP, the 10(b) Defendants traded speed and profit for any semblance of compliance with stated underwriting procedures. The ALP loans, all of which Montemayor "signed off on" (¶98), were approved with little to no documentation of income or ability to repay, and were based on facially suspect documents, contrary to the 10(b) Defendants' statements to investors. For example, letters from purported employers or CPA firms bore unmistakable signs of unreliability,

---

[8] As detailed below, the FE allegations are reliable, as the Complaint describes each individual's job and the basis for their first-hand knowledge, and their accounts are coherent, plausible, and corroborated by other witnesses and Sterling's own disclosures and the OCC's findings. *See* Section II.B, *infra*.

26

including originating from the same IP address, leading some underwriters to question whether the CPA firms even existed. ¶¶97, 100, 130.  Moreover, Sterling relied on informal, in-house translations of foreign language documents or, worse, allowed borrowers to self-translate letters – negating the very reason to have a corroborating document from a third party.  ¶¶96, 113, 118, 128, 130.  Similarly, to verify income, ALP customers were only required to open an account at a Sterling branch with cash, and then make structured deposits into the account over time (and such structured payments themselves were a red flag).  According to FEs 2, 3 and 7, the Bank made little or no attempt to authenticate the account holder's identity or the source of those funds.  ¶¶104, 111-12, 130.  FEs 3, 5, and 7 also detailed the rampant use (nearly 90%) of unconfirmed "gifts" without any verification of the source of such gifts, even when the borrower provided inconsistent information about such gifts.   ¶¶114, 122, 124, 130.  These practices were undisclosed and in direct contradiction to the 10(b) Defendants' statements, notwithstanding Sterling's false assertion otherwise.  Dkt. #57, PageID.644.

The falsity of these statements is further demonstrated by the fact that, at least as of March 2018, when the OCC issued its Report, it had uncovered BSA/AML violations with the ALP.  Then, later in the Class Period, Sterling and the OCC entered into the OCC Agreement, which detailed unsafe or unsound practices regarding the Company's credit administration and violations of law relating to

27

aspects of its BSA/AML compliance program, and cited the need to implement "effective controls and processes to collect and verify employment and income"; "verification of borrowers' income and cash flow information used in the Bank's underwriting process for nonowner occupied properties"; and "effective controls and verification procedures for the acceptance of gift letters, including proper execution and endorsement by both the donor and recipient." ¶248.

Additional late- and post-Class-Period disclosures and admissions concerning the rampant problems with the ALP further support the falsity of the 10(b) Defendants' statements. These include the resignation and terminations of senior management, loan producers, and numerous employees for misconduct relating to the origination and underwriting of ALP loans in connection with the "origination of loans, including with respect to verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation," the suspension and then permanent shuttering of the ALP, and the fact that the Company remains the target of criminal and regulatory investigations. ¶¶249, 268, 283, 287 310-12, 318, 320, 322-23.

While these allegations are more than sufficient to demonstrate falsity, post-Complaint statements by Sterling continue to demonstrate the falsity of the Class Period statements. In October 2020, the Company revealed that it had fired or accepted the resignations of over 100 officers and employees and acknowledged that

it had "fail[ed] to comply with federal regulations governing the origination of residential mortgage loans," including "numerous instances of noncompliance with the income verification requirements under the ability to repay rules of the CFPB." Moody Decl. Ex. C (2019 10-K) at 29.

Courts routinely find statements like those here actionable, particularly where the statements concern the heart of the company's business. *See, e.g., In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*, 694 F. Supp. 2d 1192, 1211 (W.D. Wash. 2009) (statements that company was "disciplined and vigilant in its underwriting standards" and had "excellent processes, policies, underwritings, standards" actionable); *In re Countrywide Fin. Corp. Deriv. Litig.*, 554 F. Supp. 2d 1044, 1071-73 (C.D. Cal. 2008) (statements that management of credit risk and "stringent underwriting standards" actionable); *In re New Century*, 588 F. Supp. 2d 1206, 1225 (C.D. Cal. 2008) (statements about "higher credit quality" loans and "strict underwriting and risk management disciplines," actionable).

In *Atlas v. Accredited Home Lenders Holding Company*, the court held that defendants' statements that Accredited was "focused more on credit quality than merely increasing the volume of loans it originated" and that "Accredited's underwriting procedures were better and more conservative than those of other sub-prime mortgage lenders" were actionable false statements, based on confidential witnesses ("CWs") who described how defendants "caused Accredited's employees

29

to disregard the company's stated underwriting guidelines." 556 F. Supp. 2d 1142, 1149-50, 1154 (S.D. Cal. 2008). Significantly, the court found such statements material because a mortgage lender's "underwriting practices would be among the most important information looked to by investors." *Id*. at 1155. Where, as here, the nature of the ALP (with its focus on foreign borrowers and lower documentation) already required heightened scrutiny, statements about underwriting take on even more importance to investors.

### 2. Misrepresentations Concerning Risk Management and Internal Controls

The 10(b) Defendants repeatedly touted Sterling's risk management and internal controls as a key driver of the ALP's success and the Company's performance. They emphasized Sterling's "effective risk management," that "[o]ur board of directors and management team have created a risk-conscious culture that is focused on quality growth, which includes infrastructure capable of addressing the evolving risks we face, as well as the changing regulatory and compliance landscape," that "[o]ur risk management approach employs comprehensive policies and processes to establish robust governance [that] emphasizes … accountability for risk with our employees" with "established processes and procedures intended to identify, measure, monitor, report and analyze the types of risk to which we are subject, including credit, liquidity, operational, [and] regulatory compliance" and stressed that "[o]ur risk management includes disciplined documentation of ability

30

to repay" and "a financial documentation process."  ¶¶136, 155, 215, 224.   They stated that "[o]ur internal policies and procedures are a critical component of our corporate governance and, in some cases, compliance with applicable regulations.  We adopt internal policies and procedures to guide management and employees regarding the operation and conduct of our business."  ¶¶142, 159, 218.

These statements were false and misleading because effective risk management and internal controls were not in place to prevent improper lending, underwriting, banking practices (including money-laundering), and inflation of the Company's financial results.  Far from a "risk-conscious culture" with "robust governance" and "accountability for employees," employees received "no training" on risk or compliance issues, and many underwriters had no familiarity with key risk procedures, including SARs and CTRs.  ¶123.  Further, the so-called "established" and "disciplined" "financial document processes" were non-existent. Rather, as consistently confirmed by FEs 1, 2, 3, 5, 6, and 7, Sterling repeatedly issued loans to borrowers with no confirmation of employment; no verification of the ability to repay; and no verification of facially-suspect documentation and gift payments. ¶¶95, 103, 104, 111-14, 122, 128, 130.  Further, Sterling's entire ALP was riddled with money laundering red flags.  *See* ¶¶78-83; Section II.A.3, *infra*.

Moreover, the detailed FE allegations demonstrating falsity are corroborated by the 2018 OCC Report and the OCC Agreement, which found unsafe or unsound

31

practices and a lack of "effective controls and processes to collect and verify employment and income" and "verification of borrowers' income."  ¶167(b); *see also* Moody Decl. Ex. C (2019  10-K) at 155 (Sterling's statements that "deficiencies" and "material weakness[es]" in its internal controls and the ALP that made the program ripe for "fraud risks.").

Courts have held that similar misstatements about risk management and internal controls are actionable when a complaint pleads contrary information undermining the accuracy of those statements.  *See, e.g.*, *In re Goldman Sachs Grp., Inc. Sec. Litig.*, No. 10 Civ. 3461(PAC), 2014 WL 2815571, at *1, *5 (S.D.N.Y. June 23, 2014) (statements that "we have extensive procedures and controls that are designed to … address conflicts of interest" actionable where "directly at odds with its alleged conduct"); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 317 (S.D.N.Y. 2013) (misstatements describing risk controls as "robust," "effective," "adequate," and "comprehensive" and "designed to monitor, evaluate, and manage the risks" actionable because complaint "pleads contrary information … that undermines the accuracy of those disclosures"); *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 285 (S.D.N.Y. 2011) (allegations of company's "frequent, significant departures" from stated policies "permit the inference that its senior officers' statements to the effect that Lehman had 'strong' and 'conservative' risk management were false"); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d

171, 176, 189-90 (S.D.N.Y. 2010) (statements regarding "discipline and conservatism in its risk management and monitoring of its loan portfolio" actionable "misrepresentations of existing facts" where "statements touting risk management were … juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent credit risk procedures").

Plaintiff also alleges that Judd and Lopp's certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attesting to the accuracy and completeness of Sterling's SEC filings and the adequacy of its internal controls (¶¶135, 159, 160, 179, 194, 206, 219, 237, 267, 282), were materially false and misleading because Sterling's internal controls were practically non-existent, and its financial reporting was misleading, as discussed below.[9]  Sterling's SEC filings were riddled with false and misleading statements, as demonstrated by, *inter alia,* the FE accounts, the OCC's findings of material problems and deficiencies, and the Company's admission of widespread internal control failures.  As such, the false SOX certifications are actionable.  *E.g., In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720-21 (S.D.N.Y. 2019) ("Misstatements made in its certifications concerning the design and efficacy of internal controls are actionable"); *In re ForceField Energy*

---

[9]  The 10(b) Defendants' argument that Plaintiff does not challenge any financial controls is wrong, as the Complaint alleges far-ranging internal control issues regarding Sterling's SEC disclosures, including material misrepresentations of its purported financial performance, all tied to the unbridled ALP.  *See* Section II.A.4, *infra*.

33

*Inc. Sec. Litig.*, No. 15 Civ. 3020 (NRB), 2017 WL 1319802, at *13 (S.D.N.Y. Mar. 29, 2017) (sustaining claims that SOX certification was misleading).[10]

### 3.     Misrepresentations Concerning Regulatory Compliance

The 10(b) Defendants materially misrepresented Sterling's BSA/AML compliance.[11]  For example, they stated that Sterling "must comply with anti-money laundering and anti-terrorism laws and regulations" and provided details about what actions were necessary to achieve compliance, including "enhanced recordkeeping and customer identification requirements" and the need to maintain an "effective anti-money laundering program and to file timely reports such as suspicious activity reports and currency transaction reports." ¶¶143, 158, 218.  But these statements were false and misleading because Sterling was not in compliance with BSA/AML laws and regulations.  Indeed, its noncompliance is manifestly evident from the allegations in the Complaint.  Despite the admitted heightened risks for money laundering presented by the ALP, the 10(b) Defendants turned a blind eye to numerous red flags and executed the ALP with no guardrails, few controls or income

---

[10] *See also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380-81 (S.D.N.Y. 2015) (allegations that "the Company's management was professing its opinion that the company's internal controls were effective [and] that same management was well aware of the extensive corruption in the Company's procurement activities ... are sufficient to infer that the Company disbelieved the alleged statements at the time they were made").

[11] *See* ¶¶143, 144, 158, and 218 (false and misleading statements); *see also* ¶¶164, 241 (why each statement was false or misleading).

34

and employment verification, and no training on BSA/AML compliance procedures. *See, e.g.*, ¶¶123, 131.  In fact, while the Company purported to maintain a system that included timely filing of SARs and CTRs, in reality, many underwriters had no familiarity with those key risk procedures.  ¶123.  The problems were so rampant that FEs 2, 3, 5, and 7 suspected that the ALP was being exploited for money laundering.  ¶¶105, 111, 122, 124-25, 131.  The ALP was riddled with money laundering red flags, including:

- Customers splitting large cash deposits into "structured" amounts – numerous deposits over short periods of time (¶¶80, 104, 111, 122, 130);
- Acceptance of unverified cash deposits (¶¶104, 111-12, 122, 130);
- Suspect funds, meaning deposits to buy property for which the source of those funds could not be easily identified, including the failure to verify supposedly gifted money even where the borrower gave inconsistent accounts of the donor's identity (¶¶114, 122, 124, 130);
- Wire transfers originating from overseas (¶¶104, 112, 119, 122, 128, 130);
- Questionable involvement of third parties (¶¶100, 120); and
- Over-reliance on foreign documents, allowing customers to translate their own Chinese-language documents, and reliance on customer identification documents evidencing signs of manipulation and inauthenticity (¶¶96-97, 100, 107, 118, 122).

Sterling's non-compliance is also apparent from the OCC Agreement, which found unsafe or unsound practices relating to credit administration and violations of the law regarding aspects of its BSA/AML compliance program.  ¶248.  The OCC Agreement required Sterling to revise its policies and procedures to ensure effective controls over loan underwriting, quality control, and BSA/AML oversight.  ¶248;

35

*see also* Moody Decl. Ex. C (2019 10-K) at 155 (Sterling's statements that "deficiencies" and "material weakness[es]" in its internal controls and the ALP that made the program ripe for "fraud risks.").

Such allegations more than suffice to state a § 10(b) claim. *See In re BofI Holding, Inc. Sec. Litig. (BofI I)*, No. 3:15-CV-02324-GPC-KSC, 2016 WL 5390533, at *11 (S.D. Cal. Sept. 27, 2016) (statements about "significant investments in our overall compliance infrastructure … including BSA and AML compliance" actionable, where falsity was sufficiently pled based on statements that defendant interfered with audit "in contravention of OCC guidance," that internal controls were "nonexistent," and that the risk department was understaffed); *Burges v. BancorpSouth, Inc.*, No. 3-14-1564, 2015 WL 4198795, at *4-5 (M.D. Tenn. July 10, 2015) (statements of compliance with applicable laws were false where complaint plausibly alleged that defendants were not in compliance with those laws).

### 4.    Misrepresentations Concerning Financial Results

The Complaint adequately alleges that the 10(b) Defendants materially misrepresented Sterling's financial condition.[12]  These statements were false and misleading because the financial results were inflated by the ALP's illegal and

---

[12]  *See* ¶¶140-41, 145-46, 148-49, 153-54, 168-69, 171-72, 175-76, 180-81, 184, 190-91, 195-98, 202-03, 207-08, 210, 213-14, 222, 226-27, 230, 23-34, 256-57, 259, 263-64, 270-71, 273, 278-79, 295, 296 (false and misleading statements); *see also* ¶¶162, 239, 302 (why they were false and misleading).

36

improper activities. The ALP was the driver of Sterling's financial results and performance. Defendant Montemayor falsely described the "formula that has driven our success" as "a highly responsive and efficient underwriting process for residential mortgages which often enables us to close loans in half the time it takes our competition." ¶200, and the 10(b) Defendants stressed that "disciplined underwriting … ha[s] driven consistent earnings and exemplary net interest margins, efficiency metrics and shareholder returns." ¶¶6, 136, 155, 215. In truth, the relative speed with which Sterling could close ALP loans was not due to "responsive and efficient underwriting" but rather, because Sterling dispensed with any pretense of verifying borrowers' employment, income, or gifted down payment funds. ¶¶104, 117, 122.

It is well settled that when a company "puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information." *Freudenberg*, 712 F. Supp. 2d at 180. Here, the 10(b) Defendants misrepresented what fueled the success of the ALP, which, in truth, was the essentially non-existent underwriting and internal controls and noncompliance with BSA/AML laws, which inflated its financial results. Once the OCC focused its scrutiny on the ALP, the impact was dramatic and ultimately resulted in: the ALP's complete collapse; abrupt and

37

widespread firings; civil, criminal, and internal investigations; and a significant delay in the filing of the Company's audited financial statement for 2019.  ¶¶249, 268, 283, 287, 310-12, 316.  Once Sterling's 2019 audited financials were released, the results were striking:  Sterling's stated that its 2019 profits saw a 54% decline over 2018, and that its actual reported profits announced in October 2020 were roughly half of what was reported to investors in January 2020.  Moody Decl. Ex. C (2019 10-K) at 66, 80.

The 10(b) Defendants also materially misstated Sterling's financial condition by failing to reserve for repurchases of non-compliant loans sold on the secondary market.[13]  Yet, throughout the Class Period, Sterling failed to record any reserves for loan repurchases.  ¶¶140, 153, 175, 190, 202, 213, 233, 263, 278.  Moreover, the Company described its repurchase risk as "low" based on its purported "careful loan underwriting and documentation standards."  ¶¶136, 155, 215.

These statements were false and misleading because they did not accurately reflect Sterling's true potential exposure for non-compliant loans.  It was not until the end of the Class Period that Sterling first announced *any* repurchase reserve.  ¶322.  The Company also recently stated that it has "commenced making offers . . . to repurchase 100% of our sold Advantage Loan Program loans."  Moody Decl.

---

[13]  ¶¶140, 145, 153, 168, 175, 180, 190, 195, 202, 207, 213, 226, 233, 256, 263, 270, 278, 295.

Ex. C (2019 10-K) at 5, 29, 64.

By failing to accurately reflect the impact of its unsound and noncompliant lending on its repurchase liability, the Company also overstated its net income and gain on sale income for the sale of mortgages, which should have been offset by the repurchase liability, and thus violated federal securities laws. *See New Century*, 588 F. Supp. 2d at 213-14 (sustaining claim that mortgage lender's financial results were misstated by improperly reserving for loan repurchases).[14]

### 5.    Misrepresentations Concerning Pipeline and Demand

The 10(b) Defendants also repeatedly and regularly touted the rising demand for and pipeline of ALP loans.[15]   These statements were false and misleading because the pipeline for ALP loans was driven by the Company's reckless lending practices and essentially non-existent underwriting. *See, e.g.*, ¶¶104, 117, 122. *See In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017) (statements

---

[14]   Courts repeatedly hold that the concealment of problematic loans through the establishment of inadequate reserves is actionable under the federal securities laws. *E.g., Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 276-77 (3d Cir. 1992); *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 926 (9th Cir. 1993); *In re Converium Holding AG Sec. Litig.*, No. 04 Civ. 7897 (DLC), 2006 WL 3804619, at *3 (S.D.N.Y. Dec. 28, 2006), *reconsideration in part*, 2007 WL 1041480 (S.D.N.Y. Apr. 9, 2007); *In re Signet Jewelers Ltd. Sec. Litig.*, No. 16 Civ. 6728 (CM), 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018); *In re PMA Capital Corp. Sec. Litig.*, No. 03-6121, 2005 WL 1806503, at *10 (E.D. Pa. July 27, 2005).

[15]   *See* ¶¶149, 152, 170, 173, 183, 186, 200, 231, 258, 260, 272, 274 (false and misleading statements); *see also* ¶¶165, 242, 304 (why each statement was false and misleading).

about sales pipeline actionable); *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 71, 73 (E.D.N.Y. 1999) (company's statements portraying itself "as a company whose order pipeline was strong" actionable).

Further, once Sterling started to experience a slowdown in loan production triggered by heightened regulatory oversight, the 10(b) Defendants gave pretextual explanations for the decline in growth.[16] For example, Judd attributed the decline in growth to "increasing price competition on the loan side" (¶187, *see also* ¶161) and macroeconomic/trade issues with China (¶¶209, 211, 229, 232, 275); *see also* ¶188 (Lopp attributed decline in growth to "increasingly aggressive pricing among some competitors"); ¶¶189, 199 (Montemayor attributed decline in growth to pricing of "competitors" and macroeconomic factors). Even when analysts questioned the Company's excuse for declining demand, Montemayor doubled down on his misleading talking points. ¶276.[17] In truth, the blame for declining growth and lower loan production lay with the increased regulatory oversight and remedial actions required by the OCC to address Sterling's violations. *See In re Braskem S.A. Sec.*

---

[16]   *See* ¶¶187-89, 199, 209, 211-12, 225, 229, 232, 261, 275, 276 (false and misleading statements); *see also* ¶¶243, 305 (why each statement was false and misleading).

[17]   The 10(b) Defendants' excuses were particularly dubious because such macroeconomic factors would have similarly affected competitors, and ALP loans were not price-sensitive, as they were typically priced higher than competitors' loans – ALP borrowers were willing to pay a premium to avoid time-consuming scrutiny and verification of their personal and financial information. ¶¶104, 117, 122.

*Litig.*, 246 F. Supp. 3d 731, 758 (S.D.N.Y. 2017) (statements about factors contributing to price of raw materials triggered duty to disclose that the price had been set as a result of substantial bribes paid by defendant, leaving the "market with the misleading impression that the cost of this vital input was the product of unremarkable market forces, when in fact it, largely, resulted from corporate corruption"); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 472-73 (S.D. Tex. 2016) ("downplaying the extent and duration of the … problems" gave false impression of "a viable operation that had minor and temporary setbacks, overcame them, and was now ready for the long haul"), *amended on denial of reconsideration*, No. CV H-15-012, 2016 WL 3959164 (S.D. Tex. July 22, 2016).

Moreover, even after the ALP was suspended, the 10(b) Defendants continued to mislead investors by touting the development of new loan programs to replace the ALP.  ¶¶297, 299, 307.  For example, Lopp assured investors that a portion of the reduced volume would be offset by new products that would be consistent with Sterling's "prudent underwriting" and "excellent credit quality."  ¶¶299.

These statements were false and misleading because Sterling's problems with underwriting and compliance were acute, systemic, and existential.  Sterling had no history of "prudent underwriting" to return to in order to build new initiatives.  Accordingly, Sterling would have to focus on fixing the severe issues rather than developing new products.  Indeed, just months after these statements, Sterling

41

cautioned investors "not to expect" net loan growth as "job one is to straighten out the regulatory challenges and restore the Bank's regulatory standing."  ¶323 ("it's frankly not the time to develop new programs.  It's the time to fix what we have."). *See Curran v. Freshpet, Inc.*, No. 16-2263, 2018 WL 394878, at *4-5 (D.N.J. Jan. 12, 2018) (representations that company was continuing to grow and meet manufacturing expectations when, in reality, company "was facing substantial obstacles," including manufacturing problems that were impeding new products reaching the market, actionable); *Hall v. Rent-A-Ctr., Inc.*, No. 4:16CV978, 2017 WL 6398742, at *11, *23 (E.D. Tex. Oct. 19, 2017) (sustaining allegations based on statement about "upgrades" and a "new system" where "Defendants knew of the problems with the [point-of-sale] development and implementation"), *report and recommendation adopted*, 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017).

### 6. Misrepresentations and Omissions Concerning the 2018 OCC Report, OCC Agreement and OCC Investigation

Contrary to Sterling's argument (Dkt. #57, PageID.689-694), the Complaint adequately alleges both material misstatements and omissions regarding the OCC investigation, 2018 OCC Report, and OCC Agreement.

### a) Misrepresentations Regarding the OCC Agreement and Its Impact

On June 21, 2019, Sterling first disclosed the existence of the OCC Agreement.  ¶¶9, 246.   But it was not until August 9, 2019 that Sterling disclosed

the OCC Agreement itself, which revealed the existence of the undisclosed 2018 OCC Report and BSA/AML violations by the Company. ¶13. A series of misleading statements followed that minimized the impact of the OCC Agreement and the underlying findings. For example:

- The June 21, 2019 Form 8-K stated: "The Company does not believe that the Agreement will have any material impact on its performance metrics, the payment of dividends, or the current share repurchase program." ¶247.
- On the Third Quarter 2019 Earnings Call, an analyst offered a mild characterization of Sterling's regulatory issues as part of a question: "You have a little bit of regulatory issues here that you're working through" – which went uncorrected by the 10(b) Defendants; indeed, Defendant Lopp responded, "I think that's fair." ¶277.
- On the Fourth Quarter and Year-End 2019 Earnings Call, Defendant Montemayor signaled that compliance problems with the ALP would be temporary, stating, in regard to heightened expenses for professional fees, "I would say that Q4 was definitely very high. Q1, I think, would be comparable. But then I think you could see that start to drop meaningfully." ¶298. On the same call, Defendant Lopp also downplayed the problems with the ALP as a "setback" and touted Sterling's "prudent underwriting" and "excellent credit quality." ¶299.

In truth, the OCC's findings concerned material issues (the same widespread compliance issues identified by the FEs) that would ultimately lead to the termination of the entire ALP, massive officer and employee terminations and resignations, a multi-month delay in filing the Company's 2019 10-K, and formal ongoing DOJ and OCC investigations. *See, e.g.,* ¶¶14, 17, 19, 22, 24-27.[18]

---

[18] *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583-84 (S.D.N.Y. 2016) (disclosures, including that the company was "subject to scrutiny

**b)      Misrepresentations and Omissions Concerning the 2018 OCC Report**

The 10(b) Defendants argue that Sterling was under no duty to disclose the 2018 OCC Report; the existence of an OCC investigation; or any other facts underlying the OCC investigation.  Their arguments are flawed.

The 10(b) Defendants had a duty to disclose the 2018 OCC Report (and/or its underlying findings and accompanying risks) under Items 303, 103, and 105 of Regulation S-K.  ¶¶392-98.  Item 303(a)(3) requires a registrant to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii).  Plaintiff pleads both prerequisites: the 10(b) Defendants knew no later than March 31, 2018 of the OCC's findings and the serious risks and uncertainties stemming from such findings, which were "reasonably likely to have a material effect" on Sterling's business. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011).  Item 105

---

by regulatory agencies" which "has resulted or may in the future result in regulatory agency investigations, litigation, and subpoenas" did not insulate defendants because they "misled investors by suggesting that the company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation"); s*ee also No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 935 (9th Cir. 2003) ("a reasonable investor would consider the potential effects of [these investigations] on the overall economic health of the company as significantly altering the total mix of information made available").

(previously located at 503(c)) requires an issuer to disclose the "material factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105(a).  Yet the 10(b) Defendants failed to disclose the Report's findings and/or the accompanying risks that the Report identified as present and ongoing.  *See City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 427 (S.D.N.Y. 2011) (sustaining allegations based on failure to disclose known risks required by Item 503).[19]

Sterling nevertheless maintains that it was barred from disclosing the 2018 OCC Report under 18 U.S.C. § 641 and 12 C.F.R. § 4.37(b).  Those statutes, however, merely require that the disclosing party first seek approval from the OCC before disclosure.  *See* 12 C.F.R. § 4.37(b) ("*Without OCC approval*, no person, national bank, Federal savings association, or other entity, including one in lawful possession of non-public OCC information under paragraph (b)(2) of this section, may disclose information covered by this subpart in any manner, except….").

Moreover, even if the 10(b) Defendants could not disclose the 2018 OCC Report itself, there was nothing preventing them from alerting investors about the

---

[19]  Similarly, Item 103 requires the disclosure of legal "proceedings known to be contemplated by government authorities."  ¶396.  Sterling argues that the 2018 OCC Report is "non-public OCC information" that amounted to "preliminary" regulatory communications, not litigation that was "substantially certain to occur."  Dkt. #57, PageID.691-693. But Item 103 does not require filed proceedings; "contemplated" actions are sufficient.  17 C.F.R. § 229.103.

existence of the 2018 OCC Report and the fact that Sterling had violated BSA/AML laws, or from disclosing information related to or derived from that Report and the anticipated effect it would have on matters important to shareholders. "OCC's regulations limiting disclosure of bank examination reports … apply only to reports of examination or supervisory activity (or portions thereof) … not to other information related to the examination process or to materials prepared by a third party." *First E. Corp. v. Mainwaring*, 21 F.3d 465, 467 (D.C. Cir. 1994).[20]

Ultimately, Sterling's argument comes down to the standard defense that Sterling had no obligation to "charge[] itself with wrongdoing." Dkt. #57, PageID.693. This argument is a red herring. Plaintiff does not allege that they had such an obligation.[21] The 10(b) Defendants ignore that they did not remain silent.

---

[20] Sterling's citation to *In re Nextcard, Inc. Sec. Litig.*, No. C-01-21029-JF (RS), 2005 WL 6342406, at *11 (N.D. Cal. Feb. 7, 2005), to support its argument that Sterling was "prohibited" from disclosing the 2018 OCC Report, is misplaced. The prohibition discussed there dealt only with the "contents" of the Report, not its existence or information related to or derived from it. Moreover, that opinion cited no authority to support its decision, stated it was relying on "the record before the court" which was incomplete because "[p]laintiffs have failed to address this fact in their pleading," and designated the opinion as "Not for Citation" under the local rule, meaning that the judge did not want it cited as precedent. *See* N.D. Cal. L.R. 3-4(e).

[21] Moreover, Sterling's cases are distinguishable. For example, in *In re Sofamor Danek Grp., Inc.*, the defendants actually disclosed the FDA warning letter, and no regulatory action was ever initiated by the FDA. 123 F.3d 394, 402 (6th Cir. 1997). Similarly, in *Lubbers v. Flagstar Bancorp Inc.*, the defendants had previously disclosed an "[o]ngoing investigation." 162 F. Supp. 3d 571, 578-80 (E.D. Mich. 2016). Here, the 10(b) Defendants concealed the OCC investigation and report until mid-2019, when they entered into the OCC Agreement. In *TransDigm Grp., Inc.*

It is axiomatic that "a company may choose silence or speech ... but it may not choose half-truths." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001), *overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd. (Tellabs I)*, 551 U.S. 308, 324 (2007), as recognized in *Dana I*, 547 F.3d at 571 (observing that *Tellabs* rejected the "most plausible of competing inferences" standard applied in *Helwig*, 251 F.3d at 553, in favor of a more lenient standard holding that "where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs I* instructs that the complaint should be permitted to move forward" (citing *Tellabs I*, 551 U.S. at 324 & n.5)).[22]  Here, the 10(b) Defendants repeatedly chose half-truths

*Sec. Litig.*, the court noted that alleged price gouging was already "public knowledge" and defendants had further "expressly warned investors" of the risk of a federal audit into drug pricing.  440 F. Supp. 3d 740, 769 (N.D. Ohio 2020).  Here, Sterling's lack of compliance was hidden from the public.  In *In re Citigroup Inc. Sec. Litig.*, the court noted that defendants were not required to "predict[] … litigation," 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Tr. v. Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006), whereas here, the risks of the OCC investigation were present, ongoing and undisclosed.

[22]  *See MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, No. 6:19-cv-619-Orl-40LRH, 2019 WL 5394011, at *15 (M.D. Fla. Oct. 16, 2019) ("[A]lthough securities laws do not impose a general duty to disclose corporate mismanagement or uncharged criminal conduct[,] a duty to disclose uncharged criminal conduct does arise if it is necessary to ensure that a corporation's statements are not misleading." (citing *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 403 (S.D.N.Y. 2016))), *report and recommendation adopted*, No. 6:19-cv-619-Orl-40LRH, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020); *Washtenaw Cty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15-cv-3187, 2016 WL 5720375, at *6 (N.D. Ill. Sept. 30, 2016) (finding that duty to disclose arose where defendant's statement that "we always experience some

and outright misrepresentations when they discussed Sterling's underwriting, risk controls and BSA/AML compliance.[23]

Sterling's own caselaw is illustrative. Dkt. #57, PageID.692-693.  In *In re Lions Gate Entertainment Corp. Securities Litigation*:

> The plaintiffs' cases [finding a duty to disclose] stand for the proposition that when a company speaks on a subject, it cannot omit material facts about that subject, and cannot make a material misrepresentation about the existence of an investigation. But in this case, the plaintiffs *point to no statements during the Class Period* about the Transactions *that were the subject of the SEC investigation or about the SEC investigation itself*.

165 F. Supp. 3d 1, 13 (S.D.N.Y. 2016).  Therefore, according to *Lions Gate*, when the 10(b) Defendants made statements on a topic that was the subject matter of the OCC investigation and 2018 OCC Report, this triggered a duty to disclose the investigation and underlying violations uncovered, because that information would sufficiently alter the "total mix of information" available to investors.  *Id.*[24]

---

level of reimbursement pressure portrayed the reimbursement pressures … as routine" and "plaintiff ha[d] plausibly alleged that those reimbursement pressures…were anything but routine").

[23] Sterling's argument that the existence of the 2018 OCC Report and findings of unsafe and unsound lending practices and BSA/AML compliance failures are "unrelated" to "statements regarding its underwriting, controls, financial results, and the pipeline for its loans" (Dkt. #57, PageID.690), is absurd.  Sterling's lending practices are at the core of both the challenged statements and the OCC's findings.

[24] Sterling's reliance on *In re United Am. Healthcare Corp. Sec. Litig.*, No. 2:05-CV-72112 (LPZ/RSW), 2007 WL 313491 (E.D. Mich. Jan. 30, 2007), is misplaced. Unlike the 10(b) Defendants' statements here that minimized the BSA/AML issues identified in the OCC Agreement without disclosing the 2018 OCC Report, the defendant there never made statements that were directly undermined by the

48

### 7. The 10(b) Defendants' Additional Arguments Fail

#### a) None of the Challenged Statements Is Puffery

Faced with a host of repeated misrepresentations about the Company's core loan program, the 10(b) Defendants attempt to escape liability by raising a factual challenge that certain of the underlying statements were "puffery" and ignoring the context of those statements. This argument is an attack on materiality, raising fact-based contentions as to which courts typically proceed cautiously on a motion to dismiss because "context matters when analyzing materiality." *Omnicare*, 769 F.3d at 472, 478 (cautioning that courts "must tread lightly at the motion-to-dismiss stage, engaging carefully with the facts of a given case and considering them in their full context"); *Grae v. Corr. Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017) ("[E]ven superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism.").[25] "What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation

---

undisclosed information, but instead argued an alleged breach of contract based on "pure speculation." *Id*. at *13.

[25] *See also In re Cardinal Health Sec. Litig.*, 426 F. Supp. 2d 688, 749 n.70 (S.D. Ohio 2006) ("Following the devastating corporate scandals occurring in the past decade, most courts now consider statements of corporate optimism with more hesitation" and should "proceed cautiously when examining [d]efendants' assertions that their enthusiastic statements ... were 'puffery' as opposed to reckless or fraudulent misstatements.").

of material fact when used to emphasize and induce reliance upon such a representation." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672-73 (6th Cir. 2005).

Sterling's argument that their statements here regarding underwriting, risk management, credit quality, and controls are mere puffery fails, as those statements conveyed material information about the heart of Sterling's business, which was undoubtedly important to investors. The ALP was the core of Sterling's business, representing 75% or more of the Company's entire loan portfolio during the Class Period. ¶¶1, 84-87, 136, 355. Moreover, as Sterling admits (Dkt. #57, PageID.657-658), both the customer base and banking activity of the ALP posed heightened BSA/AML risks requiring increased diligence (¶¶84-87).

Thus, not only was the ALP itself essential to the Company and its investors; the alleged false and misleading statements about the product and Sterling's lending practices were topics of key importance to investors. "Far from being … vague statement[s] of intention or optimism, fraudulent comments regarding such a fundamental aspect of [Sterling's] business [we]re of vital importance to investors." *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, No. 13-6731, 2015 WL 3755218, at *13 (E.D. Pa. June 16, 2015). *See also In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 386-87 (S.D.N.Y.) (statements about company's careful "underwriting disciplines" not puffery when viewed in context, specifically that the

50

company eventually revealed that 42% of its consumer loan portfolio was sub-prime), *reconsideration in part on other grounds*, 856 F. Supp. 2d 645 (S.D.N.Y. 2012); *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1224 (N.D. Ga. 2019) (statements about being "committed" to data security not puffery; "the fact that these statements relate to a core aspect of Equifax's business makes it even more likely that a reasonable investor would assign weight to them"); *DFC Glob. Corp.*, 2015 WL 3755218, at *13 (statements about an event "fundamental" to business were "of vital importance to investors").[26]

In *New Century*, the defendants argued that statements about "strict underwriting and risk management disciplines" and "higher credit quality" concerning risky, subprime loans were nonactionable puffery.  588 F. Supp. 2d at 1225.  The Court roundly rejected this argument, holding:

> Even in the sub-prime world, there must be a basis for distinction between loans to at-risk borrowers that meet basic standards of good lending practice and loans that plainly do not. Those standards may provide the measure for evaluating Defendants' statements. Here, Plaintiffs offer New Century's statements that it observed standards of high-quality credit and underwriting, and set those statements against detailed allegations of practices that utterly failed to meet those standards. That is sufficient to plead false and misleading

---

[26] *See also Accredited Home Lenders*, 556 F. Supp. 2d at 1155 ("as a mortgage lender … underwriting practices would be among the most important information looked to by investors"); *Countrywide*, 554 F. Supp. 2d at 1057 (plaintiff sufficiently pled defendants' misrepresentation of the rigor of their loan origination process, the quality of its loans, and the company's financial situation); *Wash. Mut.*, 694 F. Supp. 2d at 1211 (statements that bank was "disciplined and vigilant in its underwriting standards" were false and misleading).

statements.

*Id.* at 1226.  The same is true here.

*BofI I* is likewise instructive.  In that case, the court rejected a bank's puffery arguments based on nearly identical statements.  There, as here, defendants argued that the statements concerning the bank's underwriting standards being "conservative" and statements that the company's controls were "on sound regulatory footing" were non-actionable puffery.  2016 WL 5390533 at *5.  The court rejected this argument, finding "that taking a few of [p]laintiffs' allegations out of context and labeling them as puffery is not sufficient to undermine [p]laintiffs' detailed allegations that BofI's actual lending practices fell short of the standards BofI represented to investors."  *Id.* at *9.  The court found plaintiffs' allegations "neither aspirational nor general," adding: "[plaintiffs] allege that [d]efendants repeatedly represented, in a variety of forums, that [the bank] continued to adhere to conservative loan underwriting practices and that it had not loosened credit guidelines in order to increase loan volume, when the defendants had, in fact, resorted to lax lending practices."  *Id.*  The same reasoning applies here.

Moreover, the statements here were coupled with specific representations about the documentation and verification process of ALP loans, thus painting a vivid picture of underwriting at Sterling.  These include statements about specific documentation and verification requirements – *e.g.*, "we require not only financial

52

and other information from our borrowers, but our loan officers are required to meet face-to-face with each of our borrowers in our Advantage … program[] and produce a narrative documentation recommending the loan" and include "a thorough review of [borrowers'] ability to repay, liquidity analysis and face-to-face customer interaction." ¶136.  Likewise, they included specifics about what Sterling's risk management culture entails, such as "in our key residential loan program, we manage residential credit risks through a financial documentation process and programs with low loan to value ratios.  Our risk management includes disciplined documentation of ability to repay, liquidity analysis and face-to-face customer interaction" and "established processes and procedures intended to identify, measure, monitor, report and analyze the types of risk to which we are subject, including credit, liquidity, operational, [and] regulatory compliance."  ¶155.

Yet, as the FEs detail, these statements were false because, *inter alia*, Sterling did not verify employment, ability to pay, or gifted funds and, in fact, turned a blind eye to glaring red flags.  ¶¶80, 96-97, 100, 104, 107, 111-12, 114, 118-20, 122, 124, 128, 130.  *See Freudenberg*, 712 F. Supp. 2d at 190 (rejecting puffery challenge when statements were juxtaposed with "detailed factual descriptions of the [c]ompany's woefully inadequate or non-existent credit risk procedures"); *In re RAIT Fin. Trust Secs. Litig.*, No. 2:07-cv-03148-LDD, 2008 WL 5378164, at *6 (E.D. Pa. Dec. 22, 2008) ("We cannot say that a statement claiming that

53

[defendant's] 'credit underwriting involves an extensive due diligence process' is mere puffery when [p]laintiffs allege that [defendant] 'did not conduct any meaningful ongoing credit analysis whatsoever.'"); *see also MF Glob. Holdings*, 982 F. Supp. 2d at 317 (statements describing company's "internal controls as 'robust,' 'effective,' 'adequate,' 'comprehensive' and 'designed to monitor, evaluate, and manage the risks [defendant] assume[d],' not puffery where the complaint "pleads contrary information…that undermines the accuracy of those disclosures").

Indeed, statements "describing specific steps taken" are "more specific than statements courts typically discount as mere 'puffery.'" *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *9 (S.D.N.Y. Sept. 19, 2017). The full picture presented by all of these statements undoubtedly would mislead a reasonable investor, and as such, is not puffery. Moreover, by putting the quality of the ALP's underwriting and risk controls into play when they decided to speak, the 10(b) Defendants are accountable for their false and misleading statements.[27]

---

[27] *In re Wilmington Tr. Sec. Litig.*, 29 F. Supp. 3d 432, 447 (D. Del. 2014) ("[W]here a defendant affirmatively characterizes management practices as 'adequate,' 'conservative,' 'cautious,' and the like, the subject is 'in play.' For example, if a defendant represents that its lending practices are 'conservative' and that its collateralization is 'adequate,' the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations.").

54

Sterling's authorities are non-binding and distinguishable.[28]  They also cite a host of cases brought against megabanks with multiple loan products that only challenge certain vague, high-level risk statements.[29]  Here, in contrast, Plaintiff alleges specific statements tethered to the key underwriting standards, internal controls and risk management for Sterling's core loan program.

---

[28]  *See In re Synchrony Fin. Sec. Litig.*, 450 F. Supp. 3d 127, 153-54 (D. Conn. Mar. 31, 2020) (general statements about underwriting found to be puffery, not material where defendants "regularly disclosed … that they consistently modified their underwriting standards"), *appeal docketed*, No. 20-1352 (2d Cir. Apr. 24, 2020).  In *Waterford Twp. Gen. Emps. Ret. Sys. v. BankUnited Fin. Corp.*, recognizing that while selected vague statements about the company's underwriting could be puffery, the court noted that related statements could be actionable where defendants "frequently elaborated on the meaning the [c]ompany ascribed to this label by stating that the [c]ompany did not engage in subprime or piggyback lending, maintained low LTV ratios, and lent to customers with high FICO score."  No. 08-CIV-22572, 2010 WL 1332574, at *8 (S.D. Fla. Mar. 30, 2010); *see also Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 434-35 (S.D.N.Y. 2010) (dismissing certain statements as puffery, sustaining others tied to the quality of loan portfolio, including finding actionable statements that defendants "independently underwrote all loans"); *In re Sec. Cap. Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 598 (S.D.N.Y. 2010) (sustaining claims tied to misrepresentations about classifying borrowers based on FICO score and alleged false statements that company "developed and utilized its own, distinct internal models for assessing the risks presented by subprime exposure").  Here, Plaintiffs allege such further elaborating statements about Sterling's purported income and employment verification processes and controls.

[29]  *Stratte-McClure v. Morgan Stanley*, 784 F. Supp. 2d 373, 380 (S.D.N.Y. 2011), *aff'd*, 776 F.3d 94 (2d Cir. 2015), and *aff'd*, 598 F. App'x 25 (2d Cir. 2015); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 354 (S.D.N.Y. 2011); *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009).

55

### b) Sterling's Risk Disclosures Argument Fails

Sterling's argument that its "extensive disclosures" notified investors of the risks inherent in the ALP and absolved them from liability (Dkt. #57, PageID.675-680), is flawed for several reasons.

First, each alleged misrepresentation is a statement of then-current fact, and the 10(b) Defendants do not, and cannot, argue that any statement was forward looking so as to implicate the PSLRA's safe harbor. 15 U.S.C. § 78u-5. Thus, the cited "risk disclosures" are a red herring.

Second, Sterling points to disclosures, including that the ALP is a non-traditional product and targeted at recent immigrants and foreign nationals – aspects of the ALP that the Complaint acknowledges were disclosed (*see, e.g.,* ¶¶84-85), and which heightened the import of the challenged statements. Indeed, these disclosures underscore the critical importance of underwriting and risk management to the ALP and investors.

Third, the other disclosures that Sterling clings to were themselves misleading, as they gave the false impression that future risks ***could*** materialize at a time when those risks and worse were already present and rampant. *See Williams v. Globus Med., Inc.*, 869 F.3d 235, 242 (3d Cir. 2017) ("[A] company may be liable under Section 10(b) for misleading investors when it describes as hypothetical a risk

56

that has already come to fruition.").[30]   For instance, Sterling's warning that a "[f]ailure to maintain and implement adequate programs to combat money laundering … could … have serious reputations consequences" (Dkt. #57, PageID.676), is misleading when there was no training in proper BSA/AML procedures, nor was the Company verifying the cash received from suspect sources or vetting the identity or employment of its borrowers.  A chorus of FE allegations details how these programs and controls were already compromised, with violations already detected (and sanctioned) by management.  ¶¶115, 132.

Similarly, Sterling's warning that "employee and customer misconduct *could* subject us to financial losses or regulatory sanctions" (Dkt. #57, PageID.651), at the very same time that its ALP underwriters were routinely writing loans with no constraints and complaints from FEs to management went unheeded, is misleading. And while the Company also cited "precautions we take to prevent and detect this activity" (Dkt. #57, PageID.676), in reality, Sterling provided no training on compliance issues, and management turned a blind eye to rampant red flags (¶¶80, 96-97, 100, 104, 107, 111-12, 114, 118-20, 122, 124, 128, 130).[31]

---

[30]  *See also Cutler v. Kirchner*, 696 F. App'x 809, 813, 814 (9th Cir. 2017) ("these statements were misleading because they disclosed a risk 'in the abstract' but omitted the fact that it had 'already come to fruition.'").

[31] Sterling's cases are inapposite.  The quote from *Citigroup*, 330 F. Supp. 2d at 377, has nothing to do with the sufficiency of risk disclosures.  And Plaintiff does not allege any "distaste" for the ALP, but only challenges the legion of

### c) The Complaint Does Not Allege Mere Corporate Mismanagement

Following the permanent discontinuation of the ALP, mass terminations of over 100 officers and employees, commitment to repurchase all outstanding sold ALP loans, and in the midst of ongoing criminal and civil probes, Sterling's response is simply that mistakes were made or, more precisely, that "[c]ertain compliance issues unfortunately materialized." Dkt. #57, PageID.642. In essence, Sterling argues that the Complaint does "not plead that the controls did not exist, but merely that they were ineffective," and that such claims amount to, at most, nonactionable "allegations of corporate mismanagement." Dkt. #57, PageID.681. Sterling misreads the Complaint and the law.

Plaintiff does not argue that the 10(b) Defendants violated § 10(b) by failing to implement better standards and controls. Rather, Plaintiff alleges, *inter alia*, that they violated § 10(b) by making false and misleading statements as to the strength, quality, and specific aspects of Sterling's stated underwriting and risk controls. Such allegations are actionable. *See Equifax*, 357 F. Supp. 3d at 1217-18; *In re Accredo Health, Inc. Sec. Litig.*, No. 03-2216-BBD, 2005 WL 8152649, at *12 (W.D. Tenn. Apr. 11, 2005) (rejecting "corporate mismanagement" challenge where complaint

---

misrepresentations about the program. Thus, Sterling's reliance on *Stadnick v. Vivint Solar, Inc.*, No. 14-cv-9283 (KBF), 2015 WL 8492757, at *13 (S.D.N.Y. Dec. 10, 2015), *aff'd*, 861 F.3d 31 (2d Cir. 2017), is a red herring.

asserts "deceptive conduct, misrepresentations, and nondisclosure of material facts"); *In re Rospatch Sec. Litig.*, 760 F. Supp. 1239, 1248 (W.D. Mich. 1991) (rejecting "corporate mismanagement" challenge where complaint asserts "claims of misrepresentation, deception, manipulation and nondisclosure").

Moreover, in contrast to Sterling's argument and cases, Plaintiff here details the falsity of the statements by demonstrating that far from having mere deficient controls, Sterling's internal controls, underwriting, and risk management were essentially non-existent. *See, e.g.*, ¶7 ("In truth, however, the Company's risk management, internal controls, BSA/AML compliance, and underwriting for the ALP were practically non-existent and riddled with red flags indicating that the entire ALP was open for abuse by money launderers."). The FE allegations paint a portrait of a reckless company, with no compliance training, and a rampant disregard for verification of employment or source of deposited funds. ¶¶95-97, 100, 103, 104, 111-13, 118, 122, 128, 130. Even in the face of waving red flags, such as suspicious letters and gifts, Sterling turned a blind eye. ¶¶96-97, 100, 104, 112-14, 118, 122, 130. Thus, "Plaintiff['s] claim is not based solely on the underlying failures of [Sterling's] internal controls to detect and prevent [BSA/AML] violations; Plaintiff[] allege[s] that [Sterling's] disclosures regarding the existence and efficacy of those controls were false." *VEON*, 2017 WL 4162342, at *8.

In contrast, in several of Sterling's cases, "[p]laintiffs do not plead that the

controls did not exist," *Deutsche Bank, Aktiengesellschaft*, 2017 WL 4049253, at *7,[32] and the plaintiffs "allege[d] neither facts showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, nor facts showing that the processes were not followed," *id*.[33]

Sterling's argument that "generic descriptions of risk management" are insufficient to make failures of such systems actionable fares no better. Dkt. #57, PageID.682. Plaintiff pleads far more than generic descriptions of mismanagement, and Sterling's authority does not apply to the allegations in this Complaint. In *Strougo v. Barclays PLC*, the statements found by the court to be non-actionable did not reference the Alternative Trading System dark pool at the heart of that lawsuit. 105 F. Supp. 3d 330, 337, 339, 344-45 (S.D.N.Y. 2015). The court essentially held that a plaintiff cannot connect any random statement to a legal violation and call it fraud. Here, in contrast, the alleged misstatements directly concern the program at

---

[32] *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019), is also distinguishable on this basis.

[33] Sterling's remaining cases are distinguishable. For instance, in *Doshi v. Gen. Cable Corp. (Doshi II)*, 386 F. Supp. 3d 815, 831 (E.D. Ky. 2019), the complaint focused on a single statement: "we have implemented policies and procedures designed to ensure compliance with [the FCPA]." *Id*. at 827. In contrast, Plaintiff here alleges that many different statements concerning Sterling's internal controls, policies, procedures, and systems were false or misleading, several of which are more specific than the single statement challenged in *Doshi II*. *See, e.g.*, ¶136. *United Am. Healthcare*, 2007 WL 313491, does not concern statements regarding the existence or efficacy of internal controls, but instead whether the defendant breached an agreement through its illegal activity.

the heart of the Company, which was the subject of the OCC investigation and OCC Agreement that found unsafe or unsound practices and "violations of law relating to certain aspects of its BSA/AML compliance program." ¶248.

### d) The Statements Were Not Non-Actionable "Opinions"

Contrary to Sterling's argument, the statements they cite – concerning conservative underwriting and robust risk management – are not opinions, but material misrepresentations. *See In re Merck & Co., Inc. Sec. Litig.*, MDL No. 1658 (SRC), 2015 WL 2250472, at *11 n.7 (D.N.J. May 13, 2015) (statements not opinions where they "ma[de] direct assertions" instead of "express[ing] [d]efendants' opinion or belief in some assertion"). Courts have held that those types of statements are not opinions as a matter of law. *See, e.g., Signet Jewelers*, 2018 WL 6167889, at *11, *13 (holding defendant's underwriting statements were not opinions).[34] The *Signet* court explained why similar statements are not opinions:

> The Supreme Court in *Omnicare* [*v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015)] took care to distinguish between facts and opinions, noting that, a fact is a thing done or existing," whereas "an opinion is a belief, a view, or a sentiment which the mind forms of persons or things." As the Second Circuit recently instructed, "Expressions of optimism and projections about the future are quintessential opinion statements." Here, Defendants' statements were neither forward-looking nor estimative. They spoke to a present state of affairs, not a belief about future events.

---

[34] *See also Equifax*, 357 F. Supp. 3d at 1231 (that company "employs strong data security and confidentiality standards" and "maintain[s] a highly sophisticated data information network" were not opinions because "[w]hile such statements use some indefinite language, they do not constitute a subjective opinion").

61

2018 WL 6167889, at *12-13.  Here, the 10(b) Defendants did not merely convey an optimistic hope that their underwriting and risk management would be strong. Instead, they made statements about the present condition of Sterling's underwriting and risk management and pointed to the particular procedures that allegedly made them conservative, disciplined, and robust.[35]  *See* Section II.A.7.a, *supra*.

Moreover, several statements Sterling asserts are "ancillary" "opinions" taken out of context and ignore related false and misleading statements that speak to the very same topics.[36]  Thus, even *if* Sterling's cited examples were deemed opinions,

---

[35]  Indeed, contrary Sterling's argument, the statements here were misstatements of historical and present fact, including specific aspects of the underwriting and risk management, not statements conveying vague, soft information.  Thus, *TransDigm Grp.*, 440 F. Supp. 3d at 762, is inapposite.

[36]  *Compare* Dkt. #57, PageID.684 n.11 (compliance issues) (citing ¶247 ("The Company does not believe that the Agreement will have any material impact on its performance metrics . . . .")) *with* ¶285 ("[W]hile the [top two loan] producers were not following company policies and procedures, there was no fraud….."); *compare* Dkt. #57, PageID.684 n.12 (intentions for new products) (citing ¶297 ("[W]e will continue to develop new residential loan products that we believe will meet the needs of our customers")) *with* ¶299 ("All three of these products allow for expanded credit metrics with prudent underwriting offsets, which is consistent with our lending history and one of the main reasons for our excellent credit quality.").  *See* Dkt. #57, PageID.684 n.13 (pipeline for loans) (citing ¶173 (Sterling quotes "[W]e remain optimistic about 2018," but omits the rest of the statement which states, in part, "there continues to be good demand [for] our loan products" and "[w]e entered the second quarter with robust loan pipelines")).  *Compare* Dkt. #57, PageID.684 n.14 (decline in loan growth) (citing ¶212 ("We perceive [lower production volumes] to be somewhat temporary," which Sterling omits was in response to an analyst question, thus highlighting its importance)) *with* ¶299 ("While we are disappointed that we have encountered this setback with our advantage loan program, we are

which they are not as they speak to verifiable factual information, the 10(b) Defendants made at least some actionable statements in each category.

Nevertheless, to the extent any of the 10(b) Defendants' statements are deemed opinions, they remain actionable because they omitted then-existing material information. *See Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188-89 (2015)).[37]  *See* Section II.A, *supra*.[38]  Their so-called opinions were also not sincerely held.  For example, the Complaint alleges that

---

committed to making the necessary investments in 2020 to realize our long-term growth potential, while maintaining our higher profitability metrics.").

[37] *Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, No. 14 CV 3876-LTS, 2016 WL 1261135, at *10 (S.D.N.Y. Mar. 30, 2016), is inapposite, as the 10(b) Defendants' statements here are stronger, and there, "[p]laintiffs … alleged no facts demonstrating that … management believed that the [c]ompany's underwriting practices were unsound or inappropriate for a program of that type." *Id*.

[38] For example, statements regarding underwriting, risk management, and credit and asset quality omitted, *inter alia*, that the Company originated loans to borrowers without verifying their ability to repay, and Sterling obtained minimal and questionable documentation before approving those loans.  Statements concerning compliance issues, including the statement Sterling cites at ¶247, omitted, *inter alia*, that compliance issues identified in the OCC Agreement were severe.  Statements concerning intentions for new products, including the statement Sterling cites at ¶297, omitted, *inter alia*, that Sterling's problems with underwriting and compliance, as identified in the OCC Agreement, were acute, systemic, and existential.  Statements concerning pipeline for loans, including the statement Sterling cites at ¶173, omitted, *inter alia*, that demand for ALP loans was driven by its essentially non-existent underwriting and compliance.  Statements concerning decline in loan growth, including the statement Sterling cites at ¶212, omitted that blame for declining growth lay with increased regulatory oversight and remedial actions as a result of Sterling's violations of law.  Statements concerning reserves omitted that the ALP loans were at risk for repurchase due to the Company's inadequate underwriting, compliance, and internal controls.

practically non-existent underwriting facilitated BSA/AML violations and that because management was aware of this, they could not have believed that their underwriting practices were "conservative" or "disciplined." *See also* Section II.B., *infra*; *see also Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000) (defendants claimed situation was "in good shape" when they allegedly knew the contrary). Accordingly, the statements the 10(b) Defendants point to are actionable either way.

### e)   The Complaint Does Not Allege Fraud By Hindsight

Sterling's contention that the Complaint amounts to "fraud by hindsight," is conclusory, contradicted by the plain allegations of the Complaint, and based on inapposite authority.

First, Sterling argues that the Complaint provides no contemporaneous facts from which to infer falsity. Dkt. #57, PageID.685. This is categorically false. The Complaint is replete with contemporaneous FE allegations, as detailed above. Further, the Complaint details the conclusions of the 2018 OCC Report and OCC Agreement, which were issued and entered into during the Class Period.[39] Additionally, the Complaint relies on Sterling's own late-Class Period admissions of rampant problems with the Company's underwriting and controls, which led to the shuttering of the ALP. The fact that the Company later admitted to the even

---

[39]   Moreover, Sterling ignores allegations that even after certain "subsequent disclosures" (like the OCC Agreement), the 10(b) Defendants continued to issue false and misleading statements. *See* Section II.A.6, *supra*.

greater severity of the problems, including massive terminations and resignations, buyback offers for all ALP sold loans, and the ongoing civil and criminal investigations, only corroborates the well-pled allegations in the Complaint.

Second, Sterling's attempt to side-step the FE allegations by arguing that they "are untethered to any particular time period" is simply wrong.   Dkt. #57, PageID.685-686.   The Complaint specifically details when each FE worked at Sterling, what each FE learned during the duration of each FE's employment, and in several instances, the time periods when the relevant events occurred.   *See*, *e.g.*, ¶¶94, 99, 102, 107, 110, 116, 121-22, 126, 129-30.   That the underwriting, internal controls, and risk management failures were severe, ongoing issues is critical to Plaintiff's case: these were not isolated, one-time events, and the consistency of the FE allegations speaks to that.   *See, e.g.*, *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 962-63 (N.D. Cal. 2014) (CWs "provided consistent accounts of the conditions, practices, and procedures;" "[p]laintiffs use the [CWs] … to demonstrate the pervasive and systemic nature of Impax's problems and the purposefulness in failing to address [them] …, from which the falsity … may be inferred").[40]

---

[40] Moreover, Sterling's authorities are inapposite.  In *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 963 (S.D. Ohio 2009), the "Court accept[ed] the [CW] statements in full and without discount," even though it ultimately found that the plaintiffs did not adequately allege that the subject statements were false and misleading.  The FE allegations here are at least as strong as those in *Bancshares*, which the court accorded full weight.  The allegations offered in *In re LendingClub*

### f)      Montemayor Is Liable For Each Misrepresentation

Defendant Montemayor seeks to avoid liability for any statements he did not expressly make.  He is mistaken.  Montemayor can be held liable for other group published statements, including the SEC filings and press releases, based on the group pleading doctrine, "which allows plaintiffs to hold a corporation's officers and directors liable for false statements found in collectively published documents." *Cardinal Health*, 426 F. Supp. 2d at 742-43.  A plaintiff fulfills the particularity requirement under this doctrine "by pleading the misrepresentations with particularity and, where possible, the roles of the individual defendants." *Id*. (citing *Bridgestone*, 399 F.3d at 689).[41]  Here, the Complaint adequately details each false

---

*Sec. Litig.*, were "based on an unspecified source," 254 F. Supp. 3d 1107, 1120 (N.D. Cal. 2017), and not on consistent accounts from seven different FEs.  *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004), is irrelevant, as the decision does not discuss fraud by hindsight.  *See also Novak*, 216 F.3d at 309 (containing no analysis of how fraud by hindsight applied to the facts).  Sterling also cites cases where the plaintiff relied *solely* on post-corrective disclosure facts.  *In re Royal Bank of Scotland Grp. PLC*, No. 09 Civ. 300 (DAB), 2012 WL 3826261, at *7 (S.D.N.Y. Sept. 4, 2012), *aff'd sub nom. Freeman Grp. v. Royal Bank of Scotland Grp. PLC*, 540 F. App'x 33 (2d Cir. 2013); *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015); *Coyne v. Gen. Elec. Co.*, No. 08cv1135 (SRU), 2010 WL 2836730, at *3, *10 (D. Conn. July 15, 2010), *aff'd sub nom. Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368 (2d Cir. 2011); *Sec. Cap. Assurance*, 729 F. Supp. 2d at 597-98; *Synchrony Fin.*, 450 F. Supp. 3d at 151-52; *BankUnited*, 2010 WL 1332574, at *12; *United Am. Healthcare*, 2007 WL 313491, at *14.  *See also* Section II.B, *infra*.

[41]  Montemayor relies solely on *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005), for the proposition that group pleading is impermissible in the Sixth Circuit post-PSLRA.

and misleading statement issued on Sterling's behalf and the specific role

Montemayor played, including signing off on all ALP loans. *See* Section V, *infra*.

This is all that is required.

## B.   Plaintiff Adequately Pleads a Strong Inference of Scienter

A plaintiff must "state with particularity facts giving rise to a strong inference

that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

4(b)(2)(A). In the Sixth Circuit, recklessness satisfies the scienter requirement.

*Helwig*, 251 F.3d at 550-52 (scienter can be pled through circumstantial allegations

that support a strong inference that defendants were at least reckless). "While the

danger need not be known, it must at least be so obvious that any reasonable man

would have known of it." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th

Cir. 2004), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*,

563 U.S. 27 (2011), *as recognized in Dana II*, 646 F.3d at 961 (under *Siracusano,*

courts must consider scienter allegations collectively rather than sorting through

each allegation individually).

The Court must consider the allegations "holistically" and decide "whether

---

However, *Cardinal Health*, decided three years after *Conaway*, demonstrates that
the group-pleading doctrine remains viable. *See* 426 F. Supp. 2d at 742-43 (though
"defendants argue that the Sixth Circuit has not adopted the doctrine at any point
after the Reform Act the court found 'that the Doctrine survived the passage of the
PSLRA and has continuing viability in the Sixth Circuit'") (quoting *In re Century
Bus. Servs. Sec. Litig.*, No. 1:99CV02200, 2002 WL 32254513, at *12-13 (N.D.
Ohio June 27, 2002)).

*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Dana II*, 646 F.3d at 959 (quoting *Tellabs I*, 551 U.S. at 310, 323 (emphasis in original)). While an inference of scienter "must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," it "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs I*, 551 U.S. at 314, 324. In other words, a tie goes to the Plaintiff. *See Dana I*, 547 F.3d at 571 ("*Tellabs* now awards the draw to the plaintiff.").

In *Helwig,* the Sixth Circuit set forth the following "non-exhaustive" list of factors to consider for evaluating scienter:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

251 F.3d at 552. A plaintiff need not establish all these factors, and the Court should consider other indicia of scienter as well. *See, e.g., Bridgestone*, 399 F.3d at 687 (finding scienter allegations adequate even though four *Helwig* factors were not probative of scienter); *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th

Cir. 2011) (eschewing *Helwig*'s checklist of non-exhaustive factors and analyzing scienter by following *Tellabs*' "holistic" approach); *Cardinal Health*, 426 F. Supp. 2d at 718 n.43 (plaintiff "should draw upon these factors where applicable").

### 1. Plaintiff Alleges Facts Establishing the 10(b) Defendants' Knowledge and/or Recklessness

Contrary to the 10(b) Defendants' assertion (Dkt. #57, PageID.696; Dkt. #55, PageID.568), the Complaint details facts implicating at least five *Helwig* factors, as well as several other factors probative of scienter, thereby more than sufficiently alleging a strong inference of scienter.

***The Consistent Accounts By Former Employees***:   Numerous courts have recognized that statements from confidential witnesses can support a strong inference of scienter.  *See, e.g., Doshi v. Gen. Cable Corp. (Doshi I)*, 823 F.3d 1032, 1037 n.2 (6th Cir. 2016); *Makor Issues & Rights, Ltd. v. Tellabs, Inc. (Tellabs II)*, 513 F.3d 702, 712 (7th Cir. 2008); *In re Am. Serv. Grp., Inc.*, No. 3:06-0323, 2009 WL 1348163, at \*58 (M.D. Tenn. Mar. 31, 2009).  The sources must be identified with "sufficient particularity to support the probability that a person in the [CW's] position would possess the information alleged." *Doshi I*, 823 F.3d at 1037 n.2; *Conaway*, 284 F. Supp. 2d at 739.  Moreover, corroboration from multiple sources strengthens an inference of scienter.  *Tellabs II*, 513 F.3d at 712; *Countrywide*, 554 F. Supp. 2d at 1058.

The Complaint describes the FEs with sufficient particularity to support the probability that persons in their positions would possess the information alleged. ¶¶94, 102, 110, 116, 121, 126, 129.[42] Their consistent accounts demonstrate that the 10(b) Defendants were either aware of or recklessly disregarded that the ALP was rife with pervasive and widespread issues; Sterling's documentation, underwriting, internal controls, and risk management programs were neither disciplined nor conservative but practically non-existent; it was not in compliance with BSA/AML laws and ability-to-repay regulations; and the ALP was riddled with money laundering red flags. ¶¶326-47.

For example, FE 7 relayed that the Company had weak and deficient internal

---

[42] FE 1 was a Commercial Real Estate Relationship and Portfolio Manager at Sterling in San Francisco before and during the Class Period until Winter 2019 who is familiar with the ALP and whose role was to gather loan documentation and present it to the underwriting and credit teams. ¶94. FE 2 was a Loan Consultant at Sterling in San Francisco prior to the Class Period until the end of 2017, whose job included consulting with prospective borrowers, advising them on the loan-approval process, and gathering documents for the application. ¶102. FE 3, who worked at the Michigan headquarters, was a BSA Compliance Analyst from late Fall 2017 through October 2019. ¶110. FE 4 was a residential loan officer at Sterling in the Los Angeles area from prior to the Class Period through the end of 2017 and closed 10 to 12 loans through the ALP. ¶116. FE 4 was responsible for working with clients to obtain documentation and then closing the loan. *Id.* FE 5 was a loan officer at Sterling from early to mid-2017, resigning a few months before the IPO. ¶121. FE 5 worked in Washington and reported to Senior Vice President Steve Adams. *Id.* FE 6 was a Quality Control Analyst at the Michigan headquarters from Fall 2018 until Spring 2019, whose role was to review and conduct pre-closing reviews of the loans, including ALP loans. ¶126. FE 7 was an underwriter at Sterling until a few months before the IPO, worked in the loan origination office in Kirkland, Washington, and reported to head underwriter, Jon Kolk. ¶129.

controls, and FEs 1, 2, and 3 relayed that the underwriting and documentation for the ALP was neither conservative nor disciplined. ¶¶95, 103 111, 131. FEs 1, 2, 3, 4, 5, 6, and 7 relayed that there was almost no documentation required for ALP loans. ¶¶94-95, 103, 111, 117-18, 122, 128, 130. FEs 1, 2, 3, 4, 6, and 7 explained that all that was required to approve a borrower was a monthly bank statement and a letter from an employer or a CPA. ¶¶95, 104, 111, 118, 128, 130. However, even this minimal documentation was suspicious. ¶¶7, 96-97, 100-01. Likewise, 90% of ALP loans involved huge lump sums of "gifted" money, including those where the borrower contradicted himself regarding the source of the gift. ¶¶7, 114, 122, 124, 130. Yet, as Fes 2, 3, 5, 6, and 7 relay, no further diligence was performed, including no attempt to confirm account holders' identity or verify the source of the borrowers' funds. ¶¶104, 111, 113-14, 122, 124, 127-28, 130. FE 5 relayed that Sterling provided no training on risk or compliance, and Sterling employees with whom FE 5 dealt, including Bank managers, had no training or familiarity with SARs, CTRs, or other compliance procedures. ¶123. Indeed, Fes 2, 3, 5, and 7 suspected that the ALP loans were being used for money-laundering. ¶¶105, 115, 122, 124, 131.

Several of these Fes expressed their concerns to senior management regarding the Company's suspicious lending practices and possible money laundering, but they were either ignored or instructed by senior management to keep quiet and not worry about it. ¶327. FE 3 raised concerns about the ALP to Sterling's Vice President and

71

General Counsel, as well as to two of FE 3's supervisors in the BSA/AML department, but management did nothing.  ¶¶115, 341.  Indeed, FE 3 was later denied a promotion, and the reason given by FE 3's supervisor was that FE 3 had voiced concerns about the ALP.  *Id.*

When FE 7 expressed concerns about the ALP to Jon Kolk, the manager of underwriting, who worked in the corporate office where the Officer Defendants were located, Kolk told FE 7 not to question these loans, "just underwrite."  ¶¶132, 345. FE 7 also complained to Kolk about Senior Vice President Adams (¶346) – who had primary responsibility for oversight of the ALP in California (¶¶354, 367), who was "fully integrated into monthly senior management meetings" (¶357), and who was later terminated by Sterling – as someone whose conduct and statements during the underwriting process appeared to violate the Company's Code of Conduct, but nothing came of it (¶346).  According to FE 2, Montemayor supervised Kolk's department and "protected" Kolk.  ¶¶108-09.

According to FE 1, Montemayor knew that Yihou Han used a broker to send prospective clients to the bank (a red flag for money laundering), and Montemayor also knew that the CPA letters that Han was using had suspiciously come from the same IP address.  ¶¶100-01, 342.[43]  Further, when FE 1 informed both a supervisor

---

[43] Contrary to Sterling's contention, the fact that FE 1 learned this information "secondhand" does not "limit[] its probative value."  Dkt. #57, PageID.705.  *See*

and Montemayor that FE 1 had been contacted by an OCC auditor, Montemayor instructed FE 1 not to speak with the auditor.  ¶¶99, 344. According to FE 1, Montemayor "absolutely" was fully aware of all the problems with the ALP and signed off on all of the loans.  ¶¶98, 344.  Similarly, FE 2 stated that Montemayor "knew exactly what was happening" at the Bank.  ¶109.  Likewise, FE 5 believes that the senior executives, which would include the Officer Defendants, also knew what was going on. ¶125.

In response to these allegations, the 10(b) Defendants cite non-binding decisions in *Higginbotham v. Baxter Int'l, Inc*., 495 F.3d 753 (7th Cir. 2007), and *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc*., 537 F.3d 527, 535 (5th Cir. 2008) (relying on *Higginbotham*).  Dkt. #57, PageID.703-704, 706; Dkt. #63, PageID.900.    However, in *Tellabs  II*, the Seventh Circuit limited *Higginbotham,* stating that in *Higginbotham*, "[t]here was no basis other than the confidential  sources,  described  merely  as  three  ex-employees  …  and  two consultants," to support plaintiff's claim of scienter, whereas in *Tellabs II*, "[t]he confidential  sources  …  are  numerous  and  consist  of  persons  who  from  the description of their jobs were in a position to know at first hand the facts to which

*Halford v. AtriCure, Inc*., No. 1:08cv867, 2010 WL 8973625, at *16 (S.D. Ohio Mar. 29, 2010) (strong inference of scienter was supported by, *inter alia,* confidential witnesses who did not interact directly with defendants); *Am. Serv. Grp.*, 2009 WL 1348163, at *58 ("Hearsay is a sufficient basis on which to allege such facts in a complaint.").

73

they are prepared to testify." 513 F.3d at 711-12. *See also Institutional Investors Grp. V. Avaya, Inc.*, 564 F.3d 242, 262 (3d Cir. 2009) (courts "have qualified *Higginbotham's* strong skepticism of confidential sources"). Accordingly, numerous courts, including those in the Sixth Circuit, have declined to follow *Higginbotham* and will "consider allegations based on information provided by confidential sources without discounting those allegations due *solely* to the[ir] anonymity…." *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 526 n.18 (S.D.N.Y. 2009) (emphasis in original), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009). *See, e.g., Doshi I*, 823 F.3d at 1037 n.2; *In re Hayes Lemmerz Int'l, Inc.*, 271 F. Supp. 2d 1007, 1016 (E.D. Mich. 2003); *Wilkof v. Caraco Pharm. Labs, Ltd.*, No. 09-12830, 2010 WL 4184465, at *6 (E.D. Mich. Oct. 21, 2010); *In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 740 (E.D. Mich. 2007).

Here, the Complaint pleads the basis for the FEs' knowledge, including – importantly – their own firsthand experiences based on their positions at the Company. ¶¶94, 102, 110, 116, 121, 126, 129; *see* note 42, *supra*. *See Ricker v. Zoo Entm't, Inc.*, 534 F. App'x 495, 496 n.2 (6th Cir. 2013) (CW's "employment in Zoo's accounting department positioned her to learn of the facts now alleged"); *Halford*, 2010 WL 8973625 at *3, *7 (crediting allegations from six CWs where their job descriptions supported a finding that they could have "gained first hand

74

knowledge of the facts attributed to [them]"); *BofI I*, 2016 WL 5390533, at \*10, \*13 (holding that complaint pleaded scienter where numerous CWs corroborated allegations regarding bank's lax lending practices and failure to enforce compliance measures, with one CW describing being pressured by senior management to underwrite loans that should not have been approved, another CW describing internal controls as "nonexistent," and a senior underwriter CW expressing concerns to the CEO's assistant about a loan that should not have been approved).

Moreover, the FE allegations are corroborated by, *inter alia,* (1) the 2018 OCC Report, which required the signature of all directors, including Judd; (2) the OCC Agreement, which was signed by Judd, together with the directors, and which details Sterling's violations of BSA/AML laws, fraudulent underwriting practices, and poor internal controls; (3) the civil and criminal investigations by the OCC and DOJ, respectively, which are ongoing; (4) the terminations or retirements of over 100 employees, including the Officer Defendants, including for engaging in the exact conduct the FEs observed; (5) the total shutdown of the ALP due to widespread misconduct; (6) the Company's own internal investigation which found (a) widespread misconduct in connection with the origination of a significant number of loans regarding verification of income, the amount of income reported for borrowers, reliance on third parties, and related documentation, and (b) a failure by the Bank to comply with federal regulations, including the income verification

75

requirements under the ability-to-repay rules, and (7) Sterling's own belated admissions. ¶¶15-26, 246-48, 287, 309-13, 316, 318, 320, 322; *see also* Moody Decl. Ex. C (2019 10-K) at 5, 6, 26, 29, 64, 154. Courts in the Sixth Circuit regularly credit such allegations where the underlying facts indicate the witnesses are reliable. *E.g.*, *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 703-05 (E.D. Mich. 2010); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 WL 1335803, at *35-37, 44 (M.D. Tenn. Mar. 31, 2011). Courts in the Sixth Circuit also regularly credit such accounts where they are corroborative of other facts. *E.g.*, *Wilkof*, 2010 WL 4184465, at *6; *ProQuest*, 527 F. Supp. 2d at 739-40. Thus, there is no reason to "discount" the FE allegations; instead, these allegations add to a compelling inference of the 10(b) Defendants' scienter.[44]

*Disregard of the most current factual information*: The 10(b) Defendants' disregard of contemporaneous facts further adds to a strong inference of scienter.

---

[44] The 10(b) Defendants' cited authorities are inapposite. *See* Dkt. #57, PageID.704 (citing *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008), and *Huntington Bancshares*, 674 F. Supp. 2d at 960); Dkt. #63, PageID.900 (citing *Visteon*). Unlike in *Visteon* – which relied on *Higginbotham*'s now widely rejected "steep discounting" of CW allegations and which analyzed each allegation individually rather than collectively – here, the FE allegations do indicate that senior management knew about the problems with the ALP. And in *Huntington Bancshares*, the court concluded that none of the CWs stated that "they communicated anything to anyone" at the company or that the defendants "committed fraud or disseminated false information." 674 F. Supp. 2d at 963. Here, in contrast, the FEs communicated their concerns to supervisors and senior management and did state that the 10(b) Defendants' statements were false.

*Helwig*, 251 F.3d at 552; *Bridgestone*, 399 F.3d at 684 (holding that "[t]here was … at least a seeming disregard, of the most current factual information before making statements" where defendant falsely stated that its tires were "high quality" and "safe" despite contemporaneous knowledge of facts indicating otherwise); *In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 681, 690 (E.D. Mich. 2004).  The FE allegations establish that the 10(b) Defendants disregarded contemporaneous facts demonstrating that, contrary their representations, Sterling's documentation, underwriting, and risk management programs were neither disciplined nor conservative or followed the specific touted practices; the Company was not in compliance with BSA/AML and residential lending requirements; and effective internal controls were not in place to prevent fraudulent lending, underwriting, and banking practices.  ¶¶94-95, 97, 103-05, 111-15, 122-24, 127-28, 130-31, 326, 335. Moreover, the Complaint establishes that the 10(b) Defendants had actual knowledge of significant BSA/AML compliance problems at least as early as March 2018, when the OCC issued its 2018 OCC Report.  ¶13.  *See In re BofI Holding, Inc. Sec. Litig. (BofI II)*, No. 3:15-CV-02324-GPC-KSC, 2017 WL 2257980, at *7 (S.D. Cal. May 23, 2017) (holding that defendants acted with scienter because, contrary to their representations regarding "strong loan growth" and "high credit quality standards," the bank was not adhering to high credit quality standards and had begun to sacrifice credit quality to increase loan originations).

77

Additionally, the Company's own SEC filings, which describe the regulatory framework within which the Bank must operate, establish the 10(b) Defendants' awareness of their obligations to comply with BSA/AML laws, particularly given the nature of the ALP loans. ¶¶372-73.

*Divergence between internal reports and external statements*: Relatedly, the foregoing facts establish a divergence between internal reports and external statements. *See Helwig*, 251 F.3d at 552; *Dana II*, 646 F.3d at 959-61. In *Wilkof,* the court contrasted the CWs' statements describing the poor conditions and manufacturing problems at the company's Detroit facility with the company's statements to the public that minimized the scope and significance of these problems, and concluded that such allegations also contribute to a strong inference of scienter due to the divergence between internal reporting of problems and external public statements made. 2010 WL 4184465, at *1, *6. The same is true here.

The 10(b) Defendants were aware of the 2018 OCC Report, yet their public statements directly contradicted what they knew internally. Any inference that the 10(b) Defendants did not have access to the 2018 OCC Report "is directly contradicted by the fact that [they] specifically addressed [the matter] in [their] statements." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017); *see Garden City*, 2011 WL 1335803, at

78

*57 (inferring knowledge of fraud based on detailed public statements concerning undisclosed matters).[45]  By speaking directly on the issue, the 10(b) Defendants were required to have a reasonable basis to do so, including informing themselves of contradictory information in their possession.

**The 10(b) Defendants Ignored Red flags**:  The Sixth Circuit has found that "[s]pecific factual allegations that a defendant ignored red flags, or warning signs" that would reveal the falsity of their statements may support a strong inference of recklessness, particularly where plaintiffs allege "multiple, obvious" warnings.  *PR Diamonds*, 364 F.3d at 686-87.  *See, e.g., Garden City*, 2011 WL 1335803, at *56; *Halford*, 2010 WL 8973625, at *16; *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1031 (N.D. Ohio 2000).  Here, as detailed above, the loans in the ALP were riddled with red flags indicating money laundering, which were ignored, thus further

---

[45] Thus, the 10(b) Defendants' assertion that the Complaint has no such allegations is incorrect, and Montemayor's reliance on *In re EveryWare Global, Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 860 (S.D. Ohio 2016), *aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017), Dkt. #55, PageID.566-567, is misplaced.  Montemayor quotes only a portion of the pertinent sentence in *EveryWare*, which stated that plaintiff had not identified internal reports "or alleged any conversation took place … that would bear on scienter." 175 F. Supp. 3d at 860.  Here, Plaintiff identifies the "conversations" and "other relevant factual information" that bear on Montemayor's scienter, including his conversation with FE 1 in which he instructed FE 1 not to speak with an OCC auditor who had contacted FE 1.  ¶344. As such, Montemayor was aware that Sterling was being investigated by the OCC.  *See also* ¶98 (based on FE 1's interactions with Montemayor and conversations with a Sterling underwriter, FE 1 believed that Montemayor "absolutely" was fully aware of all of the problems with the ALP).

supporting a strong inference of scienter. ¶¶7, 80, 161-66.

*Temporal Proximity*:  The closeness in time (temporal proximity) between the 10(b) Defendants' falsehoods and subsequent disclosures also supports scienter. ¶¶348-54.  *See Helwig*, 251 F.3d at 552; *Wilkof*, 2010 WL 4184465, at *5; *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) (auditors' resignations within "three to four months," and company's bankruptcy "a mere eight months" following misleading press releases, were both "so temporally connected" to the releases).

For example, over the one- to three-month period before Sterling's June 21, 2019 revelation that it had entered into the OCC Agreement regarding deficiencies in its BSA/AML compliance, the 10(b) Defendants repeatedly falsely touted, *inter alia*, Sterling's underwriting, documentation, and duty to comply with significant AML laws and regulations.  ¶¶350-51.

In another example, on November 8, 2019, Sterling disclosed that it had terminated the employment of its top two ALP loan producers (Yihou Han and Frank Yu) and misleadingly stated that "*if* these producers or other loan producers within our Advantage Loan program are found to have engaged in misconduct, we could face regulatory or other pressure to disband the Advantage Loan Program, which would materially and adversely affect our profitability and margins." ¶352 (emphasis in original).  Thus, even as it acknowledged that these top two ALP producers had been fired, the Company would not acknowledge that they had

80

engaged in misconduct.  Then, just one month later, on December 9, 2019, Sterling announced that it was suspending the ALP but assured the market that it was just a "temporary" halt and, one month later, a "setback."  ¶353.   But then, just over a month later, on March 6, 2020, Sterling disclosed that it was shuttering the ALP permanently due to misconduct in the loan origination process and that the Bank was now under formal investigation by the OCC and DOJ.  ¶354.  *See Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *21-22 (M.D. Tenn. Apr. 26, 2011) (temporal proximity probative of scienter where company admitted financial results were questionable three weeks after reaffirming them and restated three weeks later), *report and recommendation approved*, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012); *Conaway*, 284 F. Supp. 2d at 744 (four-month interval between statement and correction supports scienter).

*Existence of ancillary lawsuit/government investigations*: The existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit contributes to an inference of scienter.  *Helwig*, 251 F.3d at 552.  Here, the fact that the OCC initiated an investigation of Sterling's BSA/AML practices and policies, issued the undisclosed 2018 OCC Report in March 2018 documenting Sterling's BSA/AML violations, entered into the OCC Agreement with Sterling – which is akin to a settlement agreement –  to remedy those violations and to which it is still subject, and then commenced a formal investigation of the

81

Company, which is still ongoing, as well as the separate investigation by the DOJ and its issuance of multiple grand jury subpoenas regarding Sterling's BSA/AML violations, supports a strong inference of scienter. ¶¶372-76. *See Bridgestone*, 399 F.3d at 685 ("The apparent animating idea [of this *Helwig* factor] is that a company engaging in such practices is, all things being equal, more likely than not aware of the improper nature of the practice being alleged, or at least of the perception of the given problem, which puts it on notice and, is fair to say, generates a duty to inquire"); *Dana II*, 646 F.3d at 961 (SEC investigation into defendants' accounting practices contributed to scienter); *Reddy*, 757 F. Supp. 2d at 714 ("[I]f this entire matter could have been settled with reference to [defendants' non-culpable explanations], the FBI and DOJ would not be conducting nationwide investigations" into defendants' conduct); *Garden City*, 2011 WL 1335803, at *56 (investigations "create the 'red flags' that support a strong inference of scienter"); *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) (government investigation is one more piece in the circumstances adding up to a strong inference of scienter).

***Insider Trading*:** Here, the suspicious insider trading, which consists of massive sales by members of the Founding Family, either individually or through trusts, and at suspicious times, is evidence of scienter. ¶¶377-83. *See Helwig*, 251 F.3d at 552; *Cardinal Health*, 426 F. Supp. 2d at 727; *Huntington Bancshares*,

82

674 F. Supp. 2d at 969 ("[P]ersonal financial gain may weigh heavily in favor of a scienter inference." (quoting *Tellabs I*, 551 U.S. at 325)).

Specifically, members of the Founding Family, including Meltzer, Sandra Seligman, and Scott Seligman, individually or through family trusts, sold 9,557,692 shares of Sterling common stock at $12.00 a share for proceeds of $114,692,304 in the IPO, when the stock was trading at an inflated price due to the meteoric growth of the ALP.[46] ¶379. This is more money than the Company itself raised in the IPO. *See id.*; *see also* ¶3. Moreover, these individuals, as Sterling admitted in the Prospectus, exerted substantial control over Sterling's management and operations. ¶382. Further, on December 4, 2019, Scott Seligman's K.I.S.S. Dynasty Trust No. 9 ("Trust No. 9") sold 400,000 shares for $9.48 per share, for proceeds of $3,792,000. ¶379; *see also* Sterling Ex. K (Dkt. #57-12). This was just three trading days before Sterling announced on Monday, December 9, 2019 that it was suspending the ALP, causing the stock price to drop by a whopping 22.86%. *Id. See, e.g., ProQuest*, 527 F. Supp. 2d at 743 (finding that "the timing of stock sales" led to a "quite compelling" inference of scienter where the sales came soon before negative company news). The gross proceeds from these insider sales totaled $118.4 million.

---

[46] Because the Class Period started with the IPO, there is no prior period with which to compare these trades. ¶380 n.19. But "[t]rading histories are not a *sine qua non* of an allegation of unusual insider trading. Some trades may, from the face of things, be unusual." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 761 (1st Cir. 2011).

*See In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 599 (N.D. Ohio 2004) (insider sales at "opportunistic time[s]" are "probative of scienter"); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001) (factors considered in determining whether insider trading activity is unusual include the amount of profit from the sales and the number of insiders selling); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) ($78 million profit from sale of 1.2 million shares is "massive by any measure").  As such, the timing and size of the trading was suspicious, contrary to Sterling's assertion.  Dkt. #57, PageID.702.

While these individuals are not named in the § 10(b) claim, their trades are nevertheless relevant in assessing scienter.  *See, e.g., Dearborn Heights*, 632 F.3d at 762 n.5 ("This court has considered stock sales by non-defendant insiders when evaluating the sufficiency of a pleading of scienter." (citing *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996))); *In re Pixar Sec. Litig.*, 450 F. Supp. 2d 1096, 1104-05 (N.D. Cal. 2006) (considering stock sales by both defendant and non-defendant insiders).  *See also In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d 887, 902 (N.D. Ohio 2002).

Sterling attempts to dismiss the trading in the IPO by relying on *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1373 (N.D. Ga. 2004).  Dkt. #57, PageID.702; *see also* Dkt. #56, PageID.601-602.  However, the courts in *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379,

84

419 (S.D.N.Y. 2020), and *Roseville*, 814 F. Supp. 2d at 421-22, disagreed with *AFC* that insider sales during public offerings "categorically do not raise an inference of scienter." 450 F. Supp. 3d at 419. As explained in *Roseville*:

> The defendants' argument essentially amounts to a claim that an interest in stock sold in an IPO or significant public offering could never qualify as motive for purposes of scienter. This is plainly incompatible with the holding that "motive can be sufficiently pleaded where plaintiff alleges that defendants misrepresented corporate performance to inflate stock prices while they sold their own shares."

814 F. Supp. 2d at 421-22 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)). Moreover, here, the IPO was suspiciously timed to take advantage of the massive growth of the Company fueled by the rampant violations in the ALP.

Sterling attempts to discount Trust No. 9's sale of 400,000 shares of stock just prior to announcement of the ALP's suspension, by arguing that (1) the Complaint does not allege who benefits from this trust, (2) this sale amounted to only 3% of the trust's holdings, and (3) the "fact that no other defendants likewise sold their stock in December 2019 negates any suspicion." Dkt. #57, PageID.703 & n.19 (citing Sterling Ex. K (Dkt. #57-12)).

These arguments are unavailing. First, this trust was for the benefit of Scott Seligman. As alleged, the family's trustee, Erwin Rubenstein, exercised voting and dispositive power over the shares held by Trust No. 9. ¶380 n.20. The Prospectus, in turn, states that "Mr. [Scott] Seligman disclaims beneficial ownership except to the extent of his pecuniary interest, if any, therein." Moody Decl. Ex. A

85

(Prospectus) at 116. If Seligman has a pecuniary interest in the stock, he is getting the profits on the sale and therefore benefits from this trust.

Second, the Court should consider the entirety of Trust No. 9's sales during the Class Period, not just the sale on December 4, 2019. This trust owned 15,871,000 shares at the start of the Class Period, and it sold 3,363,268 shares in the IPO, at $12 per share, for $40,359,216. ¶¶379-80; Moody Decl. Ex. A (Prospectus) at 116; Sterling Ex. K (Dkt. #57-12); Seligman Ex. 1-B (Dkt. #56-3); Moody Decl. Ex. B (Form 4 and Form 3 for Trust No. 9).[47] These sales, combined with the December 4, 2019 sales, yielded proceeds of $44,151,216 and constituted **24%** of the trust's holdings during the Class Period. *See In re SmarTalk Teleservs., Inc. Sec. Litig.*, 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000) (insider defendants' sales of 40%, 27%, 11%, and 37% of their holdings supported a strong inference of scienter); *Marksman Partners LP v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) ("Twenty percent of a corporate insider's shares, especially where the dollar amounts involved are high, may constitute a 'suspicious amount' sufficient to support a scienter allegation."). Moreover, this does not even comprise the entirety

---

[47] The 10(b) Defendants have submitted Form 4s in connection with their scienter argument. *See* Sterling Ex. K (Dkt. #57-12); Judd Exs. 3 & 4 (Dkt. #63-4 & 63-5); Lopp Exs. 1-5 (Dkt. #59-2 to 59-6); Montemayor Ex. A (Dkt. #55-2). Plaintiff opposes their being offered for the truth of the matter asserted and to the extent the Court considers the Form 4s in connection with their scienter argument, then Plaintiff should be entitled to judicial notice of the Form 4 to respond to such arguments. *See* Pltf. RJN, filed concurrently herewith.

of Seligman's sales during the Class Period.  Trusts associated with Scott Seligman sold 8,953,013 shares during the Class Period for profit of $106,428,156.  ¶380.

Third, neither the lack of stock sales nor the purchase of stock by the Officer Defendants "negates" scienter. Dkt. #57, PageID.703; Dkt. #63, PageID.896, 899-900; Dkt. #59, PageID.851; Dkt. #55, PageID.566.  The Sixth Circuit stressed in *PR Diamonds* that "we have never held that the absence of insider trading defeats an inference of scienter."  364 F.3d at 691 (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992)) (scienter can be established even if officers who made misleading statements did not sell stock during class period).  *See Cardinal Health*, 426 F. Supp. 2d at 736.  *PR Diamonds* also rejected "[d]efendants' contention that their **purchase** of shares during the class period refutes" scienter. 364 F.3d at 691.  Indeed, "[t]here is no legal requirement that an individual alleged to have committed securities fraud have personally profited by his own conduct." *ProQuest*, 527 F. Supp. 2d at 741.  As the Supreme Court stated in *Tellabs I*, "[w]hile it is true that motive can be a relevant consideration, … the absence of a motive allegation is not fatal."  551 U.S. at 325.  In any event, inferences to be drawn from stock transactions often "cannot be resolved on a motion to dismiss." *Garden City*, 2011 WL 1335803, at *58.

***The Numerous and Suspiciously Timed Terminations and Resignations***: The numerous and sudden resignations and terminations of corporate executives,

directors, and employees also adds to an inference of scienter.  ¶¶361-71.  *See*, *e.g.*, *Dana II,* 646 F.3d at 960, 962 (scienter adequately pled where defendant retired within months of company's disclosure of accounting errors and at same time as its bankruptcy filing); *Willis v. Big Lots, Inc. (Willis I)*, No. 2:12-cv-604, 2016 WL 8199124, at *34 (S.D. Ohio Jan. 21, 2016) (resignation of executive on same day company announced its failure to meet sales projections was suspiciously timed and indicative of scienter); *Am. Serv. Grp.*, 2009 WL 1348163, at *58; *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009).

First, Defendant Fox resigned on June 21, 2019, after having served as a director for 22 years and as a member of the Audit and Risk Management Committee – on the same day that Sterling disclosed it had entered into the OCC Agreement. ¶361. Next, Judd resigned on October 17, 2019, just three weeks before Sterling announced it had terminated its top two ALP loan producers.  ¶¶362-63.  Then just one month later, on December 9, 2019, Sterling disclosed that it was suspending its ALP.  ¶364.  Analysts and industry observers expressed suspicion, with one stating: "***Seems like the CEO quitting was not a coincidence after all***." *Id.*[48]

Ten days later, on December 19, 2019, Sterling announced that Tom Minielly, who had replaced Fox on the Board and who also served on the Audit and Risk

---

[48] Consequently, Judd is incorrect in asserting that there was nothing suspicious about his resignation or its timing.  Dkt. #63, PageID.897.

Management Committee, was also resigning.  ¶365. This resignation was just days before the Company announced the ALP's suspension.

A little over two months later, on March 6, 2020, Sterling announced that it was terminating the ALP and that "a significant number of employees either have been terminated, including [Steve Adams,] the Senior Vice President with primary responsibility for, among other things, oversight of the [ALP] in California, or have resigned" and that Sterling was under investigation by the OCC and DOJ.  ¶367.

Just two months after that, on May 8, 2020, the Company announced that Lopp, who had been at the Company for 20 years, led Sterling's expansion into Southern California, and, having served as CEO for only five months, was also resigning, effective immediately.  ¶368.  Three weeks later, on May 29, 2020, Sterling announced that it had terminated Montemayor, who had been with the Company for 25 years, effective immediately.  ¶369.  Thus, all three members of senior management – Judd, Lopp, and Montemayor – resigned or were terminated in the wake of the investigations into the Company's lending, underwriting, internal control, compliance, and risk management practices.  ¶370.

Three days later, on a June 1, 2020 earnings call, Sterling announced that "just short of 30" employees were let go in association with the ALP, almost 10% of the Company's work force.  ¶371.  More recently, Sterling's 2019 10-K stated that Scott Seligman had resigned as consulting director to the Board of the Bank and as Vice

President of the Company effective December 31, 2019 and that more than 100 officers and employees have been terminated or resigned. Moody Decl. Ex. C (2019 10-K) at 6, 38-39, 54, 64.

These numerous and abrupt terminations and resignations add to a compelling inference of scienter than cannot be chalked up to mere "mismanagement." Dkt. #57, PageID.642, 644-645, 665, 680. *See Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) ("resignations, terminations, and other allegations of corporate reshuffling may … be indicative of scienter"); *Willis v. Big Lots, Inc. (Willis II)*, No. 2:12-cv-604, 2017 WL 2608690, at *3 (S.D. Ohio June 16, 2017) ("high-ranking executives' departures … are relevant to scienter"); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011) ("suspicious" resignations "add to a pleading of circumstantial evidence of fraud").

Moreover, Sterling has admitted that there were numerous instances of misconduct by employees in connection with the origination of ALP loans, that it has identified numerous instances of noncompliance with the income verification requirements under the ability-to-repay rules. ¶322; *see also* Moody Decl. Ex. C (2019 10-K) at 26, 29 (statements regarding the numerous reforms the Company is undertaking). As explained in *America Service Group*:

> As to Plaintiffs' allegations about **the firing of [CEOs] Hartman and Bryson**, the **adoption of sweeping internal reforms**, and **the resignation of members of ASG's Audit Committee**, some courts do describe these events as **unusual**. As one court recognized in similar circumstances:

90

> This was strong medicine. ***Such house-cleaning and reforms do not follow innocent mistakes***. Rather, ***they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls***….

2009 WL 1348163 at \*58 (quoting *In re Sipex Corp. Sec. Litig.*, No. C 05-00392 WHA, 2005 WL 3096178, at \*1 (N.D. Cal. Nov. 17, 2005)).[49]

***Core Business and Product***:   Because the facts alleged relate to the Company's core operations and its key product – the ALP, which represented four-fifths of the Company's residential loans and two-thirds of the Company's total loan portfolio – they support a strong inference of scienter.  ¶355.  *See PR Diamonds,* 364 F.3d at 688 ("high-level executives can be presumed to be aware of matters central to their business's operation") (citing *In re Complete Mgt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-26 (S.D.N.Y. 2001))); *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 1000 (S.D. Ohio 2008) (the "more central a fact is to a company's core operations the more likely its executive acted with scienter"); *Bridgestone*, 399 F.3d at 687 (that subsidiary "was the primary engine fueling" Bridgestone's growth supported Bridgestone's scienter as to its misrepresentation of Firestone's impairment risk); *Grae*, 2017 WL 6442145, at \*21 (13% of revenue

---

[49] Thus, Sterling's argument that Yihou Han's termination "cut[s] against scienter because it shows that when employees did not follow protocol, they were terminated" (Dkt. #57, PageID.706), rings hollow, given that it waited until after the OCC had initiated an investigation of the Company and had entered into the OCC Agreement with Sterling.

"was central to [its] operations by any meaningful definition of the term").

Indeed, some courts have held that a plaintiff may adequately allege scienter based *solely* on the fact that "the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter." *S. Ferry L.P., No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). Thus, in *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985, 987-88 (9th Cir. 2008), the Ninth Circuit held that although the CWs did not have direct knowledge of the CEO and CFO's practices, plaintiffs nevertheless pled a strong inference of scienter because the notion that the CEO and CFO were unaware of four stop-work orders, which had a devastating effect on the company's revenues that were crucial to the business, was "absurd." *See also Rihn v. Acadia Pharms. Inc.*, No. 15CV00575 BTM(DHB), 2016 WL 5076147, at *8 (S.D. Cal. Sept. 19, 2016).[50]

***The Officer Defendants' High Level Positions, Oversight of Day-To-Day Operations and Business, and Knowledge of the Issues***: In a similar vein, that the

---

[50] These authorities refute Judd's contention that the core operations doctrine has been "eviscerated," "rejected or narrowed to the point of near irrelevance by all Circuits that have considered it." And none of the cases cited supports this dubious contention. Dkt. #63, PageID.897, 902. Indeed, *Stein*, 2020 WL 3584800, noted that the Sixth Circuit has "acknowledged that the core-operations doctrine is valid….," *id.* at *38 n.34 (citing *PR Diamonds*, 364 F.3d at 688), and that "[a] majority of district courts appear to have concluded that the doctrine survived [the PSLRA]," *id.* at *39. And contrary to Judd's assertion that "the Second Circuit … recently noted that the doctrine's presumption did not survive the PSLRA….," Dkt. #63, PageID.902 (citing *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020)), *Abernathy* said no such thing. *Id.*

Officer Defendants controlled Sterling's day-to-day operations and were informed of and responsible for monitoring the ALP, its largest loan product (¶¶356-60), further supports scienter.  As stated in *Garden City*:

> "Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to 'central, day-to-day operational matters.'" *Cardinal Health*, 426 F. Supp. 2d at 724.  This is particularly appropriate for "[f]acts critical to a business's core management." *In re Ancor Commc'ns*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998). ***A company's chief executive officer who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise strong inference of scienter***. *In re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647, 663-64 (M.D. Tenn. 2001).

2011 WL 1335803, at *57.  *See Am. Serv. Grp.*, 2009 WL 1348163, at *60 (same).

That Judd, Lopp, and Montemayor were at the top of Sterling's corporate structure and were focused upon these core issues bolsters the strong inference of their access and knowledge:

> [A]t the top of the corporate pyramid sat [the company's] CEO.... Almost all the false statements that we quoted emanated directly from him. Is it conceivable that he was unaware of the problems of his company's two major products and merely repeating lies fed to him by other executives of the company? It is conceivable, yes, but it is exceedingly unlikely.

*Tellabs II*, 513 F.3d at 711.[51]  *See also* ¶360.

---

[51] Judd and Lopp argue that none of the FEs is alleged to have had contact with them and that it is not enough to allege that Judd and Lopp "had to have known" their statements were false and misleading.  Dkt. #63, PageID.897, 901 (citing *Konkol v. Diebold, Inc.*, 590 F.3d 390, 401 (6th Cir. 2009), *abrogated by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), *as recognized in Dana II*, 646 F.3d at 961); Dkt. #59, PageID.851.  In *Konkol*, the CWs were described only generally, and the court held that their "general statements" that the fraud was "perpetrated at a high

Moreover, FE 1 confirmed that Montemayor was the person with the most knowledge about the Bank's operations, was fully aware of the problems with the ALP, and signed off on all loans. ¶¶98, 359.[52] The Company touted Montemayor as having "broad experience in all aspects of our lending business" and stated that "his long-term service as our Chief Lender has helped to provide continuity and consistency in our business model and lending practices." ¶369.[53] *See Miss. Pub. Emps.' Ret. Sys. v. Boston Sci. Corp.*, 523 F.3d 75, 91-92 (1st Cir. 2008) (strong inference of scienter arises, in part, from fact that executive was "point person" on company's new product and "would presumably have been aware" of its status).

In fact, the Company acknowledged in its SEC filings that it had "established

---

level within the Company" and was "openly known within the Company" were not a substitute for specific facts establishing defendants' scienter. 590 F.3d at 401. Here, in contrast, the FEs are described with particularity – including their positions, job responsibilities, time frame of their employment, and contacts with senior management. And cases such as *Berson* and *Rihn* establish that direct contact with the CEO is not required, where, as here, other members of senior management knew of the problems with the ALP, the ALP was crucial to Sterling and constituted the cornerstone of its business, and Judd and Lopp were alerted to the problems at the very latest by March 2018 when the OCC issued its Report of Examination. *See also Halford*, 2010 WL 8973625 at *16 (strong inference of scienter was supported by, *inter alia*, CWs who did not interact directly with defendants).

[52] Additionally, FE 1 stated that Montemayor was aware of Yihou Han's use of a broker to send prospective clients to the Bank and that the CPA letters Yihou Han was using had all come from the same IP address. ¶¶100-01.

[53] Any attempt to minimize or deny Montemayor's position as a member of senior management of the Company (*see* Dkt. #57, PageID.648; Dkt. #55, PageID.561, 569), also fails, as discussed in Section V, *infra*.

94

a culture that places credit responsibility with individual loan officers ***and***

***management*.**  ¶356.  And in a letter to the SEC just prior to the IPO, Judd stated:

> [T]he Company's senior leadership team typically spends at least one week
> per month at the Company's primary San Francisco branch and makes
> periodic in-person visits to its Los Angeles operations and more recently, to
> Seattle and New York City.  In addition, the Company has long-tenured
> employees based in California, including [Steve Adams,] a senior vice
> president with over 28 years' experience at the Company and a vice president
> of commercial lending with over 9 years' experience at the Company, each of
> whom are fully integrated into monthly senior management meetings. Finally,
> the Company utilizes videoconferencing technology to enable virtual face-to-
> face contact as its operations have grown geographically.

¶357. Thus, Judd confirmed just prior to the IPO that Sterling's senior leadership –

namely, the Officer Defendants – was and would continue to be in close and regular

communication with senior management regarding the Company's day-to-day

operations and business, including Adams, who was "fully integrated into monthly

senior management meetings."

Furthermore, while "fraudulent intent cannot be inferred merely from the

Individual Defendants' positions," *PR Diamonds*, 364 F.3d at 688, "high-level

executives can be presumed to be aware of matters central to their business's

operation," *id.*, and the 10(b) Defendants do not dispute that BSA/AML compliance

was critical to Sterling's business.  *See Novak*, 216 F.3d at 308 (holding that scienter

may be predicated on allegation that defendants "failed to review or check

95

information that they had a duty to monitor").[54]

Here, the Complaint alleges that Judd and Lopp signed all of the relevant Class Period SEC filings, that Judd, Lopp and Montemayor participated in earnings calls, and that they were involved in the decision-making of the Company.  ¶¶34-36, 135. Moreover, the OCC's Report of Examination required the signature of all directors, including Judd.  ¶¶248.  Additionally, Judd, together with the directors, signed the OCC Agreement. ¶248.  And it was Lopp who signed the 2019 Form 8-K disclosing that Sterling had entered into the OCC Agreement.  ¶246.

Furthermore, Montemayor stated that compliance problems with the ALP would be temporary, and Lopp similarly downplayed the ALP suspension as merely a "setback" while continuing to tout Sterling's prudent underwriting and credit quality.  ¶¶298-99, 353.  Just one month later, the ALP was shuttered for good, and the Bank announced it was under formal investigation by the OCC and DOJ.  ¶354.

*The SOX Certifications*:  Judd and Lopp's SOX certifications, attesting to the Company's reported financial results and the effectiveness of its disclosure and

---

[54] Consequently, Plaintiff is not seeking to hold Judd and Lopp liable merely based on their positions in the Company.  Dkt. #59, PageID.849; Dkt. #63, PageID.901 (citing *Reddy,* 757 F. Supp. 2d at 719).  In *Reddy,* unlike here, the Complaint did not allege that the defendant had "signed any corporate disclosure statements which would support Plaintiffs' claim that he made a material misrepresentation." 757 F. Supp. 2d at 719.  *See Willis I*, 2016 WL 8199124, at *32 ("access to information central to the Company's business operations creates a strong inference of scienter because Plaintiffs allege that the 10(b) Defendants made false statements about significant portions of the Company's operations").

internal controls procedures, also support scienter.  ¶¶390-91.  *See, e.g., Dana II*, 646 F.3d at 961; *Reddy*, 757 F. Supp. 2d at 712 n.6.  Given that Sterling's SEC filings were littered with false and misleading statements and the OCC found the Company's internal controls were lacking, the SOX certifications further support scienter.  ¶¶384, 391; *see also* Moody Decl. Ex. C (2019 10-K) at 34-35 (Sterling stated that its internal controls were deficient).  *See Dana II, supra; Reddy, supra*; *ProQuest*, 527 F. Supp. 2d at 742-43 ("The SOX certifications give rise to an inference of [defendant's] scienter"); *Wilkof*, 2010 WL 4184465, at *6 ("the Sarbanes-Oxley (SOX) certifications in SEC filings add to the strong scienter inference" (citing *ProQuest*, 527 F. Supp. 2d at 742-43)).[55]

***Lack of Internal Controls***:  The reports by the FEs regarding the lack of internal controls together with the OCC's finding that the Company's internal controls were deficient also support a strong inference of scienter.  ¶384; *see also* Moody Decl. Ex. C (2019 10-K) at 34-35 (Sterling stated that its internal controls were deficient). *See, e.g., In re Miller Energy Res. Sec. Litig.*, No. 3:11-CV-386-TAV-CCS, 2014 WL 415730, at *16, *20 (E.D. Tenn. Feb. 4, 2014); *Garden City*, 2011 WL 1335803 at *56-57.  Here, as in *In re BofI Holding, Inc. Sec. Litig. (BofI III)*, 977 F.3d 781, 787

---

[55] Sterling's reliance on *Konkol*, *see* Dkt. #57, PageID.700, is misplaced, because in *Konkol,* "[t]he investors … provided no contemporaneous facts showing that the Defendants knew or should have been aware that the[ir] statements were false." 590 F.3d at 402.

(9th Cir. 2020), "with respect to internal controls and compliance infrastructure, the [CWs'] allegations plausibly suggested that [the company] had not adequately staffed its BSA and AML compliance along with other internal control departments." *See, e.g.,* ¶¶326, 328-40, 335 (FE 7 confirmed that Sterling had weak and deficient internal controls), 364, 385-86, 444. *See N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 785-86 (M.D. Tenn. 2013) (holding that "Defendants' later admissions about the clearly improper accounting treatment … raise[] an inference of scienter about the Defendants' prior statements on these issues and [the company]'s internal controls").

*Violations of Sterling's Code of Conduct and Risk Management Policy*: Finally, that the Officer Defendants, the Company's insiders, and members of senior management acted contrary to the Company's own Code of Conduct and risk management policies is additional evidence of scienter, as they cannot plead ignorance of the duties set forth therein. ¶¶387-89. For example, in violation of the Code, senior management was warned about misconduct but told the complaining employees to ignore it, and at least one employee was retaliated against for reporting same; insiders sold a massive amount of stock whose price was artificially inflated (¶¶115, 327, 341-42, 344-46); and SARs were not submitted, nor were employees being trained about SARs (¶¶123, 326, 331).

***

98

Taken collectively, these thirteen factors more than sufficiently allege a strong inference of scienter. Moreover, for the reasons discussed more fully in Sections II.A.7.a, b & d, *supra*, the 10(b) Defendants' misrepresentations concerned hard, objectively verifiable information rather than "soft information," opinion or puffery, and, thus, Plaintiff need not plead facts showing the 10(b) Defendants' actual knowledge. But even if actual knowledge were required, these allegations meet that test. For example, the 10(b) Defendants knew at least by the March 2018 OCC Report that there were problems with the ALP, including BSA/AML violations, but they waited for over a year to disclose that Sterling was being investigated by the OCC, all the while issuing false and misleading statements to investors. *See* ¶¶9, 13. This fact, in and of itself, establishes the 10(b) Defendants' knowledge. *See Burges*, 2015 WL 4198795, at *5 ("Plaintiffs have pled facts … which demonstrate that Defendants were not in compliance with federal banking laws [regarding BSA/AML] at the time these representations were made.").

### 2. The Complaint Also Alleges Facts Giving Rise To a Strong Inference of the Company's Scienter

For the reasons discussed above, Plaintiff has pleaded facts establishing the scienter of Judd, Lopp, and Montemayor, each of whom made false or misleading statements. Their scienter can thus be imputed to Sterling under the first prong of *Omnicare,* the state of mind of "the individual agent who uttered or issued the misrepresentation." 769 F.3d at 476.

99

The Complaint also alleges facts establishing corporate scienter under the third prong of *Omnicare*, based on the state of mind of any "high managerial agent … who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." 769 F.3d at 476. Specifically, Senior Vice President Steve Adams and Jon Kolk, the manager of underwriting who was based in Sterling's headquarters – both "high managerial agent[s]" under *Omnicare* – at the very least "tolerated" and "recklessly disregarded" Sterling's misrepresentations regarding its purportedly conservative and disciplined underwriting, risk management, and internal controls regarding the ALP. *See, e.g., Bridgestone*, 399 F.3d at 684, 690 & n.34 (plaintiff adequately pleaded corporate scienter where company's annual report stated that company's tires "are high-quality, safe tires" despite its awareness that those tires had caused vehicle rollovers, death and injury, and noting that "an individual officer's knowledge may be attributed to the corporation"); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) (plaintiffs' allegations that defendants received information regarding "problems which they should have realized contradicted the company's public statements" gave rise to a strong inference of company's scienter).

## III. PLAINTIFF ADEQUATELY PLEADS A SECTION 20A CLAIM AGAINST SCOTT SELIGMAN

A plaintiff states a claim under § 20A if it alleges (i) "a requisite independent, predicate violation of the securities law" and (ii) "contemporaneous purchase or sale

100

of securities with the purchase or sale of securities by … 'insider' [d]efendants."

*Beach v. Healthways, Inc.*, No. 3:08-0569, 2009 WL 650408, at \*6 (M.D. Tenn. Mar. 9, 2009) (citing 15 U.S.C. § 78t-1(a)). The Complaint has adequately alleged a § 20A claim against Scott Seligman.

First, Plaintiff adequately pleads that Scott Seligman violated § 20(a) of the Exchange Act – a predicate violation of the Exchange Act. *See* Section V, *infra.* *See, e.g., In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 665 (S.D.N.Y. 2007) (Section 20(a) violation served as a predicate violation for 20A claim).

Second, despite Seligman's argument otherwise,[56] Plaintiff purchased Sterling shares contemporaneously with his sales, as such trades were made on the same day. *See Refco*, 503 F. Supp. at 664 ("Bennett is alleged to have sold … in the IPO, … [p]laintiffs are alleged to have purchased shares in the same IPO. Bennett makes no attempt to explain how these events, which took place on the same day, could be any more contemporaneous. His argument is without merit."). *See also Beach*, 2009 WL 650408, at \*6 ("for purposes of this Motion to Dismiss, alleging 'contemporaneous' sales by the [d]efendants is sufficient"). Seligman, individually or through family trusts, sold shares of Sterling common stock in connection the IPO

---

[56] Defendant Seligman has submitted Form 4s in connection with this argument. *See* Seligman Exs. 1A-1D (Dkt. #56-2 through 56-5). Plaintiff opposes their being offered for the truth of the matter asserted and to the extent the Court considers the Form 4s in connection with his argument, then Plaintiff should be entitled to judicial notice of its exhibits to respond to such arguments. *See* Pltf. RJN, filed concurrently herewith.

(¶¶90, 379-80), and Plaintiff purchased shares in the IPO (¶¶32, 426; Compl. Ex. 1 (Dkt. #36, PageID.496-499)).  This is all that is required.[57]  As such, Seligman's assertion that selling stock in the IPO "is not uncommon or otherwise suspicious" is of no import and, in any event, is legally and factually inaccurate.  *See* Section II.B, *supra* at pp. 84-85.

Third, contrary to Seligman's assertion, the sales were made by him, as he controlled and/or held pecuniary interests in the trusts at issue.  Seligman is the trustee for and holds sole voting and dispositive power over shares held by the Scott J. Seligman Revocable Living Trust, which sold 758,929 shares of Sterling stock on November 21, 2017.  Dkt. #36, PageID.448 n.20; Dkt. #56, PageID.601; Seligman Ex. 1-C (Dkt. #56-4); Moody Decl. Ex. A (Prospectus) at 116 n.8.  Moreover, as a revocable trust, Scott Seligman owns the assets in and income earned by this trust, because he can revoke the trust at any time.  *See, e.g.,* Restatement (Third) of Trusts § 74 (2007).  As such, the sales by this trust were sales by Seligman.  *See SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 729 (S.D.N.Y. 2003) (finding that individual and trust entity were jointly and severally liable for illegal activities

---

[57] Indeed, Seligman concedes that the sales at issue were made on November 21, 2017 by K.I.S.S. Dynasty Trust No. 5 (1,543,459 shares); K.I.S.S. Dynasty Trust No. 9 (2,571,513 shares); the Scott J. Seligman Revocable Living Trust (758,929 shares); and the Scott J. Seligman 1993 Long Term Irrevocable Dynasty Trust (1,180,845 shares).  ¶¶379-80; Dkt. #56, PageID.601; Seligman Exs. 1-A through 1-D (Dkt. #56-2 to 56-5).  Plaintiff purchased shares on November 21, 2017.  ¶¶32, 426; Compl. Ex. 1 (Dkt. #36, PageID.496-499); Dkt. #56, PageID.601.

perpetrated through trust).

As for K.I.S.S. Dynasty Trust No. 5, K.I.S.S. Dynasty Trust No. 9, and the Scott J. Seligman 1993 Long Term Irrevocable Dynasty Trust, the Prospectus states that "Mr. Seligman disclaims beneficial ownership *except to the extent of his pecuniary interest,* if any, therein." Moody Decl. Ex. A (Prospectus) at 116 nn.4-6. Thus, because he held pecuniary interests in these trusts, Seligman reaped profit from the trusts' sales of stock, and as such, these are likewise sales by him. *See Johnson v. Aljian*, 490 F.3d 778, 779-81 (9th Cir. 2007) (finding defendants faced § 20A liability even though their trades were conducted through a separate entity)*; see also Norris v. Wirtz*, 719 F.2d 256, 260 (7th Cir. 1983) (denying motion to dismiss § 10(b) claim where, despite delegation of investment authority under the terms of the trust, the beneficiary "had authority to make the investment decisions involving the securities sales in which the alleged misrepresentations were made").

Furthermore, Seligman offers no authority that supports his argument. His reliance on *Sumpter v. United States*, 302 F. Supp. 2d 707, 722 (E.D. Mich.), *subsequent determination*, 314 F. Supp. 2d 684 (E.D. Mich. 2004), is unavailing, as it involved a question of tax liability in connection with a delinquent taxpayer's irrevocable conveyance of property to a trust for the sole benefit of others and to which he ceded all benefit. *Id*. at 721; Dkt. #56, PageID.601 n.9. Thus, not only is the context entirely different, but, unlike the Seligman trusts at issue here, the grantor

103

had no interest in the trust.[58]

At best, Seligman raises an issue of fact as to the nature of his relationship with the trusts, which cannot be resolved on a motion to dismiss. *See, e.g., Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 752-53 (E.D. Mich. 2014) ("The existence of an agency relationship and the scope of the relationship are questions of fact." (quoting *Global Tech., Inc. v. Moto Diesel Mexicana*, No. 05-cv-70069, 2007 WL 1500178, at *12 (E.D. Mich. May 22, 2007)))).

Finally, Plaintiff adequately alleges that Seligman possessed material nonpublic information regarding Sterling's endemic BSA/AML compliance and loan origination issues when he sold off a substantial number of shares at his first opportunity. Plaintiff alleges Seligman's deep involvement in and knowledge of

---

[58] Seligman directs the Court to "*supra* n.3" in support of the premise that trusts are separate legal entities. Dkt. #56, PageID.601 n.9. However, footnote 3 states: "The elements of a control person claim under Section 15 and Section 20(a) are the same," Dkt. #56, PageID.592 n.3, which has no bearing on this legal issue. Presumably, Seligman intended to direct the Court to footnote 5, but the cases there are likewise unavailing. He cites *Banks v. N. Trust Corp.*, 929 F. 3d 1046, 1054 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 1243 (2020), for the premise that a grantor is "not treated as owning the trust property when his beneficial enjoyment of the trust corpus or income is subject to the control of an independent trustee." However, the Ninth Circuit based its holding on the fact that "the complaint alleged that the beneficiaries 'had no control over how [the trustee] invested the trust's assets …'", whereas here, the Complaint alleges Seligman's pecuniary interest in, and control over, his associated trusts. *See, e.g.,* Dkt. #36, PageID.448 n.20. Likewise, in *SEC v. Wyly*, 56 F. Supp. 3d 394, 431 (S.D.N.Y. 2014), the court ordered disgorgement by the individual defendants of profits from unpaid taxes on sales of stock even though the stock was held in trusts and the sales were made by the trusts – in fact *disregarding* any legal separateness of the trusts.

104

Sterling's operations as the founder of the Bank, Vice President of Sterling, consultant to the Bank's Board, and his advisory services to Sterling and the Bank, including through attendance at Board meetings and frequent consultation with senior management.  ¶¶66-67.  Plaintiff further alleges Seligman's participation in, unlimited access to, and awareness of Sterling's reports and operations. ¶¶382, 418. Thus, Plaintiff adequately pleads a § 20A claim.[59]

## IV.   PLAINTIFF PROPERLY ALLEGES CLAIMS UNDER SECTIONS 11 AND 12 OF THE SECURITIES ACT

### A.   The Securities Act Claims Do Not Sound In Fraud

Fraud is not an element of Plaintiff's Securities Act claims.  *See Envision*, 2019 WL 6168254, at *27. Moreover, contrary to Defendants' assertions,[60] the

---

[59] Seligman's out-of-circuit authority is inapposite.  Dkt. #56, PageID.603-605 (citing *In re 3Com Sec. Litig*, No. C-97-21083 JW, 1999 WL 1039715, at *8 (N.D. Cal. July 8, 1999); *Berger v. Ludwick*, No. C-97-0728-CAL, 2000 WL 1262646, at *10 (N.D. Cal. Aug. 17, 2000), *aff'd*, 15 F. App'x 528 (9th Cir. 2001); *In re Oak Tech. Sec. Litig.*, No. 96-20552 SW, 1997 WL 448168, at *12 (N.D. Cal. Aug. 1, 1997)).  Moreover, *In re Enron Corp. Sec., Deriv. & "ERISA" Litig.*, No. 1446, 2016 WL 4095973, at *29 (S.D. Tex. Aug. 2, 2016), *aff'd sub nom. Giancarlo v. UBS Fin. Servs., Inc.*, 725 F. App'x 278 (5th Cir. 2018), based its dismissal primarily on plaintiffs' failure to allege contemporaneous trading, and the trading took place *after* Enron made the financial disclosures "trigger[ing] a chain of events culminating in Enron's unprecedented bankruptcy filing."  Finally, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 311 (S.D.N.Y. 2008), based its dismissal on plaintiffs' failure to plead a predicate insider trading violation, which is not the law of the Sixth Circuit.  *In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-CV-01112, 2019 WL 6168254, at *25 (M.D. Tenn. Nov. 19, 2019).

[60] Dkt. #57, PageID.663-665; Dkt. #58, PageID.841; Dkt. #59, PageID.850; Dkt. #63, PageID.896; Dkt. #60, PageID.869; Dkt. #61, PageID.881-882.

Securities Act claims do not sound in fraud and, thus, Rule 9(b) does not apply. *See, e.g., FirstEnergy*, 316 F. Supp. 2d at 602; *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 270 (3d Cir. 2006) ("Where a plaintiff's Section 11 or Section 12(a)(2) claims are not grounded in allegations of fraud, the liberal notice pleading requirements of Rule 8 apply.").

Where, as here, plaintiffs "expressly exclude any allegations which might sound in fraud" and "specifically separate[] out their §11 [and §12] claims into distinct counts [from the Exchange Act claims premised on scienter] ... the allegations of fraud did not 'convert or contaminate the separate [Securities Act] claims" so that Rule 9(b) applies. *In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 688 (M.D. Tenn. 2000) (quoting *In re Consumers Power Co. Sec. Litig.*, 105 F.R.D. 583, 594 (E.D. Mich. 1985)); *see also Suprema*, 438 F.3d at 273 (Rule 9(b) did not apply where plaintiff "carefully segregated its allegations of negligence against [certain defendants] from its allegations of fraud against those defendants," thereby creating "a clear conceptual separation in the complaint between claims sounding in negligence and those sounding in fraud").

Specifically, the Complaint includes repeated disclaimers of fraud, including expressly disclaiming allegations sounding in fraud and disclaiming the specific paragraphs and sections of the Complaint that are disclaimed. *See, e.g.*, ¶¶432 ("expressly exclud[ing] all allegations . . . contained in [¶¶]98, 99, 101, 109, and

106

125 and in Section VII [Exchange Act Violations] in its entirety"), 452, 462, 472.[61] The Complaint is further structured to draw a clear distinction between negligence/strict liability claims and the fraud claims, with the Exchange Act allegations and claims in the first half of the Complaint and the Securities Act allegations and claims in the second half.

Plaintiff also asserts exclusively non-fraudulent conduct in support of the Securities Act claims – allegations sounding solely in strict liability and negligence. *See, e.g., ¶¶*432, 453, 459, 463, 470, 473, 478; *Sirrom*, 84 F. Supp. 2d at 938 (where "[p]laintiff[] speak[s] in terms of [d]efendants' failure to make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the [r]egistration [s]tatement and [p]rospectus were true," Rule 9(b) does not apply (citing *Consumers Power*, 105 F.R.D. at 595); *In re Atlas Air*

---

[61] While the Complaint here does far more than this, courts, including in this Circuit, have held that disclaimers of fraud ***alone*** may suffice to prevent application of Rule 9(b). *In re Sirrom Capital Corp. Sec. Litig*., 84 F. Supp. 2d 933, 938-39 (M.D. Tenn. 1999) (finding plaintiffs' express disclaimer of any allegations "which might sound in fraud," combined with the fact that "fraud is not a necessary element of a Section 11 claim, and the Court cannot read it into the statute," warranted denial of dismissal); *FirstEnergy*, 316 F. Supp. 2d at 602 & n.19 (§ 11 claims not governed by Rule 9(b) where plaintiffs "ha[d] purposely not premised their claims on any allegations of fraud" by "explicitly exclud[ing] any allegation contained [in the Complaint] that could be construed to allege intentional or reckless conduct"); *Fox v. First BanCorp*, No. 05-2148 (GAG), 2006 WL 4128534, at *4 (D.P.R. Nov. 6, 2006) ("The plaintiffs' complaint expressly disclaimed any allegations that sound in fraud concerning the claims under the Securities Act. This disclaimer prevents the complaint from sounding in fraud and the application of Rule 9(b).")

*Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 503 (S.D.N.Y. 2004).

While Sterling asserts Plaintiff "attempts to shield its Securities Act claims" with a

"one-sentence disavowment of fraud" (Dkt. #57, PageID.663), this is belied by the

Complaint.[62]

Accordingly, the Securities Act claims do not sound in fraud, and Rule 8

applies.   In any event, even if Rule 9(b) did apply, the Complaint more than

adequately alleges with particularity why Defendants' statements were false and

misleading.

### B.      Plaintiff Adequately Pleads Untrue Statements and Omissions

The requirements for pleading a § 11 claim "stand in stark contrast" to those

---

[62] As such, Defendants' cited authorities are inapplicable.  *See, e.g., Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 161 & n.24 (3d Cir. 2004) (Rule 9(b) applied where complaint was "devoid of any allegations that Defendants acted negligently" and fully incorporated allegations supporting its Exchange Act claims "including the sections entitled 'scienter and scheme allegations'"); *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 885 (9th Cir. 2012) ("[A] plaintiff's nominal efforts to disclaim allegations of fraud with respect to its section 11 claims are unconvincing where the gravamen of the complaint is fraud and no effort is made to show any other basis for the claims."); *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156 (9th Cir. 2009) (complaint had only a single set of allegations followed by Securities Act and Exchange Act counts); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 68 (1st Cir. 2008) (finding § 12 claims grounded in fraud where single, factual narrative supported both Securities Act and Exchange Act claims, and *all* § 10(b) allegations were incorporated by reference in § 12(a)(2) Count).  *See also Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 948  (6th Cir. 2009) (finding, without analysis, that GAAP violations sounded in fraud, whereas here, no GAAP violations are alleged).  Indeed, *Lubbers*, 162 F. Supp. 3d at 574, 584 (*see* Dkt. #60, PageID.869), does not address this issue **nor does it even involve any Securities Act claim**.

of § 10(b). *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 n.5 (3d Cir. 2004). Section 11 "places a relatively minimal burden on a plaintiff" who "need only show a material misstatement or omission to establish [a] prima facie case," and "liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 371-82 (1983). Section 11 creates a claim against "***every person who signed the registration statement***" if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact." 15 U.S.C. § 77k(a)(1). "The section was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Huddleston*, 459 U.S. at 381-82.

To state a claim under § 12(a)(2), plaintiffs only must allege that they purchased securities pursuant to a materially false or misleading prospectus or oral communication. *Sohol v. Yan*, No. 1:15-cv-00393, 2016 WL 1704290, at *6-7 (N.D. Ohio Apr. 27, 2016).

As with the Exchange Act claims, the Securities Act claims sufficiently detail the untrue statements and omissions contained in the Registration Statement. Specifically, the Complaint details the Registration Statement's untrue statements in the following categories:

- Underwriting standards and practices, Sterling's knowledge of customers, its credit and asset quality, and its risk management (¶¶438-

109

41);

- Financial results and growth (¶¶442-43);
- Internal controls (¶444);
- BSA/AML duties and compliance (¶445).

Plaintiff further specifies why each statement was untrue and misleading when made, ¶¶446-51, and specifies that Defendants Sterling, Judd, Lopp, and the Director Defendants signed the Registration Statement. ¶460. Thus, the assertions that "the Complaint does not include a single allegation that ... any Director Defendant made a false or misleading statement" (Dkt. #57, PageID.668-669), "a single act of alleged wrongdoing by any of the Outside Directors" (Dkt. #60, PageID.869), and that the Complaint "contains nothing purporting to establish [Sinatra's] liability for any alleged misrepresentation or omission" (Dkt. #58, PageID.841), is patently false.

For the reasons already detailed in Section II.A, *supra*, statements in the Registration Statement in each of the aforementioned categories were untrue statements of material fact, and Defendants' arguments otherwise fail.

For example, the Registration Statement touted Sterling's "disciplined" and "conservative" underwriting, risk management, and internal controls – including specific practices, such as "disciplined documentation of ability to repay, liquidity analysis and face-to-face customer interaction," a "financial documentation process," and "established processes and procedures intended to identify, measure, monitor, report and analyze the types of risk to which we are subject, including

110

credit, liquidity, operational, [and] regulatory compliance." ¶438 It also detailed its BSA/AML obligations and stated that "Our internal policies and procedures are a critical component of our corporate governance and, in some cases, compliance with applicable regulations.  We adopt internal policies and procedures to guide management and employees regarding the operation and conduct of our business."  ¶¶444-45. Moreover, the Registration Statement touted the Company's financial results and growth, including that its "disciplined underwriting….have driven consistent earnings and exemplary net interest margins, efficiency metrics and shareholder returns.  ¶¶438, 442-43.

As detailed in the Complaint, the exponential growth of the ALP drove the success of Sterling's IPO.  ¶¶3, 88.  Yet, this growth was driven by the utter lack of underwriting, risk management, controls, and compliance, not "disciplined underwriting."  Moreover, the extreme importance of the ALP underscores that the statements about the Company's underwriting, risk management, internal controls, and compliance were material to IPO investors.  Yet, the consistent accounts of FEs 1, 2, 3, 4, 5, and 7 demonstrate that these statements were untrue at the time of the IPO.[63]   Their detailed accounts reveal that there was almost no underwriting,

---

[63]  FEs 1, 2, 3, and 4 were employed at the time of the IPO.  ¶¶94, 102, 110, 116. FEs 5 and 7 worked at Sterling until a few months before the IPO (¶¶121, 129), and their statements both demonstrate pre-IPO conduct and operations, but are also consistent with the statements of the FEs whose employment straddled the IPO.

documentation, or due diligence for ALP loans, despite being subject to ability-to-repay and BSA/AML regulations, and that although those loans were riddled with red flags of money laundering. ¶¶94-125, 129-33; 450. There was "no training" on risk compliance (¶123), and the problems were so rampant that FEs 2, 3, 5, and 7 suspected that the ALP was being exploited for money laundering (¶¶105, 111, 122, 125, 131). Moreover, the FE accounts show that Sterling did not have effective risk management and internal controls in place to prevent improper lending, underwriting, banking practices (including money-laundering), or inflation of the Company's financial results. ¶450. The FE accounts are further corroborated by the findings in the 2018 OCC Report which was issued just a few months after the IPO and, thus, the OCC's investigation started prior to the Report's issuance and found violations and problems prior to the issuance date. ¶13; *see also* ¶99 (FE 1 relayed that the OCC contacted FE 1 in "either 2017 or 2018"). Thus, the Registrations Statement was riddled with material untrue statements and omissions.

As detailed in Section II.A, *supra*, because these statements are false and misleading under the more exacting standard of § 10(b), they easily meet the less stringent standard under the Securities Act as well. *See, e.g.*, *Accredited Home Lenders*, 556 F. Supp. 2d at 1149-50, 1154 (finding substantially same actionable statements that formed basis of § 10(b) claim sufficient under § 11 for same reasons); *New Century*, 588 F. Supp. 2d at 1239 (stating "discussion" in which court

112

"determined that the Complaint adequately allege[d] false and misleading statements with respect to financial accounting, internal controls, and loan quality and underwriting" under § 10(b) was "fully applicable to the Section 11 claims").

### C.      The Underwriters Are Statutory Sellers

A § 12(a)(2) statutory seller "is one who 1) passes title, or other interest in the security, to the purchaser for value or 2) successfully solicits the purchase based at least in part on a desire to further his own financial interests or those of the securities' owner." *In re Regions Morgan Keegan Sec., Deriv., & ERISA Litig.*, No. 2:09-2009 SMH V, 2012 WL 12875982, at *9 (W.D. Tenn. Mar. 30, 2012) (citing *Pinter v. Dahl*, 486 U.S. 622, 647 (1988)).  Sterling does not dispute that it is a 12(a)(2) statutory seller.  However, the Underwriter Defendants argue that the Complaint fails to plead that they are 12(a)(2) statutory sellers by wrongly asserting that the Complaint "says nothing about from whom plaintiff acquired Sterling stock, and certainly does not plead that it was from either of the Underwriter Defendant" (Dkt. #61, PageID.881), and that "apart from a cursory allegation that it purchased stock 'in the IPO,' ¶32, plaintiff pleads no facts about its acquisition of Sterling stock" (Dkt. #61, PageID.883).  *See also* Dkt. #61, PageID.888-884 (Plaintiff does not "allege from whom such shares were purchased").  This is blatantly false.

Plaintiff expressly alleges, in the paragraph the Underwriter Defendants cite for their assertion otherwise, that it purchased shares in the IPO and that its "***IPO***

113

***shares were purchased from defendant Piper Sandler Companies, the successor to Sandler O'Neill & Partners, L.P.***" ¶32. This paragraph also cites Plaintiff's certification attached to the Complaint which includes Plaintiff's purchases on the date of the IPO at the IPO price. *Id.*; Compl. Ex. 1 (Dkt. #36, PageID.496-499). Moreover, courts in this Circuit and elsewhere have found that alleging a purchase in the offering at the offering price alone is sufficient at the pleading stage, even where Plaintiff does not identify who it purchased from. *See EveryWare*, 175 F. Supp. 3d at 867 (finding § 12(a)(2) claim sufficiently pled where plaintiffs alleged that they purchased company shares on the date of the IPO); *Suprema*, 438 F.3d at 274 (sustaining § 12(a)(2) claims where plaintiffs alleged that they bought their securities pursuant and/or traceable to the offering). As such, Plaintiff has adequately alleged the Underwriters are statutory sellers under *Regions'* prong 1.

Plaintiff also sufficiently alleges that the Underwriter Defendants are statutory sellers under prong 2, as Plaintiff alleges that, *inter alia*, both Underwriter Defendants "assisted in the preparation and dissemination of the Registration Statement" (¶¶49-50); "were sellers, offerors, or solicitors of purchasers of the shares offered pursuant to the Registration Statement" and that "[b]y means of the Registration Statement… [Sterling and the Underwriter Defendants], through the Offering, … solicited and sold Sterling common stock to members of the Class" (¶¶464-65); and "earned approximately \$12.42 million in connection with the IPO"

114

(¶52).   *See also* ¶¶32, 433, 437, 453-57, 459-61, 465-68, 470-71; Dkt. #36, PageID.334 n.16.   *See, e.g., In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 204-05 (E.D.N.Y. 2000) (allegations that underwriter defendant "solicited the sale of [c]ompany shares through participating in the preparation of the materially false and misleading [p]rospectus" stated a § 12(a)(2) claim).

## V.   PLAINTIFF PROPERLY ALLEGES CONTROL PERSON LIABILITY

Plaintiff adequately alleges its § 20(a) and § 15 control person claims, and the Control Person Defendants' arguments to the contrary are legally and factually inaccurate.   Allegations of control are not averments of fraud and thus need only satisfy Rule 8.   *In re Nat'l Century Fin. Enters., Inc. Inv. Litig. (Nat'l Century II)*, 504 F. Supp. 2d 287, 300 (S.D. Ohio 2007).   The "two requirements for a finding of control person liability" are: "[f]irst, the 'controlled person' must have committed an underlying violation of the securities laws" and "[s]econd, the 'controlling person' ... must have directly or indirectly controlled the person liable for the securities law violation."   *PR Diamonds*, 364 F.3d at 696-97.   "Control" is defined as "***the possession, direct or indirect, of the power*** to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."   *Id*. (citing 17 C.F.R. § 230.405); *see also Bridgestone*, 399 F.3d at 667.   To survive a motion to dismiss, "a plaintiff need only allege the power to control and not an actual exercise of control."   *Nat'l Century*

115

*II*, 504 F. Supp. 2d at 304; *see Envision*, 2019 WL 6168254, at \*30 (analyzing whether defendants "controlled *or had the ability to control*").

Thus, Scott Seligman's argument that he must have "(1) 'actually participated in [*i.e.*, exercised control over] the operations' of Sterling [in general]; and (2) 'possessed the power to control the specific transaction or activity upon which the primary violation is predicated'" is contrary to applicable law. Dkt. #56, PageID.592. He cites *USM Holdings, Inc. v. Simon*, No. 15-14251, 2016 WL 4396061, at \*13 (E.D. Mich. Aug. 18, 2016), which relies on *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 486 (6th Cir. 1992), but *Sanders* predates *PR Diamonds* and did not actually adopt this standard. As explained in *Nat'l Century II*:

> In *Sanders*, the Sixth Circuit described the standard applied in *Metge* as the "least rigorous" one available. Since *Sanders* was decided, courts in the Fifth and Ninth Circuits have applied a less rigorous standard. Though other district courts in this circuit view *Sanders* as approving the *Metge* standard, **the Sixth Circuit expressly declined to adopt a standard for controlling person liability**. *Sanders*, [973 F.2d] at 486. This Court does not view *Sanders* as adopting the *Metge* standard. Rather, the Sixth Circuit applied it because it was the least rigorous standard used at that time.

504 F. Supp. 2d at 303. In any event, the Complaint even meets this standard.

Likewise, the Control Person Defendants' assertion notwithstanding (*see* Dkt. #57, PageID.708; Dkt. #56, PageID.597-598; Dkt. #58, PageID.842), "[t]he Sixth Circuit has not held that culpable participation is an element of a section 20(a) claim." *ProQuest*, 527 F. Supp. 2d at 746 n.10 (citing *PR Diamonds*, 364 F.3d at

116

696); *see also Wilkof*, 2010 WL 4184465, at \*10 (same); *Huffy*, 577 F. Supp. 2d at 1021 n.56 (same).

### A.    Plaintiff Adequately Pleads Control

For the reasons discussed above, Plaintiff has established the predicate violations of the securities laws by Sterling, the controlled entity.  *See* Sections II, IV, *supra*; *Wilkof*, 2010 WL 4184465, at \*9.  Further, Plaintiff has more than adequately alleged control by each Defendant and goes well beyond conclusory allegations or merely alleging the individual's position within the Company, contrary to the Control Person Defendants' assertion otherwise.  Dkt. #57, PageID.708-709; Dkt. #56, PageID.592-598; Dkt. #63, PageID.904; Dkt. #59, PageID.852; Dkt. #55, PageID.569; Dkt. #60, PageID.868-870; Dkt. #58, PageID.841-42.

***The Officer Defendants***:  As alleged, the Officer Defendants were the senior executives of the Company who participated in and oversaw Sterling's day-to-day operations, including lending activities, risk management, and compliance.  *See, e.g.,* ¶¶34-36, 38, 91 (Judd letter to SEC describing their oversight of lending activities and regular communications with branch offices), 101, 418-19, 438 (the Company stated it "established a culture that places credit responsibility with individual loan officers and management" and management's focus includes a "risk-conscious culture," including as to quality growth and compliance), 474-75.  *See Fushi*

*Copperweld*, 929 F. Supp. 2d at 788-89 (citing *Sanders*, 973 F.2d at 486) (Section 20(a) claims against similarly situated high-level executive defendants sufficiently pled). Moreover, the Officer Defendants personally issued and oversaw a number of false and misleading Company statements such as signing and overseeing SEC filings, including the Registration Statement, and participating in and making misrepresentations during earnings calls. *See, e.g.,* Sections II.A, *supra*. *See Local 295/Local 851 IBT Emp'r Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp*, 731 F. Supp. 2d 689, 715 (S.D. Ohio 2010) (allegations that director defendants "reviewed, approved, and signed allegedly false and misleading filings with the SEC, … sufficient to establish … liabil[ity] as controlling persons," even under the more demanding control person test requiring active participation in operation of the primary violator); *Sirrom*, 84 F. Supp. 2d at 945 (control claims adequately pleaded against director defendants where directors signed allegedly false and misleading prospectus). Further, Judd and Lopp signed the false SOX certifications, and Montemayor 'signed off on all loans" in the ALP. ¶¶98, 101, 135, 159-60, 179, 194, 206, 219, 237, 267, 282.

Taken together, these allegations detail the Officer Defendants' day-to-day involvement in the management of Sterling and "control[] and/or ... authority to control the contents of [defendant company]'s reports, press releases and presentations to the public" – the same statements alleged to violate the securities

118

laws. *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 898 (M.D. Tenn. 2005) (control person claims sufficiently pled against top officers where they possessed authority to control contents of company reports, even under the more rigorous standard applied in *Sanders*); *see Cardinal Health*, 426 F. Supp. 2d at 762 (Section 20(a) claim adequately pled against directors and senior management who had supervisory involvement in day-to-day operations, along with "unlimited access to copies of the [c]ompany's press releases, public filings, and other statements alleged to be misleading"); *Fushi Copperweld*, 929 F. Supp. 2d at 789 (Section 20(a) claims sufficiently alleged against executive defendants where their responsibilities included controls and procedures designed to ensure adequate and accurate company disclosures, applying heightened standard applied by *Sanders*); *Wilkof*, 2010 WL 4184465, at *9 (denying dismissal of § 20(a) claims against CEO and director defendants where plaintiff sufficiently pled their "power to influence and control company decision making, including statements disseminated").

Montemayor nevertheless argues that the control person claims against him must be dismissed, claiming that, contrary to the Complaint's allegations, he held the positions of "President, Commercial and Retail Banking and Chief Lending Officer" at the Bank, rather than at the Company. Dkt. #55, PageID.561, 569. In support, he relies on a portion of a press release, which portion is not quoted in the Complaint and he does not submit the press release as an exhibit, and uses the quote

119

to raise a factual dispute, which is improper and should not be considered.

In any event, Montemayor's assertion is belied by Sterling's own SEC filings, which repeatedly state that he was an officer at the **Company**. *See* Moody Decl. Ex. A (Prospectus) at 101 (Montemayor's "Position(s) with the Company [were]: President Commercial and Retail Banking, Chief Lending Officer"). *See also id*. at 4, 81, 108, 104 ("Mr. Montemayor has served as our Chief Lending Officer since 2006 and *has been with the Company* since 1992. He has also served as Executive Vice President from 2006 to 2016 and President of Commercial and Retail Banking from December 2016 to present…."). In fact, Montemayor himself submits two SEC Form 4's that denote his position as an *Officer of Sterling Bancorp, Inc., and that list his relationship with the Company as "President, Comm. & Retail, CLO*." Montemayor Ex. A (Dkt. #55-2).[64]

*Scott Seligman*: Plaintiff's allegations go far beyond "the bare conclusion that Seligman, 'due to his positions' with Sterling, had such control…." Dkt. #56, PageID.593. Sterling made clear in the Registration Statement that "Scott Seligman has access to and influence with respect to Company operations" and "will have the ability to influence Company operations and control the outcome of matters

---

[64] Thus, even assuming Montemayor held positions at the Bank, this is not inconsistent with him also being an officer at the Company. As such, Montemayor's cases have no bearing here. *See* Dkt. #55, PageID.570 (citing *Teamsters Local 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 980 (D. Ariz. 2010), and *Brown v. Enstar Grp., Inc*., 84 F.3d 393, 397 (11th Cir. 1996)).

submitted for shareholder approval." ¶¶67, 382. Moreover, the Complaint specifically alleges Seligman's participation in Sterling's operations, including attendance at Board meetings and frequent consultations with senior management, ¶¶39-40, and that he "had the power to directly or indirectly control or influence Sterling to engage in the acts described herein, including by causing Sterling to conduct the Offering pursuant to the Registration Statement, *and exercised same*." ¶474. *See also* ¶¶39-40, 67, 382, 420, 423, 474, 477. These allegations far exceed even the inapplicable *USM Holdings* control standard. *See Cardinal Health*, 426 F. Supp. 2d at 762. Moreover, Scott Seligman, members of his family, and associated trusts hold a controlling interest in the Company and beneficially own approximately 70% of Sterling's common stock and voting power. ¶¶39, 67. Seligman's possession of such a significant block of voting stock further evidences his exercise of control over Sterling. *JAC Holding*, 997 F. Supp. 2d at 738 (finding that claim against controlling shareholder corporation survived motion to dismiss); *City of Painesville v. First Montauk Fin. Corp.*, 178 F.R.D. 180, 192 (N.D. Ohio 1998) ("[s]tock can be a means of control over a corporate entity").

*Director Defendants*: Plaintiff alleges that the Director Defendants had a duty to disseminate accurate and truthful information regarding Sterling's operations. ¶¶92, 474, 476. Plaintiff further alleges that the Company touted the Board's focus on a "risk-conscious culture," including as to quality growth and compliance, and

that the Board "sets the tone at the top of our organization, *adopting and overseeing the implementation of [Sterling's] company-wide risk management framework*…." ¶438.  Indeed, the Company admitted that internal controls were a Board-level responsibility and that the Audit Committee "assists the board of directors in fulfilling its responsibilities for general oversight of the integrity of our financial statements, compliance with legal and regulatory requirements, the independent auditors' qualifications and independence, and the performance of our internal audit and risk management function and independent auditors." ¶92.  Moreover, Fox served on the Audit and Risk Management Committee, which specifically reviewed "disclosure controls and procedures, internal controls, [and performed] internal audit function and [monitored] corporate policies with respect to financial information." ¶¶11, 92.  Plaintiff also avers that each Director Defendant signed the Registration Statement containing untrue statements.  ¶¶41-48, 476.

Furthermore, as to Meltzer and Sandra Seligman, the fact that they and other members of the Founding Family and associated trusts hold a controlling interest in the Company and beneficially own approximately 70% of Sterling's common stock and exercise commensurate voting power further evidences their control over Sterling.  *See JAC Holding*, 997 F. Supp. 2d at 738.

Courts routinely hold that a defendant's status as a director, while not alone dispositive, is strong evidence of control.  *See, e.g., JAC Holding*, 997 F. Supp. 2d

122

at 738; *Nat'l Century II*, 504 F. Supp. 2d at 304.  Courts have also held that signing

an untrue and misleading prospectus is sufficient to establish § 15(a) control person

liability.  *Sirrom*, 84 F. Supp. 2d at 945 (control claims against director defendants

survived motion to dismiss where directors signed allegedly untrue and misleading

prospectus); *Local 295*, 731 F. Supp. 2d at 715 (same, even applying heightened

*Sanders* control liability).  The allegations here go much further.

In any event, the question of control person liability is necessarily fact-

intensive and often cannot be resolved at the pleadings stage.  *See, e.g., In re Regions*

*Morgan Keegan Sec., Deriv., & ERISA Litig.*, 743 F. Supp. 2d 744, 761 (W.D. Tenn.

2010) ("Whether a party exercised the requisite control involves a factual analysis

best saved for later determination."); *Pullins v. Klimley*, No. 3:05-CV-082, 2008 WL

85871, at *28 (S.D. Ohio Jan. 7, 2008) (control person determination is "normally a

question of fact" that cannot be determined at the pleading stage).

### B.    Pleading a Primary Violation and Secondary Control Person Liability Is Expressly Allowed by the Federal Rules

Sterling erroneously argues that Plaintiff may not simultaneously assert

claims against the Control Person Defendants as both primary violators and control

persons.  Dkt. #57, PageID.709.  To the contrary, Congress intended for federal

securities law remedies to be cumulative.  *See In re Enron Corp. Sec., Deriv. &*

*ERISA Litig.*, 258 F. Supp. 2d 576, 600 (S.D. Tex. 2003) (citing *Huddleston*, 459

U.S. at 386-87).  And, as Sterling mentions (*see* Dkt. #57, PageID.709), the Sixth

Circuit has **abstained** from deciding whether a plaintiff may assert §§ 10(b) and 20(a) claims in parallel.  *See PR Diamonds*, 364 F.3d at 697 n.4.  Yet, this Court and other courts in this Circuit have sensibly allowed both primary violations and control claims to be pleaded simultaneously.  *In re CMS Energy Sec. Litig*., No. 02-CV-72004, 2005 WL 8154422, at *13 (E.D. Mich. Jan. 7, 2005).  *Accord In re Nat'l Century Fin. Enters., Inc., Inv. Litig. (Nat'l Century I)*, No. 2:03-MD-1565, 2006 WL 469468, at *23-24 (S.D. Ohio Feb. 27, 2006) ("A plaintiff may … plead that a defendant is both a primary violator and a control person without redundancy."); *U.S. S.E.C. v. Smith*, No. C2-CV-04-739, 2005 WL 2373849, at *9 n.2 (S.D. Ohio Sept. 27, 2005); *Picard Chem. Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1134 (W.D. Mich. 1996).   At the very least, the two claims may be pled in the alternative.  Fed. R. Civ. P. 8(d)(2).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motions to Dismiss.  However, if the Court finds otherwise, Plaintiff respectfully requests leave to amend.  *See Huffy*, 577 F. Supp. 2d at 982 n.14.

124

DATED:  December 8, 2020        Respectfully submitted,

**BERMAN TABACCO**

By:  */s/ Kristin J. Moody*
     Kristin J. Moody

Carl N. Hammarskjold
44 Montgomery Street, Suite 650
San Francisco, CA  94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: kmoody@bermantabacco.com
     chammarskjold@bermantabacco.com

    -and-

Patrick T. Egan
**BERMAN TABACCO**
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
Email: pegan@bermantabacco.com

*Counsel for Lead Plaintiff Oklahoma Police*
*Pension and Retirement System and Interim*
*Lead Counsel for the Putative Class*

125

Paul F. Novak
Fisher Building
**WEITZ & LUXENBERG**
3011 West Grand Blvd., 24th Floor
Detroit, MI 48202
Telephone: (313) 800-4170
Facsimile: (646) 293-7992
Email: pnovak@weitzlux.com

*Local Counsel for Lead Plaintiff Oklahoma
Police Pension and Retirement System and
Interim Local Counsel for the Putative Class*

126

## CERTIFICATE OF SERVICE

I, Kristin J. Moody, of Berman Tabacco, hereby certify that on December 8, 2020, I electronically transmitted the foregoing document via the Court's CM/ECF System, which will notify all counsel of record authorized to receive such filings.

*/s/ Kristin J. Moody*
Kristin J. Moody

Carl N. Hammarskjold
**BERMAN TABACCO**
44 Montgomery Street, Suite 650
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
Email: kmoody@bermantabacco.com
chammarskjold@bermantabacco.com